UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

--------------------------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff,

     -vs-                        Case No. 5:21-CR-434-M-1


CHRISTOPHER LAMAR BAKER,

                    Defendant,

          and

UNITED STATES OF AMERICA,

                    Plaintiff,

     -vs-                        Case No. 5:21-CR-434-M-13

LANDON HOLCOMB,

                    Defendant.


--------------------------------------------------------

JURY TRIAL - VOLUME I
SEPTEMBER 12, 2022
THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE


Risa Kramer, RMR, CRR
Official Court Reporter
United States District Court
Wilmington, North Carolina

**A P P E A R A N C E S**

On Behalf of the Government

ROBERT J. DODSON
KELLY L. SANDLING
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601


On Behalf Of Defendant Christopher Lamar Baker

DAMON CHETSON
The Chetson Firm, PLLC
19 W. Hargett Street, Suite 400
Raleigh, North Carolina 27601


On Behalf Of Defendant Landon Holcomb

ELISA CYRE SALMON
The Salmon Law Firm, LLP
P.O. Box 185
Lillington, North Carolina 27546

```
1                    INDEX OF PROCEEDINGS

2


3   VOIR DIRE EXAMINATION OF SPECIALIST JEREMY SCHEETZ

4       Direct Examination by Ms. Sandling........4
        Cross-Examination by Ms. Salmon..........14
5       Cross-Examination by Mr. Chetson.........22

6

7   VOIR DIRE EXAMINATION OF SPECIAL AGENT STEPHEN BABITS

8       Direct Examination by Mr. Dodson.........35
        Cross-Examination by Mr. Chetson.........40
9       Cross-Examination by Ms. Salmon..........43

10  INSTRUCTIONS BY THE COURT...................45

11

12  OPENING STATEMENTS

13      By Mr. Dodson...........................55
        By Mr. Chetson..........................61
14      By Ms. Salmon...........................65

15  INVESTIGATOR JEREMY SCHEETZ

16      Direct Examination by Ms. Sandling.......73
        Cross-Examination by Ms. Salmon..........94
17

18

19

20

21

22

23

24

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2              (Proceedings commenced at 3:03 p.m.)
 3              (The following took place outside the
 4    presence of the jury.)
 5              THE COURT:  All right.  Back on the record
 6    in the case of United States of America versus
 7    Christopher Lamar Baker and Landon Holcomb.  At this
 8    point, we're going to proceed to voir dire of the
 9    government's expert witnesses.
10              MS. SANDLING:  Thank you, Your Honor.  The
11    government would call Jeremy Scheetz.
12              THE COURT:  Witness will step forward and be
13    sworn.
14              THE CLERK:  Raise your right hand, left hand
15    on the Bible.  Please state your name for the record.
16              THE WITNESS:  Jeremy Colton Scheetz.
17              (The witness was placed under oath.)
18              MS. SANDLING:  Thank you, Your Honor.
19                      DIRECT EXAMINATION
20    BY MS. SANDLING:
21       Q.  Good afternoon, Mr. Scheetz.
22       A.  Good afternoon, ma'am.
23       Q.  What is your occupation?
24       A.  I am an intelligence operations specialist, IOS,
25    with the Alcohol, Tobacco, Firearms, and Explosives.
```

1    Q.  How long have you been employed with ATF?

2    A.  I've been employed with ATF since 2003.

3    Q.  Prior to being assigned to the IOS unit, were you

4    assigned to any other units or divisions within ATF?

5    A.  Yes.  From 2003 to 2006, I worked in our joint

6    support operations center, basically running warrants,

7    clearing warrants, stuff of that nature.

8    Q.  What are your duties and responsibilities as an

9    intelligence operations specialist?

10   A.  I monitor and track outlaw motorcycle gangs or

11   motorcycle clubs on a global perspective.  I write

12   strategic and tactical intelligence-based reports on a

13   global perspective.  I support ongoing investigations by

14   creating charts, conducting debriefings, proffers of

15   that nature.  I conduct expert testimony in federal,

16   state, and military court.  I work a lot of outlaw

17   motorcycle gang or motorcycle club events, parties,

18   funerals across the world.  And I also instruct at gang

19   conferences, symposiums, expert symposiums, and to

20   dignitaries across the world, and that's usually about

21   30 to 35 times a year.

22   Q.  Are you a member of any professional

23   associations?

24   A.  Yes.  It's IOMGIA.  That's the International

25   Outlaw Motorcycle Gang Investigator Association.

1    Q.  And have you received any specialized training in

2  any areas of outlaw motorcycle investigations and/or

3  gangs?

4    A.  Yes.  I've gone to many gang symposiums.  I've

5  taught at many gang symposiums.  And then in 2006 I went

6  to the ten-week Drug Enforcement Administration school

7  where I learned to become an intelligence research

8  specialist.

9    Q.  Have you ever taught any courses relating to

10  outlaw motorcycle investigations?

11    A.  Yes, ma'am --

12    Q.  Or gangs?  What are those, please?

13    A.  First and foremost, it's intelligence for an

14  outlaw motorcycle gang or motorcycle club investigation.

15  I do a lot of teaching on trends and patterns; migration

16  leads to violence, the inner workings of an outlaw

17  motorcycle gang or motorcycle club.  I look at gang

18  structure.  I look at their history.  I look at their

19  recruiting patterns.  I do a lot of street gang OMG.

20  Primarily, I look at the violent crime aspect affiliated

21  internally and externally with outlaw motorcycle gangs.

22    Q.  Do you keep current on literature pertaining --

23  literature and studies pertaining to outlaw motorcycle

24  gangs and prosecutions?

25    A.  Yes, ma'am.

1    Q.   What do you do to keep current?

2    A.   I'm in constant contact -- if I'm not part of the

3 investigation on an intelligence aspect or if I'm not

4 testifying, a lot of times because of my role with ATF

5 and within the Department of Justice, I'm able to have

6 great contact, and a member of IOMGIA, with a lot of

7 ongoing investigations that are transpiring across the

8 globe.  And that's also on state, federal, and also the

9 military level as well.

10   Q.   Have you written any articles within the field

11 pertaining to outlaw motorcycle gangs and prosecutions?

12   A.   Not articles.  No, ma'am.

13   Q.   Okay.  Are your publications or any internal

14 reports that you do write, are they peer-reviewed?

15   A.   Yes, ma'am.

16   Q.   How are they -- describe that process for me.

17   A.   It's part of the process of being an intelligence

18 component within ATF.  It's not mandatory, but it's

19 perceived that you'll have one of your coworkers do a

20 peer review on your report.  Anytime I create a

21 document, it could be small as a tactical report or

22 strategic report, I always have someone who's been

23 deemed an expert either by their agency or state or

24 federal court, who oversees and looks at my report or

25 writings to make sure that everything's up to speed.

Q. As an intelligence operation specialist, do you come into contact with gang members, specifically outlaw motorcycle gang members?

A. Yes, ma'am.

Q. How often?

A. I would say very often because I work a lot of outlaw motorcycle gang or motorcycle club events across the globe every year.

Q. What types of situations have you had personal contact with outlaw motorcycle gang members?

A. It could be from interviews, debriefings, working large-scale events like Sturgis every year, or another motorcycle club or OMG's event, where I'm there on a traffic stop or when somebody gets arrested, or on the intelligence component pattern when I'm assisting the state and locals if they're having contact with an OMG member or motorcycle club member. A lot of times state and locals will bring me in to discuss the run, the funeral, the party, or the event with that person in the room at the same time.

Q. Over the course of your career, how many outlaw motorcycle gang members have you spoken with?

A. I would say a little over 200.

Q. And how did you know that these individuals were involved in an outlaw motorcycle gang?

A.  Either by the colors or the cuts or the rags that they are wearing on themselves; maybe some type of indicia on their body that says that they're a member or a supporter or prospect of that club.  It could be somebody who did self-reporting.  It could be somebody through one of our long-term or short-term investigations with ATF or the Department of Justice.

Q.  Describe, if you would, some of the typical markers that an outlaw motorcycle gang member may wear.

A.  First and foremost, they'll wear what we call a vest, or it will be considered leathers, in words of the Pagans.  It could be cuts or rags.  On those colors, rags, cuts, vest, or jacket, there's some type of notation which they consider themself an emblem or a moniker, which is either on the front or on the back or sometimes on both.  It symbolizes or shows that they're a member of that particular motorcycle club or OMG.

Q.  As an intelligence operation specialist, is it your responsibility to keep current as to the markers that individuals within these groups wear?

A.  Yes, ma'am.

Q.  And what steps do you take to keep current?

A.  First and foremost, I do a lot of compare and contrast.  I look at old photos in comparison to new photos, comparing a member or prospect's colors, rags,

1   or vest to see if they've earned any new patches or tags

2   on their colors, rags, or cuts.

3            I look at -- a lot of times when they've

4   been in a former or been members of a previous

5   motorcycle club and I look at the steps they've taken to

6   join another motorcycle club and stuff of that nature.

7   I looked at, you know, what type of lifestyle they had

8   beforehand; if they were in a smaller motorcycle club,

9   if they've moved up into what we deem an outlaw

10  motorcycle gang.  I look at all aspects and study and

11  analyze and see their progression.

12      Q.  Do you work with colleagues to keep current as to

13  typical outlaw motorcycle gang markers and their

14  culture?

15      A.  Yes, ma'am.

16      Q.  What are some of those steps that you and your

17  colleagues take?

18      A.  First and foremost, my job is the intelligence

19  component where -- the enforcement component, since I do

20  not have arrest powers.  So my job is to analyze

21  everything that's brought in if I'm there or not there.

22  It could be from police reports.  It could from

23  interviews.  It could be from debriefings, proffers.  It

24  could be from traffic stops.  It could be pictures that

25  we've snapped at an event.  And it's my job to analyze

 1    and keep those up to speed and also notify the people in

 2    the field of any new trends and patterns that pertain to

 3    the OMG or a particular OMG or an ongoing investigation

 4    to make sure those individuals are up to speed as well.

 5        Q.   Have you ever testified in connection with an

 6    outlaw motorcycle gang case?

 7        A.   Yes, ma'am.

 8        Q.   How many times?

 9        A.   I believe six times.

10        Q.   In which courts?

11        A.   I testified recently in the spring in a federal

12    court in San Francisco.  Before that I testified online

13    for a federal investigation in Portugal.  I've also

14    testified in a couple military administrative hearings

15    for active duty military members or a government

16    contractor employee that was a member of an outlaw

17    motorcycle gang.  I've testified in administrative

18    hearings at police departments.

19        Q.   Have you been recognized by these Courts as an

20    expert in the field of outlaw motorcycle gangs?

21        A.   Yes, ma'am.

22        Q.   Has a Court ever not recognized you as an expert

23    within this field?

24        A.   No, ma'am.

25                MS. SANDLING:  Your Honor, the government at

1    this time would tender Jeremy Schwartz [sic] as an

2    expert in the field of outlaw motorcycle gangs.

3                    THE COURT:  Voir dire, counsel?

4                    MR. CHETSON:  I think Ms. Salmon was gonna

5    go first.

6                    MS. SALMON:  Your Honor, we would ask,

7    before the government completes its questioning, that

8    the record be made more complete about what the opinions

9    that he may wish to render might be, and that might be

10   more directly given on direct examination, or more

11   efficiently given.  We have not heard what the expert

12   opinion is.  And the defense maintains that the initial

13   disclosure that was filed was insufficient in that it

14   did not provide us any information about what his

15   opinions were as applied to this case.

16                   THE COURT:  Ms. Sandling, I'll ask you to

17   proceed by proffer regarding the -- without going into

18   excessive detail, the expected substance of the

19   testimony and how it fits against the opinions your

20   expert would render.

21                   MS. SANDLING:  Okay.  Mr. Scheetz, are

22   you -- oh.

23                   THE COURT:  By proffer.

24                   MS. SANDLING:  Okay.  I'm sorry.

25                   Your Honor, basically, Mr. Scheetz would be

testifying as to the hierarchy of the Pagans, the roles within the members of the Pagans, what individual terms mean within the hierarchy, his familiarity with Chris Baker, not personally but through his position as an intelligence operation specialist, and that at the time that the defendant was indicted in this case, he was a 13 within the Pagans. That's basically the substance of his testimony.

THE COURT: And the basis for his knowledge regarding this individual defendant?

MS. SANDLING: The basis for his knowledge would be his familiarity with a ATF DEA investigation out of New Jersey in which Victor Conan, who was the national president of the Pagans, was indicted and arrested by New Jersey ATF DEA. Mr. Baker attended some rallies for Conan. Conan and the defendant were very close. Mr. Conan was a great supporter of Mr. Baker. That would be his familiarity with Mr. Baker. And that was through debriefs of cooperator defendants in the New Jersey DEA case, Your Honor -- or ATF case.

THE COURT: So the position would be that as a result of his role as an outlaw motorcycle gang specialist and intelligence officer for the ATF, it's been his duty to debrief members of this particular outlaw motorcycle club, and in the course of debriefing

```
 1    them, he became familiar with this defendant and his
 2    role within the organization?
 3                    MS. SANDLING:  That's correct, Your Honor.
 4                    THE COURT:  All right.  Ms. Salmon.
 5                    MS. SALMON:  Thank you, Your Honor.
 6                        CROSS-EXAMINATION
 7    BY MS. SALMON:
 8       Q.  Agent Scheetz, you testified that you have been
 9    qualified as a testifying expert before, right?
10       A.  Yes, ma'am.
11       Q.  And most recently, you were qualified in the
12    Northern District of California in United States versus
13    Nelson, et al.  Is that correct?
14       A.  Yes, ma'am.
15       Q.  And the specific subject matter in which you were
16    qualified in that case was in Hells Angels history,
17    correct?
18       A.  Yes.  It was one of them.  Yes, ma'am.
19       Q.  And symbols?
20       A.  Yes, ma'am.
21       Q.  And terms, correct?
22       A.  Yes, ma'am.
23       Q.  And the territory of the Hells Angels in that
24    case.  Correct?
25       A.  Yes, ma'am.
```

1    Q.  Am I correct that that is the sort of subject

2 matter on which you were previously qualified?

3    A.  Yes, ma'am.  Scope, yes.

4    Q.  And you just heard the United States say that you

5 have formed opinions in this case.  Did you review the

6 indictment in this case?

7    A.  No, ma'am.

8    Q.  Did you review any discovery or memorandums of

9 interview in this case?

10    A.  No, ma'am.

11    Q.  So what written documents do you rely on in

12 forming your expert opinions on outlaw motorcycle gangs?

13    A.  It could be previous expert testimony documents;

14 previous expert testimony documents that have been

15 written during proffers or debriefings.  And it's not

16 just United States.  It could be across the world.

17 Other documents that have been submitted as

18 intelligence-based products; a lot of ATF or DEA or,

19 say, ATF ROIs that have been done through the multiple

20 investigations that I've assisted since 2006; a lot of

21 the debriefings that I've conducted on ATF undercover,

22 special agents, or task force officers who have taken

23 time, two or three years out of their life, to

24 infiltrate these outlaw motorcycle gangs.

25    Q.  So is it fair to say that your opinions are

1  largely based on information that you get from law

2  enforcement personnel or investigations by law

3  enforcement personnel?

4      A.  A lot of it comes from that.  Yes, ma'am.

5      Q.  And is there a -- just forgive me.  I do not

6  know.  Is there a field of study or an academia that

7  studies outlaw motorcycle gangs?

8      A.  No, ma'am.

9      Q.  Are you aware of any studies based on, you know,

10  data, longitudinal studies, things that could be

11  replicated?

12      A.  On outlaw motorcycle gangs?

13      Q.  Yes, sir.

14      A.  No, ma'am.

15      Q.  Are there any statistical analysis that you rely

16  on in rendering your opinions about outlaw motorcycle

17  gangs?

18      A.  Yes, ma'am.

19      Q.  Could you tell me about that?

20      A.  Every year I submit documentation -- since

21  2009 -- to approximately 400 or so state and local and

22  federal law enforcement agencies across the United

23  States.  And that is based on arrest reports, probation

24  violations.  And I keep track of all the ongoing

25  violence with outlaw motorcycle gangs and motorcycle

clubs within that time frame that year. And then I use
that to analyze and utilize a thing called predictive
analytics, and that way I can tell if a certain
motorcycle club or OMG moves into a certain area, if
we're gonna see some type of violent altercation
transpire.

Q. And do you often serve as a liaison between state
and federal law enforcement in motorcycle club
investigations?

A. Yes, ma'am. That's part of my job.

Q. Tell me, how does that work?

A. We might get a request for information that comes
in saying -- say it's -- because it's from a state and
local law enforcement agency, they might need an updated
roster, they might need someone who's familiar with a
certain motorcycle club or a certain outlaw motorcycle
gang. Or if somebody or a certain club moves into a
certain area, we say "migrates" into someone's
self-controlled territory, if they've seen any
historical value or historical basis of a violent
altercation taking place, they look at -- I look at
trends and patterns. If a certain motorcycle club or
outlaw motorcycle gang moves into an area, are they
gonna see not just violent crime but are they gonna see
large-scale drug trafficking or other types of illegal

transactions or activities are going to arise from their

moving into a certain area.

Q.   And so a lot of your field work has been with the

Hells Angels, correct?

A.   I wouldn't say a lot of it.  I would say a good

portion, yes, ma'am.  Not more than 50 percent.  I'd say

about 40 percent.

Q.   Are you familiar -- you mentioned the prosecution

out of New Jersey related to the Pagan Motorcycle Club,

right?

A.   I did not, no.

Q.   Oh, I'm so sorry.  You're familiar with a

prosecution out of New Jersey related to the Pagan

Motorcycle Gang?

A.   Yes, ma'am.

Q.   Could you tell me a little about that?

A.   Well, it's an -- I know it's an ongoing

investigation right now, so I don't think I can really

talk too much about it.

Q.   Okay.  Are you familiar with New Jersey Crime

Commission Report about outlaw motorcycle gangs entitled

"The Rise of the Pagans in New Jersey"?

A.   Yes, I'm familiar with the report.  Yes, ma'am.

Q.   Did you participate in the creation of that

report?

1    A.   No, ma'am.

2    Q.   Did you liaise or otherwise interact in any way

3   with New Jersey Crime Commission or local law

4   enforcement as they were creating that report?

5    A.   I did not, but the International Outlaw

6   Motorcycle Gang Investigator Association did provide

7   some historical value to that report.

8    Q.   Have you read it?

9    A.   I've not read it.  I've seen the video interview.

10    Q.   One of the things in that report that they talk

11   about is something called cell theory within motorcycle

12   gangs.  Are you familiar with cell theory?

13    A.   No, ma'am.

14    Q.   You mentioned that you have not authored -- I'm

15   not sure.  You said you didn't author any publications

16   but you do author reports.  Could you tell me more about

17   that?

18    A.   Yes.  I think -- not speaking for -- sorry.  I

19   don't write anything that's a periodical or something

20   that's gonna go to be published.  I am required in my

21   job to write tactical and strategic reports on the basis

22   of outlaw motorcycle gang or motorcycle clubs.  And a

23   lot of times I write those reports based on new trends

24   and patterns that we see around the violent aspect or

25   any other thing that's nefarious within the outlaw

1    motorcycle gang culture, subculture.

2        Q.   So did you -- have you authored a report about

3    the interaction between outlaw motorcycle gangs and the

4    military?

5        A.   Yes, ma'am.

6        Q.   Is that sort of a field that you focus on?

7        A.   No, ma'am.

8        Q.   When's the last time you did that kind of a

9    report?

10       A.   That report was last disseminated in 2019, and

11   it's every two years, so actually it's in the process

12   right now of being submitted.

13       Q.   Oh, so that's being updated again.

14       A.   Yes, ma'am.

15       Q.   And you said that there's not a field of academia

16   that really focuses on what you do.  Is that right?

17       A.   Not that I'm aware of, no, ma'am.

18       Q.   But are you familiar with the work of

19   Dr. William Dulaney, Ph.D.?

20       A.   I am familiar with him, yes.

21       Q.   Are you familiar with what he calls the blue jay

22   theory?

23       A.   No, ma'am.

24       Q.   Have you read any of his published or

25   peer-reviewed articles that have appeared in criminology

1  journals?

2      A.  No, ma'am.

3      Q.  Are you familiar with the work of

4  Dr. Mark Adams Locks [phonetic] in Australia?

5      A.  No, ma'am.

6      Q.  You've not heard of him?

7      A.  No, ma'am.

8      Q.  Do you work with Australian and people

9  internationally --

10     A.  Yes, ma'am.

11     Q.  -- in your work on motorcycle gangs?  So you're

12  not familiar with any Ph.D. work or published

13  peer-reviewed articles in this arena.

14     A.  No, ma'am --

15     Q.  Correct?  You didn't rely on any of those things,

16  if they exist, to form the basis of your opinion?

17     A.  If they exist, I would read it and take it into

18  value, but I've never read them.  No, ma'am.

19          MS. SALMON:  One second, Your Honor.

20  BY MS. SALMON:

21     Q.  Do you intend to -- the prosecutor has forecasted

22  that you intend to offer opinions related to Mr. Baker

23  and his role in the Pagan Motorcycle Gang.  Have you

24  formed an opinion as to Landon Holcomb in this case?

25     A.  I don't know who Landon Holcomb is, ma'am.

1          MS. SALMON:  No further questions, Your

2    Honor.

3          THE COURT:  Mr. Chetson.

4          MR. CHETSON:  Yes.  Just a few questions.

5                    CROSS-EXAMINATION

6    BY MR. CHETSON:

7    Q.  So if I understand this correctly, you intend to

8    offer an opinion as to Mr. Baker in this case?

9    A.  Not per se Mr. Baker but the whole totality of

10   the Pagans.  And I know Mr. Baker's history.  Yes, sir.

11   Q.  Okay.  And the information about Mr. Baker

12   doesn't come from any of the case file or discovery in

13   this case, correct?

14   A.  No, sir.

15   Q.  Comes from a New Jersey case?

16   A.  Not just New Jersey.  There's other

17   investigations that are ongoing right now, or case has

18   been adjudicated, and older investigations that I have

19   worked or assisted on where Mr. Baker was involved.

20   Q.  Okay.  But there is a New Jersey investigation,

21   is that correct?

22   A.  Yes.  There's an ongoing investigation in

23   New Jersey.  Yes.

24   Q.  Okay.  And in that on- -- are there any written

25   documents that you've consulted as a result of that

1  New Jersey investigation?

2      A.  No, sir.

3      Q.  So your knowledge of that is from hearing other

4  individuals -- I mean, how did you get that knowledge

5  out of New Jersey investigation if not by documents?

6      A.  It was through intelligence sharing and ongoing

7  investigations and working events that were -- at the

8  time we were assisting on going to work events, take

9  photos, collect intelligence.  We would observe

10  Mr. Baker or people with Mr. Baker.

11     Q.  And I don't mean to belabor too much, but what

12  was the mechanism?  Did you talk to people and people

13  told you things?  Is that how you found out?

14     A.  Yes.  So we had corroborated between other

15  people.  And it wasn't just New Jersey --

16     Q.  I'm just sticking with New Jersey for now.

17     A.  Yes, sir.

18     Q.  Did you hear things out of New Jersey about

19  Mr. Baker's status in the motorcycle club?

20     A.  Yes, sir.

21     Q.  And that's how you formed your opinion about

22  Mr. Baker -- in part, that's one of the cases that led

23  you to the opinion about Mr. Baker's status within the

24  club, correct?

25     A.  Not just that, sir.  There was other -- that's

just a small percentage of -- from my totality of how I
gained my opinion.

Q.  And the other -- how, mechanically?  Did you hear
it from people?  Did you --

A.  We hear --

Q.  -- hear people tell you Mr. Baker is a 13 in the
club?

A.  Yes.

Q.  Okay.  And so it was by hearing other people
telling you that that you formed your opinion that
Mr. Baker was a 13 in the club.

A.  You're correct, sir.

Q.  Okay.  But there aren't written reports to this
effect.  Is that...

A.  Not that I've observed.  No, sir.

Q.  And when's the last -- when's the last time that
you had a communication with somebody where they said
Mr. Baker was in November 5 -- on November 15th of last
year a 13 in the Pagans Motorcycle Club?

A.  I have no clue, sir.

Q.  So you don't remember when's the last time you
heard about Mr. Baker's status in the motorcycle club.

A.  No, sir.

Q.  You were asked about how many times you've
testified as an expert witness, and it's my

 1  understanding that you've testified just once in a

 2  federal courtroom as an expert witness.  Correct?

 3      A.   That's correct, yes.  I mean, Portugal was

 4  considered federal, because federal --

 5      Q.   I'm talking about the United States --

 6      A.   Yes, sir.  Yes, sir.

 7      Q.   And in any -- other than that one time in a

 8  federal courtroom in San Francisco, have you testified

 9  in any state courtrooms, by which I mean states of the

10  United States, in criminal prosecutions?

11      A.   No, sir.

12      Q.   You talked about being a member of the IOMGIA,

13  International Outlaw Investigators group?

14      A.   "Motorcycle Gang."  Yes, sir.

15      Q.   What countries other than the United States are

16  part of that group?

17      A.   Oh.  Australia, Canada, Sweden, Norway, Denmark,

18  Belgium, England, Ireland, Scotland.  There's a good

19  host of European countries as well, sir.

20          MR. CHETSON:  Your Honor, I think that

21  concludes my voir dire.  The rest of the issues were

22  covered by Ms. Salmon.

23          THE COURT:  All right.  I'll hear argument

24  from the defense.  The United States has proffered --

25  I'll appropriately make my record.

The United States has proffered that this
individual be able to testify regarding the structure of
the Pagans Outlaw Motorcycle Club.  My understanding is
that that will include testimony that there are
particular individuals who have authority over certain
territories within the club, and that this individual
has a reputation amongst other members of the Pagans
Outlaw Motorcycle Club as serving in that position; that
this individual has individually identified and
interviewed members of the Pagan Outlaw Motorcycle Club
through prior investigations and also through interviews
and conversations that have taken place at rallies such
as Sturgis.  And so this is really testimony regarding
the reputation within the Pagan community with which
this defendant has become familiar regarding the
defendant's role and status.  Is that a correct
forecast?

MS. SANDLING:  That's a correct forecast,
Your Honor.  Yes.

THE COURT:  The Court's prior ruling at the
hearing in limine was that we have to be very careful
that this does not become a referendum on his
relationships outside, the extent to which they explain
his participation in the relationships that are the
basis for this case.

1            I'll tell you, I want to be sure that the

2    limitations that were placed at the hearing in limine

3    regarding 404 and 403 are scrupulously honored.  I think

4    this defendant [sic] is qualified.  I think there's a

5    separate question outside of the 702 issue.  702 permits

6    a witness who's qualified as an expert by knowledge,

7    skill, experience, training, or education.  This is not

8    a <u>Daubert</u> case.  This is not scientific knowledge.  This

9    is knowledge regarding historic information regarding

10   the particular organizational structure of a particular

11   club.

12           One can become an expert in such a club by

13   interview of that club's members and participation in

14   events where that club frequents those events and by

15   review of intelligence testimony.  That is a proper

16   subject for expert testimony.  However, this Court's

17   very concerned about 404 and 403 and contaminating this

18   trial with anything that does not use that to bear

19   directly on this defendant's role and how that bears on

20   the particular transactions that took place.  And we've

21   discussed that.  I want to be clear.

22           I'll hear from the parties first as to

23   whether or not this is properly a subject of expert

24   testimony.  I want you to make your record.  But I've

25   given you a forecast of where the Court comes out on

702.  I think this is properly subject matter that is properly subject to it.  This is not Kumho Tire.  This is not Daubert.  This is not scientific expertise.  This is not peer review.  This is historic information that one can through significant study over time become the knowledge holder and bearer that goes beyond the ordinary knowledge of the jurors.

The question is is it sufficient facts.  Are those -- is it reliable principles and methods, and has he applied the principle and methods to the facts of this case.  There's a hearsay concern, which I think is where you're driving, Mr. Chetson, and I understand that.  I'll hear from you, though, regarding 702, and then there's a separate question as to scope under 403 and 404.  I'll turn the floor over to -- I guess I'll turn it over to you first, Ms. Salmon, and then to you, Mr. Chetson.

MS. SALMON:  Well, Your Honor, my objection is largely -- since he has forecasted he's not formed any opinion about my client specifically, then this is more an issue about the Court having ruled on its inclination to find that this is specialized knowledge that would be appropriate expert testimony in this case.

Mister -- I'm sorry, Agent.  Agent Scheetz was previously qualified.  And the umbrella under which

he was qualified to testify, those subject matter areas
were history, symbols, terms, and territory.  With
respect to that, the 702 standard, Your Honor, we really
have no objection, preserving our previous objections
and understanding the Court's current ruling.

We do, however, question -- beyond that
umbrella, we would object and say that there's not been
a sufficient showing that anything outside of that would
be based on sufficient facts or data because it does
sound as if it is just ongoing investigations and
materials which cannot be replicated.

And secondarily, the testimony would not be
the product of reliable principles and methods.  They
sound investigatory in scope, and again, nothing that
could be replicated or challenged because they do seem
to be investigation-based observations.

So again, within that previously qualified
umbrella of history, symbols, terms, and territory, we
would not object to him testifying as to those things.

THE COURT:  All right.  Thank you, counsel.

Mr. Chetson, you wish to add anything?

MR. CHETSON:  Yes, Your Honor.

I think we tread on some dangerous ground
here when we start to talk about this witness being able
to testify as to the history, and then bringing into

that history the historical roles that my particular
client has played, if only because then the expert
witness rule becomes a way for, largely, government
agents get on the stand and say:  I've investigated this
crowd for years.  We're not gonna bring the individual
folks that actually have been a part of the community.
And that's originally what reputation evidence was about
and was about what's the nature of the community, you're
in the community, you see them day-to-day, and
therefore, you can't say things particular about that
person's actions but about their overall reputation.

So the problem is that the government agents
are in a particular role, and obviously this will be
part of cross-examination.  But I think we tread in very
-- have to be very careful about allowing that to come
in under the guise of expert witnesses.  And we can talk
about that -- and I don't mean to make this a
political -- but to kind of abstract this out to what
people believe about this party or that party becomes
very dangerous as expert witness says:  I've studied the
Republican party, I've studied the Democratic party, and
I'm gonna start opining for you, Your Honor, because I
engage in -- I engage in political science in some
university.

I agree with Your Honor, first of all, that,

1  you know, academics are academics, and that's wonderful,

2  and you are an academic, but people trained and don't

3  have -- can be admitted as an expert without -- haven't

4  had training.  So I worry about that issue, and I object

5  on that ground.

6            THE COURT:  I understand.  The objection is

7  gonna be overruled.  I'm gonna qualify him as an expert

8  as to symbols, terminology, the organization and

9  structure of the Pagans Outlaw Motorcycle Gang, and I'm

10  gonna find that he has stated a sufficient basis, which

11  is intelligence work over time regarding an organization

12  that exists, has a coherent structure, has participants.

13  Those participants -- he's interviewed multiple numbers

14  of those participants over time.

15            And it's my understanding that there will be

16  fact witness -- lay witness testimony from fellow

17  participants within the organization who will testify to

18  underlying facts that would allow him to render a basis.

19  For example, "He's a 13."  No one in here is gonna know

20  what that means without some explanation of what that

21  means.  And this witness would be here to expand beyond

22  the lay knowledge of a juror what that means.

23            If someone wants to testify "And I did a

24  drug case in New Jersey, and" -- I'm not gonna allow

25  that to go forward.  Now we're into the 404(b) problem.

So to the extent that he's here to clarify and explain statements, understandings that are going to come from other witnesses who are going to be present, subject to cross-examination, capable of being confronted and participating in this trial, that's permissible. To the extent that it is not, the Court is going to put significant limitations on that. Does everybody understand where we're going?

MR. CHETSON: Thank you, Your Honor. Just one question about that ruling.

THE COURT: Yes.

MR. CHETSON: He will not be able to testify that Mr. Baker was a 13. Other witnesses can say he was a 13, and he can explain to the jury what the structure is. That would be my understanding of what the Court is -- is --

THE COURT: I think what -- he's gonna be able to testify to more than that. He can testify to -- my understanding is that by -- from his proffer is that by attendance at Sturgis, conversations with other Pagans who were Pagans at the same time as this defendant, that this defendant had a role within that organizational structure; that he became aware of that through conversations with people who are contemporaneous members of the Pagan community, and that

1  people testified, sometimes as parts of criminal

2  investigations and sometimes at conversations at

3  Sturgis, that he has encountered this defendant himself

4  personally, that he has seen him wearing patches, and

5  that in the context of everything that he has put

6  together regarding outlaw motorcycle clubs, that this is

7  part of his knowledge.

8          Now, if the other witnesses don't testify

9  and close that circle, I'm gonna order all this

10 testimony stricken and we're in danger of mistrial.  But

11 my understanding is that there will be percipient

12 witnesses who will testify "I was a Pagan.  I am aware

13 of his role in the organization.  He was this, and this

14 is what it means."

15         Now, it's not my job to tell the government

16 how to try its case.  I would put this witness on after

17 those people had testified, not before, at which point

18 it will be clear what testimony he would be squaring the

19 circle on.  He can forecast it.  They can suggest it's

20 going to come, we're gonna talk about it structurally.

21 But if they don't close the circle, we're in danger of

22 mistrial.  I want to be absolutely crystal clear to

23 everybody that that's where I am.  All right?

24         MS. SANDLING:  Yes.  Understood, Your Honor.

25         THE COURT:  All right.  So he's not going to

be able to testify to 404(b) about specific facts -- or
specific events that he was not a percipient witness to.
He can testify that there's been a forecast of evidence,
and given everything else he knows that's consistent
with that, he can testify what it means to be a 13 and
what it means to participate and what the structure of
the organization is.  And that would put a framework
within which the jury can place other knowledge.  That
is a proper subject of expert witness testimony.  The
Court has stated very clearly on the record, I'm
concerned that we're going to devolve into areas that
fall under 404 and 403, and I think the United States is
on full notice.

            Witness is qualified to testify pursuant to
702.  I'll give the proposed jury instruction number 8
where I will speak about the fact that he is allowed to
give opinion testimony.  I will allow counsel to make
any cross-examination that's considered appropriate of
any expert at the appropriate time regarding his
percipient knowledge and the extent to which some of
this is hearsay.

            And I will warn counsel for the United
States and I will warn the witness that if we're talking
about specific events and specific facts as opposed to
reputation within the community, and the basis for that

reputation within the community, or what it means to be
a Pagan or what particular terms mean within the context
of the Pagans, the Court's going to shut that down.

All right.  Any clarifying questions on the
Court's ruling?  All right.

Next witness.

MR. DODSON:  United States calls Stephen
Babits.

THE COURT:  Thank you, sir.  You may step
down.

AGENT SCHEETZ:  Thank you, Your Honor.

THE CLERK:  Raise your right hand, left hand
on the Bible, and please state your name for the record.

THE WITNESS:  Stephen Babits.

(The witness was placed under oath.)

MR. DODSON:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DODSON:

Q.  Good morning, sir.

A.  Good morning.

Q.  What is your current employment?

A.  I'm a special agent with the Bureau of Alcohol,
Tobacco, Firearms, and Explosives, otherwise known as
ATF.

Q.  How long have you been employed with ATF?

1    A.  I've been a special agent with ATF since August

2 of 2001.

3    Q.  What are your general duties and

4 responsibilities?

5    A.  General duties and responsibilities have been to

6 investigate interstate firearms trafficking, armed drug

7 trafficking networks, both proactive and historical

8 cases; prohibited persons in possession of firearms;

9 carjackings; commercial robberies; robberies of federal

10 firearm licensees; arson and explosive violations of the

11 United States as well.

12    Q.  Can you please explain --

13       MS. SALMON:  Your Honor, defense objection.

14 I'm concerned about the presence of multiple potential

15 government witnesses in the courtroom during the voir

16 dire when we're talking about forecasted testimony.  You

17 had issued the sequestration order as to allow

18 Agent Fields to be in the courtroom, but I'm concerned

19 with Agent Babits testifying and then also having

20 Agent Scheetz present for this forecast of testimony.

21       THE COURT:  Sequestration orders ordinarily

22 don't apply to expert witnesses who will be testifying

23 in their expert capacity.  It was the Court's

24 understanding that percipient witnesses were being

25 sequestered.  For the expert witnesses to reliably give

their expert testimony regarding the underlying factual
content, they're ordinarily permitted to remain.  To the
extent there are other fact witnesses, percipient fact
witnesses, those should be sequestered, and they're
ordered out of the courtroom.

        MS. SALMON:  Thank you, Your Honor.

        MR. DODSON:  We don't identify any other
fact witnesses in the courtroom, Your Honor.

BY MR. DODSON:

  Q.  Agents Babits, please explain your experience as
a special agent in ATF dating back to when you first
began with the agency.

  A.  When I first began, I was assigned in 2001 to the
Fayetteville field office.  My areas of responsibility
included the Johnston County and Harnett Counties in the
Eastern District of North Carolina.  There I was
embedded with the Harnett County drug unit and the
Johnston County drug unit where we would identify armed
drug trafficking organizations, conduct investigations
in order to dismantle them from operating in the Eastern
District.

        In around 2014, I was transferred to the Raleigh
field office where I began working with the Raleigh
Police Department.  Specifically the -- I was embedded
with the gang suppression unit, the Raleigh Police

1　Department drugs and vice unit, and the Criminal

2　Enterprise Drug Unit, where there too we would identify

3　armed drug trafficking organizations, conduct

4　investigations into those, create OCDETF investigations

5　into those unit -- into those organizations to dismantle

6　them in the Eastern District of North Carolina.

7　　Q.　What training have you been involved in in

8　preparation for your position as a special agent?

9　　A.　Prior to being a special agent with ATF, I was a

10　Deputy United States Marshal in Boston, Massachusetts,

11　from 1998 to 2001, where I attended the Federal Law

12　Enforcement Training Center special agent training.

13　Then when I was hired by ATF in 2001 and went to the

14　special agent basic training, 2001, where we received

15　training in drug investigations, to include narcotic

16　identifications.

17　　　　I've also attended several OCDETF conferences.

18　I've also presented at OCDETF conferences.  The North

19　Carolina Gang Investigators Association conferences I've

20　attended and also have spoken with -- spoken at.

21　　　　And I'm also a instructor at the ATF National

22　Academy where I teach case management, interviewing,

23　drug investigations, firearm trafficking investigations,

24　gang investigations, confidential informants, and

25　technical operations.

     1     Q.   Who are you teaching at the National Academy?

     2     A.   New basic students, special agents that are going

     3   through the ATF Academy.

     4     Q.   You mentioned that you've been involved

     5   previously in drug trafficking investigations.

     6   Approximately how many such investigations have you been

     7   involved in?

     8     A.   Since 2001, I'd say about over 1,000.

     9     Q.   What types of narcotics have been involved in

    10   those investigations?

    11     A.   Everything from marijuana to methamphetamines to

    12   cocaine, crack cocaine, heroin.

    13     Q.   What quantities of narcotics have been involved?

    14     A.   Everything from the kilogram level coming in to

    15   the gram level to the user amount.

    16     Q.   And have you been involved -- you mentioned

    17   you've been involved in armed drug trafficking

    18   investigations.  Approximately how many of those

    19   investigations have you been involved in?

    20     A.   Probably about just as much, about 1,000.  Drug

    21   trafficking is a violent crime, and the individuals that

    22   partake in drug trafficking keep a gun on them in order

    23   to protect not only their drugs but also the money that

    24   they make for those drugs.

    25     Q.   What are some of the investigative techniques

that you have personally been involved in during drug

trafficking and armed drug trafficking investigations?

A. We've had, you know, physical surveillance.

We've had electronic surveillance. We've done Title III

investigations, otherwise known as wiretaps. We've used

confidential informants and undercover agents in these

investigations.

Q. Have you used controlled purchases during those

investigations previously?

A. Yes, we have, with our confidential informants.

Q. How many of those -- how many investigations have

you done, approximately, that have involved the use of

controlled purchases as an investigative technique?

A. Pretty -- every drug trafficking investigation we

do, we utilize a confidential informant to conduct

controlled purchases.

Q. And have you ever been admitted as an expert in

the field of armed drug trafficking in a federal court?

A. Yes, I have, here in the Eastern District of

North Carolina in Judge Dever's courtroom.

MR. DODSON: Nothing further, Your Honor.

MR. CHETSON: Yes.

CROSS-EXAMINATION

BY MR. CHETSON:

Q. Agent Babits, I'm gonna ask you a few questions.

1  What did you -- what was the subject matters you

2  testified in Judge Dever's courtroom about as an expert?

3     A.  It was about how drug dealing is an inherent

4  violent crime, and individuals possess guns in order to

5  protect their drugs, or they protect their money that

6  they make selling drugs, and also for intimidation as

7  well.

8     Q.  Were you a case agent in that case as well?

9     A.  I was a case agent in that case.  Yes, sir.

10    Q.  What percentage of -- do you know what the

11 percentage of folks in North Carolina that -- or

12 households in North Carolina that have firearms in them?

13    A.  No, I do not.

14    Q.  Have you done a study to find out what the

15 percentage of drug trafficking organizations have

16 firearms, or people within drug trafficking cases have

17 firearms on them at the time of arrest?

18    A.  Can you repeat that question?

19    Q.  Have you done a study or do you have any studies

20 to hand --

21    A.  No, sir.

22    Q.  Let me just finish the question, make sure the

23 record's clear.  Do you have any studies -- have you

24 done any studies or do you have any studies to hand that

25 say how many individuals in the drug trafficking

 1    organization possess a firearm at any one particular

 2    time?

 3        A.   No.

 4                 MR. CHETSON:  Similarly with the past

 5    witness, Your Honor, I'd simply ask that the government

 6    just proffer what areas it intends to offer this witness

 7    as an expert in.

 8                 THE COURT:  I'll ask the United States to

 9    provide a proffer.

10                 MR. DODSON:  Yes, Your Honor.

11                 The government proffers or would tender

12    Agent Babits as an expert in the field of armed drug

13    trafficking.  As the Court knows, the defendant Chris

14    Baker is charged with possession of a firearm during a

15    drug trafficking crime.  And so it's important for

16    Agent Babits to testify as to why drug traffickers carry

17    firearms in order to assist the government in proving

18    possession of a firearm.  It'd be in furtherance of the

19    drug trafficking.

20                 In addition, the jury should hear evidence

21    from Agent Babits as to the quantities of drugs that are

22    considered drug trafficking as opposed to just a user

23    amount of drugs and combined with a firearm versus

24    trafficking amounts of narcotics in relation to the

25    firearm.

```
 1                   MR. CHETSON:  I have no further questions
 2    for the witness, Your Honor.
 3                   THE COURT:  Ms. Salmon.
 4                        CROSS-EXAMINATION
 5    BY MS. SALMON:
 6         Q.  Hello, Agent Babits.
 7         A.  Hello.
 8         Q.  Have you read the indictment in this case?
 9         A.  The latest one?
10         Q.  Any of them.
11         A.  Yes.
12         Q.  And you're aware that Mr. Holcomb is not charged
13    with any armed drug trafficking crimes, correct?
14         A.  Correct.
15         Q.  Will you be rendering any opinion related to
16    Landon Holcomb?
17         A.  Not to him specifically.  No, ma'am.
18                   MS. SALMON:  No further questions, Your
19    Honor.
20                   THE COURT:  All right.  The Court finds that
21    it's not a subject of ordinary juror knowledge how much
22    of a particular -- there may be people who are aware of
23    how much of a particular drug, such as methamphetamine,
24    constitutes a user amount and how much constitutes a
25    trafficking amount.  This is specialized knowledge which
```

1    is within the area of expertise of this witness based on

2    his training and experience, and he'll be able to

3    testify regarding drugs, drug quantities, user amounts,

4    and trafficking amounts on the basis of his expert

5    training and prior knowledge.

6            The Court also finds this defendant's [sic]

7    training and experience qualifies him to provide

8    background information to jurors regarding why one might

9    carry a firearm in connection with a drug trafficking

10   offense and to explain the circumstances under which

11   that becomes reasonable and lay a background for that

12   inference.

13           Under Rule 702, the invasion of the province

14   of the jury limitation has been removed and he, under

15   the Rules of Evidence, may testify regarding his opinion

16   regarding this particular defendant's use of a firearm.

17   The Court is concerned that it does come close to

18   invading the province of the jury.  But I recognize

19   where the federal rules have taken that rule, and the

20   Court will follow the Rules of Evidence.

21           MR. DODSON:  Thank you, Your Honor.

22           THE COURT:  All right.  The Court has issued

23   its rulings including the parameters around which these

24   witnesses will be allowed to testify.  We'll bring the

25   jury back.  And I'll just tell the parties, given the

time, I'm not sure we will get to both of these
witnesses today.

MR. DODSON:  Your Honor, if I may before the
jury comes in, the electronics on our side, the control
panel we think might be muted up front.  It's not
responding to us.

(Discussion off the record among the parties
and court personnel regarding technical difficulties.)

(The jury entered the courtroom.)

THE COURT:  All right.  Back on the record
and in the presence of the jury.

Ladies and gentlemen of the jury, sorry for
the delay.  There were some matters that the Court had
to take up with the attorneys outside your presence
regarding some presentation of evidence in this case.  I
promise you that I don't take your time lightly, and I
told you I'd bring you back at 3:00, and I know it's
significantly later than that, but we had some motions
work that we had to do.

What I say now is intended to serve as an
introduction to the entire trial of this case.  It's not
a substitute for the detailed instructions on the law
that I will give you at the end of the case and before
you retire to deliberate on your verdict.  It's only a
brief overview of the trial process.

         Beginning with these preliminary

instructions and during the trial, you will hear me use

a few terms with which you may not be familiar.  Let me

now briefly explain some of the most common to you.

         You'll sometimes hear me refer to counsel,

which is another way of saying lawyers or attorneys.  I

will sometimes refer to myself as the Court.  The

prosecution and the defendants are sometimes called the

parties to this case.  When I sustain an objection, I'm

excluding that evidence from this trial for good reason.

When you hear that I have overruled an objection, I'm

permitting that evidence to be admitted.

         When I say "admitted into evidence" or

"received into evidence," I mean that the particular

statement or particular exhibit is now part of the

trial, and most importantly, may be considered by you in

making the decisions you must make at the close of this

case.  Statements or exhibits that are not admitted into

evidence may not be considered by you in reaching your

verdict.

         The term "burden of proof" or "sustaining

its burden of proof" means the obligation of a party to

prove its case.  In this trial, it is the government's

obligation to produce proof beyond a reasonable doubt of

the charges in the indictment.

1          This is a criminal case commenced by the

2     United States, which I may sometimes refer to as the

3     prosecution and sometimes as the government, against

4     Christopher Lamar Baker and Landon Holcomb, to whom I

5     may refer as defendants.  The case was initiated by way

6     of an indictment, which has been modified to the

7     pleading now in operation called the fourth superseding

8     indictment which charges the defendants with violating

9     federal law.

10          You should understand that an indictment is

11     simply a charge by the government to begin a case and

12     that it is not in any sense evidence of the allegations

13     or statements it contains.  The government has the

14     burden or obligation to prove to you beyond a reasonable

15     doubt each of the essential elements of the crimes

16     charged in the fourth superseding indictment.

17          The purpose of this trial is to determine

18     whether the government can meet this burden.  Mr. Baker

19     and Mr. Holcomb, the defendants, have pleaded not guilty

20     to the charges in the fourth superseding indictment.  I

21     instruct you that you must presume that they are not

22     guilty of the crimes charged in that indictment.

23          To help you analyze the evidence as you hear

24     it at trial, I'll now give you a preliminary summary of

25     the crimes charged.

Count 1 of the fourth superseding indictment charges both defendants with conspiracy to distribute and possess with the intent to distribute methamphetamine.

Counts 2, 3, 8, 11, 12, 15, and 16 charge Defendant Baker with possession with the intent to distribute 50 grams or more of methamphetamine and aiding and abetting.

I'll send all these instructions back with you in writing. You don't have to memorize them or take notes. You'll have a full packet with everything I'm telling you now. All the rules that you have to follow at the end of the trial, those will go back with you to aid you as you make your decisions.

Count 8 also charges the Defendant Holcomb with the same crime.

Count 4 charges Defendant Baker with possession of a short-barrelled shotgun in furtherance of a drug trafficking crime and aiding and abetting.

Count 6, 7, 9, 10, and 13 charge Defendant Baker with possession with the intent to distribute 5 grams or more of methamphetamine and aiding and abetting.

Count 14 charges Defendant Baker with possession of a firearm in furtherance of a drug

trafficking crime and aiding and abetting.

Count 17 charges Defendant Baker with possession of a firearm, to include a machine gun, in furtherance of a drug trafficking crime and aiding and abetting.

And count 18 charges Defendant Baker with conspiracy to commit money laundering.

At the conclusion of the trial, after you've heard all of the evidence and after I've had an opportunity to confer with the lawyers, I'll give you the final and controlling statement as to what the elements of the charged crimes are. I'm giving you this preliminary summary now to help you during the trial as you hear the evidence and see the exhibits.

The trial will proceed in the following order.

First, the parties have an opportunity to make opening statements. The government may make an opening statement at the beginning of the case. The defendants may make opening statements following the government's opening statement, or they may postpone making of any opening statement until the close of the government's case. The defendants are not obligated to make opening statements.

What is said in the opening statements is

not evidence.  The opening statements simply serve as an
introduction to the evidence each party intends to
produce during the trial.

After opening statements, the government
will introduce evidence it feels supports the charges
contained in the fourth superseding indictment.

Third:  After the government has presented
its evidence, each defendant may present evidence --
may, but is not obligated to do so.  The burden or
obligation, as you'll be told many times during the
course of this trial, is always on the government to
prove each and every element of the offenses charged
beyond a reasonable doubt.  The law never imposes on a
defendant in a criminal case the burden of calling any
witnesses, producing any exhibits, or introducing any
evidence.  A defendant is presumed to be innocent of the
charge.

Fourth:  After all of the evidence has been
received -- in other words, after all the witnesses have
testified and after all the exhibits have been
admitted -- I will give you orally and in writing the
final instructions concerning the laws which you must
apply to the evidence received during the trial.  Those
instructions will be much more detailed than those I'm
giving you now.

1          Fifth:  After you've heard the instructions,

2    each party will be given the opportunity to present

3    argument to you in support of its case.  This is called

4    closing argument.  What is said in closing arguments is

5    not evidence just as what is said in the opening

6    statements is not evidence.  The closing arguments are

7    designed to present to you the theories and conclusions

8    of the parties as to what each feels the evidence has

9    shown and what inferences must be drawn from the

10   evidence.

11         Sixth:  You will then retire to consider

12   your verdict.  Your verdict must be unanimous.  That is,

13   all 12 of you must agree to it.  Your deliberations are

14   secret except under certain circumstances.  You will not

15   be required to explain your verdict to anyone.

16         By your verdict, you will decide disputed

17   issues of fact.  I will decide all questions of law that

18   arise during the trial.  Before you begin your

19   deliberations at the close of the case, I will instruct

20   you in more detail on the law that you must follow and

21   apply.  Because you will be asked to decide the facts of

22   this case, you should give careful attention to the

23   testimony and evidence presented.  Later, I will

24   instruct you about determining the credibility or

25   believability of the witnesses.

1          During the trial, you should keep an open

2     mind and should not form or express any opinion about

3     the case until after you've heard all of the testimony

4     and evidence, the lawyers' closing arguments, and my

5     instructions to you on the law.

6          While the trial is in progress, you must not

7     discuss the case in any manner amongst yourselves or

8     with anyone else.  In addition, you should not permit

9     anyone to discuss the case in your presence.  The

10    lawyers are not allowed to speak with you during this

11    case.  When you see the lawyers at a recess or pass them

12    in the halls and they do not speak to you, they're not

13    being rude or unfriendly.  They're simply following the

14    law.

15         During the trial, it may be necessary for me

16    to talk with the lawyers out of your hearing about

17    questions of law or procedure.  Sometimes you may be

18    excused from the courtroom during those discussions.

19    I'll try and limit these interruptions as much as

20    possible, but you should remember the importance of the

21    matter you're here to determine and should be patient

22    even though the case may seem to go slowly.

23         The law of the United States permits a

24    federal judge to comment to the jury on the evidence in

25    a case.  Such comments, to the extent they happen, are

only expressions of my opinion as to the facts, and the
jury may disregard them entirely. You as jurors are the
sole judges of the facts in this case. It is your
recollection and evaluation of the evidence that is
important to the verdict in this case.

Although you must follow the Court's
instructions concerning the law applicable to this case,
you're totally free to accept or reject my observations
concerning the evidence received in the case.

During the course of the trial, I may
occasionally ask questions of a witness. Do not assume
that I hold any opinion on the matters as to which my
questions may relate. The Court may ask a question
simply to clarify a matter, not to help one side of the
case or hurt another side. Remember at all times that
you as jurors are the sole judges of the facts in this
case.

It is the duty of the Court to admonish an
attorney who, out of zeal for his or her cause, does
something I feel is not in keeping with the Rules of
Evidence or Procedure. You are to draw absolutely no
inference against the side to whom an admonition of the
Court may have been addressed during the trial of this
case.

Objections and rulings. Testimony and

exhibits can be admitted into evidence during a trial only if they meet certain criteria or standards. It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the Rules of Evidence. Only by raising an objection can a lawyer request and obtain a ruling from the Court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or the attorney's client because the attorney has made objections. Do not attempt, moreover, to interpret my rulings on objections as somehow indicating how I think you should decide this case. I'm simply making a ruling on a legal question.

The Court will permit jurors to take notes during the course of this trial. You, of course, are not obliged to take any notes. If you do not take notes, you should not be influenced by the notes of another juror but rely on your own recollection of the evidence. Notes are only an aid to recollection and are not entitled to any greater weight than actual recollection or the impression of each juror as to what the evidence actually is. Note-taking must not be allowed to interfere with the ongoing nature of the trial or distract you from what happens here in court.

Notes taken by any juror, moreover, are not evidence in the case and must not take precedence over the independent recollection of the evidence received in the case. Any notes taken by any juror concerning this case should not be disclosed to anyone other than a fellow juror.

Finally, you're to give separate consideration for each defendant. Although the defendants are being tried together in this case, you must give separate consideration to each defendant. In doing so, you must determine which evidence in the case applies to each defendant regarding any evidence admitted solely against the other defendant. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to the other defendant.

All right. At this time, we're gonna have opening statements. Do we need to move the podium?

MR. DODSON: If we could, Your Honor.

THE COURT: Okay. And if I understand, we're having a few technical difficulties at counsel table? Is that correct?

MR. DODSON: Yes, Your Honor, but I don't think we're gonna need it for today, for the remainder of today.

1          THE COURT:  All right.  Thank you.

2          MR. DODSON:  Thank you.

3          Well, ladies and gentlemen, good afternoon.

4    I introduced myself to you earlier, but let me say again

5    I'm Robert Dodson, Assistant United States Attorney,

6    along with my co-counsel, Kelly Sandling; our case

7    agent, Catherine Fields, from the Bureau of Alcohol,

8    Tobacco, Firearms, and Explosives; and Scott Tyson, our

9    litigation support specialist.

10         We will present evidence to you throughout

11   the course of this trial this week that Christopher

12   Lamar Baker used his position and leadership in the

13   Pagan Motorcycle Gang to further his own gun and drug

14   trafficking activity.  We will present evidence to show

15   that Mr. Baker had a position of leadership in the

16   Pagans, and he used that position of leadership to have

17   others below him to help him distribute methamphetamine

18   on his behalf.  And that activity included driving him

19   around, driving him across states to go on resupply

20   trips to get more methamphetamine to distribute on his

21   behalf.  That will also include providing security

22   during some of the controlled purchases that you'll hear

23   about today.

24         You already heard the judge describe to you

25   that several of the charges included distribution of an

amount of methamphetamine. I ask you to pay special attention to those amounts because they'll become important later on, as the judge will instruct you.

The co-conspirators will testify during the course of the trial that it was their duty to provide support for Mr. Baker because of that leadership position in the Pagans. And you'll hear from some of those individuals during the course of the trial, and some of those individuals were members of the Pagans themselves. Some of those people were close associates to the Pagans or close associates of Mr. Baker. And they wanted to help Mr. Baker in these activities sometimes because they didn't have a choice or other times because they wanted to fit in with the Pagans or because they wanted to advance their own membership in the Pagan Motorcycle Club.

The codefendant, Landon Holcomb, the evidence will show was a member of the Pagans. He was one of those individuals charged in aiding and abetting Christopher Baker and his drug trafficking activities. And aided and abetted, of course, as the Court will explain later, is just helping in that activity.

The charges will be explained to you in greater detail at a later time, but the conspiracy in this case encompasses a certain time frame, and that

time frame is October of 2020 through November of 2021.
And the evidence that we'll present to you during the
course of this trial will show that there were 12
controlled purchases of methamphetamine and/or of
firearms during the course of the conspiracy. So during
the course from October 2020 to November of 2021, there
are 12 times when law enforcement utilized a
confidential informant to conduct these controlled
purchases.

You will hear from that confidential
informant during the course of this trial. You will
hear his testimony about how he was equipped on each
occasion with an audio/video recording device. And if
you'll notice the screens in front of you, during the
course of this trial we'll play those audio and video
recordings. You'll see some of them on your screen.
Some of them are a little difficult to see, so you'll
hear some things that are going on. And some of the
individuals who are present during those deals, other
than the confidential informant, you'll also hear from
on the witness stand this week.

You'll also hear from some of the other
people involved in the conspiracy again about how they
drove Mr. Baker across states and how they assisted him
in picking up methamphetamine from states, including

Georgia, and driving them back here to the Eastern
District of North Carolina and to other locations.

One of those controlled purchases I
mentioned earlier, one of the 12, we'll introduce
evidence to show that the defendant Landon Holcomb was
involved in that controlled purchase of distributing
more than 50 grams of methamphetamine.

We talked some about methamphetamine.
You'll also hear evidence of firearms involved in some
of these controlled purchases. You'll hear evidence
that some of the firearms included handguns, a sawed-off
shotgun, and you'll also hear from a ATF undercover
agent who set up a controlled purchase whereby a fully
automatic machine gun was sold to Mr. Baker and one of
his conspirators. You'll hear from individuals involved
in that controlled purchase.

You'll also hear evidence that Mr. Baker
utilized several locations in addition to people to
store methamphetamine that include residences in western
North Carolina and in West Virginia, and you'll hear
evidence that ATF raided a house in West Virginia where
they located Mr. Baker along with some methamphetamine.
The evidence will show that Mr. Baker laundered his
proceeds from his drug trafficking activity, money
laundering, through Cash App. And we'll explain to you

during the course of this trial, if you haven't heard of Cash App, what that is and how it was used to launder Mr. Baker's drug money.

You're gonna hear from some experts during the course of this trial. Some of those experts include forensic chemists from the Drug Enforcement Administration that tested all of the drugs that were recovered from all of the locations I just told you about, from the 12 controlled purchases to some of the drugs that were recovered in West Virginia and some of the drugs that were recovered in Georgia during the course of the conspiracy. You'll hear from those chemists this week about their testing of all of those narcotics that were recovered.

And going back to -- culminates -- the whole story culminates -- remember I told you the conspiracy runs from October 2020 to November of 2021. It culminates in that raid in West Virginia. Mr. Baker is located in the house. You'll hear from some other people who were located in the house. You will hear evidence of what happened after Mr. Baker's arrest, and you'll hear -- we'll present evidence to you of Mr. Baker's confession of trafficking methamphetamine upon his arrest in November of 2021.

Ladies and gentlemen, after the government

has presented all of its evidence during the course of
this trial, Ms. Sandling is gonna come to you at the end
of the trial and present a closing argument where we
will ask you to examine the evidence and find the
Defendant Baker guilty of all charges and Defendant
Holcomb guilty of all charges.  Thank you.

THE COURT:  Counsel for Mr. Baker.

MR. CHETSON:  May it please the Court.
Ladies and gentlemen, before I walk over to you, I'm
gonna introduce you -- this is Chris Baker.  He is my
client, and I'm proud to represent him.

I'm here to tell you that Chris Baker dealt
methamphetamine.  Over my table, we've got a nice big
binder here provided to us by the government that's got
some of the evidence, and I expect the evidence that
you're gonna hear over the course of the next week.  And
I'm gonna say it again, that Chris Baker dealt
methamphetamine.  And before I move on to say, well,
what am I doing here as a defense attorney admitting
this all to you in my opening statement to y'all -- and
again, I'm Damon Chetson -- let me back up for a moment
and say something about language and the way we talk in
the courtroom.  And you're gonna hear a lot of language
from the witness stand and from the lawyers, words like
"trafficking," words like "controlled purchase," really

terms of art in the kind of work that we do as
prosecutors, defense attorneys, agents, and so forth.
Really what it amounts to, trafficking is dealing in an
illegal substance.  Methamphetamine is an illegal
substance.  And I'm here to say Chris Baker dealt it.

So why am I here?  What are we doing here?
We're here because this is a special room and this is a
special building.  It's a building that's been created
by the American people to help us adjudicate
disagreements between parties.  Sometimes those parties
are a landlord suing a tenant or a tenant suing a
landlord.  Sometimes these are between the government
and a human being over here saying, "I am not guilty,
and I want 12 folks to come to court and make that
decision by certain rules that we follow."

And so this case comes to us here for you to
be chosen at random from the community to say, "Yes,
it's been proved beyond a reasonable doubt," or "No,
it's not been."

So back to our case and Chris Baker dealing
methamphetamine.  It's an incredibly sad story.  I think
there are gonna be moments during the trial, as there
are in any trial, where a little bit of humor creeps in.
You're gonna hear about an RV traveling all over Georgia
and North Carolina and South Carolina and Chris Baker --

and it may seem sort of comical in some vision, but it's an incredibly sad story. It's a sad story about the distribution of methamphetamine in our communities.

But it's also a story about -- sad story about Chris when he was arrested last year in November. It was evident that he was a methamphetamine addict as well and that he had been using methamphetamine.

So now having essentially admitted that to you that he dealt methamphetamine, then we still need to go through the process, which I'm sure we will do this week, where the government has to prove its case beyond a reasonable doubt. And so I ask you, even though the defense attorney has stood up here and said this, to think through all of the evidence that is going to be presented to you and match that up with the indictment, which is the document that has accused Chris of these crimes.

Then why are we really here? Well, we're really here because this case is also about firearms. And the government contends that Chris and others possessed firearms in furtherance of a drug trafficking offense. And in particular, these are counts 4, counts 14, and count 17. Four, 14, 17. And those are the three counts that I'll be focusing on and asking you to focus on. On February 27th, 2021, count 14; on June

1   4th, 2021, count 4; and on November 5th, count 17,

2   November 5th of last year, when Mr. Staley is finally

3   arrested and there are two machine guns that have been

4   provided by the ATF as part of that transaction.

5             I expect in a little while, maybe this

6   afternoon or tomorrow, there'll be some government

7   witnesses to testify and they will likely be admitted as

8   expert witnesses. But really they're government agents.

9   And one of those agents, Steve Babits, is probably going

10   to tell you that drug trafficking organizations, that is

11   groups or cohorts of people that sell and buy drugs,

12   oftentimes have firearms. But really it's up to you at

13   the end to determine whether or not the firearms in

14   question in those counts, counts 14, 4, and 17, were

15   really done in furtherance of -- the firearms were

16   really possessed in furtherance of the drug trafficking

17   offenses.

18             Who is Chris Baker? Well, you're gonna

19   learn that he's the defendant, he's the man with the

20   beard over here; that he's a biker; that he's a member

21   of the Pagans Motorcycle Club, although his particular

22   membership at times vacillates; that he's a person who

23   was addicted and consumed methamphetamines, and he's a

24   person who bought and sold it. And to not make too much

25   about it and to not make this issue too plain to you,

```
 1    but to make it clear, I expect by the end of the trial
 2    you'll see me seated over there and there will be -- you
 3    can imagine little packets of methamphetamine piled
 4    around me, and that's something that I'm here to tell
 5    you will, ultimately, likely be proved.
 6             But I ask you to consider who the government
 7    brings to testify, what their incentives might be in
 8    testifying for the government, and why they say the
 9    things that they say.  Ultimately, I'll be back at the
10    end of the case to ask you to hold the government to its
11    burden, which is that it prove this case and each charge
12    and every element of each charge beyond a reasonable
13    doubt.  Thank you.
14             (Brief pause in proceedings.)
15             MS. SALMON:  Excuse me, Your Honor.  I
16    apologize for the delay.  I'm gonna use a visual aid, so
17    the government agents are nicely helping me out.  I
18    apologize for the delay.
19             Your Honor, may it please the Court.  Good
20    afternoon, ladies and gentlemen.  I am Elisa Salmon.  I
21    introduced myself earlier and my whole team, so I won't
22    do it again.  Again, my name is Elisa Salmon, and I am a
23    defense attorney.  My client this week is Landon
24    Holcomb, the young man sitting right over there wearing
25    a tie and black suit.
```

Now, at the outset, I want to say something very important. These are going to be two very different cases that you're going to hear as to Mr. Baker and Mr. Holcomb. And from where I stand and what's important for me to tell you is that even though there will be a lot more evidence and information about Mr. Baker than Mr. Holcomb, Mr. Holcomb, his future, and what we maintain is his innocence in this case, is of the utmost importance in this proceeding for us and of course for all of you. And I know that you understand that.

You've heard the government's forecast of evidence, and what I heard him to say -- what I heard Mr. Dodson, my colleague, to say, was the evidence they expect will show that Landon intended to help Mr. Baker in his meth dealing. And, ladies and gentlemen, the evidence will not show that Landon Holcomb intended to ever or wanted to ever help Mr. Baker and his crowd with their meth dealing.

It's important that we talk about what the evidence will show, but it's equally important that we talk about what the evidence will not show, because that's evidence as well. You will not see Landon handing drugs, holding drugs, interacting with the confidential informant. You won't hear him on a

recording.  You won't hear him talking to Mr. Baker.
Ladies and gentlemen, evidence you're going to hear over
the next five days will convince you that Mr. Baker and
Mr. Holcomb, as of 4:30 today, have now spent more time
together in this room than they ever did in the real
world.  These individuals, the evidence will show you,
are almost strangers to one another.

So how is Landon here?  You're looking at me
thinking, "Why is he sitting over there?"  Every one of
us at some point in our life has been told by a parent,
a grandparent, a beloved teacher, that we are known by
the company we keep.  And there's a reason that every
one of us was told that, because it's excellent and
sound advice.  Now, we're not just known by the company
we keep.  Sometimes, and unfortunately for Mr. Holcomb,
that can have very bad consequences, because sometimes
we are also arrested and charged with the crimes of the
company we keep.

The evidence will show you that Landon
Holcomb has a Harley Road King.  He is a young man.
He's only 28 years old.  At the time of this case, he's
living down in Richlands, North Carolina, which is in
Onslow County.  You are going to hear -- the evidence is
going to show you that Mr. Baker and his crowd are
located over sort of in the Kings Mountain area.  So the

evidence will show you there's a divide east of 95, west of 95, and how the motorcycle club operates.

The evidence will show you that Landon, at the time of the charge that we're gonna be talking about in a moment, is doing what's called prospecting with the Pagans Motorcycle Club east of 95. Prospecting, as I have learned in the course of this representation, it's essentially your tryout period. It's like when you're in a new job and they put you -- like, you have a six-month probationary period to make sure you're, you know, know how to type and use a computer. Well, in Landon's case, he's prospecting in November of 2020. That means that he's not really a full-fledged member but he's someone who is riding motorcycles and becoming associated with the Pagans east of 95, and mostly let's talk about it being in Onslow County.

Now, the government will have an expert who will talk to you about the Pagan Motorcycle Club or the Pagan Motorcycle Gang, as they call it. And you're going to hear a lot about what this thing is. Right? This is not something that most of us in our day-to-day lives ever encounter or think about. And you're going to hear about the history of these clubs and essentially that, by and large, they were borne out of returning GIs after World War II who missed the camaraderie, the

hierarchy, the structure that they had in the military,
that they had serving overseas as uniformed soldiers,
and that when they came back -- and also had been
motorcycle riders -- they sought out that same kind of
adventure, freedom, structure, and camaraderie. And,
ladies and gentlemen, that's -- and a love of
motorcycles -- what draws a lot of folks to these clubs.

The government expert will also likely tell
you there's significant crossover in motorcycle clubs
with the American military, both current active duty
personnel and recently separated contractors and retired
personnel. There's a great crossover in that. In fact,
majority of folks who ride motorcycles in these clubs
have at some point in their life been uniformed service
members. And you'll hear that that was the case with
Landon, that he served five and a half years as a Marine
and was government contracting at New River Airfield at
the time of this indictment. So this is Landon.

You've already heard Mr. Chetson,
Mr. Baker's counsel, tell you that Mr. Baker sold meth.
There will be 12 controlled buys in this case that the
government will present evidence on. Landon Holcomb is
charged related to aiding and abetting -- so helping --
one deal, November 6, 2020.

You are going to hear a lot of evidence

1  about this RV that Baker owns.  He owns this old RV, and
2  they travel all over Georgia and western North Carolina
3  and South Carolina picking up meth and dropping off meth
4  with women and selling user amounts and just doing all
5  kinds of criminal things.  But on this specific day
6  while Landon is prospecting with the -- this is during
7  the time frame where he's in the trial for the Pagans
8  east of 95 -- he's contacted by Baker.

9          Now, you're going to hear from one witness
10  for the government that was there, and his name is
11  Joshua Presley.  And the evidence will show you that at
12  this time, Presley and Baker are thick as thieves.
13  They're in this RV together, they're going state to
14  state, they're sleeping together, they're eating
15  together, they're doing all kinds of things together.
16  They are thick as thieves.

17          You will also hear at this time that Baker's
18  growing.  He's growing his influence.  And Mr. Presley,
19  when he walks out that door and takes that stand, he
20  will tell you, as he recently told law enforcement in an
21  interview, that at this time Baker was looking to reach
22  outside of his inner circle because they needed to find
23  fall guys.  Fall guys.  So if anyone has watched old
24  Mafia movies, we know what fall guys are:  Dupes,
25  scapegoats, patsies, fall guys.

1          They're specifically looking for fall guys

2     from outside their own little unit that they can push

3     the blame on for drug and gun crimes if they get caught

4     by law enforcement.

5          Enter Landon.  He is called by Mr. Baker,

6     and he shows up in his Nissan Murano.  So he has a nice,

7     mom-looking sedan.  The evidence will show you that

8     Mr. Presley gets in the car with this, and that in it is

9     54 grams of methamphetamine.

10          Now, Mr. Presley initially told law

11     enforcement that nobody looked in that cigarette pack,

12     that he placed it in the console, and that he did not

13     tell Landon Holcomb what was up.  They were told to

14     drive to Raleigh.  Presley said, "We're meeting somebody

15     at a Burger King," and that's what Mr. Holcomb did.

16     Now, remember, this is a military-style structure.  So

17     Landon's job was just to show up with his Nissan Murano.

18          So Presley and Baker the evidence will show

19     you are thick as thieves.  And Mr. Presley gets out of

20     that car.  And Mr. Presley gets into the car of the

21     confidential informant, gives this to him -- right? --

22     this is the buyer, this is his buyer, he doesn't know

23     he's working with the cops -- leaves the cigarette pack

24     with him, does his deal, and gets back in with Landon.

25          Ladies and gentlemen, that's it.  That's

1    what the evidence will show you.

2              Now, I submit to you that the evidence will

3    show you that Landon did not want to help these people,

4    Baker's crowd, to sell drugs, that he did not willingly

5    enlist himself as their scapegoat, patsy, or fall guy,

6    because you will see, as this story about Mr. Baker and

7    his inner circle goes on and on and on after November

8    6th, you will never hear about Landon Holcomb being

9    anywhere near them ever again.  He does not allow his

10   Nissan Murano to be conscripted to their ill purposes

11   because Landon never wanted to help Baker or anybody

12   else sell and distribute drugs.

13             So at the end of this, ladies and gentlemen,

14   I will come back before you.  This is really the only

15   time -- this time and at the very end -- where I get to

16   talk directly to you.  And I want you to hold me to what

17   I've represented to you that the evidence will show and

18   what it will not show.  And I will ask you to conclude

19   the government has not met its burden to rule out the

20   reasonable possibility that when Landon figured out that

21   he had been conscripted into Baker and his crowd to be

22   their fall guy and their scapegoat and their patsy, he

23   left his Nissan Murano at home.

24             Thank you, ladies and gentlemen.

25             THE COURT:  All right.  If the United States

 1    would call its first witness.

 2              MS. SANDLING:  Your Honor, the government

 3    would call Jeremy Scheetz.

 4              THE COURT:  Witness will step forward to be

 5    sworn.

 6              THE CLERK:  Left hand on the Bible and raise

 7    your right hand, and state your name for the record.

 8              THE WITNESS:  Jeremy Colton Scheetz.

 9              (The witness was placed under oath.)

10              THE COURT:  You may proceed.

11              MS. SANDLING:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13    BY MS. SANDLING:

14       Q.  Good afternoon, Mr. Scheetz.

15       A.  Hello, ma'am.

16       Q.  What is your occupation?

17       A.  I am an intelligence operations specialist,

18    that's an IOS, with the Alcohol, Tobacco, Firearms, and

19    Explosives in Washington, D.C.

20       Q.  How long have you been employed with the ATF?

21       A.  Been with ATF since 2003.

22       Q.  Prior to being assigned in the intelligence

23    operation -- or prior to being assigned as an

24    intelligence operations specialist, where within the ATF

25    were you employed?

1    A.   I was in the 24-hour joint support operation

2    center.

3    Q.   How long were you employed within that particular

4    division?

5    A.   Approximately three years.

6    Q.   What are your duties and responsibilities as an

7    IOS, or intelligence operation specialist?

8    A.   I monitor and track outlaw motorcycle gangs and

9    motorcycle clubs on a global perspective for the ATF.  I

10   analyze and decipher intelligence, ongoing and

11   historical information.  I assist ongoing investigations

12   not just on the federal level but on the state and the

13   military level as well.  I conduct or assist in

14   interviews or proffers with not just ATF personnel or

15   Department of Justice personnel but along with our state

16   and local counterparts.  I work outlaw motorcycle gang

17   or motorcycle club events on a global perspective.  I

18   conduct training at symposiums, gang conferences, and

19   for dignitaries that I'm asked for not just at ATF level

20   but for state and locals as well.  And I also work OMG

21   events and I also do conduct -- I conduct testimony in

22   court.

23   Q.   When you say you work OMG events, what do you

24   mean by that?

25   A.   Due to the fact that I'm not a sworn -- or carry

a firearm, I'm there for the intelligence collection
component only.  I would say 90 percent of the time I'm
there with a camera snapping photos in real time trying
to identify new members, prospects, hang-arounds,
associates.  And it's not just based on one club.  We
work and monitor and track a lot of outlaw motorcycle
gang and motorcycle clubs across the globe.

Q.   Have you ever taught any courses involving outlaw
motorcycle investigations and/or prosecutions?

A.   Yes, ma'am.

Q.   Describe what they are, please.

A.   I've taught courses on collection of intelligence
or intelligence-based work in a long-term or short-term
investigation, not just on the federal side but also on
the state side.  During those classes, I teach on how to
create charts, timelines, analyze historical
information, new information, how to decipher, and stuff
of that nature.

        I also teach on trends and patterns.  I teach on
violence, in particular to a certain OMG or variable of
various OMGs or motorcycle clubs.  I teach on things
like migration leads to violence, which basically
entails when a motorcycle gang or club moves into
someone else's self-perceived territory, some type of
violent action is going to transpire because they're

moving into that territory.

I look at stuff like predictive analytics where I can look at historical facts or historical acts of violence that have transpired not just in the United States, because we're dealing with outlaw motorcycle gangs on a global perspective. Looking at predictive analytics, I can prove or try to prove that some type of violent altercation is going to occur with that club or a support club if they move into someone else's self-perceived territory.

Q. And "OMG" stands for outlaw motorcycle gang, is that correct?

A. Yes, ma'am.

Q. Have you received any specialized training as an intelligence operation specialist?

A. Yes. In 2006 when I switched over to the IRS job series, I went to the Drug Enforcement Administration ten-week academy at Quantico where I learned the inner workings and the day-to-day operations of being an intelligence analyst. Even though it was for DEA, we did it metaphorically and we put that into perspective in what we do for ATF.

Q. Are you currently a member of any professional associations?

A. Yes. I belong to -- it's an organization called

IOMGIA.  It's the International Outlaw Motorcycle Gang

Investigators Association.

Q.  Do you frequently keep current on literature

pertaining to outlaw motorcycle investigations and

gangs?

A.  Yes, ma'am.

Q.  What is that?

A.  It could be anything from historical indictments,

any type of arrests.  Even newspaper articles, anything

that's been written, anything that's adjudicated, even

officer safety bulletins.  I analyze and decipher all

that information.  I look at that stuff to see if

there's going to be trends and patterns, look at the

predictive analytics.  And that way I also share on a

global perspective with my coworkers and my colleagues

who are working outlaw motorcycle gangs, who are

analyzing outlaw motorcycle gangs, or are working on

outlaw motorcycle gang or motorcycle club investigation.

Q.  You write articles that are shared within the

ATF, is that correct?

A.  I write strategic and -- basically, analytical

reports is what I write.

Q.  Are those articles peer-reviewed?

A.  Yes, they are, ma'am.

Q.  As an IOS investigator, do you come into contact

1  with outlaw motorcycle gang members?

2      A.  Yes, ma'am.

3      Q.  How often would you say you come into contact

4  with them?

5      A.  Routinely, because I'm very fortunate.  I work a

6  lot of outlaw motorcycle gang or motorcycle club events

7  across the globe, so when I'm working those events, I'm

8  there snapping photos, or if they ask for my assistance

9  on a traffic stop, or if someone gets arrested and they

10  need to be interviewed, or if there's a conversation

11  that goes on between a high-ranking member of that

12  specific outlaw motorcycle -- motorcycle club that's

13  holding the event and my state and local counterpart

14  who's communicating with them, often they ask me to come

15  in to discuss that conversation, how things are gonna

16  work for the parameters of that one-day, two-day, or

17  three-day event.

18      Q.  Describe for the jury, if you would, the types of

19  situations in which you have had personal contact with

20  outlaw motorcycle gang members.

21      A.  It could be during long-term investigations,

22  short-term investigations.  It could be on traffic

23  stops.  I've had the opportunity to conduct interviews

24  or belong or take part in interviews, not myself per se,

25  proffers.  During some of these conferences that I

attend, a former outlaw motorcycle gang member will be
there to speak, and I have the opportunity to debrief
them about the inner workings and the history and the
violence and everything that pertains to outlaw
motorcycle gangs.

I'm also very fortunate that I've assisted on
numerous investigations within the ATF, DEA, and other
state and local, to include FBI, where ATF agents, or
what we deem "task force officers," have conducted
infiltrations into outlaw motorcycle gangs or motorcycle
clubs.  And I have been able to debrief and interview
those individuals on a daily basis, or when they were
finished with the overall totality of the investigation
after it's been adjudicated.

Q.  Over the course of your career, approximately how
many outlaw motorcycle gang members have you come into
contact with or had the opportunity to speak with?

A.  I would say a little over 200.  That includes
members, prospects, associates, hang-arounds.

Q.  And how did you know that these particular
individuals were outlaw motorcycle gang members?

A.  First and foremost, if I was working an event,
it's because they were wearing some type of article of
clothing, which they call their cuts or their rags, if
we're talking about the Pagans.  It's basically a

leather vest or a denim vest.  Some motorcycle clubs or

OMGs call them jackets or colors or their patch, or

they're wearing something on their body which we refer

to as indicia that symbolizes that they are a member, a

prospect or hang-around or associate of that OMG or MC.

It could even be an earring.  It could be a

necklace.  Or if they've been self-reported, and I have

done a debriefing at a prison or a jail, or they're a

defendant or a suspect in an investigation, or when I go

to a gang conference or a training and they

self-admitted to the audience or the crowd that they

were a former member of that, I've had that opportunity

to speak to them.

Q.  Are cuts or rags the typical markers of an outlaw

motorcycle gang member?

A.  That would be -- cuts and rags is -- there's many

different sayings for it in the outlaw motorcycle gang

MC culture.  When we refer to, like, the Hells Angels,

they wear colors or their patch.  When you refer to the

Pagans, it would be their cuts or their rags.  When

you're working or analyzing Africa American multiracial

club, they could be considered your vest or your jacket

or your cuts or your rags.  There's many different names

or different symbolisms that they use for a name to

identify their cuts or their rags or their jacket.

Q.   As an intelligence operation specialist, is it
your responsibility to keep current with the markers of
outlaw motorcycle gang members?

A.   Yes, ma'am.

Q.   What steps do you take to keep current, would you
say?

A.   First and foremost, I look at arrest reports.  I
look at pictures that have been snapped just not by
myself but by a plethora -- or what we deem could be
gang investigators, gang cops, or even OMG experts from
across the globe.  I'm able to get a copy of their
photos or certain photos that were snapped at these
events.  My job for ATF and Department of Justice is
analyze these photos.  I look at any historical value of
that photo.  I look and see if there's been a rank
status change or structure change with what they're
wearing on their colors.

     I look at any identifiable markings on their rags
or their cuts or their colors or vests to see if they
have been involved with a certain act of violence and
they've been rewarded or awarded.  I also look to see if
they're a member of a hierarchy, if they hold rank or
structure within their outlaw motorcycle -- or
motorcycle club or the chapter itself, and those are
usually denoted or shown by some type of symbol or a

1    patch or a tag on their colors, rags, or cuts.

2        Q.    Do you work with colleagues in order to keep

3    current as to both culture and markers of OMGs?

4        A.    Yes, ma'am.

5        Q.    And what are some of the steps that you and your

6    colleagues take in order to keep current?

7        A.    Like I previously stated, first and foremost, it

8    comes from working investigations.  It comes from being

9    out there and working these events on a weekend basis

10   across the globe and seeing the trends and patterns

11   within those motorcycle clubs or OMGs.  It comes from

12   our investigations, our interviews, any police reports

13   or any self-admittance during someone being taken to

14   prison for an arrest or a probation violation.

15       Q.    Have you ever testified in a court as an outlaw

16   motorcycle gang expert and/or in a outlaw motorcycle

17   gang case?

18       A.    Yes, ma'am.

19       Q.    How many times and which courts did you testify?

20       A.    I believe six times.  And I recently testified

21   several months ago in San Francisco in a federal Hells

22   Angels investigation.  I think it was about a month or a

23   couple months before that, I testified in a Hells Angels

24   trial that was held in Portugal, but I did that --

25   because of the COVID and travel policies, I did that via

1   Webex or Zoom.  I can't remember.

2        I've testified in several Department of Defense

3   administrative hearings where a DOD employee or a

4   contractor has held a clearance or applying for a

5   clearance at the same time he was a self-admitted member

6   or a member of an outlaw motorcycle gang or a prospect

7   for a documented outlaw motorcycle gang.  I also

8   testified in an administrative hearing out of, I think

9   it was Willoughby, Ohio, where a police officer was

10  dating a full patch member of the Hells Angels.

11     Q.  And you testified in these courts as an expert,

12  is that correct?

13     A.  Yes.

14     Q.  Have you ever not been tendered or recognized as

15  an expert within the field of outlaw motorcycle gangs?

16     A.  No, ma'am.

17          MS. SANDLING:  Your Honor, at this time the

18  government would tender Jeremy Scheetz as an expert

19  within the field of outlaw motorcycle gangs.

20          MR. CHETSON:  The defense objects, Your

21  Honor.

22          MS. SALMON:  Defense objects, Your Honor.

23          THE COURT:  All right.  The Court's heard

24  the objections and the reasons for those objections.

25  Those objections are matter of the record.  The Court

has ruled that this witness will be allowed to give a circumscribed opinion regarding certain aspects of outlaw motorcycle gangs.

Ladies and gentlemen of the jury, you're about to hear from this witness who will testify to some of his opinions and the reasons for his opinions.  This opinion testimony is allowed because of the education or experience of this witness.  You should judge this opinion testimony just as you would any other testimony.  You may accept it or reject it, and give it the weight you think it deserves considering the witness's education and experience, the reasons given for the opinion, and all of the other evidence in the case.

BY MS. SANDLING:

Q.  Mr. Scheetz, could you please explain for the jury when and where the Pagans started.

A.  Pagans originated in Prince George's County, Maryland in 1959.

Q.  Explain the day-to-day life of a Pagan member, if you would.

A.  Pagans member, first and foremost, he's a member of the Pagans.  That's his first priority.  The second priority, depending on the individual, could be his employment.  It could be his family.  He is at the beck and call of the Pagans Motorcycle Gang, Motorcycle Club.

He is at their mercy.  If they call or if he's notified
he needs to report -- they hold what we call a meeting,
most of the time once a week.  They call that "church."
It could be held in a bar.  It could be held in a
restaurant.  It could be held at a member's residence.
The Pagans, unlike most motorcycle clubs or motorcycle
gangs, for the most part don't have clubhouses where
they would hold their church meeting, so they would hold
it once a week at the bar or restaurant.

Afterwards, a lot of times, not per se every
single one, will go out and do a power -- will go out to
the bars or stay at the bars or they'll go out for the
evening.  It's one of those things that when you're a
member of the Pagans, you will -- you are at their beck
and call no matter what it is.  It doesn't matter if
you're a Pagan in the state of Washington or if you're a
Pagan in North Carolina or Virginia.  You are first and
foremost a member of the Pagans, and you will report and
do whatever the Pagans nation calls upon you to do.

Q.  What is a one-percenter?

A.  It's any group of motorcyclists who voluntarily
make a commitment to band together to abide by their
organization's rules, which -- their bylaws -- who
engage in violence and are serious and repeated
offenders that come into contact with society in law.

Q. Can you explain for the jury what a prospect is?

A. A prospect is -- first and foremost, it's an ingratiation period. It's a period within most motorcycle gangs or motorcycle clubs where the individual voluntarily decides that he wants to become a prospect. It's usually the phase after you become an associate or a hang-around, depending on the outlaw motorcycle gang or the chapter.

And it's a period where you listen. You learn about the history of the club. In the Pagans, during this time frame, or right now within the Pagans, you can either buy your patch for about 500 or $650 where there is no prospect period, or in certain chapters they will make you prospect for three months to six months. Within that time period, you are basically brought in by a patch member or sponsored by a patch member of that chapter, and it's his responsibility along with the other members of the Pagans to teach you about the Pagans nation, as they call it. First and foremost, you are at the beck and call. You will do what you are told. You will go places. You will conduct guard duty during the church meeting which we just discussed.

You will not be going into any church meeting. You will stand guard outside. You are looking for adversaries, looking for, you know, something that could

be of hindrance or something that could be a threat to the Pagans at that time.  You are responsible to have a motorcycle.  That responsible [sic] should be -- should be working at all times.  You should be expected to attend events.  And when you're working these events, just like church, you'll be doing guard duty.  You would be at the beck and call.  It could be something so miniscule as going to get beer or going to carry an axe handle or do something at the furtherance of the club.  But first and foremost, you will do whatever you are told within the Pagans.

Q.  Does a Pagan that is a prospect wear a different rag or cut than a Pagan who is an actual member?

A.  Yes.  A Pagans prospect, unlike most motorcycle gangs or motorcycle clubs, wears a plain denim vest.  There's nothing on the front, nothing on the side, and nothing on the back.

Q.  Does a president wear a different type of cut than a member?

A.  Yes, ma'am.

Q.  What type of cut does a president wear?

A.  Once you become a full patch member of the Pagans, you can wear anything that says the word "Pagans" or has the Pagan symbol, which is the Surtr, or their moniker.

The back is the most important. It's pretty much gonna be the same. When you become a member of the Pagans, the top portion, which is called the top rocker, is called the Pagans cloud. It says the word "Pagan's" in there, apostrophe S.

Below that you have their center patch or their moniker, which is their Surtr. And then below that you will see MC, which are two rectangle or two small square patches, which mean "motorcycle club." And below that you will see the area that they control in the United States, or the Pagans themselves, they wear five different bottom rockers. If you're on the East Coast, North Carolina, Virginia, you'll wear East Coast. That's for a regular member, or an RM.

If you are a president or called a diamondback, it's the exact same set of colors on the back. The only difference is above that top rocker which is the Pagans cloud, you'll have a diamond over that, and that signifies or illustrates that you are a chapter president or called a Diamond, is their vernacular for it.

Q. What is a mother club?

A. The mother club member is the overall hierarchy within the Pagans. They have the final say. The mother club members either control a state, or depending on the

size of the state and the number of members and chapters within that state, you might have three or two mother club members that control a certain amount or chapters within that state. Every president or diamondback within that state or that region that he controls reports to the President of President, who's between the 13 or the mother club member. And then they go into the mother club member himself.

The mother club member controls everything. It could be from when they're gonna host parties to what they're gonna sell as T-shirts or their indicia or where they're gonna try to open new chapters. The mother club member is the one who controls what we call the OMG underworld or the subculture. It's the mother club member who a lot of times will have conversations with other dominant OMGs or even their adversaries in an area about expanding into one's self-perceived territory.

The mother club members of the Pagans is basically called the counsel. They hold meetings pretty much every six to eight weeks, but that's not always the case. Within the Pagans, they hold what we call state meetings. Every state -- not every state now, but states will hold what we call a state party, and a lot of times at that state party you'll get a group -- say if there's 15 mother club members right now, maybe 10 of

1    the 15 will show up to that party.  And during that

2    party they will sometimes hold meetings.  And those

3    members will vote within the mother club on who they

4    should bring into the new mother club members, maybe

5    bring in some new President of Presidents, if they

6    should expand or if they should -- you know, what type

7    of territory they should control, if they should be

8    friendly or adversarial towards certain motorcycle

9    clubs.  And mother club members will also talk about

10   ongoing investigations, adjudicated investigations, and

11   stuff of that nature.

12       Q.  Is there a difference between a mother club and a

13   local chapter of the Pagans?

14       A.  Oh, yeah.  The mother club is the highest.  The

15   local chapter is just a group of members belonging to

16   one entity.  The entity is that chapter.

17           Within the mother club itself, say for one mother

18   club member, he could have up to eight to probably 12

19   different chapters that he oversees or governs.  Per se,

20   right now, say if we have about 15 or 16 mother club

21   members in the Pagans, there's about 164 chapters within

22   the Pagans, so -- and it's not equally divided out.

23   Like, Pennsylvania has three mother club members broken

24   up to western Pennsylvania, central Pennsylvania,

25   eastern Pennsylvania, because there's so many chapters

and they oversee a certain -- whereas -- like Virginia right now only has one mother club member.  He oversees all of Virginia.

So it's not just about each mother club controlling a state.  We have some mother clubs that can control five, six, seven states, or certain -- or more than that, more regions.

Q.  Across the United States, how many mother club members are there?

A.  We believe right now there's 15.

Q.  So within the Pagan hierarchy, can you explain what that hierarchy is?

A.  The hierarchy starts with -- you start off as an associate or a hang-around.  It also depends on the chapter.

Once you are a hang-around, you become a prospect in some instances.  Some instances you can completely skip if you come from another motorcycle club or a motorcycle gang or an outlaw motorcycle gang.  You can pay a certain amount of money.  Sometimes it's 500 or $650.  You'll become a member.  That's basically your real phase.  Phase 1 is the hang-around or associate phase.  Phase 2 is prospect.  Phase 3 is member.

After membership, you're gonna be what we call a Diamond, or the chapter president.  After that is the

President of Presidents.  The President of Presidents

oversees a group of Diamonds, similar to a mother club,

but he is the liaison between the Diamond or the chapter

president and the mother club members.

So anything -- that way, the Diamonds can't go

directly to the mother club members themselves.  They

have to go through the POP, and then he instructs what

he just learned from all his Diamonds.

It's a very military type hierarchy.  I would say

it's from the top down, not from the bottom up.  The

overarching control comes from the mother club, and then

from the mother club they also have a president.  I like

to say there's an international president, because the

Pagans have expanded into Puerto Rico, but that

president has overarching rights to say -- in control.

Even if the mother club's members disagree, he can make

a decision and overrule them.

Q.  Can you explain the role of a 13?

A.  Yeah.  The role of a 13 is basically he controls

an area or region.  He has -- there's been times where

I've seen a mother club member control four different

chapters, and I've seen it where they've controlled up

to 15 different chapters.  He makes sure everything runs

on a day-to-day basis and everything he is aware of.

Does that always happen that I've seen?  No.  But for

the most part, the Pagans mother club member controls every aspect of the Pagans within his bottom down hierarchy.  He makes sure that anything that takes place from new indicia, any runs, any adversaries, any type of violence, he is aware of that goes on.  Anything nefarious or anything that they want to do has to go through the mother club member.  He has total control. And then he goes to the other mother club members, which they call the counsel, and a lot of times they'll vote on it or he keeps them aware of what's going on or transpiring in his region or state or states.

Q.  Are you familiar with the defendant Chris Baker?

A.  Yes, ma'am.

Q.  How are you familiar with him?

A.  I knew Chris Baker from before he was a member of the Pagans, when he was a member of another motorcycle club, through pretty much the same thing, me working outlaw motorcycle gang events across the country.  I had seen him at those events in colors.  And then I know him from being a member of the Pagans as well.

Q.  And what role did you know Mr. Baker to have within the Pagans?

A.  I knew him to be a mother club member, a 13.

MS. SANDLING:  Nothing further, Your Honor.

THE COURT:  Cross-examination, counsel.

```
 1            MR. CHETSON:  I think Ms. Salmon was gonna

 2   start.

 3                     CROSS-EXAMINATION

 4   BY MS. SALMON:

 5     Q.  Hello, Agent Scheetz.

 6     A.  Hello, ma'am.

 7     Q.  You do not know who Landon Holcomb is, do you?

 8     A.  No, ma'am.

 9     Q.  You've not encountered him in your investigations

10   and research and studies of the Pagans, have you?

11     A.  No, ma'am.

12     Q.  So you do not have an opinion about his role in

13   the hierarchy, correct?

14     A.  No, ma'am.

15            THE COURT:  Thank you, counsel.

16            MS. SALMON:  Your Honor, I actually just was

17   making sure that, time-wise, you would like me to

18   continue.

19            THE COURT:  Oh, okay.  You can continue.

20            MS. SALMON:  Okay.  Thank you, Your Honor.

21   BY MS. SALMON:

22     Q.  You talked a little bit about prospecting and the

23   hierarchy.  You mentioned -- correct?  Prospects?

24     A.  Yes, ma'am.

25     Q.  And you mentioned that a prospect during that
```

1  period is at the beck and call of the higher ranking

2  members, right?

3      A.   Correct, ma'am.  Yes.

4      Q.   So if they are ordered to do an errand, they have

5  to do it, right?

6      A.   They have to, yes, or there's ramifications.

7  Yes.

8      Q.   What do you mean?

9      A.   A lot of times, there could be -- they could be

10  stripped of their prospect status.  They can be

11  assaulted.  They can be beaten.  Or they can be kicked

12  out for not following an order.

13      Q.   And is disrespect or the idea of disrespect

14  within that hierarchy a central part of the Pagan

15  structure?

16      A.   Yes, ma'am.

17      Q.   Tell me about that.

18      A.   It's all built around -- the motorcycle club or

19  the OMG subculture lifestyle is all about respect.  It's

20  about earning respect and giving respect.  It's a very

21  alpha male driven society.  If you are a prospect, you

22  are on the lower rung, or a probate, depending on what

23  you prospect for.  You're at the beck and call, and you

24  will listen and you will take orders.  If you do not

25  follow those orders, then there will be some type of

1   ramification for not following that order.

2      Q.  And you mentioned it's very similar to the

3   military structure, correct?

4      A.  Yes, ma'am.

5      Q.  In its hierarchy, right?

6      A.  Correct, yes.

7      Q.  And so orders come from the top down, correct?

8      A.  Correct.

9      Q.  And it would not be appropriate within that

10  culture for a low-rank person to ask questions of a

11  high-rank person, correct?

12     A.  Not in the Pagans.  No, ma'am.

13     Q.  That is just not done.  Am I correct?

14     A.  I wouldn't say it's not done, but it's frowned

15  upon.

16     Q.  Is it a sign of disrespect?

17     A.  It's a sign of disrespect, yes.

18     Q.  You mentioned when Ms. Sandling was questioning

19  you that you had written reports for ATF and internal

20  reports for law enforcement, right?

21     A.  Yes, ma'am.

22     Q.  And one of those reports was about the crossover

23  between outlaw motorcycle clubs or gangs and the United

24  States Armed Forces, is that true?

25     A.  Yes, ma'am.

1     Q.   Could you tell the jury about that.

2     A.   So, historically, back in 2009 we got a request.

3   When I say "we," my partner and I, or my mentor, got a

4   request from the Air Force out of Texas saying that they

5   were seeing a lot of outlaw motorcycle gangs, per se the

6   Bandidos, on an Air Force base in Texas.

7         We looked into it and realized that it was a

8   fairly large problem.  It was a brand new trend and

9   pattern that we were observing.  Within that, our bosses

10   told us to write a report.  Every year I've written a

11   report up until about 2015.  Now I write it every other

12   year, looking at trends and patterns.  And it doesn't

13   just have to be just with military or active duty

14   military.  We're looking at all aspects of the military,

15   the federal government, state and local governments, law

16   enforcement.

17         It started off as a military base report looking

18   at active duty and former military, but it looks at all

19   aspects of the U.S. and state and local governments,

20   members that hold clearances, doing hold clearances,

21   that are active members or associate openly with outlaw

22   motorcycle gangs or motorcycle clubs.

23     Q.   And is it fair to say that over a good percentage

24   or a majority of motorcycle club members have some

25   military background or affiliation?

1    A.  I would say it's -- I would say from the checks,

2    it's probably about 50 percent.  Yes, ma'am.

3    Q.  So as much as 50 percent has some --

4    A.  It also depends on the region.  You also have to

5    look where the military bases are located.  Where the

6    military bases are located, you're gonna see more of a

7    military presence within those motorcycle gangs or

8    outlaw motorcycle gangs.  As you get farther away from

9    areas where there is no military bases or military

10   compounds or even U.S. government buildings, but you're

11   going to -- you're not gonna see as many outlaw

12   motorcycle gangs affiliating with U.S. government on the

13   contractor side or employer side.

14   Q.  So in a state like North Carolina with a very

15   significant military presence, you would expect the

16   percentage to be much higher than 50 percent of military

17   affiliation, correct?

18   A.  I can't give a percentage, ma'am, but I can tell

19   you a lot of East Coast based Pagans have an affiliation

20   with the Marine Corps, yes.

21   Q.  And, in fact, the Pagans have been actively

22   recruiting around North Carolina's military

23   installations, correct?

24   A.  Yes.  They've always recruited military members.

25   Q.  Why?

```
 1      A.  It's an attention to detail.  It's -- they'll
 2   follow orders.  It's the fact that they understand the
 3   way of life.  They understand -- it is a camaraderie.
 4   It is a brotherhood.  They're looking at times -- and
 5   it's not always based on being at war.  It's based on --
 6   it's a brotherhood, and they're looking for a
 7   brotherhood or a camaraderie like they had in the
 8   military, to join that.  And they use it as a -- kind to
 9   enjoin a motorcycle club or an outlaw motorcycle gang.
10               THE COURT:  Ms. Salmon, we're after 5:00.
11   If you can wrap up in a minute or two -- if not, we'll
12   recall this witness in the morning.  What's your
13   preference?
14               MS. SALMON:  Your Honor, if we could recall
15   the witness in the morning.
16               THE COURT:  All right.  Ladies and gentlemen
17   of the jury, it is after 5:00, and I promise you that I
18   will try to respect your time.  We will return tomorrow
19   morning at 9:30.  Be prepared to be parked and in the
20   jury room and subject to being called in at 9:30.  And
21   we will proceed with the presentation of evidence in
22   this case.  Thank you so much.  We'll walk you out.
23               THE CLERK:  You can leave your notebooks
24   right there on the chairs.
25               THE COURT:  Please remember you're not to
```

1  discuss this case with anyone, including each other,

2  until you're ready to deliberate.  If anyone attempts to

3  talk to you about the case, please notify me

4  immediately.  Thank you.

5              (The jury exited the courtroom.)

6              THE COURT:  All right.  Off the record -- I

7  mean -- sorry.  Back on the record, outside the presence

8  of the jury.  Is there anything that we need to take up

9  at this time outside the jury's presence?

10             MS. SANDLING:  Not for the government, Your

11  Honor.

12             MR. CHETSON:  Not for Mr. Baker.

13             MS. SALMON:  Your Honor, I just would like

14  the record to reflect that with respect to our standing

15  objection to the government's experts, we were hustling

16  to try to find a counter-gang expert.  I was finally

17  contacted this morning by the individual that we had

18  attempted to hire saying that he would be happy to talk

19  to me this afternoon, so I would just like the record to

20  reflect that, on a standing timeliness objection.

21             THE COURT:  Okay.

22             MS. SALMON:  Thank you.

23             THE COURT:  If the information that's

24  provided to you, if you can provide that to the

25  government as it comes in if you intend to call them

1    later, we'll proceed on that basis.

2              All right.  Thank you.  We'll be in recess

3    until 9:30.

4              (Proceedings recessed at 5:06 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    **C E R T I F I C A T E**

19

20        I certify that the foregoing is a correct

21   transcript from the record of proceedings in the

22   above-entitled matter.

23

24   /s/Risa A. Kramer                    6/11/2023

25   Risa A. Kramer, RMR, CRR                  Date