UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

---------------------------------------------------------

UNITED STATES OF AMERICA,

     Plaintiff,

  -vs-       Case No. 5:21-CR-434-M-1


CHRISTOPHER LAMAR BAKER,

     Defendant.

  and

UNITED STATES OF AMERICA,

     Plaintiff,

  -vs-       Case No. 5:21-CR-434-M-13

LANDON HOLCOMB,

     Defendant.

---------------------------------------------------------

JURY TRIAL - VOLUME III
SEPTEMBER 14, 2022
THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE

Risa Kramer, RMR, CRR
Official Court Reporter
United States District Court
Wilmington, North Carolina

**A P P E A R A N C E S**

On Behalf of the Government

ROBERT J. DODSON
KELLY L. SANDLING
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601


On Behalf of Defendant Christopher Lamar Baker

DAMON CHETSON
The Chetson Firm, PLLC
19 W. Hargett Street, Suite 400
Raleigh, North Carolina 27601


On Behalf of Defendant Landon Holcomb

ELISA CYRE SALMON
The Salmon Law Firm, LLP
P.O. Box 185
Lillington, North Carolina 27546

1                    INDEX OF PROCEEDINGS

2

KEVIN ROBERSON

3
     Direct Examination by Mr. Dodson..........396
4    Cross-Examination by Mr. Chetson..........415
     Cross-Examination by Ms. Salmon...........426
5    Redirect Examination by Mr. Dodson........440
     Recross Examination by Mr. Dodson.........449
6
JOSHUA PRESLEY

7
     Direct Examination by Mr. Dodson..........453
8    Cross-Examination by Ms. Salmon...........474

9    DUSTIN TRAVIS

10   Direct Examination by Ms. Sandling........503

11   BRIAN LOPEZ

12   Direct Examination by Mr. Dodson..........517
     Cross-Examination by Mr. Chetson..........527
13
DEVAN CHRISTOPHER

14
     Direct Examination by Ms. Sandling........536
15
BRIAN JAEGER

16
     Direct Examination by Mr. Dodson..........557
17   Cross-Examination by Mr. Chetson..........572

18   ELIZABETH YOUNG

19   Direct Examination by Ms. Sandling........577
     Cross-Examination by Mr. Chetson..........599
20   Cross-Examination by Ms. Salmon...........618

21   ASHLEY HALL

22   Direct Examination by Mr. Dodson..........622

23   AMANDA GREENE

24   Direct Examination by Mr. Dodson..........640
     Cross-Examination by Ms. Salmon...........665
25

```
1              INDEX OF PROCEEDINGS CONTINUED

2

3   ERIKA DERKS

4       Direct Examination by Ms. Sandling.........668

5   KATHRYN COCHRAN

6       Direct Examination by Ms. Sandling.........680

7   SPECIAL AGENT CATHERINE FIELDS

8       Direct Examination by Ms. Sandling.........690

9

10

11

12  Exhibit Number                    Admitted into Evidence

13  Government's Exhibit
        No. 83...................................398
14      124......................................454

15  Defendant's Exhibits
        No. 2, 3.................................502
16
    Government's Exhibit
17      No. 84...................................516
        85.......................................519
18      86.......................................552
        87.......................................560
19      88.......................................595
        89.......................................624
20      93.......................................642
        94.......................................659
21      149......................................664
        106......................................674
22      91.......................................690

23

24

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2              (Proceedings recommenced at 9:28 a.m.)
 3              THE COURT:  All right.  Before we begin,
 4   there's a matter I'd like to take up with the parties at
 5   the bench.
 6              (At sidebar on the record.)
 7              THE COURT:  It's not a big deal.  One of the
 8   jurors reported to the CSOs that they saw somebody
 9   filming outside.  It was a GSA employee who was filming
10   stuff associated with building repairs, but they saw it,
11   they got nervous.  I don't want to bring it up in front
12   of everybody, including the gallery, so I'm doing it
13   sidebar.
14              What I'm gonna have the Marshal do is just
15   go back, say:  We looked into it, this is what it is,
16   there's nothing to be concerned about, and not have it
17   rise to the level of coming from the bench.  I think
18   it's insignificant, but I wanted to let the parties
19   know.
20              MS. SANDLING:  Okay.
21              THE COURT:  I'd rather not inject it into
22   the whole proceeding.
23              MR. CHETSON:  Thank you, Your Honor.
24              MS. SALMON:  Thank you, Judge.
25              (End of discussion at sidebar.)
```

```
 1                    THE COURT:  All right.  On the record and
 2       outside the presence of the jury.  Is there anything I
 3       need to take up at this time?
 4                    MS. SANDLING:  Not from the government, Your
 5       Honor.
 6                    MR. CHETSON:  Not for Mr. Baker, Your Honor.
 7                    MS. SALMON:  Nothing from Mr. Holcomb, Your
 8       Honor.
 9                    THE COURT:  And the Court has received the
10       expert witness notification, and I deem it timely, given
11       the course of trial.
12                    MS. SALMON:  Thank you, Your Honor.
13                    (The jury entered the courtroom.)
14                    THE COURT:  All right.  On the record and in
15       the presence of the jury.  The United States may call
16       its next witness.
17                    MR. DODSON:  Thank you, Your Honor.  The
18       United States calls Kevin Roberson.
19                    THE CLERK:  You can come right over here,
20       and watch your step right there.  You can see the yellow
21       triangles.
22                    THE WITNESS:  Yes, ma'am.
23                    THE CLERK:  Right over here.  Raise your
24       right hand, left hand on the Bible, and please state
25       your name for the record.
```

1          THE WITNESS:  Kevin Roberson.

2          (The witness was placed under oath.)

3          THE COURT:  Your witness.

4          MR. DODSON:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. DODSON:

7      Q.  Good morning, Mr. Roberson.  Can you see me okay?

8      A.  Yes, sir, I can.

9      Q.  Can you introduce yourself to the jury.

10     A.  My name is Kevin Roberson.

11     Q.  How old are you, sir?

12     A.  I'm 53 years old.

13     Q.  Do you work?

14     A.  Yes.  Yes, I do.

15     Q.  What line of work are you in?

16     A.  Construction.

17     Q.  Mr. Roberson, are you charged in connection with

18   this case?

19     A.  Yes, sir, I am.

20     Q.  And you pled guilty to some drug charges, haven't

21   you?

22     A.  Yes, I have.

23     Q.  You've pled guilty to conspiracy to distribute

24   and possess with intent to distribute 50 grams or more

25   of methamphetamine, correct?

```
1       A.   Yes, sir, I have.

2       Q.   And distributing 5 grams or more of

3    methamphetamine, correct?

4       A.   Yes, sir, I have.

5       Q.   Did you do all that?

6       A.   Yes, sir, I did.

7       Q.   Did you enter into a written plea agreement with

8    the government?

9       A.   Yes.

10      Q.   I want to turn your attention to the screen in

11   front of you and show you what's been marked for

12   identification as Government's Exhibit 83.  Page 2,

13   please.  You recognize page 2 of Government's Exhibit

14   83?  What does it say at the top there on the right-hand

15   side?

16      A.   You talking about the plea agreement?

17      Q.   Yes, sir.

18      A.   Yes.

19      Q.   Do you see where it says "Memorandum of Plea

20   Agreement"?

21      A.   Yes.

22      Q.   And you see it says your name, correct?

23      A.   Yes, sir, it does.

24      Q.   All right.  And we're just gonna flip through the

25   pages to make sure that you recognize it.
```

1          And if we could stop at page 11.  Mr. Roberson,

2     is that your signature on page 11 of Government's

3     Exhibit 83?

4          A.  Yes, sir, it is.

5          Q.  And does this document contain all of the

6     agreements that you have with the government in

7     connection with this case?

8          A.  Yes, sir, it does.

9               MR. DODSON:  Your Honor, the government

10    would move to admit Government's Exhibit 83 into

11    evidence.

12               THE COURT:  Without objection, it's

13    admitted.

14               MR. DODSON:  And request permission to

15    publish.

16               THE COURT:  You may.

17    BY MR. DODSON:

18         Q.  Page 2, please.  And this is what we just talked

19    about, this page 2 of Government's Exhibit 83.  This is

20    your plea agreement.  And if we could go to page 11, the

21    last page.  And that is your signature there on the last

22    page, correct?

23         A.  Yes, sir, it is.

24         Q.  Thank you.  Mr. Roberson, what are you required

25    to do under the plea agreement?

1    A.  Tell the truth and answer any questions

2  truthfully.

3    Q.  Has the government made any promises to you that

4  are not contained in this plea agreement?

5    A.  No, sir, they have not.

6    Q.  Are you testifying here today because you're

7  hoping to get some credit off of any sentence you might

8  receive?

9    A.  Yes, sir, I am.

10    Q.  Has the government promised you any particular

11  sentence that you might receive?

12    A.  No, sir, they have not.

13    Q.  What's your understanding of who determines what

14  your ultimate sentence, if any, is gonna be?

15    A.  My judge, Judge Myers.

16    Q.  Mr. Roberson, do you know the defendant

17  Christopher Baker?

18    A.  Yes, I do.

19    Q.  How do you know Mr. Baker?

20    A.  I was Baker's Sergeant of Arms at one time.

21    Q.  Can you explain to the jury what a Sergeant at

22  Arms is?

23    A.  The easiest way to explain it is like a Secret

24  Service to the President.  I'm responsible for his

25  safety and well-being at all costs.

1    Q.   Were you a member of the Pagans Motorcycle Club?

2    A.   Yes, sir, I was.

3    Q.   And do you know if Mr. Baker was a member?

4    A.   Yes, sir, he was.

5    Q.   Did he have a position of leadership?

6    A.   Yes, sir, he did.

7    Q.   And what was that?

8    A.   Well, the first time, he was a Diamond.

9    Q.   What does it mean to be a Diamond?

10   A.   You're over a chapter.  A chapter is the city

11   that you're in, the area that you're in.  You're over

12   that.  You're over the guys in that area.

13   Q.   All right.  And so were you Sergeant at Arms for

14   Mr. Baker when he was the president?

15   A.   No, sir, I was not.

16   Q.   All right.  When were you the Sergeant at Arms

17   for Mr. Baker?

18   A.   He went to POP.  He got POP.

19   Q.   And what does POP mean?

20   A.   POP is President of Presidents.

21   Q.   And what does it mean to be a President of

22   Presidents?

23   A.   It's a 13 in training, is what it is.  It's a guy

24   that's next up to be 13.

25   Q.   And what does it mean to be a 13?

1   A.  Thirteen is mother.  They're over the whole
2   state.  They're responsible for anything and everything
3   in that state.
4   Q.  And just to be clear, you're saying that a 13 is
5   responsible for a whole state, or could be several
6   states, correct?
7   A.  Very few times has it been several states, but
8   yes.
9   Q.  Okay.  So it's mostly just one state?
10  A.  Mostly.
11  Q.  And when you say in control of one state, do you
12  mean control over all of the chapters, the local
13  chapters in that state?
14  A.  He controls all them -- all the Diamonds.
15  Q.  Okay.
16  A.  All the Diamonds answer to him.
17  Q.  Okay.  So the Diamonds answer to the POPs or the
18  13s?
19  A.  Yes, sir.
20  Q.  And so you were Sergeant at Arms for Mr. Baker
21  when he was a 13.
22  A.  When he was POP.
23  Q.  When he was a POP.  Excuse me.
24  A.  He started POP first.
25  Q.  Explain to the jury what your duties and

1  responsibilities were, for Mr. Baker in particular, as

2  Sergeant at Arms while he was POP?

3       A.   To make sure he was safe, he didn't get

4  approached, didn't get jumped.  He basically told me I

5  was responsible for his safety, his well-being.

6       Q.   Mr. Roberson, why would Mr. Baker need security?

7       A.   Because he's POP; because he's the one that makes

8  the decisions and tells us what to do.  I mean, his

9  safety is above all, above ours.

10      Q.   When you say you're responsible for his safety,

11 how often were you with Mr. Baker?

12      A.   I was with him every weekend.

13      Q.   And what was the time period --

14      A.   Friday to Sunday, usually.

15      Q.   From Friday to Sunday?

16      A.   Yes, sir.

17      Q.   All right.  So on the weekends, right?

18      A.   Yes, sir.

19      Q.   And when -- do you remember month and year, if

20 you can -- when were you the Sergeant at Arms for

21 Mr. Baker while he was the POP?

22      A.   It was around the fall area.  It was around

23 this -- September, October, fall area, coming into the

24 cool weather.

25      Q.   Okay.  Of 2020?

```
 1      A.  Of 2020.  Yes.
 2      Q.  Okay.  And so you were around -- and how long
 3  were you the Sergeant at Arms for Mr. Baker while he was
 4  the POP?
 5      A.  Until he became the 13 in November.
 6      Q.  All right.  And then when he became a 13, did you
 7  remain his Sergeant at Arms?
 8      A.  For a short time.  Yes.
 9      Q.  So total, you're a Sergeant at Arms both when
10  he's a POP and then when he becomes a 13.  The total
11  time period that you are the Sergeant at Arms, how long
12  did that last?  Do you recall?
13      A.  Not specifically; around five months.
14      Q.  Okay.  Mr. Roberson, during that five or so
15  months that you were the Sergeant at Arms for Mr. Baker,
16  did you ever see him in possession of any illegal
17  narcotics?
18      A.  Yes, sir.
19      Q.  Can you explain to the jury?
20      A.  Many times we had -- he had illegal narcotics on
21  him.
22      Q.  What kind?
23      A.  Meth, coke, ecstasy, pot.
24      Q.  When you were ever with Mr. Baker, did you ever
25  observe him transport methamphetamine?
```

1      A.   Yes, I did.

2      Q.   How much?

3      A.   I never knew the exact amount.  I can only recall

4  one time I was told we transported 12 pounds.

5      Q.   Twelve pounds?

6      A.   Yes, sir.

7      Q.   Of what?

8      A.   It was supposed to be metham- -- meth.

9      Q.   All right.  When you were ever with Mr. Baker,

10  did you observe him carry a firearm?

11     A.   Yes, I did.

12     Q.   Can you explain that?

13     A.   He always had a 1911 .45 on him.

14     Q.   When you were his Sergeant at Arms, did you carry

15  a firearm?

16     A.   Yes, sir.

17     Q.   For what purpose?

18     A.   I carried two, for his safety.

19     Q.   What kind of firearms did you carry?

20     A.   Up front I carried a Ruger .40-cal in my front

21  right pocket, and in my back I always carried a

22  nine-millimeter.

23     Q.   Mr. Roberson, were you present with Christopher

24  Baker on October the 30th of 2020?

25     A.   Yes, I was.

1      Q.   Do you remember what you were doing with him on

2  that day?

3      A.   Yes, sir, I do.

4      Q.   What were you doing?

5      A.   We were on a trip from Asheboro, North Carolina,

6  down east to meet up some brothers.

7      Q.   Okay.  And did you -- were you with Mr. Baker

8  when he sold methamphetamine to anyone that day?

9      A.   Yes, I was.

10      Q.   What were y'all traveling in?  Were you on a

11  motorcycle or something else?

12      A.   No, sir.  We was in a RV.

13      Q.   And describe to the -- describe, if you would,

14  when you met that person to sell methamphetamine in the

15  RV, what happened?

16      A.   We was making a un- -- a pit stop I knew nothing

17  about.  So when we got there, there was a knock on the

18  door.  Can't remember exactly who answered the door.  I

19  think it was either me or him.  I can't recall that.

20  But a young Black gentleman had came in, with dreads.

21  And I sat down on the couch across from Mr. Baker.

22  Mr. Baker was sitting at the table, and my girlfriend

23  was sitting in the passenger's seat of the RV.  And they

24  proceeded to talk and make a deal.

25      Q.   Mr. Roberson, I'm gonna turn your attention to

1  the screen in front of you and show you what's been

2  admitted as Government's Exhibit 56.

3      A.  Yes, sir.

4      Q.  Who is the man in this photograph?

5      A.  That is me.

6      Q.  And the shirt, is that a shirt or a T-shirt that

7  you're wearing?

8      A.  That is what we call a club shirt.

9      Q.  And what's on the left-hand side of your shirt in

10 Government's Exhibit 56?  Do you see where it says

11 "Pagans"?

12     A.  On my left-hand side?

13     Q.  Yes, sir.

14     A.  That's a diamond on the left.

15     Q.  I'm sorry.  So as we're looking at it, on the

16 left, but if you're wearing the shirt it would be on

17 your right.

18     A.  Yes, sir.

19     Q.  And so if you're wearing the shirt, on your right

20 it says "Pagans."

21     A.  Yes.

22     Q.  What's the symbol or emblem under that?

23     A.  That is Surtr.  Our center patch, that's the one

24 that symbolizes who we are and what we stand for.

25     Q.  And what's directly under the Surtr?

1    A.   It's called a MC cube.

2    Q.   What does that mean?

3    A.   Just lets people know we're a motorcycle club.

4    "M" for motorcycle and "C" for club.

5    Q.   And going across the other side of the shirt,

6    does that say "one percent"?

7    A.   Yes, sir, it does.

8    Q.   What does that mean?

9    A.   Means that we're one-percenters.  It's something

10   that we adapted in 1960s.  They wrote a article that

11   said -- Easyrider wrote a article, said 99 percent of

12   the people that rode motorcycles was law-abiding

13   citizens, nice to be around; that one percent were

14   assholes and lawbreakers.  So the Outlaw Motorcycle Club

15   adapted the one percent symbol.

16   Q.   Thank you.  You can zoom out, please.  We can

17   pull that back up -- 56.  Thank you.

18        And there's a female sitting behind you in that

19   seat, correct?

20   A.   Yes, sir, they are.

21   Q.   Okay.  What was Christopher Baker -- is he

22   anywhere in the RV at this time?

23   A.   He's directly across from me, within arm's

24   distance.

25   Q.   Okay.  Why were you sitting so close to

1   Mr. Baker?

2       A.   Because his safety is my priority.

3       Q.   And where did the person that came to purchase

4   methamphetamine --

5       A.   Across the table from him.

6       Q.   Across the table from him.

7       A.   Yes, sir.

8       Q.   Okay.  And so how did you position yourself in

9   relation to both of them?

10      A.   I was positioned -- if he would have made a move

11  toward Baker, I could have intercepted him because I had

12  no table between me and him.  So I had the easiest

13  direct line to stop him if he made a move toward

14  Mr. Baker.

15      Q.   Did you have a firearm on this particular

16  occasion?

17      A.   I had two firearms.

18      Q.   Okay.  And we don't see them in this photograph.

19      A.   No, sir.

20      Q.   Were you wearing them?

21      A.   Yes, sir, I was.

22      Q.   Where were they?

23      A.   Like I said, the .40 was in the right front

24  pocket and the Glock nine-millimeter was in my back.

25      Q.   Government Exhibit 55, please.  Mr. Roberson, are

we now sort of positioned directly across from where you
were sitting?

    A.  Yeah.  I'm directly to his left, and the Black
guy is directly in front of me.

    Q.  And who -- we can't see the face of the person in
this picture, but who is it?

    A.  That is Mr. Baker.

    Q.  And does he have a similar shirt on that you did?

    A.  Yes.  He has a club shirt on.

    Q.  Have you ever referred to this, the shirts that
you all wearing, as a soft cut?

    A.  No, sir.  There was nothing soft about a Pagan,
so they do not call it a soft cut.

    Q.  The Pagans don't call it a soft cut?

    A.  No, sir.

    Q.  And why is that, again?

    A.  Because there's nothing soft about a Pagan.

    Q.  All right.  Do you see a necklace that's around
Mr. Baker's neck?

    A.  Yes, sir, I do.

    Q.  Is that also -- have a one percent emblem?

    A.  Yes, sir, it does.

    Q.  All right.  And you see the money there on
Mr. Baker's hand.

    A.  Yes, sir, I do.

1      Q.   What's directly in front of him?

2      A.   Some meth, some extra baggies, some -- just

3   supplies to bag up methamphetamine.

4      Q.   And what is -- what is the -- what is the

5   container, if you will, that -- the black container?

6   You see that there?  That's holding the meth?

7      A.   Yeah, the box.

8      Q.   Had you seen that box previously?

9      A.   Yes, sir.

10     Q.   How many times?  Describe.

11     A.   Every weekend.

12     Q.   Did Mr. Baker carry that black box with him every

13  weekend?

14     A.   Everywhere he went.

15     Q.   And what was in the box?

16     A.   That particular box?

17     Q.   Mm-hmm.

18     A.   Just small amounts of meth.

19     Q.   Okay.  Government Exhibit 54, please.  The black

20  rectangle that's beside the cash, do you see that?

21     A.   Yes, sir, I do.

22     Q.   What is that?

23     A.   That's a scale.

24     Q.   All right.  Mr. Roberson, do you remember -- the

25  deal in this RV, do you remember smoking

1   methamphetamine?

2       A.   Yes, sir, I did.

3       Q.   Were you a user of methamphetamine during this

4   time?

5       A.   Yes, sir, I was.

6       Q.   How can you remember the events of this day if

7   you were smoking methamphetamine?

8       A.   Mainly, it affects different people different

9   ways.  On this particular incident, we hadn't been on

10  the road long, so we hadn't been smoking that long, so

11  -- but it -- meth affects different people different

12  ways, and it's different -- it depends on how you take

13  meth.  There's different forms and different ways of

14  taking it, and it has different effects.

15      Q.   How does it affect you?

16      A.   If you smoke meth, it kind of opens your brain

17  up, kind of makes you more aware of what's going on.

18  You're more, like, focused because it intense things.

19  It's like -- enhances.

20      Q.   All right.  Government Exhibit 53, please.  Same

21  shot.  Still in the RV, correct?

22      A.   Yes, sir.

23      Q.   Mr. Roberson, the person in these photographs and

24  the person you served as Sergeant at Arms, and that's

25  Christopher, you identify as Christopher Baker, is he

1  sitting in the courtroom today?

2    A.  Yes, sir, he is.

3    Q.  Can you point him out to the jury?

4    A.  Sitting right there.

5        MR. DODSON:  Your Honor, may the record

6  reflect the witness has identified Defendant Christopher

7  Baker?

8        THE COURT:  It shall so reflect.

9  BY MR. DODSON:

10   Q.  Mr. Roberson, do you know Landon Holcomb?

11   A.  Yes, sir, I do.

12   Q.  Do you know him by another name or a nickname?

13   A.  Yes, I do.

14   Q.  What is that?

15   A.  Jabber.

16   Q.  How long have you known Jabber?

17   A.  Year and a half.

18   Q.  And how did you come to know Jabber?

19   A.  Through the club.

20   Q.  Through the Pagans?

21   A.  Yes, sir.

22   Q.  You were a member or Sergeant at Arms during that

23  time, correct?

24   A.  Yes.

25   Q.  Do you know what position, if any, Mr. Holcomb,

1  or Jabber, held in the Pagans?

2      A.   He's never held a position I know of.

3      Q.   Was he a member of the Pagans?

4      A.   Yes, he was.

5      Q.   Was he a member of the Pagans during the time

6  period that we've been discussing here today?

7      A.   Yes, he was.

8      Q.   Have you ever seen Mr. Holcomb in possession of

9  methamphetamine?

10     A.   Possession, yes.

11     Q.   And can you describe that?

12     A.   Just regular use; you know, keeping it on you

13 when we needed it, pulling it out of your pocket,

14 smoking it.  Just everyday type ordeal.

15     Q.   Did you ever yourself witness Mr. Holcomb

16 transport methamphetamine?

17     A.   Yes.

18     Q.   Can you describe that to the jury.

19     A.   Again, it's just normal.  We carried it in our

20 pocket.  We would pick it up from Mr. Baker sometimes

21 and take it back for people, other brothers that needed

22 it.  And we'd pick it up, just carry it back to them.

23     Q.   Were there any other brothers in particular that

24 you know of through your personal knowledge that

25 Mr. Holcomb transported methamphetamine for?

1    A.  I only can recall a few times that he mentioned

2    Egg Roll's name.

3    Q.  Egg Roll?

4    A.  Yes.

5    Q.  And can you describe what happened with Egg Roll?

6    A.  As in...

7    Q.  In terms of Mr. Holcomb.

8    A.  I could not tell you.  All I seen was he just put

9    it in his pocket and said, "I'll just take this back

10   down east for Egg Roll."

11   Q.  Okay.  So he told you he would transport

12   methamphetamine for Egg Roll?

13   A.  Yeah.  He just said he would take it back and

14   share it with Egg Roll now, so.

15   Q.  All right.  And do you know through your own

16   personal knowledge if Mr. Holcomb took direction from

17   people in the Pagans who were either members or in

18   positions of leadership?

19   A.  We all took directions.  But if you're asking me

20   if I've ever heard personally given to him, no.

21   Q.  Okay.  Mr. Roberson, the person you've been

22   discussing, Landon Holcomb, do you see him in the

23   courtroom today?

24   A.  Yes, I do.

25   Q.  Can you point him out to the jury?

```
 1      A.   Sitting beside the two young ladies, between the
 2   two young ladies.
 3            MR. DODSON:  Thank you.  Your Honor, may the
 4   witness reflect that -- may the record reflect that the
 5   witness has identified Defendant Landon Holcomb?
 6            THE COURT:  It shall so reflect.
 7            MR. DODSON:  Thank you.  Nothing further,
 8   Your Honor.
 9            THE COURT:  Cross-examination, counsel.
10            MR. CHETSON:  Yes.  Thank you, Your Honor.
11                    CROSS-EXAMINATION
12   BY MR. CHETSON:
13      Q.   Mr. Roberson -- it is Roberson, is that correct?
14      A.   Yes, sir.  Roberson.
15      Q.   Roberson.  My name is Damon Chetson and I am the
16   attorney for Chris Baker, and I'm gonna ask you a few
17   questions if that's okay.
18      A.   Yes, sir.
19      Q.   Where did you -- just -- where did you grow up,
20   sir?  Which part of the country, generally speaking?
21      A.   Forest City, North Carolina.
22      Q.   Forest City?
23      A.   Yes, sir.
24      Q.   That's in Rutherford County?
25      A.   Yes, sir, I did.  Yes.
```

```
 1        Q.   And did you grow up around guns?

 2        A.   Yes, sir, I did.

 3        Q.   A lot of guns in your household?

 4        A.   No, sir.  A lot of guns with my friends.

 5        Q.   With your friends.

 6        A.   Yes.

 7        Q.   Shotguns?

 8        A.   Yes, sir.

 9        Q.   Pistols?

10        A.   Yes, sir.

11        Q.   Forty-fives?

12        A.   Yes, sir.

13        Q.   Forties?

14        A.   Yes, sir.

15        Q.   1911 was a common pistol that -- semi-automatic

16   pistol that you or your friends might have?

17        A.   It was our favorite.

18        Q.   Our favorite.  That's a .45-caliber -- right? --

19   generally speaking.

20        A.   Generally speaking, yes.

21        Q.   Could be calibered in other -- or chambered for

22   other calibers, but usually a .45, right?

23        A.   Yes.

24        Q.   And you -- and rifles, semi-automatic rifles,

25   correct?
```

```
 1      A.   Yes.  I'm not a fan of them, but yes.

 2      Q.   You're not a fan of them but --

 3      A.   Yes.

 4      Q.   -- they're around.

 5      A.   Yes.

 6      Q.   Do you have some kind of estimate, would you say,

 7 more than half of your friends, you and your friends

 8 growing up have firearms?

 9      A.   Yes.  More than that.

10      Q.   And what kind of -- when you're thinking about

11 that, more than half, about how many?  Twenty, 25

12 people?  Thirty, 40 people, growing up?

13      A.   Be safe to say 20, 25 people.

14      Q.   Okay.  So I'm gonna ask you, "more than half,"

15 how much more than half?  Seventy-five percent?

16      A.   I would go 55, 60 percent at the --

17      Q.   Okay.  So the -- maybe six in ten.  Six in ten.

18      A.   Yeah.

19      Q.   Okay.  Would you go out shooting with those

20 firearms sometimes?

21      A.   Yes, sir.

22      Q.   Target shooting?

23      A.   Yes, sir.

24      Q.   Hunting?

25      A.   Yes, sir.
```

1    Q.   And so just -- and let me ask you this:  Except

2    for the -- set aside the drugs for -- methamphetamine

3    for a moment, right?  There was nothing illegal about

4    you possessing a firearm on that occasion, correct?  In

5    that RV.

6        A.   No, sir.  I have a concealed carry.

7        Q.   You had a concealed carry at the time?

8        A.   Yes, sir.

9        Q.   And it was perfectly legal, except for the drugs

10   there -- I'm not talking about the drugs.  But

11   otherwise, you were just walking around, you were fully

12   permitted to have that firearm?

13       A.   Yes, sir.  That's my understanding under my class

14   and my...

15       Q.   Yes --

16       A.   Concealed --

17       Q.   Did you take a concealed carry class in order to

18   get that concealed carry permit?

19       A.   Yes, sir, I did.

20       Q.   And gun safety and things of that sort, right?

21       A.   Yes, sir, I do.  I had to pass and had to be

22   certified to get my concealed carry for the state of

23   North Carolina.

24       Q.   Thank you for answering those questions.

25            Now, what did you do -- what do you do or what

1  have you done for a living?  For a trade?

2      A.  I've had my CDLs for 35 years now.

3      Q.  Okay.

4      A.  So I've always been in the trucking, heavy

5  equipment, construction type business.

6      Q.  Okay.  And I'm from Wake County, so I'm in a

7  different profession, lawyering, but -- and I'm not

8  gonna put down either one of our professions.

9      A.  Thank you, sir.

10     Q.  I'm certainly not gonna put down my profession,

11 right?  But it's fair to say that that -- your

12 profession, the trade, the trucking, a lot of guys in

13 that, right?

14     A.  Yes.

15     Q.  Male-dominated, right?

16     A.  Yes, sir, it is.

17     Q.  And kind of a brotherhood about that.  Is that

18 fair to say?  A lot of male talk.

19     A.  Yes.

20     Q.  Okay.  And there's some methamphetamine use in

21 the trucking industry, just like there's some alcohol

22 use in the -- in the attorney field, maybe other things.

23 But, I mean, there's some methamphetamine use.

24     A.  I would have to take your word at it because the

25 whole time I've been CDL holder, I've never done meth.

1    Q.   I'm not asking about you.

2    A.   Oh, I never -- I never experience- -- I never

3    seen it firsthand.

4    Q.   Okay.  Were you a long-haul truck driver?

5    A.   Twenty-four years.

6    Q.   Okay.  How did you get introduced to meth?

7    A.   It was introduced on a trip to Hickory, North

8    Carolina, by Mr. Baker.

9    Q.   Okay.  And that's something that you -- when you

10   say it makes you feel alive -- or, sorry -- opens up

11   your senses, are you talking about making you feel

12   alive?

13   A.   No, sir.  It depends on how you -- first of all,

14   it depends on how you do the meth.  There's different --

15   different ways to do meth.

16   Q.   Okay.  Well, in response to the government's

17   question about how it made you feel at particular times,

18   you talked about -- remember answering --

19   A.   Yes.

20   Q.   -- the question?

21   A.   Smoking it makes you -- it opens you up.  It

22   makes you -- the best way I can explain it, makes you

23   like you're paranoid.  And the more paranoid you are,

24   the more you pay attention to things.  And the more you

25   pay attention to things, the more you notice.

1    Q.  Was there something attractive about the fact
2  that you had that experience that you wanted to keep
3  using it?
4    A.  Somewhat.  I mean, I would say some of that would
5  be the case.
6    Q.  It'd be fair to say that there was a lot of
7  methamphetamine use among fellow Pagan club members.  Is
8  that fair to say?
9    A.  Yes, sir, very much.
10    Q.  Okay.  You talked at some point about -- I think
11  you used the phrase "There's nothing soft about being a
12  Pagan."  Do you remember saying that to the jury?
13    A.  Oh, yes, sir.  I do.
14    Q.  What was your ethic or what was your approach to
15  entering the club, and why did that appeal to you?
16    A.  Brotherhood.  Respect, belonging to something,
17  feeling like you belong, part of being a family.
18    Q.  And when did you join the Pagans?
19    A.  When did I start prospect- -- I started
20  prospecting, it was May of 2020.  I patched in July
21  28th, 2020.
22    Q.  And this incident, this drug deal in -- happens
23  on October 30th, 2020, correct?
24    A.  Yes, sir.
25    Q.  And at that point you had -- it was at that point

1    that you had risen to the level of Sergeant at Arms?

2        A.   It was a little bit before that.

3        Q.   A little bit before that.

4        A.   It was a little bit before that.  Yes.

5        Q.   Do you recall when?

6        A.   Yes.  We did a Hickory trip.

7        Q.   And do you recall when that was?

8        A.   Had to be around September.  It was still a

9    little chilly out because we had to wear our jackets to

10   Hickory.

11       Q.   When did you get out of the club?

12       A.   I got arrested in January, so I left the club

13   three months ago?  Two, three months ago, roughly.

14       Q.   In January.  Is that what you're saying?

15       A.   No, I left three months from now.

16       Q.   Okay.  So you're saying in -- if this is

17   September, say, roughly in June?  Early June?

18       A.   Yeah.  It'd be in the July area, in the midst of

19   the beginning --

20       Q.   So even after you were being -- even after you

21   were arrested, you remained in the club for another

22   three or four months?

23       A.   Yes, sir.  I did.

24       Q.   You gave an interview or a debrief at the time of

25   your arrest.  Is that correct?

          A.   Yes, sir, I did.

          Q.   And you said various things during that debrief,
is that correct?

          A.   Yes, sir, I did.

          Q.   And you spoke with Catherine Fields,
Agent Fields, who's seated in the blue chair behind the
government's table.  Do you see her?

          A.   Yes, sir, I do.

          Q.   And then you also spoke with a detective,
Mike Stangler with Raleigh PD.  Do you remember that?

          A.   Yes, sir, I do.

          Q.   That October 30th event, taking you back to that
day where you were sitting in the SUV, you -- that
exchange of methamphetamine for money that was conducted
with the African American gentleman who came into the
SUV, that exchange was -- there was no violence during
that incident, correct?

          A.   No, sir.

          Q.   He came in, purchased, and then left -- smoked
with you guys, right?

          A.   Yes, sir.

          Q.   And then left the vehicle, right?

          A.   Yes, sir.

          Q.   You didn't make -- you didn't say anything -- or
did you say anything at all to the -- other than

1  greeting him, to the guy who came into the -- the buyer?

2  The guy who came in.  Do you recall saying anything?

3     A.  I do not recall really talking to the -- to him.

4  He was mainly talking with Mr. Baker.  I remembered -- I

5  recall trying -- I think I made a few sly comments.

6     Q.  But nothing -- just small talk, right?

7     A.  Yes, just small talk, because I was not

8  interested in what they were doing other than his

9  safety.

10    Q.  Because it was your understanding that meth --

11 meth use was common within the club.

12    A.  Yes.

13    Q.  That's what you said.  But meth dealing was not

14 part of the club business.  Is that fair to say?  Not

15 supposed to be part of the club business.

16    A.  Yes.  That's fair to say.

17    Q.  And so it made you uncomfortable to be there for

18 what you considered to be Mr. Baker's business over

19 there.

20    A.  Can you repeat that, sir?

21    Q.  You were his Sergeant at Arms.

22    A.  Yes, sir.

23    Q.  At the time.  As his Sergeant at Arms, it was

24 your obligation to make sure that Mr. Baker was always

25 safe.

1  A. Yes, sir.

2  Q. Correct?  You were in that SUV with Mr. Baker,

3 and there was methamphetamine in that SUV, and you

4 smoked methamphetamine, which was, as far as you are

5 aware, not prohibited by the club, correct?

6  A. Yes, sir.

7  Q. But Mr. Baker had the business of, under your

8 understanding, distributing more significant amounts of

9 methamphetamine.  Correct?

10  A. Yes.

11  Q. I mean, you've talked about this trip, I think it

12 was to Georgia, where there was all the significant --

13 we heard about this trip to Georgia where there was a

14 significant quantity of methamphetamine, kilos amounts.

15  A. I cannot tell you about that because I never made

16 the trip to Georgia.

17  Q. Sorry.  Well, let me then back up.  With respect

18 to that -- your understanding of the club, the club --

19 club members were not to be dealing methamphetamine.  Is

20 that your understanding at the time?

21  A. That was our -- yes.

22  Q. That was your understanding.  And that came from

23 your understanding about club rules and club leadership.

24 Is that correct?

25  A. Yes, sir, it was.

1    Q.  You were uncomfortable there because you were

2    observing Mr. Baker engage in an activity that you

3    believed was prohibited by the club.  Is that correct?

4    A.  Yes.

5    Q.  So there's a difference between meth use and meth

6    dealing.  Mr. Baker was not to be dealing

7    methamphetamine, and so it was, in your view, in

8    violation of club rules at the time.

9    A.  Yes, but there's a loophole to that, so.

10   Q.  Sorry?

11   A.  There's a loophole to that.

12   Q.  Well, your understanding of the --

13   A.  Yes, that's my understanding --

14   Q.  -- your understanding of the club rules, right?

15   A.  Yes.

16        MR. CHETSON:  Thank you, Your Honor.  Thank

17   you, Mr. Roberson.  No further questions.

18        THE COURT:  Ms. Salmon.

19        MS. SALMON:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21   BY MS. SALMON:

22   Q.  Good morning, Mr. Rob- -- is it Roberson or

23   Roberson?

24   A.  It's Roberson.

25   Q.  Roberson.  Okay.  Thank you, Mr. Roberson.  You

1    said that you joined the Pagans or became associated

2    with the Pagans sometime in May 2020, right?

3         A.   Yes.   I started prospecting.

4         Q.   Prospecting.   And what does prospecting mean?

5         A.   Means -- it's kind of like boot camp.   You're

6    trained, you're taught, you hang around, you get to know

7    everybody, they get to know you.

8         Q.   And you're not actually a member while you're

9    prospecting yet, correct?

10        A.   No, you are not.

11        Q.   Were you a -- you were a motorcycle rider before

12   you joined the Pagans, right?

13        A.   Yes, I was.

14        Q.   How long had you been riding?

15        A.   I've been riding 35 years.

16        Q.   And before you became affiliated with the Pagans

17   in May 2020, were you ever part of another motorcycle

18   club?

19        A.   Yes, I was.

20        Q.   What was that?

21        A.   Outlaws Motorcycle Club.

22        Q.   I'm sorry.   What?

23        A.   Outlaws.

24        Q.   Outlaws.   And the Outlaws, are they also a one

25   percent club?

1    A.  Yes, ma'am, they are.

2    Q.  Now, you said you didn't use meth until sometime

3  in July of 2020, right?

4    A.  Yes.

5    Q.  So was meth not a part of the Outlaw Motorcycle

6  Club culture?

7    A.  I was not in the Outlaws that long.  But yes,

8  they do use meth.

9    Q.  They use meth, correct?

10    A.  Yes.

11    Q.  Is it also true of the Outlaw Motorcycle Club

12  that the rules are "Meth use, okay.  Meth distribution,

13  not okay"?

14    A.  No.

15    Q.  Okay.  What's that?  What's their rule?  What's

16  the Outlaws' rule?

17    A.  Outlaw rules is meth is okay but you can never

18  sell drugs at a clubhouse.

19    Q.  You can never sell drugs at a clubhouse.

20    A.  At a clubhouse.

21    Q.  Okay.  And so when you were in the RV -- and will

22  the government please put Government's Exhibit 56 on the

23  screen, please?  Thank you.

24        So you previously identified yourself in this,

25  and then who is the young lady in the passenger's seat

1    of the RV?

2    A.   That is -- at the time, my girlfriend.

3    Q.   What was her name?

4    A.   Mary Spears.

5    Q.   Mary Spears.  And was Mary a meth user?

6    A.   Yes, ma'am, she was.

7    Q.   And she was present during these drug

8    transactions, correct?

9    A.   Yes, ma'am, she was.

10   Q.   Did Mary want any -- did Mary have anything to do

11   with the drug distribution?

12   A.   No, she did not.  She was only there for me.

13   Q.   You just previously, in talking to Mr. Chetson,

14   said that this transaction here made you very

15   uncomfortable.  Is that correct?

16   A.   Yes.

17   Q.   And am I correct that it made you partly

18   uncomfortable because Mary was sitting there with you as

19   well?

20   A.   No, ma'am.

21   Q.   So were you concerned about Mary being involved

22   in this drug buy?

23   A.   As in what sense?  Her being there personally --

24   Q.   Yes.

25   A.   -- getting involved in...

1      Q.  Yes, sir.

2      A.  Like, violence or...

3      Q.  Just having to be around this kind of large drug

4  buy.

5      A.  No, ma'am.  I was not.

6      Q.  Why not?

7      A.  Because it wasn't her first rodeo.  It wasn't the

8  first time she'd been around it.

9      Q.  Okay.  So until you became -- were you closely

10  associated with Mr. Baker at this time?

11      A.  We -- yes.

12      Q.  And it would be safe to say you were in his

13  circle of trust at the time this photograph was taken,

14  correct?

15      A.  Yes.

16      Q.  So on October 30th, 2020, you were close enough

17  to Baker that you essentially had vowed to lay your own

18  life down for him if necessary, correct?

19      A.  That was part of my -- yes.

20      Q.  And I heard you say that the -- and I'm just

21  gonna call it -- if I say "the company line," you know,

22  the -- do you know what I mean?  Sort of the -- what am

23  I trying to say?  The -- what the message was, the

24  talking point for the Pagans was that "We are not in the

25  business of meth distribution."  Correct?

1      A.  That is correct.

2      Q.  And so when you got close to Mr. Baker, you found

3  out he was very much in the business of meth

4  distribution, did you not?

5      A.  Sure did.

6      Q.  And that was --

7      A.  Yes, ma'am.

8      Q.  I'm sorry.  And that was not -- that was not

9  something that you expected when you agreed to be a

10 Sergeant at Arms, was it?

11     A.  Now, walk back.  Can you rephrase the question

12 because it's kind of a trick question.

13     Q.  Yes, I can.  Thank you.  When you got -- when you

14 first were getting close to Baker...

15     A.  Mm-hmm.

16     Q.  You were not doing so because you wanted to help

17 him sell meth.

18     A.  No --

19     Q.  Correct?

20     A.  I hadn't -- I had not been using or anything, no.

21     Q.  You had no intention to become part of a drug

22 trafficking organization, did you?

23     A.  No.  It was an honor to be a POP or a 13's

24 Diamond.

25     Q.  And likewise, it was an honor to be his Sergeant

1    of Arms, correct?

2        A.  Yes.  I took it very seriously, yes.

3        Q.  But you found it less honorable when you found

4    out he was distributing drugs on a large scale, correct?

5        A.  No, ma'am, I cannot say that because I did not --

6    I was not there for the drugs.  I was there strictly for

7    him.  So I took no less honor in protecting him as he --

8    no matter what he was doing because my sole purpose was

9    him and him alone.

10       Q.  Because that was part of the ethos of the club

11   that you had agreed to join, correct?

12       A.  Yes, ma'am.

13       Q.  Now, you mentioned that essentially the meth use

14   was widespread at this time, correct?

15       A.  Yes.

16       Q.  But Mr. Baker was not broadcasting to everyone

17   that he was dealing in ounce amounts of meth, was he?

18       A.  No, he was not.

19       Q.  So that kind of information is kept very close to

20   the vest, is it not?

21       A.  Yes, it is.

22       Q.  And outside of the inner circle, that is not to

23   be spoken of.  Am I correct?

24       A.  Yes, ma'am.

25       Q.  So if you were not in Mr. Baker's circle of trust

```
 1    at the time of this photograph we're looking at, you
 2    would not be welcome to that information, correct?
 3        A.   That's right.  You would not be in the RV.
 4        Q.   And if you were not in the RV, you were not to
 5    know what happened in the RV, correct?
 6        A.   Exactly.
 7        Q.   Do you know an individual named Joshua Presley?
 8    Or Dozier?
 9        A.   Yes, I do.
10        Q.   And how do you know Joshua Presley, or Dozier?
11        A.   I've spent many times with him.
12        Q.   In the RV, correct?
13        A.   In and out of, yes.
14        Q.   And so during the time that this photograph was
15    taken, Mr. Presley is in the RV, correct?
16        A.   At this particular moment?
17        Q.   No, sir.  During this time frame, if you recall.
18        A.   To my recollection, he's still -- I believe he's
19    still in the time frame.
20        Q.   And did Mr. Presley carry a firearm?
21        A.   I cannot recall.
22        Q.   And you never went on the trips to Georgia in the
23    RV, correct?
24        A.   No, ma'am.  I wanted no part of that.  I had a
25    job.  I worked during the week.
```

1    Q.  And when you were initially interviewed by law

2    enforcement on your arrest, you said that you did know

3    who Jabber was, correct?

4    A.  Yes, I do.

5    Q.  And are y'all from the same hometown or same home

6    area?

7    A.  Yes, ma'am, we are.

8    Q.  So did you know him before the association with

9    the Pagans?

10   A.  No, ma'am, I did not.  I did not find out until

11   we met and discussed it.

12   Q.  At some kind of a meeting, or something?

13   A.  Yes.  It was Raleigh.

14   Q.  In Raleigh.

15   A.  Yes.

16   Q.  Is that correct?  Okay.  Was it a meeting in

17   Raleigh?  Is that where you discussed it?

18   A.  It was a party, big party we had in Raleigh.

19   Q.  Okay.  And at that time, I think in the -- that

20   would have been sometime in 2020, correct?

21   A.  Yes.

22   Q.  And at that time, do you know whether Mr. Holcomb

23   was prospecting?

24   A.  To my recollection, he just had patched in, to my

25   recollection.  He was just freshly a Pagan, if I

1    remember correctly.  I was still prospecting at the

2    time.

3         Q.  You were still prospecting then.

4         A.  Yes, ma'am.

5         Q.  And explain -- there is a division of the Pagans

6    that operates west of I-95.  Is that correct?

7         A.  Yes, ma'am.

8         Q.  And there is a division or a separate group that

9    operates east of 95.  Correct?

10        A.  Hindsight, yes.  It's -- before Baker, everybody

11   operated under one.  After Baker became POP, Baker had

12   west of 95, Dad had east of 95.

13        Q.  And so --

14        A.  That's where the separation comes in on, the --

15        Q.  So after --

16        A.  -- west and east.

17        Q.  After -- I'm sorry.  I didn't mean to interrupt

18   you.

19        A.  I'm sorry for interrupting you.

20        Q.  No, you're not.  It's my job to not interrupt

21   you.  I apologize.

22             So after Mr. Baker rises to POP, then there's a

23   split within the North Carolina club.  Is that right?

24        A.  Yes, ma'am.

25        Q.  And that is specifically because east of 95 did

1    not approve of what Mr. Baker was doing, correct?

2        A.  I could not answer that question.

3        Q.  You had no conversations with other individuals

4    about why the split happened between east of 95 and west

5    of 95?

6        A.  I have, but that was not part of the

7    conversation.  That was never mentioned, that he got

8    this side because they didn't agree with what he was

9    doing.

10       Q.  But if you were west of 95, you would take

11   direction from Mr. Baker.

12       A.  Yes.

13       Q.  Correct?  And if you were east of 95, you would

14   not take direction from Mr. Baker, correct?

15       A.  Dad was your 13 east of -- yes.

16       Q.  Okay.  So someone other than Mr. Baker, correct?

17       A.  Yes.

18       Q.  Who you're referring to as Dad.  And you

19   testified that Mr. Holcomb did not take direction from

20   Mr. Baker that you are aware of?

21       A.  No.  He was -- he was east of 95.

22       Q.  And when you were talking about meth use in the

23   Pagans...

24       A.  Yes.

25       Q.  You said that essentially people usually had it

1   -- a lot of people had it on them, correct?

2   A.  Yes, ma'am.

3   Q.  And that was for their personal use, correct?

4   A.  Yes, ma'am.

5   Q.  You were not witnessing large-scale drug dealing

6   by your fellow brothers, correct?

7   A.  That is correct.  The only one, yes.

8   Q.  The only one you're witnessing doing large-scale

9   drug dealing is this gentleman, Mr. Baker, correct?

10   A.  Yes, ma'am.

11   Q.  So you said that, you know, it wouldn't be

12   unusual for one of your fellow Pagans to have a user

13   amount in his pocket, right?

14   A.  Correct.  Yes.

15   Q.  And to potentially pull it out and share it with

16   someone else at a party or at a meeting, correct?

17   A.  Correct.

18   Q.  But not to distribute or sell it, correct?

19   A.  Correct.

20   Q.  It was just sharing it.

21   A.  Yes.

22   Q.  As a fellow user, correct?

23   A.  Yes.

24   Q.  And so you mentioned that at some point you saw

25   Landon Holcomb in possession of methamphetamine, right?

1    A.   Yes.

2    Q.   And that this was a user amount, right?

3    A.   Yes.

4    Q.   Not some big amount, correct?

5    A.   No.  He -- I never seen him with big amounts.

6    Q.   Just enough to hold in your hand, right?

7    A.   Yes.

8    Q.   And keep discreetly in your pocket.

9    A.   Yes.

10   Q.   Right?  And you said he was using meth, correct?

11   A.   Yes, because me and him used together.

12   Q.   And just as those user amounts, right?

13   A.   Yes.

14   Q.   Was he addicted?

15   A.   I mean, I couldn't tell you that because I wasn't

16   around him, like, all the time.  But every time we were

17   together, we -- we enjoyed.

18   Q.   Were you addicted at that time, Mr. Roberson?

19   A.   Yes, I was.

20   Q.   But just so I'm clear, you never saw him get

21   money or anything else from anyone for drugs, correct?

22   A.   No, ma'am, I have never seen him.

23   Q.   And you did not talk a lot about Landon when you

24   were first interviewed by law enforcement, right?

25   A.   Because my interactions with him wasn't -- just

1  see him here and there.

2      Q.  But you understood at that interview that you

3  were expected to tell them everything that you knew that

4  was about crime, right?

5      A.  Yes, ma'am.

6      Q.  And you didn't describe it because what you saw

7  Landon do was just use user amounts of meth, right?

8      A.  When they asked me, I told them the truth.  I

9  didn't go into detail in everything I seen.  I mean,

10  that'd take a while.

11      Q.  Because they didn't ask you about every person

12  within --

13      A.  No.

14      Q.  -- the Pagans you saw using meth, right?

15      A.  That's right.

16      Q.  So it was just in -- sort of as we got closer to

17  this trial that you were asked specifically about Landon

18  Holcomb and his use of meth.  Am I correct?

19      A.  Yes.  I was asked prior to this if I knew -- knew

20  him.

21      Q.  And if you knew and had ever seen him with meth,

22  correct?

23      A.  Yes.

24      Q.  But when you were describing this whole big crime

25  that you've testified Mr. Baker was doing when you were

1  first interviewed...

2      A.  Yes.

3      Q.  You remember that.

4      A.  Yes, ma'am.

5      Q.  Landon's involvement was not important enough to

6  you to mention at that time, correct?

7      A.  Correct.

8              MS. SALMON:  I have no further questions,

9  Your Honor.

10             THE COURT:  Redirect, counsel.

11             MR. DODSON:  Thank you, Your Honor.

12                   REDIRECT EXAMINATION

13 BY MR. DODSON:

14     Q.  Mr. Roberson, I want to take you back to the RV.

15 We're still at Government Exhibit 56 still on the

16 screen.

17         You testified your job was to provide security

18 and protection for Mr. Baker, correct?

19     A.  Yes, sir.

20     Q.  And that could be if he was doing any task, like

21 going out to eat, you'd provide protection, correct?

22     A.  Yes.

23     Q.  But you also provided protection for drug deals,

24 correct?

25     A.  Anywhere that he was located, anything he was

1    doing, I was there to protect Mr. Baker.  Yes.

2        Q.   And that includes drug deals.

3        A.   That includes drug deals.

4        Q.   All right.  And this incident in the RV, when the

5    African American gentleman came into the RV, were you

6    suspicious of him in any way?

7        A.   Yes.

8        Q.   Why were you suspicious of him?

9        A.   Talked too much.

10       Q.   He talked too much?

11       A.   Way too much.  He built himself up way too much.

12   He talked about things that...

13       Q.   And when he came into the RV, were you sort of

14   zeroed in on him from the get-go?

15       A.   I kept a eye on him, yes.

16       Q.   And that's because you were protecting Baker,

17   correct?

18       A.   Yes.  If I may.

19       Q.   Sure.

20       A.   If you notice in the picture, Baker is sitting

21   behind a table.  He is limited to what he can do to

22   protect himself.  At that time, he's more vulnerable for

23   attack.  That's why I'm sitting to the left of him with

24   nothing in between me and him, where I have free -- I

25   can get to Mr. Baker within two seconds.

1    Q.  And why would Mr. Baker need protection during a

2  drug deal?  Why didn't you say, "Oh, this is a drug

3  deal, I'll just step outside"?  Why would he need

4  protection during a drug deal?

5    A.  Because he's a POP.  And we are taught, as you

6  come through prospecting, his life is more important

7  than ours.

8    Q.  And would you be concerned with his life while he

9  was conducting a drug deal?

10   A.  Yes.  I was concerned with his life walking

11 through a convenience store.  I was concerned with his

12 life eating.

13   Q.  Do you remember the African American gentleman

14 smoking methamphetamine also?

15   A.  Yes, he did.

16   Q.  You remember Mr. Baker offering that gentleman

17 methamphetamine?

18   A.  He just -- yes.  He just held the thing up and

19 the guy took it.

20   Q.  Had you witnessed that during other drug deals,

21 that methamphetamine would be used during drug deals?

22   A.  Yes.

23   Q.  Would it be strange to you if someone came to

24 purchase methamphetamine and Baker offered them meth and

25 they refused?

1    A.  Very strange.  I've never seen it before and I --

2    my honest opinion, and it's only my honest opinion, if

3    that was to ever happen, I don't think the deal would

4    have went through because it would have shown -- shown

5    us that.

6    Q.  You don't think the deal would have gone through?

7    A.  Yeah, I think -- I think that would have been a

8    red flag for us or for Mr. Baker, you know, somebody

9    that's not willing to do, you know, do something to show

10   you're not law enforcement.

11   Q.  And when you saw the African American gentleman

12   smoke methamphetamine, did that put you at ease at all?

13   A.  No, sir, it did not.

14   Q.  You were still suspicious --

15   A.  Yes.

16   Q.  -- of him.  Okay.

17   A.  Because he talked too much.

18   Q.  Okay.  You can take 56 down, please.  Thank you.

19   I want to kind of shift gears a little bit.  You said

20   something on your cross-examination when you were

21   talking about the club rules for selling or distributing

22   drugs.  You were asked if that was generally against the

23   club rules, correct?

24   A.  Yes, it is.

25   Q.  And you said something, and I don't want to put

words in your mouth, but what I remember you saying is there's a loophole.  There is a loophole for that.

A.  Yes, there is.

Q.  What did you mean by that?

A.  If you notice in the pictures, he's selling in the club shirt.  He is not selling in what we call our cut.  We don't disgrace or dishonor our cuts for any reasons.  And he never made a sell in my presence in his cuts.

Q.  Okay.  And so sort of the loophole for that is you take the cut off...

A.  He's not representing -- yes.

Q.  While you're selling or distributing methamphetamine.  But it is acceptable to wear the shirt that still has the Pagan emblems and things on it.  Is that right?

A.  Yes, sir, because anybody -- I mean, you can find them anywhere online.

Q.  Okay.

A.  It's not as sacred as the cut.

Q.  All right.  You made a point about not going down to Georgia with Mr. Baker to get methamphetamine, correct?

A.  Yes.

Q.  Did he ever ask you to go down to Georgia?

1    A.   Yes.

2    Q.   Did you tell him "no"?

3    A.   Every time, yes.

4    Q.   And why did you do that?

5    A.   Different reasons at different times, work;

6    mainly because my girlfriend at the time didn't want no

7    part of that.

8    Q.   Okay.  So you had a certain amount of free will

9    during some of these interactions, correct?

10    A.   Only when work was involved.  Job comes before.

11    Q.   Okay.  So you could use your job as the reason

12    for telling Mr. Baker you didn't want to go with him

13    down to Georgia?

14    A.   Yes.  That was another loophole.  Yes.

15    Q.   Okay.  And that was acceptable.

16    A.   Yes.

17    Q.   Okay.  I want to jump to this difference between

18    east of 95 and west of 95.  Are those clubs or chapters

19    on islands by themselves and they don't talk?

20    A.   No.

21    Q.   Do they communicate with each other?

22    A.   Yes.

23    Q.   And they plan with each other?

24    A.   Yes.

25    Q.   And they have meetings with each other?

1     A.   Yes.

2     Q.   And they visit clubhouses together?

3     A.   Yes.

4     Q.   And we heard that Baker sort of became POP or the

5   leader over the western part of North Carolina.

6     A.   Yes.

7     Q.   And a man named Dad, D-A-D, was over sort of

8   eastern North Carolina, correct?

9     A.   Yes.

10    Q.   Did Baker sort of take direction from Dad or were

11  they sort of equals?

12    A.   That I cannot answer honestly because I was not

13  around during their meetings.  The way that I was

14  explained to while he was POP was he was 13 in training,

15  and when he became 13, I was explained that he was

16  equal.

17    Q.   That he was what?

18    A.   Equal.

19    Q.   Equal to Dad.

20    A.   Yes.

21    Q.   So there's a time, maybe, that Dad was his mentor

22  of sorts?

23    A.   Yes.

24    Q.   But the point is they still worked together, they

25  weren't separate entities.

```
 1      A.   No.

 2      Q.   I want to take you briefly back to Mr. Holcomb,

 3 and I want to make sure it's clear about this individual

 4 named Egg Roll.

 5      A.   Yes.

 6      Q.   Egg Roll is a nickname for someone, correct?

 7      A.   Yes, sir.

 8      Q.   Is Egg Roll a member of the Pagans?

 9      A.   Yes, sir.

10      Q.   And Egg Roll, did he have a position of

11 leadership in the Pagans?

12      A.   Not at this time, no.

13      Q.   Okay.  But if he asked prospects to do things,

14 they would do it on his behalf?

15      A.   Yes, sir.

16      Q.   Or even just as one brother asking another

17 brother to do something for him?

18      A.   No, sir.  He had a little more than that.  He had

19 a lot more respect than most.

20      Q.   So the members respected and the prospects

21 respected Egg Roll.

22      A.   Yes.

23      Q.   And so if Egg Roll were to ask Landon Holcomb to

24 transport methamphetamine, he would be expected to do

25 that.
```

```
 1      A.   You said "expected to do that"?

 2      Q.   Mm-hmm.

 3      A.   Now, that one's a hard question to answer because

 4   I wouldn't know what their thinking was.  But I would

 5   imagine he would do it out of respect.

 6      Q.   He would do it out of respect.  Okay.

 7      A.   I can't say that he's expected to or -- I mean,

 8   because he has a right to say...

 9      Q.   Yeah.  And just to be clear, you've witnessed or

10   either you have been told by others in the club that

11   Landon would transport drugs for Egg Roll at some times.

12                MS. SALMON:  Objection.

13                THE COURT:  Basis.

14                MS. SALMON:  I think there's a hearsay

15   problem that's not inside the co-conspirator's

16   exception.

17                THE COURT:  Based on the testimony that's

18   come in, it would be a statement that was made during in

19   furtherance of the conspiracy.  This individual is

20   operating as Sergeant of Arms at the time.

21                MR. DODSON:  You can answer the question.

22                THE WITNESS:  Repeat, please.

23   BY MR. DODSON:

24      Q.   Sure.  Did you yourself personally witness

25   Mr. Holcomb bring drugs or take drugs somewhere on
```

1  behalf of Egg Roll?

2      A.  I witnessed him picking drugs up and said that he

3  would take it back.

4      Q.  Taking it back to who?

5      A.  Egg Roll.

6      Q.  Okay.  And, now, we're not talking about, like,

7  large kilogram amounts, correct?

8      A.  We are not.

9      Q.  But it's not just user amounts, correct?  I mean

10  it's -- could it be more than just one user?  Like one

11  hit, methamphetamine?

12      A.  We're talking just a couple grams going back, you

13  know, sharing between brothers, parties, you know, just

14  get you through the week or...

15      Q.  Mm-hmm.  How many times -- did you see that often

16  or not so often?

17      A.  No.  I only seen it once.

18              MR. DODSON:  Okay.  All right.  Thank you,

19  Mr. Roberson.  I have nothing further, Your Honor.

20              MR. CHETSON:  Just very briefly, Your Honor.

21              THE COURT:  As long as it's within the

22  scope.

23              MR. CHETSON:  Yes, Your Honor.

24                      RECROSS EXAMINATION

25  BY MR. CHETSON:

1    Q.  Dad you've referred to, that's a gentleman named

2    John Schwartz.  Is that correct?

3    A.  I could not tell you that because I have no idea

4    his real name.

5    Q.  Okay.  You said at some point that Mr. Baker

6    became a 13 and became equal to this gentleman named

7    Dad.

8    A.  Yes.  Under my understanding, yes.

9    Q.  That was your understanding --

10   A.  Yes.

11   Q.  -- of the way it worked.

12   A.  Yes.

13   Q.  When did you find out that Mr. Baker had become a

14   13?

15   A.  He became 13 December of 2020.

16   Q.  December of 2020.

17   A.  Yes.

18   Q.  And did you understand that he had been removed

19   as a 13 in June of 2021?  June or July of 2021?

20   A.  I was not with him at the time.  I had done

21   stepped down from Sergeant of Arms, so I only heard a

22   rumor.

23   Q.  And who did you hear the rumor from?

24   A.  I mean, it just -- just a rumor that just shot

25   around the club, I mean -- you know.

1    Q.  And when you say a rumor shooting around the

2    club, there are a lot of rumors shooting around the

3    club.

4    A.  Yes.

5    Q.  There's a lot of talk in the club.

6    A.  Yes, sir.

7    Q.  Mr. Joyner -- I'll just let you know that we

8    already know that the person, that African American

9    gentleman that came into the RV is a gentleman named

10   Rudolph Joyner.

11   A.  Yes.

12   Q.  Just to be clear for the record.  You saw him at

13   some point smoke meth, is that correct?

14   A.  Yes, sir, I did.

15   Q.  When he smoked the meth, he didn't cough.  Is

16   that correct?  He had no problem smoking the meth.

17           MR. DODSON:  Objection.

18           THE WITNESS:  I cannot recall that.  I can't

19   recall that.

20           THE COURT:  He can answer to the extent he

21   observed.  You can answer if you know.

22           THE WITNESS:  I cannot recall if he -- I

23   mean, that's a little bit -- yeah, I can't --

24           MR. CHETSON:  Fair enough.

25   BY MR. CHETSON:

```
 1     Q.  Smoked the meth and then he -- after talking some
 2   more, he left, correct?
 3     A.  Yes.
 4             MR. CHETSON:  No further questions.  Thank
 5   you, Your Honor.
 6             THE COURT:  Thank you, sir.  You can step
 7   down.
 8             MR. CHETSON:  I don't know if Ms. Salmon...
 9             MS. SALMON:  Oh.  I'm sorry.  No, Your
10   Honor.  I don't have any further questions for you,
11   Mr. Roberson.  Thank you.
12             THE WITNESS:  Thank you.
13             MR. DODSON:  Your Honor, may Mr. Roberson be
14   released from his subpoena?
15             THE COURT:  You're released from your
16   subpoena, sir.  Thank you.
17             THE WITNESS:  Thank you.
18             THE COURT:  The United States may call its
19   next witness.
20             MR. DODSON:  The United States calls Joshua
21   Presley.
22             THE CLERK:  You can come right over here,
23   and just watch your step right there.
24             Raise your right hand, left hand on the
25   Bible, and please state your name for the record.
```

```
 1                THE WITNESS:  Joshua Presley.
 2                (The witness is placed under oath.)
 3                THE CLERK:  You may have a seat.
 4                     DIRECT EXAMINATION
 5   BY MR. DODSON:
 6      Q.  Good morning, Mr. Presley.
 7      A.  Good morning.
 8      Q.  Can you introduce yourself to the jury.
 9      A.  I'm Joshua Presley.
10      Q.  How old are you, sir?
11      A.  24 years old.
12      Q.  Do you work right now?
13      A.  Yes, sir.
14      Q.  What kind of work are you doing?
15      A.  I do quality control for a plant that makes truck
16   parts.
17      Q.  Mr. Presley, were you charged in connection with
18   this case?
19      A.  Yes, sir.
20      Q.  And you've pled guilty to conspiracy to
21   distribute and possess with intent to distribute 50
22   grams or more of methamphetamine, is that correct?
23      A.  Yes, sir.
24      Q.  And you've pled guilty to distributing 5 grams or
25   more of methamphetamine.  Is that correct?
```

1    A.  Yes, sir.

2    Q.  Did you do all of that?

3    A.  Yes, sir.

4    Q.  Did you enter into a written plea agreement with

5    the government?

6    A.  Yes, sir.

7    Q.  I'm gonna show you on the screen in front of you

8    what's been marked as Government's Exhibit 124, and

9    we'll flip through the pages for you.  Do you recognize

10   what's been shown to you as Government's Exhibit 124?

11   A.  Yes, sir.

12   Q.  What is it?

13   A.  My plea agreement.

14   Q.  And is that your signature on the last page of

15   your plea agreement?

16   A.  Yes, sir.

17   Q.  And has the government made you any promises that

18   are not contained within this written plea agreement?

19   A.  No, sir.

20         MR. DODSON:  Your Honor, we move to admit

21   Government's Exhibit 124 into evidence.

22         THE COURT:  It's admitted without objection.

23   BY MR. DODSON:

24   Q.  And, Mr. Presley, you see at the top it says

25   "Memorandum of Plea Agreement," correct?

1    A.  Yes, sir.

2    Q.  Has your name, Joshua Presley; "United States of

3  America versus Joshua Presley."

4    A.  Yes, sir.

5    Q.  And if we could flip a couple of pages to the

6  signature page, please.  And that's your signature on

7  page 8 of Government's Exhibit 124?  Is that your

8  signature there?

9    A.  Yes, sir.

10    Q.  And if we go to the -- and this is your plea

11  agreement that contains all the information about the

12  charges you're pleading guilty to, correct?

13    A.  Yes, sir.

14    Q.  And moving to Government's Exhibit 124, page 9.

15  This, you see it says sealed supplement to your plea

16  agreement?

17    A.  Yes, sir.

18    Q.  And is your understanding this section contains

19  all the information about your cooperation?

20    A.  Yes, sir.

21    Q.  Thank you, Mr. Presley.

22        Mr. Presley, what are you required to do under

23  the plea agreement?

24    A.  Testify and tell the truth.

25    Q.  And you testified earlier that no other promises

```
 1    have been made to you other than what's in your plea
 2    agreement, correct?
 3         A.   Yes, sir.
 4         Q.   And are you hoping to get some credit off your
 5    sentence for your testimony here today?
 6         A.   Yes, sir.
 7         Q.   Has the government promised you any particular
 8    sentence you might receive?
 9         A.   No, sir.
10         Q.   Who is it that determines what your sentence is
11    gonna be?
12         A.   The judge.
13         Q.   I want to ask you, Mr. Presley, if you know the
14    defendant, Christopher Lamar Baker.
15         A.   Yes, sir.
16         Q.   How do you know Mr. Baker?
17         A.   We met through the same club that we were in,
18    same motorcycle club.
19         Q.   And what club would that be?
20         A.   Pagans Motorcycle Club.
21         Q.   When did you start becoming involved with the
22    Pagans?  Do you remember?
23         A.   August 2020.
24         Q.   And did you have to prospect when you first came
25    around the club?
```

1    A.   No, sir.

2    Q.   Okay.  You became a member outright?

3    A.   Yes, sir.

4    Q.   And did you meet Mr. Baker after you became a

5    member?

6    A.   Yes, sir.

7    Q.   How did you meet him?

8    A.   So he had let someone borrow a car in South

9    Carolina, which had another clubhouse.  He needed the

10   car back, so I agreed to return the car to him, and

11   that's where we -- that's how we met.

12   Q.   Okay.  And did you know if Christopher Baker was

13   a member of the Pagans at that time?

14   A.   Yes, sir.

15   Q.   Did he hold any position of leadership in the

16   Pagans?

17   A.   Yes.

18   Q.   What position?

19   A.   POP.

20   Q.   What does that mean?

21   A.   President of Presidents.

22   Q.   Do you know what it means to be a POP?

23   A.   That means that you're in control of all of the

24   other local chapter presidents and whatnot.

25   Q.   How often were you around Mr. Baker?

1    A.  Fairly often.  At events we would see each other

2  and -- yeah.  At events we would see each other and

3  stuff.

4    Q.  At some point, did you advance to another

5  position in the Pagans?

6    A.  Yes, sir.

7    Q.  What position was that?

8    A.  Sergeant at Arms.

9    Q.  What does it mean to be a Sergeant in Arms?

10   A.  You run protection and security for Christopher

11  Baker.

12   Q.  And so when you became the Sergeant at Arms, was

13  he your POP?

14   A.  Yes, sir.

15   Q.  So how often were you around him?

16   A.  Weekly.

17   Q.  Weekly?

18   A.  Yes, sir.

19   Q.  And what would you do when you were around him?

20   A.  We would go out of town and pick up drugs, and

21  then we would come back and I would still stick around

22  and -- for, like, events and things like that.

23   Q.  And what time period are we talking about, do you

24  recall, by month and year?

25   A.  I believe it was November of -- I can't recall

1   the year.

2      Q.  All right.  And you said you would travel with

3   Mr. Baker to go out of town to pick up drugs?

4      A.  Yes, sir.

5      Q.  Can you tell the jury about that?

6      A.  So we would go out of town down to Georgia to a

7   hotel or wherever else we needed to go.  We would pick

8   up the drugs and we would come back.

9      Q.  How would you travel down to Georgia?

10     A.  In an RV.

11     Q.  Who would be present other than you and Mr.

12  Baker?

13     A.  Occasionally a member named Brian Lopez.

14     Q.  And why would Brian Lopez come on these trips?

15     A.  Because he was also a sergeant.

16     Q.  He was also a Sergeant at Arms?

17     A.  Yes, sir.

18     Q.  And you knew Brian Lopez through the club?

19     A.  Yes, sir.

20     Q.  How many times did you make these trips down to

21  Georgia?

22     A.  Me personally, at least four times, but over

23  the -- over the course of a month.

24     Q.  So over the course of a month, you went down four

25  times?

1    A.  Yes, sir.

2    Q.  And when you went down to Georgia, where did you

3  go?

4    A.  To a hotel to meet with the guy.

5    Q.  Do you know who, what guy you -- do you know who

6  you were meeting with?

7    A.  No, sir.

8    Q.  Do you know what he -- remember what he looked

9  like?

10    A.  No, sir.

11    Q.  And describe to the jury what would happen.  So

12  y'all would pull up in this RV to this hotel, and then

13  describe to the jury what you saw.

14    A.  He would get out, he would go in, he would handle

15  his business, and then he would come back and then we

16  would leave.

17    Q.  When you say "he," are you talking about

18  Mr. Baker?

19    A.  Yes, sir.

20    Q.  Did he go into the hotel just sort of

21  empty-handed, walk in?

22    A.  Yes, sir.

23    Q.  Did he carry anything with him?

24    A.  Not that I recall; no, sir.

25    Q.  All right.  And when he went into the hotel, did

1    you go into the hotel room with him?

2        A.   No, sir.

3        Q.   You stayed outside.

4        A.   Yes, sir.

5        Q.   And when he came out, what did he have?

6        A.   Methamphetamine.

7        Q.   How much methamphetamine are we talking about?

8        A.   So the big gallon Ziploc bags would be full and

9    then there would be a Wal-Mart bag around that.

10       Q.   You said a gallon Ziploc bag?

11       A.   Yes, sir.

12       Q.   And that would be full.

13       A.   Yes, sir.

14       Q.   Do you know how much that weighed?

15       A.   No, sir.

16       Q.   Did you ever hear Mr. Baker talk about how much

17   methamphetamine he was getting from Georgia on the trips

18   you were with him?

19       A.   A few keys; kilos.

20       Q.   And by kilos, do you mean kilogram?

21       A.   Yes, sir.

22       Q.   And is it your understanding that there's a

23   thousand -- 1,000 grams in one kilogram?

24       A.   Yes, sir.

25       Q.   And so was he getting one kilogram every time you

```
 1    went down to Georgia those four times?
 2        A.   Yes.
 3        Q.   And you went four times about, you said, correct?
 4        A.   Yes, sir.
 5        Q.   And did he get that same amount every time he
 6    went?
 7        A.   Yes; sometimes more, sometimes less.  But as a
 8    rough estimate, I would say yes.
 9        Q.   All right.  Same kind of Ziploc bag, full of
10    methamphetamine?
11        A.   Yes.
12        Q.   What did you and Mr. Baker do after you picked up
13    these -- this methamphetamine from the hotel in Georgia?
14        A.   I don't recall.
15        Q.   Okay.  Did you bring it back anywhere?
16        A.   Yes.
17        Q.   Where?
18        A.   I know one time we actually didn't bring it back.
19    We stopped at a house in Georgia.  However, someone had
20    come down to meet him, a guy named Slim.  And I believe
21    he had given him approximately four ounces of
22    methamphetamine to then sell himself.
23        Q.   And this is Slim you're talking about?
24        A.   Yes, sir.
25        Q.   So Baker gave an amount to Slim, and it's your
```

1    understanding Slim was then gonna sell that amount?

2        A.  Yes, sir.

3        Q.  And the house you went to, the house that you

4    went to in Georgia, do you know whose house that was?

5        A.  I believe it was Devan Christopher's.

6        Q.  All right.

7        A.  Or her mother.

8        Q.  Or her mother?

9        A.  Yes, sir.

10       Q.  Did Baker drop off any drugs to Devan

11   Christopher?

12       A.  I'm not certain.

13       Q.  Okay.  After stopping at the house in Georgia and

14   meeting up with Slim, did y'all return to North

15   Carolina?

16       A.  Yes, sir.

17       Q.  What did Baker do with the drugs after you got

18   back to North Carolina?

19       A.  He would give them to his people, but I'm not

20   sure.

21       Q.  Okay.  And where in North Carolina are we talking

22   about?  Where would y'all go back to?

23       A.  We would come to Raleigh; or Waxhaw, North

24   Carolina, was on one occasion.  And then after that I

25   would go home.

1    Q.   Okay.  Mr. Presley, were you with Chris Baker

2  during -- did you ever see Chris Baker -- other than

3  picking up large amounts of methamphetamine, did you see

4  him sell methamphetamine?

5    A.   Yes, sir.

6    Q.   Were you with Christopher Baker at such a time on

7  November the 6th of 2020?

8    A.   Yes, sir.

9    Q.   Okay.  So after having stated that you were with

10  him when he sold on November the 6th of 2020, would this

11  have been right around the time you went down to Georgia

12  with Baker?

13    A.   Yes, sir.

14    Q.   So you said you couldn't recall the year, but

15  does that help you remember?

16    A.   That does.

17    Q.   What year did you and Baker and Lopez go down to

18  Georgia in the RV?

19    A.   2020.

20    Q.   Okay.  And you said it was November --

21    A.   Yes, sir.

22    Q.   -- earlier, correct?

23    A.   Yes, sir.

24    Q.   So just to be clear, it was November of 2020 you

25  went down to Georgia.

1    A.   Yes, sir.

2    Q.   All right.  Taking your attention back to

3  November 6 of 2020, you testified you were with Baker

4  when he sold drugs, correct?

5    A.   Yes, sir.

6    Q.   And do you recall at some point -- you were

7  arrested at some point in connection with this case, and

8  at that time, do you recall law enforcement showing you

9  a video of that drug deal?

10    A.   Yes, sir.

11    Q.   I want to show you -- I want to show what's been

12  admitted as Government's Exhibit 8, please.  Who is the

13  gentleman in this photograph?

14    A.   That's me.

15    Q.   What are you doing?

16    A.   Making a deal.

17    Q.   Of what?

18    A.   Methamphetamine.

19    Q.   Do you remember how much?

20    A.   55 grams.

21    Q.   Do you recall how much money you received in

22  return?

23    A.   Over a thousand dollars, approximately $1400.

24    Q.   And who did you get the methamphetamine from?

25    A.   Christopher Baker.

1    Q.  And who did you give it to?

2    A.  The guy that he had us go meet.

3    Q.  So you got the meth from Mr. Baker, and you said

4    you gave it to the guy "he had us go meet."  Who had you

5    go meet someone?

6    A.  Christopher Baker.

7    Q.  And how did that happen?  How did you end up

8    doing this drug deal for Mr. Baker?

9    A.  So originally we had went -- Christopher Baker

10   and myself had went to a Burger King in Raleigh to

11   facilitate the transaction.  However, the guy didn't

12   show up, so what we did was we deviated from there

13   because he had a meeting to go to with the club that

14   night.  When we got to a town called Havelock, North

15   Carolina, he had called -- or Christopher Baker, I

16   believe, called a guy named Jabber to come and give me a

17   ride to facilitate this deal.

18   Q.  Who is Jabber, Mr. Presley?

19   A.  Landon Holcomb.

20   Q.  Okay.  And so Mr. Baker called Jabber, or Landon

21   Holcomb, to come and give you a ride for this deal?

22   A.  Yes, sir.

23   Q.  And you're in Havelock, correct?

24   A.  Yes, sir.

25   Q.  And where is Havelock, North Carolina?

1     A.  Near the coast.

2     Q.  Okay.  How far is that from Raleigh?

3     A.  About a hour and a half.

4     Q.  And so Baker asked you to take the

5 methamphetamine -- you had it with you in Havelock?

6     A.  Yes, sir.

7     Q.  And you need to get it to Raleigh.

8     A.  Yes, sir.

9     Q.  Did you have a vehicle to get there?

10    A.  I did not.

11    Q.  And so Landon Holcomb shows up to give you a

12 ride?

13    A.  Yes, sir.

14    Q.  And is Baker still there at that time?

15    A.  Yes, sir.

16    Q.  And what happened?  So you and Baker and Landon

17 Holcomb are in Havelock, and what happened?

18    A.  So he'd asked us to go facilitate this deal.

19 Then I remember him handing Landon Holcomb a dollar bill

20 with some methamphetamine in it, for what I assume is a

21 payment to go take me there.

22        So then we leave there and that's when we headed

23 to the Burger King.

24    Q.  How did Mr. Baker give you the methamphetamine?

25 Was it just in a clear bag?  Was it in a grocery bag?

1   What was it in?

2       A.   It was in a cigarette pack.

3       Q.   Was that cigarette pack -- can you describe the

4   cigarette pack?  Was it sealed up?

5       A.   No.  It was opened.

6       Q.   And the top was open?  It wasn't taped up or

7   sealed up?

8       A.   No.  It was like an open pack of cigarettes.

9       Q.   Okay.  And the methamphetamine was put down in

10  that cigarette pack?

11      A.   Yes.  Yes.

12      Q.   And you testified that you believed it was over

13  60 grams of methamphetamine is what you -- is what you

14  believed it to be, correct?

15      A.   Yes.

16      Q.   And so 60 grams is in this -- what you think is

17  60 grams is in this cigarette pack that's open, and you

18  -- and then Baker gives it to you all and then you get

19  in Landon Holcomb's car?

20      A.   Yes.

21      Q.   And then what happens?

22      A.   We head for Burger King.  When we arrive, we did

23  not have the right car.  We had found, like, the wrong

24  car.  So we circled the parking lot a few times until we

25  did -- and eventually we called Christopher Baker.  Then

```
 1   Christopher Baker called the guy that we were going to
 2   facilitate the deal with, and then we -- he called us
 3   back.  We met up with him, and then that's when this
 4   video was taken.
 5      Q.  Okay.  So Landon Holcomb drives you an hour and a
 6   half from Havelock to Raleigh.
 7      A.  Mm-hmm.
 8      Q.  With this open cigarette pack with the meth in
 9   it.  And where is the cigarette pack with the meth in it
10   as y'all are traveling from Havelock to Raleigh?
11      A.  I don't -- I don't remember.
12      Q.  All right.  And so once you -- you testified you
13   had some trouble finding the person you were supposed to
14   meet.
15      A.  Yes, sir.
16      Q.  You eventually found that person?
17      A.  Yes, sir.
18      Q.  Okay.  And then what happened?
19      A.  I had gotten out of the car and into the car with
20   him.  I handed him the cigarette pack and then he handed
21   me the money.
22      Q.  What'd he look like?
23      A.  He was a African American male with dreads.
24      Q.  Okay.  Big guy or small guy?
25      A.  Medium size guy.
```

1      Q.  Okay.  What did you do after you got the money?

2      A.  I handed it to Landon Holcomb.

3      Q.  You handed Landon the money you got from the

4   person you met to sell the meth?

5      A.  Yes.

6      Q.  And then what happened?

7      A.  We headed back.

8      Q.  Back where?

9      A.  To Havelock.

10      Q.  And when you got back to Havelock, what happened

11   with the money?

12      A.  I'm not sure.  I believe Landon would have handed

13   it over to Christopher Baker.

14      Q.  You weren't going -- you weren't traveling the

15   hour and a half from Havelock to Raleigh to sell someone

16   a pack of cigarettes, were you?

17      A.  Absolutely not.

18      Q.  And you wouldn't have gotten a thousand dollars

19   from someone selling a pack of cigarettes, would you?

20      A.  No.

21      Q.  Mr. Presley, you were arrested in connection with

22   this case back in April of this year, is that right?

23      A.  Yes, sir.

24      Q.  And you met with detectives from the Raleigh

25   Police Department at that time?

1    A.  Yes, sir.

2    Q.  And you waived your right to remain silent and

3 agreed to give a statement?

4    A.  Yes, sir.

5    Q.  Do you remember in that statement being asked

6 about this November 6, 2020, deal that we just talked

7 about?

8    A.  Yes, sir.

9    Q.  Did you deny to the detectives being involved in

10 this deal?

11    A.  Yes, sir.

12    Q.  And did they -- did they show you this video?

13    A.  Yes.

14    Q.  And then did you then admit your involvement in

15 this deal?

16    A.  I admitted that it was me in the video.  However,

17 I didn't admit my involvement because of my fear that

18 there would be repercussions, that I would get killed by

19 Christopher Baker, because he's a dangerous man and he

20 was known to carry a gun.

21    Q.  And is that why you did not tell detectives with

22 Raleigh PD that you were selling methamphetamine on

23 behalf of Christopher Baker for this deal?

24    A.  Yes.

25    Q.  Do you remember being asked if Landon Holcomb was

1    involved in this deal?

2        A.   Yes.

3        Q.   Did you not tell the full story to detectives

4    about Mr. Holcomb?

5        A.   I didn't.

6        Q.   Why didn't you tell the detectives at that time

7    the full story about Mr. Holcomb?

8        A.   Due to the fear of repercussions from Christopher

9    Baker or the club.

10       Q.   What repercussions?

11       A.   I feared that I would get killed or seriously

12   hurt.

13       Q.   After the drug deal, you testified that the money

14   you got from the African American gentleman in the car,

15   you handed that money to Landon Holcomb, correct?

16       A.   Yes, sir.

17       Q.   Why did you give that money to Landon?

18       A.   Because there was animosity in the club at the

19   time and I didn't want to be responsible in case

20   something was to happen to the money.

21       Q.   And so you didn't want to be responsible for that

22   thousand dollars?

23       A.   Yes, sir.

24       Q.   Okay.  And during the car ride either from

25   Havelock to Raleigh or from Raleigh back to Havelock,

```
 1    did you and Landon have any conversation?
 2        A.  Yes, sir.
 3        Q.  Did you talk about club business or what was
 4    happening in the club?
 5        A.  One thing I can remember was that he told me that
 6    he had gained the respect from a member that we call Dad
 7    because of an incident that had happened where he almost
 8    got hit by a motorcycle, but he sped through the light
 9    to block it.
10        Q.  When you say "he sped through the light" --
11        A.  Landon Holcomb.  I'm sorry.
12        Q.  So he gained the respect from Dad because he sped
13    through a light...
14        A.  Mm-hmm, and was willing to get hit by the car
15    instead of him.
16        Q.  He was willing to get hit by the car instead of
17    Dad?
18        A.  Mm-hmm.
19        Q.  And did Landon end up getting hit by that car?
20        A.  No.
21        Q.  Okay.  But he was just telling you the story,
22    that's how he gained the respect of --
23        A.  Yes, sir.
24             MR. DODSON:  Thank you.  Thank you,
25    Mr. Presley.  Nothing further, Your Honor.
```

1          MR. CHETSON:  No questions, Your Honor.

2     Thank you.

3                    CROSS-EXAMINATION

4     BY MS. SALMON:

5          Q.  Hi, Mr. Presley.  I'm Landon Holcomb's attorney,

6     Elisa Salmon.  I want to talk to you, just to start out

7     with, a little bit about your plea agreement in this

8     case.  Could the government put up the sealed

9     supplement.  I think it's Government 124, please.

10              So you've signed this plea agreement, correct?

11         A.  Yes, ma'am.

12         Q.  And in it, you've agreed to testify truthfully

13    and cooperate with the government in this case, correct?

14         A.  Yes, ma'am.

15         Q.  And in exchange, the government has given you

16    some help, right?

17         A.  Yes, ma'am.

18         Q.  So they have agreed -- one second.  And I'm

19    sorry, I did not want the sealed supplement.  I wanted

20    the -- excuse me -- main plea agreement.

21              So you pled guilty to conspiracy to possess with

22    intent to sell and deliver methamphetamine, correct?

23         A.  Yes, ma'am.

24         Q.  And you're guilty of that, aren't you?

25         A.  Yes, ma'am.

1     Q. And you also agreed that on November 6, the night

2 you've testified about, that you delivered meth to the

3 African American guy in the car, right?

4     A. Yes, ma'am.

5     Q. Were you on meth that night? Had you used that

6 day?

7     A. Yes, ma'am.

8     Q. And also on that day, you were at the end of a

9 multiday trip in the RV with Mr. Baker, correct?

10     A. Yes, ma'am.

11     Q. Where all had you been with Mr. Baker leading up

12 to this on November 6th?

13     A. I don't remember.

14     Q. Had you been to Georgia right before that?

15     A. Yes, ma'am.

16     Q. And maybe you'd been to South Carolina right

17 before that? It's on the way back, right?

18     A. Yes, ma'am.

19     Q. And you made some stops in South Carolina, right?

20     A. I don't remember.

21     Q. Do you remember telling law enforcement that you

22 stopped and gave some user amounts to -- meth to some

23 women and to some other people on the way back on that

24 trip?

25     A. No, ma'am.

1      Q.   Does that sound like something you might have

2  said?  If you remember.

3      A.   I don't remember.

4      Q.   Were you using a lot of methamphetamine at the

5  time in November of 2020?

6      A.   Yes, ma'am.

7      Q.   And meth use was widespread in the motorcycle

8  club, wasn't it?

9      A.   Yes, ma'am.

10     Q.   Before you got involved in the motorcycle club,

11 you were just kind of working a normal job in Grover,

12 North Carolina, right?

13     A.   Yes, ma'am.

14     Q.   You were riding motorcycles, right?

15     A.   Mm-hmm.

16     Q.   Is that a "yes"?

17     A.   Yes, ma'am.  I'm sorry.

18     Q.   No, that's okay.  It's just for purposes of the

19 record, we have to say our things out loud, so I'll just

20 remind you.

21          And you were in a different motorcycle club,

22 correct?

23     A.   Yes, ma'am.

24     Q.   And then you met Christopher Baker, as you

25 described, in South Carolina, right?  You met

1    Christopher Baker?

2        A.   Sorry --

3        Q.   You met Christopher --

4        A.   I didn't meet him in South Carolina, no.  I was

5    just returning a car that was down there.

6        Q.   Okay.  So you met him in North Carolina, correct?

7        A.   Yes, ma'am.

8        Q.   Was that in your hometown or at a motorcycle

9    clubhouse?

10       A.   I'm sorry.  Can you rephrase that question?  I'm

11   sorry.

12       Q.   Do you remember where exactly you met him?

13       A.   Yeah.  We met -- when I dropped the car off, I

14   met him in Hickory, North Carolina.

15       Q.   Was that at the Pagan's clubhouse in Hickory?

16       A.   No, ma'am.

17       Q.   Where was it?

18       A.   It was at a guy named Slim's house.

19       Q.   Okay.  And you were with a different motorcycle

20   club at that time, is that right?

21       A.   No, ma'am.

22       Q.   Were you previously in a motorcycle club?

23       A.   Yes, ma'am.

24       Q.   Which motorcycle club were you in?

25       A.   Kinfolk MC.

1    Q.  The Kinfolk Motorcycle Club.

2    A.  Yes, ma'am.

3    Q.  Okay.  And so explain to me how you patched over

4  from Kinfolk to Pagans.

5    A.  We just paid the $500 and we patched over.

6    Q.  Okay.  And were you already a meth user when you

7  were riding with the Kinfolk MC?

8    A.  No, ma'am.

9    Q.  When is the first time you used meth?

10    A.  I don't recall.

11    Q.  Was it after you became a Pagan?

12    A.  Yes, ma'am.

13    Q.  Was the first time you were introduced to meth

14  through Mr. Baker?

15    A.  No, ma'am.

16    Q.  When did you join the Pagans?

17    A.  August 2020.

18    Q.  So sometime in August 2020 was the first time

19  that you used meth.

20    A.  Yes, ma'am.

21    Q.  And were you a heavy user between August 2020 and

22  December 2020?

23    A.  Yes, ma'am.

24    Q.  Using every day?

25    A.  Not every day, but often.

```
 1      Q.  How much did you use in a day, on a day where you
 2   were using?
 3      A.  I don't remember.
 4      Q.  Well, I mean, you were using meth a lot, so you
 5   would know how many grams you would need to get through
 6   a week, right?
 7      A.  Yes, ma'am.
 8      Q.  What would that be?  Just explain it for the
 9   jury.
10      A.  Through a week, three, three and a half grams.
11      Q.  So you were -- were you smoking it?  Is that how
12   you used?
13      A.  Yes, ma'am.
14      Q.  So you would need probably about three and a half
15   grams for just a regular week, right?
16      A.  Yes, ma'am.
17      Q.  And it wasn't hard to get in the Pagans
18   Motorcycle Club, was it?
19      A.  No, ma'am.
20      Q.  And it was especially not hard to get if you were
21   close to Baker, correct?
22      A.  Correct.
23      Q.  And it was especially not hard to get if you were
24   in the RV, am I right?
25      A.  Yes, ma'am.
```

1    Q.  Okay.  So let's turn back to your plea agreement.

2  Okay.  This is Government's Exhibit 124.  Now, you've

3  seen this document before, right?

4    A.  Yes, ma'am.

5    Q.  Okay.  And if we go to page -- if we go to page 7

6  of this document, if you don't mind, sir.  All right.

7  The government made some concessions for you, right?

8  They agreed to give you something in return for your

9  cooperation, right?

10    A.  Yes, ma'am.

11    Q.  They agreed -- if you see part A, they said that

12  when -- for the amount of drugs that you're gonna be

13  responsible for, that that is at least 1.5 kilograms but

14  less than 5 kilograms.  Is that right?

15    A.  Yes, ma'am.

16    Q.  That's what the government agreed to to help you,

17  right?

18    A.  Yes, ma'am.

19    Q.  And that -- you consider that a benefit to you,

20  don't you?

21    A.  Yes, ma'am.

22    Q.  Because you just testified that sometimes on

23  these trips to Georgia, Mr. Baker was picking up many --

24  more than one kilo in one trip, right?

25    A.  Yes, ma'am.

1    Q.  And you understand that because you were in that

2  RV, you could be responsible for all the stuff that

3  Baker was doing in that RV, right?

4    A.  Yes, ma'am.

5    Q.  But the government's agreed that they're gonna

6  cap that for you at 5 kilograms, right?

7    A.  Yes, ma'am.

8    Q.  That's what this plea agreement does, right?

9    A.  Yes, ma'am.

10   Q.  And that means that when it's time for the judge

11  to sentence you, you're only gonna be responsible for

12  this amount of drugs, and that will affect your

13  sentence, right?

14   A.  Yes, ma'am.

15   Q.  Make it potentially lower than it might otherwise

16  have been, correct?

17   A.  Yes, ma'am.

18   Q.  And it also says that an upward adjustment of two

19  levels for your sentencing is not gonna apply to you

20  because -- that the defendant did not possess a firearm.

21  Is that right?

22   A.  Yes, ma'am.

23   Q.  And that's a concession or some help that the

24  government gave you in exchange for your cooperation,

25  right?

```
 1      A.  Yes, ma'am.

 2      Q.  Okay.  And you talked about this, you understood

 3   this before you signed it, right?

 4      A.  Yes, ma'am.

 5      Q.  Okay.  And you know that that's another benefit

 6   to you at sentencing, isn't it?

 7      A.  Yes, ma'am.

 8      Q.  But you, in fact -- because you did have a -- you

 9   had a gun in the RV, didn't you?

10      A.  For a short period of time.

11      Q.  But when you were interviewed by law enforcement

12   when you were first arrested -- you remember that,

13   right?

14      A.  Yes, ma'am.

15      Q.  And you were in that room and Detective Stangler

16   was in that room, right?

17      A.  Yes, ma'am.

18      Q.  And he told you how important it was for you to

19   be truthful, didn't he?

20      A.  Yes, ma'am.

21      Q.  He told you that number of times, correct?

22      A.  Yes, ma'am.

23      Q.  He was with you for over an hour in that little

24   room when you first got arrested, correct?

25      A.  Yes, ma'am.
```

1    Q.  And Detective Stangler told you, "Be honest and

2    just help yourself out," didn't he?

3    A.  Yes, ma'am.

4    Q.  Repeatedly, right?

5    A.  Yes, ma'am.

6    Q.  And you told him -- he asked you specifically

7    about firearms, right?

8    A.  Yes, ma'am.

9    Q.  And you talked about everybody that had firearms

10   and you tried -- correct?

11   A.  I don't remember.

12   Q.  He asked you just a lot about different Pagan

13   people and guns, right?  Correct?

14   A.  Yes.  I'm sorry.

15   Q.  That's okay.  And he asked you specifically about

16   Mr. Baker and firearms, right?

17   A.  Yes, ma'am.

18   Q.  And you said you did see Mr. Baker with a

19   firearm, correct?

20   A.  Yes, ma'am.

21   Q.  And, now, you remember that you told Detective

22   Stangler that you had a Taurus nine-millimeter, right?

23   A.  Yes.

24   Q.  And that you had that with you in the RV while

25   you were with Baker, correct?

1    A.  Yes.

2    Q.  And that, in fact, Brian Lopez, who you mentioned

3 earlier, stole that gun from you, right?

4    A.  Yes.

5    Q.  Or made you give it to him, is that right?

6    A.  Yes.

7    Q.  And they never gave it back to you, did they?

8    A.  No.

9    Q.  And that gun was in the RV while Baker's drugs

10 were in that RV, correct?

11    A.  I'm not sure.

12    Q.  Do you remember telling Detective --

13    A.  Yes.

14    Q.  -- Stangler that?

15    A.  Yes, ma'am.

16    Q.  And you wouldn't have told him you had a gun in

17 that RV if you didn't, would you?

18    A.  No, ma'am.

19    Q.  Okay.  So when the government here on the

20 Government's Exhibit 124 says that the defendant did not

21 possess a firearm, for punishment purposes, that's a

22 help to you, isn't it?

23    A.  Yes, ma'am.

24    Q.  Because you did have a gun in the RV, right?

25    A.  Yes, ma'am.

1    Q.   Okay.  And so in addition to that, you're

2 subjected to a -- because you pled guilty to this crime.

3    A.   Yes, ma'am.

4    Q.   You're facing a ten-year mandatory minimum at

5 sentencing.  Isn't that right?

6    A.   Yes, ma'am.

7    Q.   And you've never been in any trouble before, have

8 you?

9    A.   No, ma'am.

10    Q.   So you're facing ten years in federal prison for

11 this conviction, just so we're clear, right?

12    A.   Yes, ma'am.

13    Q.   But because you signed this plea agreement, you

14 understand that the government can file a special motion

15 so that you can get less than that ten-year mandatory

16 minimum, right?

17    A.   Yes, ma'am.

18    Q.   And if you cooperate and testify, that your hope

19 would be maybe you don't have to go to prison at all,

20 right?

21    A.   For five -- I mean, this plea agreement is still

22 for five years mandatory.

23    Q.   But if the government files a special motion, you

24 understand that you could even go below that five years,

25 couldn't you?

1    A.  I'm not sure.

2    Q.  And you're hoping that the government will file

3    that special motion for you and help you out, right?

4    A.  Yes.

5    Q.  And you only met Landon Holcomb one time.

6    A.  Yes, ma'am --

7    Q.  Isn't that correct?

8    A.  Yes, ma'am.

9    Q.  Now, let's go back into that room with Detective

10   Stangler, and you remember when you were sitting there

11   that he showed you a picture of someone and asked you if

12   you knew that person?

13   A.  Yes, ma'am.

14   Q.  And you did not recognize Landon Holcomb in that

15   picture, did you?

16   A.  Well, I did, but I -- the reason I denied it was

17   because of fear.

18   Q.  Do you remember when you were interviewed after

19   you signed your plea agreement by the United States and

20   its agents?  Do you remember that?

21   A.  Somewhat.  Yes, ma'am.

22   Q.  So this would be your second interview, right?

23   A.  Yes, ma'am.

24   Q.  And you're not in jail during this interview, are

25   you?

 1    A.  No, ma'am.

 2    Q.  You're -- in fact, are you out on pretrial

 3 release?  Are you out --

 4    A.  Yes, ma'am.

 5    Q.  -- living like a regular person?  Is that right?

 6    A.  On a ankle monitor.

 7    Q.  But other than that, you're not in jail right

 8 now, right?

 9    A.  No, ma'am.

10    Q.  Okay.  And you remember that when they

11 interviewed you the second time, they asked you -- you

12 were talking about the different motorcycle clubs and

13 Baker.  Do you remember that?

14    A.  Yes, ma'am.

15    Q.  And you told the agents that Baker was looking to

16 reach out and grab into other MC's.  Do you remember

17 telling them that?

18    A.  Yes, ma'am.

19    Q.  And MC's is motorcycle clubs, right?

20    A.  Yes, ma'am.

21    Q.  And he was doing that because he wanted fall guys

22 for his gun and drug business.  Right?

23    A.  Yes, ma'am.

24    Q.  And you remember telling the agents that in just

25 those words, right?

1    A.  Yes, ma'am.

2    Q.  Okay.  And that was at the time that you're

3  traveling around in the RV with Baker, correct?

4    A.  Yes, ma'am.

5    Q.  Okay.  And, sir, you can take down 124.  Thank

6  you.

7       When you were with Detective Stangler, do you

8  remember telling him you never wanted to sell drugs,

9  this is not what you intended to get involved in?  Do

10  you remember telling him that?

11    A.  No, ma'am.

12    Q.  You don't -- was this -- you don't remember

13  telling him that or that's not true?

14    A.  I don't remember telling him that.

15    Q.  Is that true, that you never meant -- you didn't

16  join a motorcycle club to become a drug dealer?

17    A.  That's true.

18    Q.  Why did you join a motorcycle club?

19    A.  For the camaraderie, for the family.  I didn't --

20    Q.  And you told -- oh, I'm sorry --

21    A.  I'm sorry --

22    Q.  -- go ahead.

23    A.  I didn't grow up in a close family, so I was

24  willing to do whatever it took to get that.

25    Q.  And Mr. Baker made you feel like you were very

1    close to him, didn't he?

2        A.   Yes, ma'am.

3        Q.   You described it as, "He made me feel like I was

4    his only friend in the club."  Is that what you said?

5        A.   I don't remember.

6        Q.   Did he make you feel that way?

7        A.   Yes, ma'am.

8        Q.   And that made you feel good, didn't it?

9        A.   Yes, ma'am.

10       Q.   Because he was a person with power, right?

11       A.   Yes, ma'am.

12       Q.   Or what you perceived as power, correct?

13       A.   Yes, ma'am.

14       Q.   And you just wanted to hang out, right?

15       A.   Yes, ma'am.

16       Q.   Okay.  But then when you got into this close

17   position with Baker, you were asked to do a lot of

18   different things, right?

19       A.   Yes, ma'am.

20       Q.   You were asked to drive that RV, correct?

21       A.   Yes, ma'am.

22       Q.   And you were asked to drive that RV to drug

23   deals, weren't you?

24       A.   Yes, ma'am.

25       Q.   In Georgia, right?

        A.   Yes.

        Q.   And some in -- maybe even some stuff in South
Carolina, right?  And those might not have -- is that a
"yes"?

        A.   Sorry.  Yes, ma'am.

        Q.   That's okay.  And then sometimes you weren't in
the RV; a couple times you were in trucks or other cars
driving for Mr. Baker, right?

        A.   Yes, ma'am.

        Q.   And those were drug deals also, correct?

        A.   Yes, ma'am.

        Q.   But even -- and you were close -- you would --
considered yourself close to him at that time, right?

        A.   Yes.

        Q.   But even in those deals, do you remember telling
Detective Stangler that you stood at the door and were
not allowed to go in?

        A.   Yes, ma'am.

        Q.   And Mr. Baker acted, I think in your words, like
all the stuff was taboo.  Is that right?

        A.   Yes, ma'am.

        Q.   He was not broadcasting to everybody what he was
up to, was he?

        A.   I don't remember.

        Q.   Well, you weren't allowed in the room, were you?

1    Is that a "no"?

2        A.  No, ma'am.  I'm sorry.

3        Q.  It's okay.  And I think you said to Detective

4    Stangler that he -- that Mr. Baker actually only showed

5    you the drugs, like physically showed you the drugs on

6    one occasion that you could remember.  Is that right?

7        A.  Yes, ma'am.

8        Q.  So on all these other stops, let's call them, in

9    the RV and the trucks, you're not even seeing the drugs

10   that Mr. Baker's dealing, correct?

11       A.  Correct.

12       Q.  Or the money, right?

13       A.  Correct.

14       Q.  And he's not even really talking about it to you,

15   is he?

16       A.  No, ma'am, but that's because it's understood,

17   you know.  It's understood.  It doesn't have to be

18   talked about.

19       Q.  And it's understood that it should not be talked

20   about, correct?

21       A.  Yes, ma'am.

22       Q.  But once you were in and close to him, these

23   things were mandatory for you, weren't they?

24       A.  Yes, ma'am.

25       Q.  I think you told Detective Stangler multiple

1    times, "This was mandatory," right?

2        A.  Yes, ma'am.

3        Q.  So once you were in, you really felt like you

4    didn't have a choice, didn't you?

5        A.  Yes, ma'am.

6        Q.  And you were afraid of physical violence?  Is

7    that right?

8        A.  Yes, ma'am.

9        Q.  And other kinds of punishment or pain by

10   Mr. Baker, right?

11       A.  Yes, ma'am.

12       Q.  Do you feel used by Mr. Baker, Mr. Presley?

13       A.  I don't really know how to answer that question.

14   Yes, ma'am.

15       Q.  And so stepping away from that for a moment, you

16   already testified you were using meth, right?

17       A.  Yes, ma'am.

18       Q.  And were you drinking?  Do you drink?

19       A.  No, ma'am.

20       Q.  So any other drug use besides meth?

21       A.  No, ma'am.

22       Q.  Smoke cigarettes?

23       A.  Yes, ma'am.

24       Q.  Smoke Marlboros?

25       A.  Yes, ma'am.

1    Q.   You very much want to go home and not to prison,

2    isn't that right?

3    A.   Absolutely.  But I think that's what anybody

4    would feel, how they would feel.

5    Q.   And when you were interviewed by Detective

6    Stangler, I heard you say that you didn't say that you

7    were involved, but you did tell him that Baker called

8    Landon Holcomb to come and pick you up to take him to

9    Raleigh.  You did tell Detective Stangler that right

10   away, didn't you?

11   A.   I don't remember.

12   Q.   You were in the club less than six months, right?

13   A.   Yes, ma'am.

14   Q.   That part's true, correct?

15   A.   Yes, ma'am.

16   Q.   And you were arrested on or about April 7th,

17   2021?  Or 2022?  Was it this year or last year?

18   A.   I believe it was 2022.

19   Q.   2022.  April 7th, 2022.  So they were asking

20   about something that happened more -- a while back, a

21   long time ago, right?

22   A.   I'm sorry?

23   Q.   So you were arrested April 7th, 2022, correct?

24   A.   Yes, ma'am.

25   Q.   Okay.  So you were asked -- you were showed a

1  picture of Landon Holcomb and you said -- the agent
2  asked you, "Who's that?"  Do you remember that?
3     A.  Yes, ma'am.
4     Q.  And you said, "No clue."  Do you remember that?
5     A.  Yes, ma'am.
6     Q.  Okay.
7          MR. DODSON:  Objection, Your Honor.  He's
8  already testified as to this.
9          THE COURT:  It's been asked and answered.
10 I'll ask counsel to be expeditious with everyone's time.
11         MS. SALMON:  Thank you, Your Honor.  I'm
12 laying the foundation to impeach him with the recorded
13 statement.
14         THE COURT:  I understand.
15         MS. SALMON:  Thank you, sir.
16         And, Your Honor, I would like to play a
17 portion -- a clip of this recording, recorded interview.
18 BY MS. SALMON:
19    Q.  Did you know you were being recorded during that
20 interview, Mr. Presley?
21    A.  Yes, ma'am.
22    Q.  And have you listened to that recording in your
23 preparation for your testimony today?
24    A.  No, ma'am.
25    Q.  Did you review the written report that the agent

1  prepared in your preparation for your testimony today?

2      A.  Yes, ma'am.

3      Q.  Did you review that with Agent Stangler?

4      A.  No, ma'am.

5      Q.  Okay.  How many times have you met with the

6  government to prepare for today?

7      A.  Just once -- or twice.  I'm sorry.

8      Q.  Two times?

9      A.  Yes, ma'am.

10     Q.  And they talked about what they would ask you and

11 what I might ask you, right?

12     A.  Yes, ma'am.

13     Q.  Okay.  I'm just gonna play you a short clip, and

14 you tell me if you recognize the voices on this tape.

15         And, Mr. Presley, I'm gonna play it into the

16 microphone.  If you can't hear it, you just tell me, and

17 we'll try to do it another way, okay?

18     A.  Yes, ma'am.

19             (Brief pause in proceedings.)

20             MS. SALMON:  Your Honor, we're having --

21             THE COURT:  It appears we're having some

22 technical difficulties.  We're well past our time for

23 the morning break.  What we'll do is we will take a

24 15-minute recess.  We can get the technical issues

25 sorted out and we'll come back at that time.

1          So I'll remind the jurors, please don't

2   discuss the case itself amongst yourselves.  You're free

3   to talk about anything else.  We'll see you in 15

4   minutes.

5               (The jury exited the courtroom.)

6          THE COURT:  All right.  On the record and

7   outside the presence of the jury.  Is there anything we

8   need to take up at this time?

9          MR. DODSON:  Your Honor, could we be heard

10  at the bench?

11              THE COURT:  Yes.

12              (At sidebar on the record.)

13          MR. DODSON:  Your Honor, I didn't object at

14  the time, but it's happened another time, and we just

15  want to lodge a standing objection to the repeated

16  reference to mandatory minimums.  The penalties should

17  not be referenced.  And in this case, the charges that

18  defendants face are very similar to the ones that people

19  are testifying about, and there's repeated mention of

20  mandatory minimums.  And so we just -- we didn't want to

21  interrupt the flow but we would like to lodge a standing

22  objection to reference to mandatory minimums.

23              THE COURT:  All right.  I understand the

24  objection.  We discussed this pretrial about the

25  potential risk to the defend- -- the jury misusing

```
 1    sentencing information.  What I'll do is I'll give a
 2    limiting instruction.  I'll tell the jury they're not to
 3    consider sentencing and that there may be any factors
 4    that will affect sentencing, none of which will be known
 5    to them, so any discussion of sentencing during the
 6    course of the trial may or may not apply to the
 7    individuals under trial, which is true.
 8                   MR. DODSON:  Thank you, Your Honor.
 9                   THE COURT:  There's an ongoing
10    investigation.  It's very possible these people will be
11    afforded an opportunity to cooperate at some point in
12    the future as part of a ongoing investigation, so I
13    think that's both accurate and fair.  I believe that for
14    purposes of cross-examination, understanding of
15    mandatory minimums does affect the witnesses'
16    willingness to testify and their motivation for
17    testifying.  So I'll treat it as a standing objection.
18    We discussed it pretrial.  The Court finds that it is
19    within the scope of appropriate cross-examination, but I
20    will give the limiting instruction.
21                   MR. DODSON:  Thank you, Your Honor.
22                   MS. SALMON:  And I apologize to all present.
23    It always works when you're practicing and it never
24    works when you -- unless you're the government, then it
25    always works.
```

```
 1                    THE COURT:  All right.  Thank you.
 2                    MS. SALMON:  We'll fix it.  I apologize,
 3      y'all.
 4                    MR. DODSON:  No problem.
 5                    (End of discussion at sidebar.)
 6                    THE COURT:  All right.  We will also take
 7      our recess and return in about -- about 35 after.
 8                    (Proceedings recessed at 11:23 a.m.)
 9                    (Proceedings recommenced at 11:38 a.m.)
10                    THE COURT:  All right.  We'll bring the jury
11      back in.
12                    (The jury entered the courtroom.)
13                    THE COURT:  All right.  Back on the record
14      and in the presence of the jury.  You may proceed,
15      Ms. Salmon.
16                    MS. SALMON:  Thank you, Your Honor.
17      BY MS. SALMON:
18          Q.  Mr. Presley, I'm almost finished.  Just bear with
19      me, okay?
20          A.  Yes, ma'am.
21          Q.  Okay.  Thank you.  All right.  So I want to put
22      you back in the room with Detective Stangler right after
23      your arrest, okay?
24          A.  Yes, ma'am.
25          Q.  You remember right before we took our break, you
```

1  testified that, you know, you didn't take your

2  responsibility because you were afraid of Mr. Baker.  Do

3  you remember saying that?

4      A.  Yes, ma'am.

5      Q.  But Agent Stangler did ask you about what

6  happened in Jacksonville and the trip to Raleigh, and

7  you told him, didn't you?

8      A.  Yes, ma'am.

9      Q.  In fact, you told him that Jabber -- "Jabber came

10  to the house we were at, we were all just sitting there

11  talking."  Did you tell him that?

12      A.  I don't remember.

13      Q.  Okay.  I'm gonna go ahead and play that recording

14  that you said you knew was made, okay?  And I'll stop it

15  and ask you if you recognize the voices, okay?

16      A.  Yes, ma'am.

17          (A recording was played.)

18  BY MS. SALMON:

19      Q.  Do you recognize the two voices on the tape I

20  just played?

21      A.  Yes, ma'am.

22      Q.  Who's talking?

23      A.  Detective Stangler and myself.

24      Q.  Okay.  And he's just asked you, "Okay.  What

25  happened in Jacksonville?"  Right?

```
 1      A.   Yes.

 2      Q.   Okay.  Go ahead.

 3           (A recording was played.)

 4  BY MS. SALMON:

 5      Q.   Now that you've heard that recording, do you

 6  remember telling him that?

 7      A.   Yes, ma'am.

 8      Q.   And you were telling him the truth, weren't you?

 9      A.   Yes, ma'am.

10      Q.   Okay.  And then you had testified previously that

11  some of the details aren't clear, right?  Some of the

12  details of what happened on November 6th aren't clear,

13  correct?

14      A.   Yes, ma'am.

15      Q.   But you thought that Mr. Holcomb gave some money

16  to Mr. Baker when y'all got back?  Is that right?

17      A.   Yes, ma'am.

18      Q.   All right.  Do you recall telling Detective

19  Stangler --

20           MR. DODSON:  Objection.

21           THE COURT:  Basis.

22           MR. DODSON:  Your Honor, she's got to ask

23  the question first.  She can't say what Stangler -- this

24  is not a statement of Mister --

25           THE COURT:  I understand.  It is a hearsay
```

```
 1   issue at this point.  I think you -- I think counsel is
 2   correct; you ask the question, you take your answer.  In
 3   the event it's inconsistent, you refresh.
 4              MS. SALMON:  Okay.
 5   BY MS. SALMON:
 6      Q.  So again, you recall that you were interviewed by
 7   Detective Stangler, right?
 8      A.  Yes, ma'am.
 9      Q.  And you were trying to be truthful with him on
10   that day you were arrested, correct?
11      A.  Yes, ma'am.
12              (A recording was played.)
13   BY MS. SALMON:
14      Q.  Now that you've heard the recording, do you
15   remember telling him, "I can't say I was the one for
16   sure that gave it to him"?  Do you remember that now?
17      A.  Yes, ma'am.
18      Q.  Because you don't really, in fact, remember who
19   gave him the money, do you?
20      A.  No, ma'am.
21      Q.  You don't -- when you were a Pagan, when you were
22   in the club, you didn't ask questions, did you?
23      A.  No, ma'am.
24      Q.  Because people who ask questions got hurt, right?
25      A.  Yes, ma'am.
```

                    MS. SALMON:  No further questions, Your

Honor.

                    THE COURT:  Mr. Chetson.

                    MR. CHETSON:  No questions.  Thank you.

                    THE COURT:  Redirect.

                    MR. DODSON:  No, Your Honor.  Thank you.

                    THE COURT:  All right.  Thank you, sir.  You

can step down.

                    THE WITNESS:  Thank you, sir.

                    MR. DODSON:  May Mr. Preston be released

from his subpoena?

                    THE COURT:  You are released from your

subpoena, sir.

                    THE WITNESS:  Thank you, sir.

                    THE COURT:  You may call your next witness.

                    MS. SANDLING:  Thank you, Your Honor.  The

government calls Dustin Travis.

                    MS. SALMON:  Your Honor, while Mr. Travis is

approaching, I would ask that -- having laid the

foundation, that the two clips played be admitted as

Defendant's Exhibits 2 and 3.

                    THE COURT:  They're admitted.

                    THE CLERK:  Go over here and watch your

step.  Raise your right hand, left hand on the Bible,

and please state your name for the record.

```
 1              THE WITNESS:  I'm Dustin Travis.
 2              (The witness was placed under oath.)
 3              THE COURT:  All right.  Your witness,
 4    counsel.
 5              MS. SANDLING:  Thank you, Your Honor.
 6                   DIRECT EXAMINATION
 7    BY MS. SANDLING:
 8       Q.  Good morning, Mr. Travis.
 9       A.  Good morning.
10       Q.  If you could please introduce yourself to the
11    jury.
12       A.  My name's Dustin Travis.  I'm 25.
13       Q.  Where do you live?
14       A.  I'm from Rockingham County, North Carolina.
15       Q.  Are you employed, Mr. Travis?
16       A.  Yes.  Yes, ma'am.
17       Q.  Tell the jury how you're employed.
18       A.  I own my own landscaping business.  It's called
19    Two Brothers Landscaping and More.
20       Q.  Do you know the defendant Christopher Baker?
21       A.  Yes, ma'am.
22       Q.  How do you know the defendant?
23       A.  He was with the mother chapter of North Carolina
24    Pagans Motorcycle Club.
25       Q.  And were you a member of the Pagans?
```

1    A.  Yes, ma'am.

2    Q.  Describe for the jury how you became involved and

3 how long you were a Pagan.

4    A.  It was July, August -- July to August of 2020.  I

5 was with a support motorcycle club called the Southern

6 Sons, for Hells Angels.  The Descendants, another

7 motorcycle club, and along with the Pagans came to

8 Reidsville, North Carolina, and wanted power, taking

9 over control, threatening the club, stuff like that.

10 And I got up with another defendant and met Demon, which

11 is a Pagan.  Started prospecting for them in Hickory in

12 August of 2020.

13       About beginning of September of 2020, we went to

14 a function in Virginia.  And that night I patched in and

15 I met Chris Baker along with a few others, Conan, Dad.

16    Q.  And Conan at the time was the national president

17 of the Pagans Motorcycle Club --

18    A.  Yes, ma'am.

19    Q.  -- is that correct?

20    A.  Yes, ma'am.

21    Q.  Okay.  And you also said "Dad"?

22    A.  Yes, ma'am.

23    Q.  Do you know his real name?

24    A.  No, ma'am, I do not.

25    Q.  Okay.  And Mr. Baker was at that party as well?

1    A.  Yes, ma'am --

2    Q.  Or event as well, correct?

3    A.  Yes, ma'am.

4    Q.  And this was September 2020.

5    A.  Yes, ma'am.

6    Q.  And from September 2020 to January of 2021, did

7    you have another interaction with the defendant

8    Mr. Baker in this case?

9    A.  Yes, ma'am, I did.  It was December the 10th, but

10   it was -- it was in, like, in the -- December 9th going

11   into the 10th.  It was like 2:00 in the morning.  I got

12   a phone call from Chris Baker saying:  Hey, what's up,

13   man.  I need a favor from you.  I need you to come pick

14   up me and Fame, which is Chris Baker's Sergeant of Arms

15   at the time.

16        He said:  I need a favor.  I said:  Man, I can't.

17   It's late.  I'm at the house with my wife, you know, I

18   got to get up and go to work in the morning.  And he was

19   like:  No, I need you to come to me now.  And I said:  I

20   can't.  And he said:  Yes, you are.  And so I took that

21   as if I didn't -- Chris Baker's not the type of man you

22   just say no to.  You do it.

23   Q.  Go ahead.  I didn't mean to interrupt you.

24   A.  So I went to Advance, North Carolina, to Demon's

25   house where he was staying.  And I pulled up.  Fame met

me outside.  We walked into Demon's house, where I saw

Jenny, Demon's wife, and Chris Baker.  She was popping a

boil on his butt.  And he told Fame, said:  Y'all go out

to the building, get everything together, and I'll be

out there in a minute.  And me and Fame waited on him.

Fame got his gun ready.  He had Baker's cut ready.  Fame

had his cut on.

Baker came out to the building.  He said:  Hey,

you got to take us to Georgia, I got to go pick up some

money.  And I said:  I can't go all the way to Georgia,

man.  I said:  That's a long way.  You didn't tell me I

had to go to Georgia.  And he said:  No, you're gonna go

to fucking Georgia, you ain't got no choice.

And I took him to Georgia.  We got to Georgia.

We stopped at a convenience store.  We got something to

drink, and he put gas in my car.  We left from the

convenience store and went to a house, a brick house.

It was on an incline facing downhill.  He got out with

nothing.  He went into the house, and about 15, 20

minutes later, he came back outside with a little black

safe suitcase thing.  And he had a bag of weed, like

maybe a half-ounce, ounce of weed.  He threw it to Fame,

said:  Bam sent this, you can smoke this, and...

Q.  Mr. Travis, when Mr. Baker came out of the house

in Georgia with a suitcase and a bag of weed...

1     A.   Yes, ma'am.

2     Q.   Did you know what was inside of the suitcase?

3     A.   No, ma'am, I didn't.

4     Q.   Okay.  And did you ever see Mr. Baker in the

5  possession of narcotics?

6     A.   Yes, ma'am.  On the way to arrive to Georgia, I

7  smoked.  I got high.  That was part of me taking him and

8  him putting gas in, Your Honor, so, yes.

9     Q.   Did you ever see the defendant in possession of a

10  firearm?

11     A.   Yes.

12     Q.   Describe that for the jury, please.

13     A.   It was a chrome revolver, and Fame had a

14  Smith & Wesson nine-millimeter, second gen.

15     Q.   Do you know Fame's real name?

16     A.   Brian Lopez.

17     Q.   Okay.  So both the defendant and Brian Lopez were

18  in possession of a gun?

19     A.   Yes, ma'am.

20     Q.   Are you aware of whether or not the defendant had

21  any contact with the Onslow chapter of the Pagans,

22  Onslow County?

23     A.   Can you repeat that, please?

24     Q.   Are you aware of whether the defendant Mr. Baker

25  had any contact with the Onslow chapter of the Pagans?

1    A.   Yes.  At the time, he was still the POP.  Like,

2  he was the President of the Presidents in North

3  Carolina.  He was with the mother chapter.  So, yes, he

4  talked to everybody.

5    Q.   And are you aware of whether or not the

6  defendant's role within the Pagans changed from POP to

7  another role?

8    A.   Yes.  He became the -- he became the 13, which is

9  the mother chapter.

10    Q.   Now, describe for the jury what a 13 is.

11    A.   Excuse me?

12    Q.   Describe for the jury what a 13 is.

13    A.   Thirteen is the mother chapter.  You just don't

14  get a 13 patch.  No one does.  You have to be somebody

15  very, very important.  Like, you just don't get that.

16  And Dad ran Havelock to, like, Raleigh; and from

17  Raleigh, all of western North Carolina and part of South

18  Carolina, Baker ran.  That was his jurisdiction.  That's

19  how you would say it?  Like, his part.

20    Q.   Now, on December the 10th of 2020, do you recall

21  coming to Raleigh for the defendant?

22    A.   September 10th.

23    Q.   December.

24    A.   Oh, December --

25    Q.   December the 10th.

1    A.   Yes.  Yes, ma'am.  Go ahead.  I'm sorry.

2    Q.   I want you to tell the jury about that, please.

3    A.   That day or before?

4    Q.   Leading up to that and that day.

5    A.   Yes, ma'am.  So he comes out of the house from

6    Georgia with the suitcase, and he gave the weed to Fame.

7         We left from there, went to a Waffle House which

8    is right around the block.  We ate.  We came back out to

9    the car.  We got high in the parking lot.  And we left

10   and got on the highway, and he -- he tells me we're not

11   going straight home, we got to go somewhere else first.

12   And I said:  Where we going?  He said:  I'm waiting on

13   the text to come back through.  The text came back

14   through, and he said:  We have to go to South Carolina.

15   And I said:  Baker, I'm not going to South Carolina.  I

16   can't go to South Carolina.  You only told me you wanted

17   me to go to Georgia.  I need to go home.

18        And at that time, he had that chrome revolver.  I

19   looked in my rear view mirror at the time.  He had it at

20   my back at the seat, and he said:  Motherfucker, you

21   don't have a choice.  You're gonna take me, or we'll

22   leave you here on the side of the road.

23        So I took him to South Carolina.  We pulled up to

24   the -- to the brick house.  It's a brick house.  I was

25   parked right here.  The house was facing this way.  And

there's a guy standing there.  He looked familiar, but I don't know the name.  Baker gets out with his suitcase.  He goes in the house with him.  Me and Fame's in the car.  Fame's in the back seat.  He's right behind me.  He -- 10, 15 minutes, maybe, he comes back out.  He gets in the car --

Q.  Mr. Baker came back out?

A.  Yes, Baker, Chris Baker.  And he has nothing then when he comes back out.  And he gets behind me again, and then we put in the address for North Carolina.

And he had called this Black girl.  I don't know her name.  He wanted two girls waiting on him at the -- at some store he already had the address to.  It was in my GPS.

We went to the store.  We picked the two girls up.  They sit in the back and Fame got in the passenger seat with me.  And from there we went to Burlington, which is Alamance County, to a smoke shop where Baker -- he needed more pipes for his bongs and stuff, and we got the pipes.  He bought me a marijuana pen, is what they call it, a pen.

Then from there, we was in Raleigh maybe ten minutes from the clubhouse chapter -- the Raleigh chapter, and he said:  We're gonna stop at McDonald's, get something to eat, I got to see somebody that owes me

1   some money.  He buys me something to eat.  He buys me a

2   barbecue McRib.  We go into the McDonald's.  I come out

3   before he does, and I'm in the car.  He comes out.

4   There's a guy parked beside us on, like, a white Ford

5   Explorer, maybe silver, a Black guy with dreads, had a

6   hat on.

7        Baker walks up to him and, you know, he's talking

8   to him or whatever, and he hands him a brown McDonald's

9   paper bag.  Baker hands the Black guy a brown paper bag,

10  and the guy gives Baker the money.  And they're talking,

11  and they're talking about a guy named Billy that owed

12  Baker money, and Baker was like, you know:  Hey, man,

13  handle that for me.  If not, when you see him, you tell

14  him, you know, I'm gonna make him fucking pay, you know.

15  He's gonna pay me my fucking money back one way or the

16  other.

17     Q.  Did you know who Bill was?

18     A.  No, no.  And then after that, we literally drove

19  right there to the club, the Raleigh chapter.  And I

20  stayed for that meeting, and maybe like two hours later

21  I went home by myself.

22     Q.  I want to show you what's already been introduced

23  into evidence as Government's Exhibits 12 and 13,

24  Mr. Travis.

25     A.  Yes, ma'am.

 1      Q.  We'll start with 12?

 2          (The exhibit was played.)

 3  BY MS. SANDLING:

 4      Q.  Mr. Travis, do you recognize this particular

 5  exhibit, Exhibit 12?

 6      A.  Yes, ma'am.

 7      Q.  Is this the deal that you were involved in on

 8  December the 10th of 2020 with the defendant?

 9      A.  Yes, ma'am.

10      Q.  Do you recognize who is on the screen that we're

11  looking at right now?

12      A.  It's Chris Baker.

13      Q.  And do you recognize the shirt that the defendant

14  was wearing in this particular video?

15      A.  Yes, ma'am.  It's a 13 club shirt.

16      Q.  Okay.  And if we could go to Government's Exhibit

17  13, please.

18          Now, when you say this is a club shirt, describe

19  for the jury what a club shirt is.

20      A.  It's like a T-shirt.  You have the one percent

21  right here with the East Coast.  You'd have the top

22  rocker, the center patch, and then you have MC with --

23  the 13s wouldn't have East Coast.  They would have 13 at

24  the bottom.  The only ones who wears the East Coast is

25  the regular patch members.  But when you're a 13, you

```
 1   don't wear East Coast.  You have 13 right here.
 2        Q.  Using your finger on the screen, show the jury
 3   where the 13 patch is on this shirt.  Okay.
 4            So the defendant was a 13.
 5        A.  Yes.
 6        Q.  On December the 10th of 2020, is that correct?
 7        A.  Yes.  He became a 13 after the No Rats party,
 8   which was December 2nd to the 3rd is when he became the
 9   13.
10        Q.  And describe for the jury what a No Rats party
11   is.
12        A.  So, No Rats party is a party that they would
13   raise money for, like, the Pagans that's locked up
14   behind bars, that got told on and is doing life in cases
15   and stuff like that.  And the "No Rats" means no
16   snitches; you know, anybody's an informant, anybody
17   who's ever snitched on a club member, any of that, so
18   they literally named that party "No Rats" for that
19   specifically reason.
20        Q.  I also want to show you what's already -- or
21   Government's Exhibit 84.  Mr. Travis --
22        A.  Yes, ma'am.
23        Q.  Do you recognize what this is?
24        A.  I don't know that -- I don't know that word, but
25   yes.
```

1    Q.   What does it say at the top of the page?

2    A.   The United States District Court for the Eastern

3    District of North Carolina, Western Division.

4    Q.   And below that, though?

5    A.   The "M" word?

6    Q.   Well, where it's -- on the right-hand side of the

7    caption.

8    A.   Mem- -- memor- --

9    Q.   Memorandum?

10   A.   Yes, of plea agreement.

11   Q.   Okay.  And to the left of that, "Memorandum of

12   Plea Agreement," whose name is on this?

13   A.   It's United States of America versus Dustin

14   Travis.

15   Q.   Okay.  And if we can go to the last page of the

16   plea agreement.

17        And, Mr. Travis, do you recognize your signature

18   on page 8 of this page?

19   A.   Yes, ma'am.  It's right there.

20   Q.   And is this your plea agreement in this case?

21   A.   Yes, ma'am.

22   Q.   And this is an agreement that your attorney has

23   signed where you've agreed to plead guilty to the

24   charges in this case, correct?

25   A.   Yes, ma'am.

```
 1    Q.  You have not yet appeared in front of Judge Myers
 2  to actually plead guilty, but you've agreed to plead
 3  guilty to the charges --
 4    A.  Yes, ma'am.  And no, ma'am, I haven't seen him.
 5  Yes, ma'am.
 6    Q.  Okay.  You've signed another part of the plea
 7  agreement, the sealed supplement to the plea agreement
 8  as well, is that correct?
 9    A.  Yes, ma'am.
10    Q.  And if we could go to the last page, page 3.
11  You've also signed this page as well, correct?
12    A.  Yes, ma'am.
13    Q.  That is your signature?
14    A.  Yes, ma'am.
15    Q.  And in this agreement, you agree to cooperate
16  with the government and tell the truth?
17    A.  Yes, ma'am, and nothing but the truth.
18    Q.  Have you been made any promises or assurances in
19  this case, Mr. Travis, in exchange for your testimony
20  here today?
21    A.  No, ma'am.  I know I'm going -- you know, I'm
22  guilty for what I done.  I know I'm going to prison.
23  Nothing has been promised to me.  I'm just here to tell
24  the truth and do the right thing.
25    Q.  Okay.  Have you ever had any felony convictions,
```

1     Mr. Travis?

2        A.  No, ma'am, I haven't.

3              MS. SANDLING:  Your Honor, government would

4     move to introduce Government's Exhibit 84 at this time.

5              THE COURT:  It's admitted without objection.

6              MS. SANDLING:  And I have no further

7     questions.

8              THE COURT:  Cross-examination, counsel.

9              MR. CHETSON:  Not for Mr. Baker, Your Honor.

10             MS. SALMON:  I have nothing for this

11    witness, sir.

12             THE COURT:  Thank you, sir.  We're finished.

13    You can step down.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  You're released from your

16    subpoena.

17             THE WITNESS:  Thank you.

18             THE COURT:  You may call your next witness.

19             MR. DODSON:  The United States calls Brian

20    Lopez.

21             (Brief pause in proceedings.)

22             THE CLERK:  Raise your right hand, left hand

23    on the Bible.  Please state your name for the record.

24             THE WITNESS:  Brian Lopez.

25             (The witness was placed under oath.)

                    DIRECT EXAMINATION

BY MR. DODSON:

   Q.  Good afternoon, Mr. Lopez.  Can you see me okay?

   A.  I can.

   Q.  Can you introduce yourself to the jury.

   A.  I'm Brian Lopez.  I'm from Waxhaw, North
Carolina.

   Q.  Is that in the western part of the state?

   A.  It is.

   Q.  How old are you, sir?

   A.  38.

   Q.  And you're in custody currently, correct?

   A.  I am.

   Q.  Prior to coming into custody, were you employed?

   A.  I was.

   Q.  What line of work were you in?

   A.  I'm a painter.

   Q.  Do you go by any other -- any other names or
nicknames?

   A.  Fame.

   Q.  Is that spelled F-A-M-E?

   A.  It is.

   Q.  Mr. Lopez, you're obviously in custody because
you're charged in connection with this case.  Is that
correct?

1    A.  Yes, sir.

2    Q.  And you've pled guilty to conspiracy to

3  distribute and possess with intent to distribute 50

4  grams or more of methamphetamine, is that correct?

5    A.  Yes, sir.

6    Q.  And for distributing methamphetamine, is that

7  right?

8    A.  Yes, sir.

9    Q.  Did you do all of that?

10    A.  I did.

11    Q.  Did you enter into a written plea agreement with

12  the government?

13    A.  I did.

14    Q.  And does that agreement contain all of the

15  agreements between you and the government?

16    A.  Yes, sir.

17    Q.  I want to turn your attention to the screen

18  that's in front of you on the witness stand, and I'm

19  gonna show you what's been marked as Government's

20  Exhibit 85.  We'll just flip through the pages briefly.

21  Do you recognize what's been shown on the screen in

22  front of you?

23    A.  I do.

24    Q.  What is it, Mr. Lopez?

25    A.  It's my plea agreement.

1          MR. DODSON:  Your Honor, we move to admit

2     Government's Exhibit 85 into evidence.

3          THE COURT:  It's admitted without objection.

4          MR. DODSON:  And we request permission to

5     publish.

6          THE COURT:  You may.

7     BY MR. DODSON:

8     Q.  Mr. Lopez, just so the jury -- because the jury

9     is seeing it for the first time -- this is page 1 of

10    your plea agreement, correct?

11    A.  Correct.

12    Q.  You see at the top it says "United States of

13    America versus Brian Lopez"?

14    A.  Yes, I do.

15    Q.  And if we could go to the last page of the plea

16    agreement, which for the record is page 8 of

17    Government's Exhibit 85.  Is that your signature on this

18    page?

19    A.  It is.

20    Q.  And just below your signature, is that the

21    signature of your attorney?

22    A.  It is.

23    Q.  Page 9 of Government's Exhibit 85, please.  You

24    see this document is entitled "Sealed Supplement to

25    Memorandum of Plea Agreement."  Do you see that at the

1    top right-hand side of the page?

2        A.    I do.

3        Q.    And this is the section of your plea agreement

4    that discusses your cooperation, is that correct?

5        A.    Correct.

6        Q.    Last page, please, of Government's Exhibit 85.

7    And this, again, is your signature and that of your

8    lawyer?

9        A.    Yes.

10       Q.    Mr. Lopez, are you hoping to get some credit --

11   thank you.  Are you hoping to get some credit off your

12   sentence, any sentence that you might receive, for

13   testifying here today?

14       A.    I am.

15       Q.    What are you -- has the government promised you

16   any particular sentence that you might receive?

17       A.    No.

18       Q.    Who is it that determines what your sentence is

19   gonna be?

20       A.    My judge.

21       Q.    And what are you required to do under the plea

22   agreement, Mr. Lopez?

23       A.    Tell the truth.

24       Q.    Mr. Lopez, do you know the defendant Christopher

25   Baker?

1    A.  I do.

2    Q.  How do you know Mr. Baker?

3    A.  We were part of the same motorcycle club.

4    Q.  And what club would that be?

5    A.  Pagans Motorcycle Club.

6    Q.  When did you first meet Mr. Baker?  Do you

7 recall?

8    A.  About 2020.

9    Q.  And would that be -- do you remember the month,

10 or at least the season?  Was that the fall or the

11 summer, do you recall?

12    A.  Probably summertime.

13    Q.  Of 2020?

14    A.  Yes, sir.

15    Q.  And did you have any position in the Pagans

16 Motorcycle Club?

17    A.  I'm a Sergeant at Arms.

18    Q.  And briefly --

19    A.  For my chapter.

20    Q.  I'm sorry.

21    A.  I'm the Sergeant at Arms for my chapter.

22    Q.  And briefly, what are the duties and

23 responsibilities of a Sergeant at Arms?

24    A.  To keep the chapter members safe and to enforce

25 the -- my president's rules.

1    Q.  And who was the president when you were the

2  Sergeant at Arms?

3    A.  Peter Chalemmy [phonetic].

4    Q.  Okay.  Was that the only president that you were

5  Sergeant in Arms for?

6    A.  No.  Robert Keyon [ph].

7    Q.  Anyone else?

8    A.  That's it.

9    Q.  All right.  Were you ever the Sergeant at Arms

10 when Chris Baker was the president?

11   A.  Not for his chapter.

12   Q.  Okay.  For another chapter?

13   A.  For my chapter.

14   Q.  Okay.  And so did you serve as Chris Baker's

15 Sergeant at Arms at any time?

16   A.  I did.

17   Q.  Okay.  Do you remember when that would be?

18   A.  From October 2020 to February of 2021.

19   Q.  And so you were the Sergeant at Arms when Chris

20 Baker was the president at one point, correct?  Of that

21 chapter.

22   A.  Yes.

23   Q.  And what did you do for Mr. Baker?

24   A.  I traveled with him.

25   Q.  When you traveled with him, did you see him in

1  possession of narcotics?

2      A.  I did.

3      Q.  What kind?

4      A.  Methamphetamine.

5      Q.  Did you ever assist Mr. Baker with transporting

6  methamphetamine?

7      A.  I did.

8      Q.  Can you tell the jury about that?

9      A.  I would ride with him to Atlanta, Georgia, and we

10  would pick up pound or two of meth.

11      Q.  Do you remember when you did that?

12      A.  From the months of October 2020 to February of

13  2021.

14      Q.  And that would be right around the time that you

15  were Sergeant at Arms?

16      A.  Yes.

17      Q.  How did y'all get from North Carolina to Georgia?

18      A.  We had several drivers.

19      Q.  All right.  Did you ride on motorcycles or cars

20  or something else?

21      A.  Cars.

22      Q.  Okay.  Did you ever ride in an RV?

23      A.  I have.

24      Q.  How many times did you make trips with Mr. Baker

25  down to Georgia to pick up methamphetamine?

A. Few times; probably three or four times.
Q. And when you went, how much methamphetamine was Mr. Baker picking up?
A. About a kilo at a time.
Q. And what does a kilo of methamphetamine look like, Mr. Lopez?
A. About a -- a cereal box full.
Q. Okay. And so each time you went, you said three or four times, and each time Mr. Baker picked up about a kilogram of methamphetamine. Is that correct?
A. Yes.
Q. Mr. Lopez, do you know an individual named Joshua Presley?
A. I do.
Q. Does he go by any nicknames?
A. Dozier.
Q. How do you know Mr. Presley?
A. He was part of my chapter.
Q. And do you know if he held any position in the Pagans?
A. Before he came to my chapter, he was a Sergeant at Arms of another chapter. But once he moved to my chapter, he gave that position up.
Q. Do you know who he, sir, does the Sergeant at Arms for?

1   A.  I do not.

2   Q.  All right.  Did you ever accompany Mr. Baker when

3  he sold methamphetamine, or did you sell methamphetamine

4  on his behalf?

5   A.  I did.

6   Q.  Did you sell methamphetamine on his behalf on

7  January the 13th of 2021?

8   A.  I was there at the buy.

9   Q.  I want to turn your attention to the screen in

10  front of you and show you what's been admitted as

11  Government's Exhibit 19.  Who is the person in

12  Government's Exhibit 19?

13   A.  That's me.

14   Q.  What do you have in your hand there?

15   A.  Food.

16   Q.  All right.  And is there food in that bag?

17   A.  It is.

18   Q.  Did you also have methamphetamine?

19   A.  I did.

20   Q.  And what'd you do with it?

21   A.  Gave it to the guy in the back.

22   Q.  Did you know the guy in the back?

23   A.  No.

24   Q.  What'd he look like?

25   A.  I can't remember.

1   Q.  Do you remember what race he was?

2   A.  He was white.

3   Q.  I want to play for you, Mr. Lopez, Government's

4   Exhibit 17, please, what's already been admitted as

5   Government's Exhibit -- excuse me -- 18.

6       Back up just a little bit.

7       (The exhibit was played.)

8   BY MR. DODSON:

9   Q.  Now, Mr. Lopez, we just played the first couple

10  of seconds of this exhibit, which is Government's

11  Exhibit 18.  Did you see yourself in the front

12  passenger's seat?

13  A.  I did.

14  Q.  And who is in the front driver's seat?

15  A.  Chris Baker.

16  Q.  And what are y'all doing right here?

17  A.  Making a meth sale.

18  Q.  Do you remember how much or do you know how much?

19  A.  About two ounces.

20  Q.  And do you know how much one ounce of

21  methamphetamine is?

22  A.  About 600 bucks.

23  Q.  Okay.  Costs about 600 bucks.  And one ounce of

24  methamphetamine is about 28 grams.  Is that true?

25  A.  Correct.

1     Q.  And so then two grams -- or two ounces, of
2   course, would be about 56 grams of methamphetamine?
3     A.  Yes, sir.
4     Q.  Is that your understanding?
5     A.  Yes, sir.
6     Q.  And so did y'all get, then, around $1200?
7     A.  I believe so --
8     Q.  For selling this methamphetamine?  Okay.
9         Do you recall during this controlled purchase on
10  January the 13th of 2021, did you recall any
11  conversation between you, Mr. Baker, and the person that
12  y'all were selling methamphetamine to?
13    A.  I do not.
14    Q.  Okay.  But you can clearly recognize the people
15  from the video and the photograph?
16    A.  Yes.
17            MR. DODSON:  Okay.  Thank you, Mr. Lopez.
18  Nothing further, Your Honor.
19            THE COURT:  Cross-examination.
20            MR. CHETSON:  Yes, Your Honor.
21                  CROSS-EXAMINATION
22  BY MR. CHETSON:
23    Q.  Mr. Lopez, I'm gonna ask you a few questions
24  about your testimony, if that's okay.
25    A.  Okay.

1    Q.  I'm Chris Baker's attorney, okay?

2    A.  All right.

3    Q.  Sounds like you went to Atlanta three or four

4  times, is that correct?

5    A.  Yes.

6    Q.  And you got a kilo each time, is that correct?

7    A.  Yes.

8    Q.  That would be a total of about four kilos, is

9  that correct?

10    A.  Yes.

11    Q.  Okay.  And you have admitted responsibility for

12  your part in this crime, is that correct?

13    A.  I have.

14    Q.  And is part of the plea agreement, which is

15  Government's Exhibit, I think, 85 -- if we can put up

16  Government's Exhibit 85, if we could go to the seventh

17  page.  This is a plea agreement that was negotiated

18  between you and the government, correct?

19    A.  Yes, sir.

20    Q.  And you entered this plea agreement in early

21  August, is that correct?

22    A.  I did.

23    Q.  Siting before Judge Myers, and you pled guilty to

24  these crimes, is that correct?

25    A.  Yes.

1       Q.  Pled guilty to two crimes.  You pled guilty to a

2   conspiracy to distribute -- or conspiracy to possess

3   with the intent to distribute and distribute 50 grams or

4   more of methamphetamine.

5       A.  Yes.

6       Q.  Do you remember pleading guilty to that?

7       A.  Yes.

8       Q.  And you also pled guilty to a charge of actually

9   distributing or the distribution of 50 grams or more of

10  methamphetamine on January 13th, 2021.  Do you remember

11  doing that?

12      A.  Yes.

13      Q.  And you understand that the mandatory minimum

14  possible sentence that you can receive is ten years in

15  prison, is that correct?

16      A.  Yes.

17      Q.  As part of the plea agreement, further, on page

18  7, what we see at the bottom of page 7, under paragraph

19  5 it talks about the parties agree to various terms or

20  positions.  Do you see that?

21      A.  I do.

22      Q.  And under (a), it says the readily -- the

23  relevant and readily provable quantity of

24  methamphetamine, ice, to be used in determination of the

25  base offense level pursuant to, and then it has the --

```
1    those are references there to the sentencing
2    guidelines -- is at least 500 grams but less than 1.5
3    kilograms.  Is that correct?
4        A.  Yes.
5        Q.  And then it gives you a -- tells you what your
6    base offense level for that is.  Do you see that?
7        A.  Yes.
8        Q.  That agreement is -- the government is letting
9    you, essentially, agree to an amount of methamphetamine
10   that is far below what you actually participated in.
11   Correct?
12       A.  Yes.
13       Q.  That's a benefit that you got from the
14   government.  Is that correct?
15       A.  Excuse me?
16       Q.  You got that -- the government is giving you a
17   benefit and is saying to you:  We'll let you plead
18   guilty and agree to a lower drug weight or drug amount
19   than you actually did.  Correct?
20       A.  Yes.
21       Q.  Because you actually participated in three to
22   four kilos, approximately four kilos of distribution.
23   Correct?
24       A.  No.
25       Q.  Well, you were in that -- you were in those
```

1   vehicles going back and forth from Georgia, and three to

2   four times with a kilo apiece, correct?

3        A.   Correct.

4        Q.   The government also agreed with you or gave you

5   the concession that it was not going to assess you any

6   points for possession of a firearm.  Is that correct?

7        A.   That's right.

8        Q.   So you got concessions as part of the plea

9   agreement and benefits as part of a plea agreement in

10  exchange for your agreement to come here and testify.

11  Is that correct?

12       A.   I'm here to tell the truth.

13       Q.   I understand that, but you also got some

14  concessions in exchange for your agreement to come here

15  and testify.

16       A.   I did.

17       Q.   Okay.  Now, if we could turn to the -- page 2 of

18  the sealed supplement.  Under paragraph 2, do you see

19  paragraph 2 at -- down the page?

20       A.   I do.

21       Q.   There are a list of things or positions that the

22  United States Attorney, meaning the prosecutors in this

23  case, have agreed to as part of the plea agreement.  Is

24  that correct?

25       A.   Yes.

1    Q.  They have agreed not to share any information you

2    provided with any other state or federal prosecuting

3    entities except upon those prosecutors agreeing to your

4    plea agreement.  Do you understand that?

5    A.  I do.

6    Q.  And that the United States Attorney for the

7    Eastern District of North Carolina will -- under

8    paragraph (a), that it will make known to the Court,

9    meaning Judge Myers, at your sentencing the full extent

10   of your cooperation pursuant to this agreement, but the

11   United States is not promising to move for a departure

12   pursuant to United States Sentencing Guideline -- then

13   it gives you some guidelines and some statutes there.

14   Do you see that paragraph?

15   A.  I do.

16   Q.  So that ten-year mandatory minimum operates in

17   this way, and I want to make sure that you -- well, let

18   me strike that, Your Honor.

19         You can only receive a sentence less than ten

20   years if the prosecutors at this table file a motion

21   with the Court permitting you to be sentenced below ten

22   years.  That's your understanding, correct?

23   A.  Correct.

24   Q.  And so your fate, in terms of whether you will

25   serve less than 120 months in prison, depends upon the

1   federal government, the prosecutors filing that motion

2   to then permit Judge Myers to sentence you below ten

3   years if he so wishes, correct?

4           MR. DODSON:  Objection.

5           THE COURT:  On the same basis that was

6   discussed previously?

7           MR. DODSON:  Yes, Your Honor.

8           THE COURT:  Overruled.

9   BY MR. CHETSON:

10      Q.  You can answer the question.

11      A.  Repeat the question.

12      Q.  I'll ask it again.  So your ability -- your

13  future, in terms of whether you're sentenced above or

14  below ten years, depends on the government filing that

15  motion with Judge Myers, permitting the federal judge to

16  sentence below ten years.

17      A.  Yeah.

18      Q.  So you're hoping that the federal government, the

19  prosecutors seated at this table, ultimately file that

20  motion with the Court to permit Judge Myers to sentence

21  you below ten years, correct?

22      A.  Yes.

23      Q.  Because you've testified about how -- well, I

24  think you've been in custody pending your arrest.  Is

25  that correct?

```
1       A.   Yes.

2       Q.   When were you arrested?

3       A.   January of last year -- or this year.

4       Q.   Jail is not a good place.  Is that correct?

5       A.   Correct.

6       Q.   You have family.  Is that right?

7       A.   I do.

8       Q.   You'd like to return to your family.

9       A.   I do.

10      Q.   As quickly as possible.

11      A.   Yeah.

12           MR. CHETSON:  No further questions, Your

13   Honor.  Thank you.

14           THE COURT:  Ms. Salmon.

15           MS. SALMON:  No questions for Mr. Lopez.

16           THE COURT:  Redirect?

17           MR. DODSON:  No, Your Honor.

18           THE COURT:  All right.  Thank you, sir.  You

19   may step down.

20           THE WITNESS:  All right.

21           MR. DODSON:  May Mr. Lopez be released from

22   his subpoena?

23           THE COURT:  He is.

24           Before you call your next witness, I'm gonna

25   give a limiting instruction.
```

1              Ladies and gentlemen of the jury, at various

2    times, you've heard people talk about the sentences that

3    might apply to their cases.  I'm giving an instruction

4    that you're to consider that only to the extent it might

5    motivate the person who is testifying.  You are not to

6    speculate in any way on the sentences that might apply

7    to the defendants in this case because there are many

8    factors which have nothing to do with what happens

9    before you today that might affect their sentences in a

10   way that is very different than the sentences for the

11   people who are testifying.

12             So when the attorneys cross-examine the

13   witnesses regarding their possible sentences, that is

14   for your consideration regarding the effect it might

15   have on the testifying witness; and you can decide that

16   you think it will have a big effect, a small effect, no

17   effect.  That's entirely up to you to weigh their answer

18   regarding those sentences as it affects the testifying

19   witness.

20             You are not to speculate on any sentence

21   that might apply to the defendants in this case, because

22   there may be reasons which will not appear before you at

23   any time that could affect the sentences that would

24   apply in their cases, which could go from the full

25   range, and that will come before the Court for reasons

1    that have nothing to do with your decision as to guilt

2    or innocence.  So I'm instructing you to consider it for

3    the limited purpose for which it is offered and not to

4    use it in any way in your determination of guilt or

5    innocence for the defendants to sit before you.

6              You may call your next witness.

7              MS. SANDLING:  The government would call

8    Devan Christopher.

9              THE CLERK:  You can come right over here,

10   and watch your step.  Raise your right hand, left hand

11   on the Bible.  Please state your name for the record.

12             THE WITNESS:  Devan Christopher.

13             (The witness was placed under oath.)

14             MS. SANDLING:  May I proceed, Your Honor?

15             THE COURT:  You may.

16                    DIRECT EXAMINATION

17   BY MS. SANDLING:

18      Q.  Good afternoon, Ms. Christopher.

19      A.  Good afternoon.

20      Q.  If you could, just introduce yourself to the

21   jury, please.

22      A.  I'm Devan Christopher.

23      Q.  Ms. Christopher, where do you live?

24      A.  I live in Dublin, Georgia.

25      Q.  And how old are you?

1    A.  I'm 34.

2    Q.  Are you employed?

3    A.  I am.  I'm a manager at Krystal.

4    Q.  Okay.  Can you speak up just a little for me?

5    A.  Yes, ma'am.  Sorry.

6    Q.  Do you know the defendant in this case,

7  Christopher Baker?

8    A.  I do.

9    Q.  Tell the jury how you know Christopher Baker, how

10  the two of you met.

11    A.  I met Christopher Baker in the fall of 2019, fall

12  or summer of 2019, through the guy that was my boyfriend

13  at the time.  His name was David Jones.  And David Jones

14  had asked me if I wanted to come and hang out, and I

15  did.  When I got there, we showed up at David Jones's

16  camper off of Dee Kennedy Road in Auburn, Georgia.  And

17  when I got there, the defendant -- or -- was in his

18  boxers, and he had a female with him, and David Jones

19  was there too, and we all continued to get high.

20    Q.  Now, did David Jones go by another name?

21    A.  Road Kill was his biker name.

22    Q.  And was Road Kill a biker?

23    A.  He was.

24    Q.  What kind of biker was Road Kill?

25    A.  At first he was with the Rock Machines, and then

1  he became a Pagan.

2     Q.   Did Road Kill and the defendant know one another?

3     A.   They did.

4     Q.   How did they know each other?

5     A.   They would do drugs, and Baker would buy drugs

6  from Road Kill.

7     Q.   So when you first met the defendant, the

8  defendant was purchasing drugs from your boyfriend at

9  the time, David Jones, also known as Road Kill.

10    A.   Yes, ma'am.

11    Q.   What kinds of drugs was the defendant purchasing

12 from Road Kill?

13    A.   Methamphetamines.

14    Q.   Do you know how much methamphetamine the

15 defendant initially started purchasing from Road Kill?

16    A.   It started off small, in a little -- like a

17 little sandwich baggy, and then it went from there up to

18 a half gallon Ziploc bag.

19    Q.   Okay.  And a Ziploc bag, are we talking about,

20 like, a little sandwich size?

21    A.   Gallon size.

22    Q.   Gallon size.  And those gallon size Ziploc bags,

23 how full were they of methamphetamine?

24    A.   About this full --

25    Q.   If you know.

1    A.  -- from the bottom to the middle all the way

2  across.

3    Q.  Now, how long did this go on where the defendant

4  Christopher Baker was purchasing methamphetamine from

5  your boyfriend at the time, Road Kill?

6    A.  He was purchasing methamphetamines from Road Kill

7  up until Road Kill was dead.

8    Q.  Tell the jury how Road Kill died.

9    A.  I heard it was an overdose of heroin and

10  methamphetamines on January 21st of 2021.

11    Q.  Were you with Road Kill when he died of that

12  overdose?

13    A.  I was not.  I was with Baker in a motel in

14  North Carolina.

15    Q.  Now, tell the jury how did you come to be with

16  the defendant as opposed to with Road Kill.

17    A.  I started to become the driver around November of

18  2020, started driving for Baker more and more because he

19  was showing me the attention and the affection that I

20  wanted from Road Kill that Road Kill wasn't giving me

21  because he was cheating on me all the time.

22    Q.  Now, when you say that you started driving for

23  the defendant, were you driving him around to go to

24  restaurants?

25    A.  To transport drugs, to go pick up drugs, deliver

1   drugs all over the place, South Carolina, North

2   Carolina, Georgia, Atlanta.

3       Q.   When you were driving the defendant to Georgia,

4   Atlanta, Georgia, with whom was the defendant meeting?

5       A.   Ted Cannon, Bam Bam.

6       Q.   Did you know Ted Cannon?

7       A.   I did not until Road Kill had introduced me to

8   him.

9       Q.   Road Kill introduced the defendant to Ted Cannon?

10      A.   Yes.

11      Q.   Now, are you aware of whether or not Ted Cannon

12  went by another name?

13      A.   He went by Bam Bam.

14      Q.   Okay.  Did you call him Bam Bam --

15      A.   Yes.

16      Q.   -- or did you call him Ted Cannon?

17      A.   I called him Bam Bam.

18      Q.   What did the defendant refer to him as?

19      A.   Bam Bam.

20      Q.   Okay.  Now, while you were driving the defendant

21  to go to Atlanta, Georgia, when he met with Bam Bam,

22  Ted Cannon, what was he getting?

23      A.   Ziploc -- gallon Ziploc bag full, all the way at

24  the bottom.

25      Q.   Of what?

```
 1        A.   Of methamphetamines.
 2        Q.   Now, did you and the defendant at this time -- I
 3   know you were -- starting in November 2020, you were
 4   driving the defendant.  Are you and the defendant now in
 5   a romantic relationship?
 6        A.   Not at this point, no.
 7        Q.   Okay.  But did there become --
 8        A.   Yes, it did.
 9        Q.   Okay.  And when did that happen, Ms. Christopher?
10        A.   I don't recall exactly when it happened, but it
11   was not long after November of 2020.
12        Q.   Okay.  So approximately how often, starting from
13   November of 2020 through February of 2021, did you drive
14   the defendant to Atlanta, Georgia?
15        A.   Approximately twice a week.
16        Q.   And what were you driving when you would drive
17   the defendant?
18        A.   A black --
19        Q.   What kind of car?
20        A.   -- 200 Chrysler.
21        Q.   Twice a week you were driving the defendant to go
22   to Georgia?
23        A.   Yes, ma'am.
24        Q.   Every single week?
25        A.   Just about it.
```

1    Q.   When you were driving the defendant to Georgia to

2    meet with Ted Cannon, or Bam Bam, after meeting and

3    picking up methamphetamine from Bam Bam, where would the

4    two of you go?

5    A.   We would come back towards North Carolina, but

6    we'd make pit stops in between, like South Carolina.

7    Q.   Let me ask you this:  When you went to South

8    Carolina, where did you go in South Carolina?

9    A.   To Shaun's house.

10   Q.   Okay.  And can you tell the jury who Shaun is?

11   A.   One of Baker's biggest buyers.  It's one of his

12   friends.  He hung out there all the time.

13   Q.   So Shaun was a customer --

14   A.   Yes.

15   Q.   -- of the defendant?  And did you observe

16   approximately how much methamphetamine the defendant was

17   providing to Shaun?

18   A.   Ziploc baggy full.

19   Q.   After leaving Shaun's house in South Carolina,

20   where else would you and the defendant go together?

21   A.   We would end up either at a hotel or we would end

22   up at Demon's.

23   Q.   And Demon, do you know Demon's full name or real

24   name?

25   A.   No.

```
1       Q.   Okay.  Where was Demon?  Where was he living?

2       A.   Advance, North Carolina.

3       Q.   Here in North Carolina?

4       A.   Yes, sir.

5       Q.   And in Advance, North Carolina, what would happen

6   when you and the defendant got to Demon's house?

7       A.   We would go and stay in the little building Demon

8   had in the back that was Baker's room.

9       Q.   Did you and the defendant ever come to Raleigh?

10      A.   We did, twice.

11      Q.   I want to show you what's already been admitted

12  into evidence as Government's Exhibit 31.  And let me go

13  to 32, 33.

14           Ms. Christopher, do you recognize Government's

15  Exhibit 33?

16      A.   I do.

17      Q.   Who is that?

18      A.   That's me --

19      Q.   In this photograph.

20      A.   It's me.

21      Q.   Okay.  And do you recall when this was?

22      A.   February 17th.

23      Q.   February the 18th --

24      A.   18th.  Yes, ma'am.  I'm sorry.

25      Q.   Of 2021?
```

1    A.  Yes, ma'am.

2    Q.  Can you describe for the jury what happened on

3  February the 18th of 2021?

4    A.  Me and the defendant were in the building, and he

5  had got a phone call, and he got up and walked out.  And

6  then when he came back into the building, he said:  Are

7  you ready to ride?  I said yes.

8        We got in the car.  He had started off driving,

9  and then I switched because he likes to fall asleep

10  behind the wheel when he drives.  And we went and pulled

11  up at a Burger King, and we met a Black male that got

12  out of a -- I want to say a green Explorer type deal.

13  Got in the back seat and started talking to Baker about

14  buying some methamphetamines, and then it went from that

15  to a gun purchase.

16    Q.  So on February the 18th of 2021, are you aware of

17  whether or not the defendant sold...

18    A.  He did.  He sold him --

19    Q.  A firearm?

20    A.  -- I think an ounce.  I think he sold him an

21  ounce of methamphetamines.

22    Q.  Okay.  Was a gun also sold on February the 18th

23  of 2021 by the defendant?

24    A.  Yes.

25    Q.  Now, let me ask you about that gun.  Did you ever

1  see the defendant in possession of firearms?

2      A.  Always.

3      Q.  Now, when you say "always" --

4      A.  Every day.

5      Q.  -- describe -- every --

6      A.  Every day.

7      Q.  -- day?

8      A.  Night, day.  It didn't matter.  He was always

9  armed.

10     Q.  Why was the defendant always armed?

11     A.  For his safety.  He's a Pagan, selling drugs.

12 Anybody's known to rob you, you know.

13     Q.  Did you carry a firearm, Ms. Christopher?

14     A.  I did for my safety.

15     Q.  Did the defendant provide a firearm to you to

16 carry?

17     A.  He did.

18     Q.  Okay.  What type of firearm did he provide to you

19 to carry?

20     A.  It was a small handgun, like maybe a .380.

21     Q.  And why did you carry a handgun?

22     A.  Because we were transporting drugs, and he was a

23 Pagan, and they're always head to head with the Outlaws,

24 and there's shootings going on, and it's for my

25 protection.

1    Q.  To your knowledge, the guns that the defendant

2  always possessed, were they loaded?

3    A.  Yes.

4    Q.  Was the gun that you carried loaded?

5    A.  Yes.

6    Q.  I want to turn now to February the 27th of 2021.

7  Do you recall participating in another controlled buy

8  involving the defendant in this case?

9    A.  I do.  I recall driving him to the Burger King,

10  and we had Cage with us, his SSR at the time, or wanting

11  to become his SSR at the time.

12    Q.  Now, did you know Cage's real name?

13    A.  I want to say it's Brian.  That's the only part I

14  know.

15    Q.  Okay.  And you knew Brian, or Cage, to be the

16  defendant's Sergeant of Arms?

17    A.  Yes.

18    Q.  What position did the defendant hold with the

19  Pagans in February of 2021?

20    A.  In February of 2021, he was a 13.  He was -- a 13

21  is the third in rank, the third highest person over the

22  nation, not just North Carolina.

23    Q.  Okay.  So in the entire United States --

24    A.  Yes.

25    Q.  -- he was the top three member --

```
 1      A.   Yes.

 2      Q.   -- of the Pagans.

 3      A.   Yes.

 4      Q.   Okay.  Now, from the time that you met the

 5 defendant and the, you know, summer of 2020, what rank

 6 did he hold?

 7      A.   When I first met him he was a Diamond, which is

 8 just kind of like a president of one county, one

 9 chapter.

10      Q.   And from a Diamond, were you aware of his

11 progression?

12      A.   Yes.

13      Q.   Where did he go from Diamond to 13?  Was there

14 any in between?

15      A.   No.

16      Q.   Okay.  How did you know that the defendant had

17 become a 13, Ms. Christopher?

18      A.   He had told me himself.

19      Q.   He told you himself?

20      A.   Yes.

21      Q.   What did the defendant tell you about becoming a

22 13?

23      A.   He said he was going to become the 13, and he had

24 to go to a motherhood meeting.

25      Q.   Do you recall when the defendant told you he had
```

1    become a 13?

2       A.  I don't recall exact dates or time, no.

3       Q.  Was it before or after you started driving for

4    the defendant?

5       A.  It was during.

6       Q.  During.

7       A.  Yes.

8       Q.  Okay.  I want to show you Government's Exhibits

9    41 through 44.  And let's stop here for a moment.  Do

10   you recognize Government's Exhibit 42, Ms. Christopher?

11      A.  Yes, ma'am.  It's me.

12      Q.  And that's you?

13      A.  Yes.

14      Q.  Okay.  And do you recall, you know, what date

15   this was?

16      A.  I do not.

17      Q.  On Government's Exhibit 43 -- if we could show

18   that and 44.

19      A.  February 27th.

20      Q.  Okay.

21      A.  Yeah.

22      Q.  And on the 27th of February of 2021, can you

23   describe for the jury what happened during this

24   particular deal?

25      A.  I had drove him to Burger King, and him -- as

1    soon as we parked, Cage got out of the vehicle for

2    Baker's protection.  And then they -- Baker got out and

3    they met, I want to say a Black male, and they popped

4    the trunk, and I don't know what happened after that.

5       Q.  Do you know if a firearm was exchanged during

6    this particular deal?

7       A.  I do.

8       Q.  In addition to drugs?

9       A.  Yes.

10      Q.  Did you know what type of firearm?

11      A.  I did not.

12      Q.  Okay.  Did Mr. Baker have a gun on him on

13   February the 27th of 2021?

14      A.  He did.

15      Q.  And did you have a gun on you?

16      A.  I did.

17      Q.  This particular day?  Ms. Christopher, how long

18   did you end up driving for the defendant in this case?

19      A.  I drove for Mr. Baker up until I got arrested,

20   March 15th of 2021.

21      Q.  Why were you arrested on March the 15th of 2021?

22      A.  I had went home to visit my kids and my mom for

23   the weekend and got pulled over in Auburn, Georgia,

24   while visiting them.  And the tag was bad on the

25   Chrysler 200 I was driving; that was Demon's wife's car.

1    And they had found my registered gun that was registered

2    in my mom's name in my purse, and then they found an

3    unmarked gun in the console which I did not know was

4    there.  It was Baker's.  And I had some methamphetamines

5    on me.  And they got me with possession of that and two

6    firearms.

7        Q.  And you went to jail.

8        A.  I did.

9        Q.  Okay.  And you pled guilty to those charges.

10       A.  I did.

11       Q.  And that was possession of methamphetamine,

12   felony possession.  Is that correct?

13       A.  Yes.

14       Q.  Okay.  And arising out of that conviction, what

15   happened?

16       A.  I ended up going to rehab in Dublin.  I

17   graduated.  I've been clean 18 and a half months.  I

18   have a full-time job.  I have my own place to live, a

19   vehicle, and I'm trying to get my relationship back with

20   my kids.

21       Q.  Now, during the time that you were dating

22   Road Kill up through when you got arrested in March of

23   2021, were you using methamphetamine regularly?

24       A.  I was using methamphetamines every day, ecstasy,

25   GHB, marijuana.  You name it, I was using it.

1    Q.  And when you were using methamphetamine from the

2  time that you started driving for the defendant through

3  February and March of 2021, who was providing you that

4  methamphetamine?

5    A.  Christopher Baker.

6    Q.  Had you been using methamphetamine for a long

7  time, Ms. Christopher?

8    A.  Yes.  When I was 13, I was raped by six men, and

9  I started using drugs severely then, and I haven't

10  stopped until I just stopped for 18 months.  Been using

11  drugs for over 20 years.

12    Q.  But you're clean today.

13    A.  Eighteen months.

14    Q.  Okay.  Now, you have signed a plea agreement in

15  this case and pled guilty already to the charges in this

16  case.  Correct?

17    A.  I have.

18    Q.  If we could show what's already been admitted

19  into evidence -- or not been admitted.  Excuse me.  Let

20  me show you Government's Exhibit 86.  Ms. Christopher,

21  do you recognize Government's Exhibit 86?

22    A.  I do.

23    Q.  And what is this?

24    A.  It's my agreement.

25    Q.  Is that the plea agreement?

1        A.   It is.

2        Q.   That you signed in this case?

3        A.   Yes, ma'am.

4        Q.   And if we could go to page 8.  And do you

5    recognize on page 8 your signature, Ms. Christopher?

6        A.   I do.

7        Q.   Okay.  And if we could go to the sealed

8    supplement.  And do you recognize the sealed supplement?

9        A.   I do.

10       Q.   Okay.  And if we could go to page 3.  And is that

11   your signature on page 3 as well?

12       A.   It is.

13       Q.   Okay.  And you've pled guilty to the charges,

14   conspiracy to distribute and possess with the intent to

15   distribute 50 grams or more of methamphetamine,

16   possession of a firearm in furtherance of a drug

17   trafficking crime, and distribution of methamphetamine.

18   Is that correct?

19       A.   Yes, ma'am.

20            MS. SANDLING:  Your Honor, government would

21   move to introduce Government's Exhibit 86.

22            THE COURT:  It's admitted without objection.

23            MS. SANDLING:  And would also ask to

24   publish.

25            THE COURT:  You may.

1    BY MS. SANDLING:

2       Q.  Now, Ms. Christopher, we're looking here at your

3    Memorandum of Plea Agreement.  And turning to page 8,

4    this is your signed plea agreement.  You've pled guilty

5    in front of Judge Myers?

6       A.  Yes.

7       Q.  Okay.  And then the sealed supplement as well in

8    page 3, you've agreed to cooperate in this case.  Is

9    that correct?

10      A.  Yes.

11      Q.  Have you been made any promises or guarantees

12   arising out of your cooperation in this case,

13   Ms. Christopher?

14      A.  I have not.

15               MS. SANDLING:  Okay.  I have no further

16   questions, Your Honor.

17               THE COURT:  All right.  At this time we're

18   gonna take our lunch break.  We'll come back at 1:30 and

19   proceed to cross-examination.

20               (The jury exited the courtroom.)

21               THE COURT:  All right.  On the record and

22   outside the presence of the jury.  Is there anything we

23   need to take up at this time?

24               MS. SANDLING:  Not for the government.

25               MR. CHETSON:  Not for Mr. Baker.

1          MS. SALMON:  Nothing on behalf of

2    Mr. Holcomb, sir.

3          THE COURT:  All right.  We'll be in recess

4    until 1:30.

5          (Proceedings recessed at 12:45 p.m.)

6          (Proceedings recommenced at 1:32 p.m.)

7          THE COURT:  All right.

8          MS. SANDLING:  Your Honor, before we bring

9    the jury back, I just wanted to inform the Court that at

10   the lunch recess, Mr. Chetson informed Mr. Dodson and I

11   that he would stipulate to -- may be stipulating --

12   excuse me -- to the DEA analysis analyst.

13         THE COURT:  Okay.

14         MS. SANDLING:  And we'll be working on that

15   this evening.  I do want to inquire on the record if

16   Ms. Salmon would also be stipulating to the DEA analyst

17   for the November 6, 2020.

18         MS. SALMON:  After reviewing the proposed

19   stipulation, it would be our intention to stipulate

20   also.  I haven't seen what it looks like.

21         MR. CHETSON:  That's my same position, Your

22   Honor.

23         THE COURT:  All right.

24         MR. CHETSON:  We're just waiting for the

25   draft.

1          THE COURT:  We're waiting for the draft, and

2     once the draft has come forward, we'll make some

3     determinations.

4          MS. SANDLING:  And I do believe that that

5     would save the Court six witnesses.  We have six DEA

6     analysts.  We also have John Griffin with the ATF.

7     There may be a stipulation regarding their -- the fact

8     that there was a machine gun and a sawed-off shotgun, so

9     a total of seven witnesses, potentially.

10          THE COURT:  All right.  We'll take that up

11     before we bring the jury in tomorrow morning, if that is

12     sufficient time for the parties.

13          MR. CHETSON:  It will be for the defense, if

14     I get it this evening, Your Honor.

15          THE COURT:  I'll allow you to --

16          MR. CHETSON:  Yes.

17          THE COURT:  -- exchange everything, and you

18     can inform me in the morning if we're there.  If we can

19     save that many witnesses, that would be terrific.

20          MR. CHETSON:  Yes, Your Honor.

21          MS. SALMON:  And in that same vein, if the

22     government can let us know when the jury goes out this

23     afternoon what their forecast of time will be, assuming

24     the stipulations, because the proposed expert was told

25     to be here on Friday, so I'll need to get him here

```
 1    tomorrow if we'll be done earlier.
 2                    THE COURT:  Okay.  We will...
 3                    MS. SANDLING:  We will work on that, Your
 4    Honor.
 5                    THE COURT:  All right.  Thank you.  All
 6    right.  Let's get the jury.
 7                    (The jury entered the courtroom.)
 8                    THE COURT:  All right.  Counsel, you may
 9    proceed with cross.
10                    MR. CHETSON:  No questions, Your Honor.
11    Thank you.
12                    MS. SALMON:  No questions, Your Honor.
13                    THE COURT:  All right.  Thank you, ma'am.
14    You're excused, and you're excused from your subpoena.
15                    You may call your next witness.
16                    MR. DODSON:  The United States calls
17    Brian Jaeger, Your Honor.  And, Your Honor, that's an
18    in-custody witness.
19                    THE COURT:  How many remaining in-custody
20    witnesses do we have?
21                    MR. DODSON:  Your Honor, after this...
22                    THE COURT:  Go ahead.
23                    MR. DODSON:  After this witness we will have
24    three more in-custody witnesses.
25                    THE COURT:  Okay.  Thank you.
```

1                    (Brief pause in proceedings.)

2                    THE CLERK:  Raise your right hand, left hand

3    on the Bible.  Please state your name for the record.

4                    THE WITNESS:  Brian Jaeger.

5                    (The witness was placed under oath.)

6                    THE COURT:  All right.  Your witness.

7                    MR. DODSON:  Thank you, Your Honor.

8                         DIRECT EXAMINATION

9    BY MR. DODSON:

10       Q.  Good afternoon, Mr. Jaeger.  Can you introduce

11   yourself to the jury, sir.

12       A.  I'm Brian Jaeger.

13       Q.  How old are you, sir?

14       A.  34.

15       Q.  Where are you from?

16       A.  Originally St. Louis, Missouri.

17       Q.  And you're currently in custody, correct?

18       A.  Yes.

19       Q.  Prior to coming into custody, were you employed?

20       A.  I was and wasn't at the same time.  I had my own

21   company, and COVID kind of had that take a tumble.  But

22   before that I was doing auto glass.

23       Q.  You were doing auto glass?

24       A.  Yes.

25       Q.  All right.  Mr. Jaeger, you're charged in

1    connection with this case, correct?

2        A.  Yes.

3        Q.  And you've pled guilty to conspiracy to

4    distribute and possess with intent to distribute 50

5    grams or more of methamphetamine, correct?

6        A.  Yes.

7        Q.  And you're also charged with distributing

8    methamphetamine.  Is that correct?

9        A.  Yes.

10       Q.  And you pled guilty to that?

11       A.  Yes.

12       Q.  And you also pled guilty to possession of a

13   firearm in furtherance of a drug trafficking crime.  Is

14   that correct?

15       A.  Yes.

16       Q.  Mr. Jaeger, did you do all that?

17       A.  Yes.

18       Q.  And did you enter into a written plea agreement

19   with the government?

20       A.  Yes.

21       Q.  I want to show you -- turn your attention to that

22   screen in front of you on the witness stand.  I'm gonna

23   show you what's been marked as Government's Exhibit 87.

24   I want you to take a moment to look at the pages as we

25   flip through.

1        You recognize Government's Exhibit 7?

2    A.   Yes.

3    Q.   Excuse me -- 87.

4    A.   Yes.

5    Q.   Is that your plea agreement, sir?

6    A.   Yes.

7    Q.   And if we could go back a few pages to the end of

8 the plea agreement, is that your signature on page 9 of

9 Government's Exhibit 87?

10   A.   It is.

11   Q.   And it's signed by your attorney, correct?

12   A.   Yes.

13   Q.   And the next section is the section dealing with

14 your cooperation, if we go to page 10.  This is the

15 section dealing with your cooperation.  Is that correct?

16   A.   Yes.

17   Q.   And if you go to the end of that page, please,

18 page 12, Government's Exhibit 87, that's your signature,

19 correct?

20   A.   Yes.

21   Q.   Mr. Jaeger, have any promises been made to you

22 that are not contained in your written plea agreement?

23   A.   No.

24        MR. DODSON:  Your Honor, we move to admit

25 Government's Exhibit 87 into evidence.

                    THE COURT:  It's admitted without objection.

BY MR. DODSON:

     Q.  And, Mr. Jaeger, the jury is seeing this for the
first time, so can -- and just to confirm that you see
this says "United States of America versus Brian Jaeger"
at the top?

     A.  Yes.

     Q.  And it says "Memorandum of Plea Agreement"?

     A.  Yes.

     Q.  Okay.  And then one more time we'll go to page 9.
And that's your signature, correct?

     A.  Yes.

     Q.  And the next section is your portion having to do
with your cooperation, correct?

     A.  Yes.

     Q.  And you also signed the last page of that.

     A.  Yes.

     Q.  Thank you.  Mr. Jaeger, are you hoping to get
some credit off of any sentence you might receive for
your testimony here today?

     A.  Not really.

     Q.  Are you hoping that the judge will give you some
consideration -- when you go to sentencing, are you
hoping he might give you some consideration for your
testimony here today?

```
1     A.  Yes.
2     Q.  Okay.  Has the government promised you any
3  particular sentence for your testimony today?
4     A.  No.
5     Q.  Who is it that determines what sentence you
6  receive, if any?
7     A.  The judge.
8     Q.  Mr. Jaeger, do you know the defendant in this
9  case, Christopher Lamar Baker?
10    A.  I do.
11    Q.  How do you know Mr. Baker?
12    A.  Through the Pagans Motorcycle Club.
13    Q.  And were you a member of the Pagans?
14    A.  I was.
15    Q.  When did you become a member of the Pagans?
16    A.  August 15th of 2020.
17    Q.  And did you have to go through a period of
18 prospecting?
19    A.  Yes.
20    Q.  What does that mean?
21    A.  Pretty much do anything that you're asked to do
22 when you're called on to do it.
23    Q.  And do you do that with the hopes that you'll
24 ultimately become a member?
25    A.  Yes.
```

1    Q.  And did you become a member of the Pagans?

2    A.  Yes.

3    Q.  Did you advance to any other positions within the

4    Pagans?

5    A.  I was a Sergeant at Arms.

6    Q.  What does it mean to be a Sergeant at Arms?

7    A.  Pretty much with a Sergeant at Arms, protect the

8    club, the chapter, and, ultimately, a chapter president,

9    at all costs.

10    Q.  Who was the chapter president when you were the

11    Sergeant at Arms?

12    A.  The sergeant -- the chapter president for me, I

13    was Sergeant at Arms for Smithfield, and then shortly

14    after I moved under Mr. Baker.

15    Q.  And where was he -- what area did he control?

16    A.  He controlled the western portion of North

17    Carolina.

18    Q.  And what was his position at that time?

19    A.  At that time, he was a digit, which was a 13,

20    which is a national member of the club, about the

21    highest you can get.

22    Q.  And at the time you were Sergeant at Arms for

23    Mr. Baker, can you tell the jury approximately the month

24    and the year that that -- that you were Sergeant at Arms

25    for Baker when he was a 13?

```
 1      A.   That time span ranged from around the end of
 2  December to, I want to say -- well, I guess the end --
 3  right around the end of December, early January of 2020,
 4  2021, and ended about April or May.
 5      Q.   As a Sergeant at Arms, how often were you around
 6  Christopher Baker?
 7      A.   Just about every day.
 8      Q.   And for what span of time were you around him?
 9      A.   From the point where I started to the point where
10  I ended, and it was day and night.
11      Q.   Let me ask you in other words -- a bad question.
12  For how long -- like you said, you said you were around
13  him almost every day.  For how long were you around him
14  every day?  Three months or six months or --
15      A.   From end of December, beginning of January, all
16  the way up until about April or May.
17      Q.   All right.  And --
18      A.   So about four months or so, I guess.
19      Q.   Okay.  And when you were around Mr. Baker during
20  that time period, did you ever see him in possession of
21  any narcotics?
22      A.   I did.
23      Q.   Which narcotics?
24      A.   Methamphetamines, cocaine, crack, GHB.  Just
25  about anything you wanted to get your hands on.
```

1     Q.  Specifically, with regard to methamphetamine, are
2  we talking about user amounts or something else?
3     A.  No.  Large quantities.
4     Q.  Like what?
5     A.  Kilos, multiple kilos.
6     Q.  And when you say "kilos," are you talking about
7  kilograms?
8     A.  Yes, sir.
9     Q.  Is it your understanding there's 1,000 grams in
10 one kilogram?  Is that your understanding?
11    A.  I'm not really too sure of weights and stuff.
12    Q.  Well, let me ask it this way:  Can you describe
13 -- you've seen Mr. Baker in possession of a kilogram of
14 methamphetamine?
15    A.  Correct.
16    Q.  Can you describe to the jury what that looks
17 like?
18    A.  He used to carry around gallon Ziploc bags full
19 of methamphetamine.
20    Q.  And were you ever with Mr. Baker when he
21 transported methamphetamine?
22    A.  One time.
23    Q.  When was that?
24    A.  That was when I was prospecting.  We went down to
25 Georgia to go pick up a shipment for him to bring back

1    up here and sell.

2          On a separate occasion, I road on my motorcycle

3    behind the car that him and his girlfriend at the time

4    was driving, and they picked up quite a substantial

5    amount.  And then I followed back on my motorcycle, so.

6        Q.  Couple of questions about that trip where you

7    rode on your motorcycle behind Baker and his girlfriend.

8    Do you know who his girlfriend was at that time?

9        A.  It was Devan Christopher.

10        Q.  And you said they went and got a substantial

11    amount of methamphetamine.  Those were your words,

12    correct?

13        A.  Yes.

14        Q.  What do you mean by that?

15        A.  We went to a hotel to pick up the drugs.  And I

16    got there, I went to the bathroom right away, and when I

17    came out of the bathroom, I immediately noticed that

18    there were three large, you know, rolling zip --

19    suitcases full of gallon bags of meth.  And when I

20    looked at the defendant, he was loading -- finishing

21    loading up whatever he got into his bag or case that he

22    would carry.

23        Q.  So just to clarify a few things, you and

24    Mr. Baker, you show up at this hotel, correct?

25        A.  Right.

1      Q.   And it's in Georgia?

2      A.   In Atlanta, yes.

3      Q.   In Atlanta.  And when you come into the hotel

4    room, what do you see?

5      A.   There was a lady in there, and there was a scale

6    on the table, like, a larger scale on the table, and

7    then the three suitcases.

8      Q.   Do you know the lady?  Do you know her name?

9      A.   I don't know her name.

10     Q.   What did she look like?

11     A.   Kind of a heavier-set lady, from what I remember.

12   Maybe Hispanic.

13     Q.   Okay.  And did you know anything about -- did you

14   know anything about her?

15     A.   At the time, I didn't.

16     Q.   Did Mr. Baker tell you anything about that lady?

17     A.   Not really.  We were just going to pick up.

18   That's all I knew.

19     Q.   All right.  So you went into the bathroom, and

20   then you come out of the bathroom, and that's when you

21   saw the three suitcases?

22     A.   Correct.  And there was also a gentleman in the

23   hotel room that was clearly high or -- yeah.  High, I

24   guess.

25     Q.   Okay.  And so did Mr. Baker take these three

1    suitcases or did he get meth out of those --

2        A.   He got meth from the woman that was taking the

3    stuff out of the suitcases, and he loaded it into his

4    little case or bag that he would carry.  Pretty sure at

5    that point he had picked up, like, a gallon -- a gallon

6    size bag and a half.

7        Q.   All right.  Can you describe the case that he'd

8    carry?

9        A.   It looked like a -- kind of like a vintage

10   wicker, almost baskety bag, case type of deal.

11       Q.   And after you left the hotel room, did you and

12   Baker leave together?

13       A.   Yes.

14       Q.   Where did you go?

15       A.   South Carolina.

16       Q.   For what purpose?

17       A.   Where he distributed various amounts to different

18   parties.

19       Q.   And at some point, did you return back to

20   North Carolina?

21       A.   Yes.

22       Q.   Where'd you go?

23       A.   I went back home.

24       Q.   Okay.  And when you left the hotel, are you still

25   on your motorcycle?

1      A.   Yes.

2      Q.   And is Mr. Baker in the vehicle with

3  Ms. Christopher?

4      A.   Yes.

5      Q.   Who is driving that vehicle?  Do you know?

6      A.   Ms. Christopher.

7      Q.   Did she drive to and from?

8      A.   Yes.

9      Q.   Okay.  You mentioned another trip you took to

10  Georgia.  Did you say you took one or two?

11     A.   The two.

12     Q.   Tell us about the other trip.

13     A.   The other trip was when I was prospecting.  It

14  was what I was told that I needed to do in order to

15  prove trust to Mr. Baker to be able to earn my patches.

16  So the chapter had me take Mr. Baker.  I got off work

17  one day, I picked him up, and we went down to Georgia

18  that night.  I worked Thursday.  I got off work that

19  day, drove through the night to go down to Georgia to

20  meet up with another member that's now deceased and pick

21  up some drugs from there.  And on the way back is when I

22  had my first little bit of meth.

23     Q.   How much drugs did you and Baker pick up on that

24  run to Georgia?

25     A.   At that point, I wasn't quite -- I wasn't quite

```
 1   sure about how much was being picked up.  I was assuming

 2   it was a couple ounces.

 3       Q.  And is that because you were prospecting at that

 4   time?

 5       A.  Yes.

 6       Q.  So fair to say you might not have gained the

 7   trust of Mr. Baker?

 8       A.  Correct.

 9       Q.  I want to ask you -- you talked about someone

10   that Baker dealt drugs with that is now deceased.

11       A.  Yes.

12       Q.  Do you know that person's name?

13       A.  I don't know his legal government name.  He went

14   by "Road Kill."

15       Q.  Okay.  Were you ever with Mr. Baker as Sergeant

16   at Arms when he sold drugs to individuals?

17       A.  A few times.

18       Q.  Was one of those times on February 27th of 2021?

19       A.  Yes.

20       Q.  Was there anyone with you besides you and

21   Mr. Baker?

22       A.  Ms. Christopher.

23       Q.  And it's the same -- Ms. Christopher is the same

24   person who went on that second...

25       A.  Yes.
```

```
 1      Q.  Supply -- resupply trip?  I want to show you on

 2   the screen in front of you what's already been admitted

 3   as Government's Exhibit 41.

 4      A.  Mm-hmm.

 5      Q.  Who is the person in this photograph?

 6      A.  Chris Baker.

 7      Q.  And do you see the shirt he's wearing?

 8      A.  Yes.

 9      Q.  Says "Pagan's MC"?

10      A.  Yes.

11      Q.  Does that stand for Pagans Motorcycle Club?

12      A.  Yes.

13      Q.  Have you ever heard this type of shirt referred

14   to as a soft cut?

15      A.  Not really a soft cut.  It's been referred to by

16   different people in different terms.

17      Q.  Okay.  But do the Pagans refer to it as a soft

18   cut?

19      A.  The Pagans referred to it as a form of colors.

20      Q.  All right.  Government Exhibit 42, please.  Do

21   you recognize the female in this photograph?

22      A.  Devan Christopher.

23      Q.  Okay.  And is this from that February 27th deal

24   that you just talked about?

25      A.  Yes.
```

1    Q.   Where are you located during this deal?

2    A.   I was outside smoking a cigarette.

3    Q.   Why were you outside?

4    A.   We pulled up, and I got out of the vehicle to

5    work security for a deal.

6    Q.   Why would you need to work security for the deal?

7    A.   With other rival clubs in the area, gangs, other

8    acti- -- cops.

9    Q.   Were you also -- you were providing security so

10   that the deal could actually be completed, were you not?

11   A.   Yes.

12   Q.   Did you see any firearms -- did you have a

13   firearm during this controlled purchase?

14   A.   Yes.

15   Q.   Did Mr. Baker have a firearm?

16   A.   Yes.  Mr. Baker carried a firearm daily.

17   Q.   Do you know whether in addition to

18   methamphetamine a firearm was sold by Mr. Baker during

19   this deal?

20   A.   It was.

21   Q.   Do you recall what kind of firearm that was?

22   A.   I don't remember exactly which one it was.  It

23   was a -- it was a semi or automatic machine pistol.

24   Q.   Okay.  Mr. Jaeger, do you go by any other names

25   or nicknames?

```
 1      A.  My road name with the club was Cage.
 2              MR. DODSON:  All right.  Thank you,
 3   Mr. Jaeger.  I have nothing further at this time, Your
 4   Honor.
 5              THE COURT:  Cross-examination, counsel.
 6              MR. CHETSON:  Just briefly, Your Honor.
 7   Thank you.
 8                        CROSS-EXAMINATION
 9   BY MR. CHETSON:
10      Q.  Mr. Jaeger, I represent Mr. Baker, and I'm gonna
11   ask you a few questions about your testimony.  Is that
12   okay?
13      A.  Yes.
14      Q.  Okay.  I'm gonna ask the government to put up
15   Government's Exhibit 87.  This is a copy of the plea
16   agreement you just went through with Mr. Dodson, is that
17   correct?
18      A.  Yes.
19      Q.  And you agreed to certain things in this plea
20   agreement.  Is that correct?  You agree to -- you and
21   the government agree to certain positions within the
22   plea agreement, is that correct?
23      A.  Yes.
24      Q.  Page 4 of the plea agreement, if we could flip to
25   the -- flip to that page, paragraph 3, do you see where
```

1    it says the defendant understand, agrees, and admits?

2        A.   Yes.

3        Q.   Okay.  And you pled guilty to one, two, three

4    counts.  Is that correct?

5        A.   Yes.

6        Q.   Three crimes.

7        A.   Yes.

8        Q.   Correct?  The first crime is a conspiracy crime

9    in which you admitted to -- to conspiring to possess

10   with the intent to distribute and to distribute 50 grams

11   or more of methamphetamine, a Schedule II controlled

12   substance.  You see that?

13       A.   Yes.

14       Q.   Count 13 is on the next page, if we could flip to

15   page 5, and it indicates that you pled guilty to

16   possession with intent to distribute 5 grams or more of

17   methamphetamine, a Schedule II controlled substance,

18   aiding and abetting.  Do you see that?

19       A.   Yes.

20       Q.   Now, for the first count, you understand that

21   your penalty is a ten-year mandatory minimum.  You

22   understand that, correct?

23       A.   Yes.

24       Q.   And then I want to turn to the sixth page, page

25   6.  Page 6 you plead guilty to count 14, which is

1  possession of a firearm in furtherance of a drug

2  trafficking crime, aiding and abetting.  Do you see

3  that?

4      A.  Yes.

5      Q.  And that is for possessing that firearm on

6  February 27th, 2021, in that vehicle that you've talked

7  about with Mr. Dodson.  Do you remember that?

8      A.  Yes.

9      Q.  And that charge carries with it a penalty of a

10 minimum of five years consecutive, meaning in addition

11 to any other sentence.  Is that correct?

12     A.  Yes.

13     Q.  So the idea is that you would first be sentenced

14 on count 1, and you at this point face a mandatory

15 minimum of ten years, okay?  And on count -- is that

16 your understanding?

17     A.  Yes.

18     Q.  And then on count 14, on page 6 here, you would

19 serve that -- count 14, a minimum of five years

20 consecutive to whatever you received on the first count.

21     A.  Yes.

22     Q.  Okay.  You've also agreed to -- if we could go to

23 page 1 of the supplement.  You've also agreed to

24 cooperate with the government, correct?

25     A.  Yes.

1    Q.  I see you're in jail.

2    A.  Yes.

3    Q.  Where are you currently housed?

4    A.  Bladen County.

5    Q.  Bladen County.  Okay.  And it's not pleasant.  Is

6  that fair to say?

7    A.  It's not at all.

8    Q.  It's a terrible place to be.

9    A.  It's not enjoyable.

10   Q.  You're limited in what exercise you can get.

11   A.  Yes --

12   Q.  Is that fair?  You're limited in the contact that

13  you have with your family?

14   A.  Yes.

15   Q.  You're cut off from normal activities that you

16  were used to doing when you were out in the real world.

17  Is that correct?

18   A.  Well, yes.  It's incarceration.

19   Q.  Right.  You're also -- the food is not very good.

20  Is that fair to say?

21   A.  It's delicious.

22   Q.  I gotcha.  And there's commissary that you get --

23  your family can put money in your commissary and you can

24  buy extra goodies.

25   A.  Yes.

 1    Q.  To supplement the pretty bad food.  Is that fair?

 2    A.  Yes.

 3    Q.  So you want to get out of jail and, presumably,

 4  out of prison as quickly as possible.  Is that fair to

 5  say?

 6    A.  I want to get back to my family, yes, but I want

 7  to serve what I owe as well.

 8    Q.  Okay.

 9    A.  I acknowledge that I was in the wrong too.

10    Q.  Fair enough.  And you understand that in order to

11  go below that mandatory minimum of 15 years in prison,

12  you would need the government to file a special motion

13  and say that your cooperation was sufficient to allow

14  the judge to sentence you below 15 years.  Is that

15  correct?

16    A.  I guess.  That's not why I'm doing this, though.

17            MR. CHETSON:  Thank you.  Thank you, Your

18  Honor.  No further questions.

19            MS. SALMON:  No questions for this witness,

20  sir.

21            THE COURT:  Redirect?

22            MR. DODSON:  No, Your Honor.

23            THE COURT:  All right.  Thank you, sir.

24            MR. DODSON:  May Mr. Jaeger be released from

25  his subpoena?

```
 1                    THE COURT:  Mr. Jaeger, you're released from
 2      your subpoena.  Thank you.
 3                    You may call your next witness.
 4                    MS. SANDLING:  The government calls
 5      Elizabeth Young.  Your Honor, she is also in custody.
 6                    (Brief pause in proceedings.)
 7                    THE CLERK:  Raise your right hand, left hand
 8      on the Bible.  Please state your name for the record.
 9                    THE WITNESS:  Elizabeth Anne Young.
10                    (The witness was placed under oath.)
11                    THE COURT:  Your witness.
12                    MS. SANDLING:  Thank you, Your Honor.
13                            DIRECT EXAMINATION
14      BY MS. SANDLING:
15        Q.  Ms. Young, good afternoon.  If you could
16      introduce yourself to the jury.
17        A.  My name is Elizabeth Anne Young.  I also go by
18      "Piper."  Do you want some background or..
19        Q.  Yes.  If you could tell the jury where you're
20      from.
21        A.  Okay.  I live in Berkeley Springs, West Virginia.
22        Q.  Are you married?
23        A.  I was married.  I'm a widow.  I was with my
24      husband for 18 years, and he passed away almost four
25      years ago.
```

1    Q.   Ms. Young, how did you used to be employed?

2    A.   Registered nurse.

3    Q.   Okay.

4    A.   Yup.

5    Q.   Are you still working as a nurse?

6    A.   I still have my license right now, but no.  I

7    left nursing a while ago when I realized I had a drug

8    problem.

9    Q.   Okay.  And why did you have a drug problem?

10   A.   Well, so Saturday will actually be four years.  I

11   was mandated to work as a registered nurse at a hospital

12   in South Carolina, and Hurricane Florence came through.

13   So I was there Wednesday night, Thursday night, Friday,

14   Saturday, Sunday.  My husband was supposed to pick me up

15   Monday morning, and he had had a massive heart attack.

16        The coroner couldn't get there, so they had me

17   call time of death.  Our 15-year-old son found him.  And

18   a couple of years prior to that, my mom had died from

19   brain cancer.  And when she was home on hospice, I was

20   her nurse.  I was the last person to give her medicine.

21        So I started having nightmares, like terrors.  I

22   would try and go to sleep, and I felt like I heard my

23   mom calling me and my husband calling me and somebody

24   was choking me, and I couldn't wake up, and so I didn't

25   want to sleep anymore.

1      So that's why I started using methamphetamines,

2  so I could stay awake and not sleep because I couldn't

3  go through it.  I felt so much guilt for both their

4  deaths.  Like, if I would have been home I could have

5  done CPR, I could have done something, and I wasn't.

6  And when my mom -- I was the last person to give her

7  medicine, so I felt like I killed my mom and not the

8  cancer.  I'm sorry.

9     Q.  It's okay.  Take a minute.

10    A.  Yeah.  So the more and more meth I did, the

11 longer I could stay up, and then I didn't have those

12 dreams anymore.

13    Q.  And using meth, did it cause you to lose your job

14 as a nurse?

15    A.  I mean, I was so scatterbrained, and a lot going

16 on, and it just wasn't safe.  I mean, at one point I was

17 trying to smoke meth and go to work, and I'm like, I

18 can't take care of patients when I can't even take care

19 of myself.  So yeah, I stopped nursing.

20    Q.  Did you come to meet the defendant Christopher

21 Baker in this case?

22    A.  I met him through a member of the Pagans

23 Motorcycle Club, and he was a member at the time.

24    Q.  Who was that member that introduced you to --

25    A.  I don't know his real name.  I just know his road

1  name, which was Ghost.

2      Q.  Ghost introduced you to the defendant?

3      A.  Yes, ma'am.

4      Q.  When was that, Ms. Young?

5      A.  Like late summer, early fall of 2020.

6      Q.  After meeting the defendant -- well, let me ask

7  you this first:  You have several children.

8      A.  Yes, ma'am.

9      Q.  Tell the jury who your children are.

10     A.  I have three kids.  My oldest son is 27.  His

11  name's Austin.  I have one daughter, she's 22 now,

12  Ashley.  And a younger son, he's 19 now, Dylan.  And

13  then I have one grandbaby, Ava.  She's 6 and just

14  started first grade.

15     Q.  Ashley, your daughter, is Ashley Hall, is that

16  correct?

17     A.  Yes, ma'am.

18     Q.  And does Ashley Hall, did she used to be in a

19  relationship with the defendant Christopher Baker?

20     A.  Yes.  Yes, ma'am.

21     Q.  Okay.  And after you met the defendant in this

22  case, describe for the jury whether or not the defendant

23  started supplying you with methamphetamine.

24     A.  The first time I went to meet him, that's what we

25  were going down for.

1    Q.  Where did you first meet the defendant?

2    A.  I don't recall where it was in North Carolina,

3  but it was in North Carolina.

4    Q.  Okay.  And you went down to meet the defendant to

5  get what?

6    A.  To get methamphetamines so I could sell it and

7  also use it, because at that point I was working

8  sporadically, and I figured if I could get enough to

9  sell up in my area, then I wouldn't have to pay for my

10 own drugs.

11   Q.  On that first meeting with the defendant

12 Christopher Baker, how much methamphetamine, if you

13 recall, did you get?

14   A.  I honestly don't recall.  It'd just have been a

15 couple ounces then.

16   Q.  You would have been coming from West Virginia?

17   A.  Yes, ma'am.

18   Q.  And you were meeting him in North Carolina?

19   A.  Yes.

20   Q.  Correct?  Do you recall where in North Carolina

21 you met the defendant for that first deal?

22   A.  No, I don't.

23   Q.  So you got a couple ounces on that first deal,

24 correct?

25   A.  Yes.

1    Q.  And how did you know the defendant would supply

2  you methamphetamine?

3    A.  Through who I went down there with, through

4  Ghost.

5    Q.  Okay.  After that first meeting with the

6  defendant, describe for the jury whether or not you saw

7  the defendant again after that first time.

8    A.  I think after that first time I probably saw him

9  close to once a week until I just started hanging out

10  down there.  I joked that I ran away from home and my

11  responsibilities.  And then I was kind of driving him

12  around all over the place and then taking random trips

13  back up to West Virginia because I was still selling

14  stuff there.

15    Q.  Were you staying in North Carolina for any period

16  of time?

17    A.  I stayed in North Carolina and South Carolina,

18  but we were all over the place, so.

19    Q.  Okay.  And when you say "we were all over the

20  place," who was "we"?

21    A.  The defendant, myself, and whoever his sergeant

22  would have been at the time with the motorcycle club.

23    Q.  Were you driving for the defendant?

24    A.  A lot, yes.

25    Q.  Okay.  Now, describe for the jury -- when you say

1  you were driving for the defendant, what were you

2  driving -- doing?

3      A.  Well, we were in my car, which is a Challenger,

4  and we were going down to buy larger quantities of

5  methamphetamine for my people, my purchases, and then

6  Mr. Baker's.

7      Q.  Do you recall when you started driving for the

8  defendant in this case?

9      A.  It was kind of sporadic to start with because I

10  was riding with him when he had an RV, and then when

11  that was gone, then I drove sometimes.  And then it was

12  probably maybe January or February when I kind of went

13  full-time driving for a little while.

14      Q.  January, February of 2021?

15      A.  Yes, ma'am.

16      Q.  Okay.  Did you know Devan Christopher?

17      A.  Yes, ma'am.

18      Q.  And how did you know Devan Christopher?

19      A.  Through Mr. Baker.

20      Q.  Was she driving for Mr. Baker when you met and

21  started driving for the defendant as well?

22      A.  I started driving for him more after they broke

23  up, so.

24      Q.  Okay.  So you were driving the defendant to

25  Georgia?

             1      A.   Yes.

             2      Q.   Did you know where in Georgia the two of you were

             3    going?

             4      A.   Outside of Atlanta.

             5      Q.   Describe for the jury who you were meeting with

             6    when you went to Georgia.

             7      A.   We went to a man named Bam's house.  I don't know

             8    his real name.  I only went inside his house once, but I

             9    was definitely there a couple times.

            10      Q.   What did Bam look like?

            11      A.   A large man.  I can't really describe him that

            12    well.  I'm sorry.

            13      Q.   How did you know that his name was Bam?

            14      A.   Through, first of all, Road Kill, and Mr. Baker.

            15      Q.   What did you see or observe when you and the

            16    defendant met with Bam?

            17      A.   We were going down to get drugs.  I mean, we used

            18    drugs with them in their house and, I mean, every time

            19    we went there, he would purchase drugs, so.

            20      Q.   Approximately how many times would you say that

            21    you and the defendant went to Bam's house to pick up --

            22    and this is methamphetamine.

            23      A.   Yes, ma'am --

            24      Q.   Is that correct?

            25      A.   Mm-hmm.

1  Q.  How many times would you say you and the

2  defendant did that?

3  A.  Maybe four or five times.

4  Q.  Approximately how much methamphetamine was the

5  defendant getting when you went down to Atlanta --

6  A.  That I honestly don't know because it wasn't my

7  business what he was getting.  I just knew what I was

8  getting when I went down, so.

9  Q.  Who were you getting it from?

10  A.  I was getting it from Mr. Baker.

11  Q.  Okay.  How much was Mr. Baker, the defendant,

12  giving you after you and he would go see Bam?

13  A.  It just depended.  It started off, like, a couple

14  ounces at a time.  Then it went up to a pound, then it

15  went up to a kilo, and so it just varied.  But it kept

16  going up, so.

17  Q.  And when you say "kilo," are you referring to

18  kilogram?

19  A.  Yes, ma'am.

20  Q.  Do you know how much a kilogram is in grams?

21  A.  In grams?  No.

22  Q.  Okay.

23  A.  No.  That's probably a lot of grams.

24  Q.  How were they packaged?  Or how was the

25  methamphetamine packaged that you were getting from the

1  defendant?

2      A.  Well, different ways, because at some point we

3  had it FedEx, so it was coming, like, stuffed in

4  pillows; in big Ziploc bags or big sealed bags that they

5  could seal the top to.

6      Q.  The bags of methamphetamine that the defendant

7  was getting, were they full?  Were they half full?  How

8  did they look?

9      A.  Oh, gosh.  Pretty full.

10     Q.  Okay.

11     A.  Yeah.

12     Q.  Were you paying the defendant for methamphetamine

13  that you were receiving from him?

14     A.  Yes, ma'am.

15     Q.  Approximately how many times over the course from

16  January to February of 2021 through April, May 2021,

17  would you say you drove to Atlanta or Georgia with the

18  defendant?

19     A.  Oh, gosh.  Usually about once a week.  So April I

20  probably would have been back home, so I probably was

21  only down there February, March.  Yeah.

22     Q.  After meeting with Bam in Georgia, where would

23  you and the defendant go?

24     A.  All over the place, wherever his customers were.

25  We would just go and drop it off and -- and then I would

1    usually either run home or send somebody up the road

2    with my stuff.

3        Q.  Well, describe for the jury a typical drive.  If

4    you went to Georgia --

5        A.  Okay.

6        Q.  -- where after leaving Bam's house from Georgia

7    would you and the defendant go?

8        A.  I mean, it varied.  South Carolina a lot, a

9    couple stops in South Carolina, and then back to North

10   Carolina, a couple places.

11       Q.  When you went to South Carolina, what was

12   occurring in South Carolina related to the defendant?

13       A.  He had several customers down there, so we would

14   stop and hang out and party some and then either stay

15   the night or just keep moving on, so.

16       Q.  And after leaving South Carolina, where would you

17   go at that point?

18       A.  Back to North Carolina and then repeat.  Back

19   down to get more.

20       Q.  And what was occurring in North Carolina after

21   leaving South Carolina?

22       A.  He would meet more of his people.  A lot of them

23   were the Pagans but -- and then get rid of what he had,

24   sell what he had, and then we would start over again.

25       Q.  Ms. Young, did you ever see the defendant in

1    possession of a firearm?

2       A.  Yes, ma'am.

3       Q.  Describe that for the jury, please.

4       A.  I saw him in possession of a lot of firearms.  He

5    actually ended up staying at my house right before we

6    were arrested, and there were firearms there.  But he

7    always carried one with him, so.

8       Q.  What type of firearm did the defendant always

9    carry with him, if you know?

10      A.  A handgun.  But I don't remember what kind it is,

11   honestly.

12      Q.  Do you recall June the 4th of 2021, Ms. Young?

13      A.  I do, yes.

14      Q.  Can you describe for the jury what occurred

15   leading up to and on June the 4th of 2021?

16      A.  I was coming back down to North Carolina, to

17   Kings Mountain on my motorcycle, and I was going down to

18   get my stuff.  I had stopped driving for him at that

19   point.

20      Q.  And just one second.  When you said you were

21   coming down to get your stuff, what is your stuff?

22      A.  The methamphetamines.

23      Q.  Okay.

24      A.  Yeah.

25      Q.  And who were you coming down to Kings Mountain to

1    meet with?

2        A.   To Raw's house, Justin.  I don't remember his

3    last name.  And plus my daughter then was dating

4    Mr. Baker.  And my granddaughter was there.  So I was

5    going down to see the girls, get my methamphetamines,

6    and then head back home.

7        Q.   So you went to Kings Mountain.  Is that where Raw

8    or Justin -- and Justin would be Justin Fite, also known

9    as Raw, is that correct?

10       A.   Yes, ma'am.

11       Q.   So you went to Justin Fite's house?

12       A.   Mm-hmm.

13       Q.   Describe for the jury what occurred when you got

14   to Justin Fite, or Raw's house.

15       A.   There was a brick outbuilding where Ashley, the

16   defendant, and my granddaughter were staying.  So I went

17   in there to go see everybody and then just take care of

18   my purchase.  And I recall Mr. Baker being a little

19   frantic because he had to be a lot of places at once to

20   deliver to his customers, and he ask- -- well, mentioned

21   that he had a delivery to make in Raleigh and asked if I

22   was okay doing that, and I told him that would be fine.

23   I wanted to ride more anyway.  So that's how I ended up

24   on June 4th riding down to Raleigh.

25       Q.   How much methamphetamine were you getting from

 1  the defendant on June 4th of 2021?

 2      A.  I don't recall.  But it would have been either a

 3  pound or a kilo at that point.

 4      Q.  Okay.  That you were gonna take back up to

 5  West Virginia --

 6      A.  Yes, ma'am.

 7      Q.  -- and sell to your customers.  Okay.

 8          So the defendant tells you that he needs you to

 9  go to Raleigh.

10      A.  Yes.

11      Q.  And did he tell you why he needed you to go to

12  Raleigh?

13      A.  He had a gun that needed to go, or guns, and some

14  methamphetamines to bring to somebody.

15      Q.  Did he tell you how much methamphetamine he

16  wanted you to take to Raleigh?

17      A.  No, ma'am.

18      Q.  So you knew you were gonna be taking guns and

19  methamphetamine to Raleigh?

20      A.  Yeah.  I was given a bag and then --

21      Q.  Who gave you the bag, Ms. Young?

22      A.  It would have been either Raw or Mr. Baker.

23      Q.  Okay.

24      A.  And then a shotgun that was wrapped up in a bag.

25  So they strapped that to my bike, Raw did, for me.

```
 1      Q.  Where did the shotgun come from?

 2      A.  I'm not sure where it came from.  I mean, I got

 3   it from Mr. Baker, and then Raw hooked it on my bike for

 4   me.  But I don't know where it had come from before

 5   that, so.

 6      Q.  How was the shotgun affixed to your motorcycle?

 7      A.  Two heavy-duty zip ties to the front fairing, the

 8   front, like, on the handlebars.

 9      Q.  You stated or testified that you were given a

10   bag.

11      A.  Yes, ma'am.

12      Q.  Who gave you the bag?

13      A.  Mr. Baker did.

14      Q.  Did you look inside the bag?

15      A.  I did not, no.

16      Q.  Did you know what was inside the bag?

17      A.  I mean, I was told that there was meth that was

18   going there, and it was too heavy just to be meth, so I

19   assumed there was another gun in there.

20      Q.  Okay.  Do you recall after receiving the bag and

21   the shotgun, did you leave Raw's house at that point?

22      A.  Yes, ma'am.

23      Q.  Do you recall approximately what time you would

24   have left Raw's house?

25      A.  I mean, it was nighttime, so.
```

1    Q.   Okay.  And you were by yourself?

2    A.   Yes.

3    Q.   And you were riding a -- or driving a motorcycle.

4    A.   Yes, ma'am.

5    Q.   And did you make any stops along the way?

6    A.   I made one stop to get gas.

7    Q.   And then you came to Raleigh?

8    A.   Yes.

9    Q.   Describe for the jury what happened when you got

10   to Raleigh.

11   A.   I was given an address to go to, and I think it

12   was a BP station.  It was a gas station.  And I got

13   there.  I believe I probably texted Mr. Baker to let him

14   know that I was there, and maybe less than ten minutes

15   later somebody pulled up in a car, and I gave him the

16   bag.  It was a struggle to get the zip ties cut on my

17   motorcycle, so that took forever.  And then he gave me

18   money, I think $3600, and then he left.

19   Q.   I want to show you some exhibits that have

20   already been introduced into evidence, Ms. Young.

21   A.   Okay.

22            MS. SANDLING:  And we'll start with

23   Government 68.

24            (The exhibit was played.)

25   BY MS. SANDLING:

1    Q.  Ms. Young, do you recognize what this is?

2    A.  Yes, ma'am.

3    Q.  What is this?

4    A.  This is who I met at that gas station in his

5  vehicle and me on my motorcycle.

6    Q.  Okay.  What are you doing as -- what's going on

7  right here?

8    A.  Probably I'm looking for the bag or looking for a

9  knife to cut the zip ties at this point.

10    Q.  Okay.

11    (The exhibit was played.)

12  BY MS. SANDLING:

13    Q.  Ms. Young, the sound that we're hearing in the

14  background, what was that?

15    A.  It's got to be me trying to saw those big thick

16  zip ties.

17    Q.  Did you have a hard time getting the shotgun off

18  your bike?

19    A.  Yes, ma'am.

20    Q.  Okay.  Let's go to Government's 70, please.  And

21  who is in this particular photograph?

22    A.  That would be me.

23    Q.  And let's look at Government's 78.  Ms. Young,

24  I'm showing you a picture of the shotgun in Government's

25  78.  Do you recognize what that is?

1    A.  I mean, I recognize that it's a shotgun, but when

2  I had possession of it on my bike, it was wrapped up,

3  so.

4    Q.  But is that the shotgun that you gave to the

5  informant in this case on June the 4th of 2021?

6    A.  I would assume so.

7    Q.  Okay.  And I'm showing you Government's 75

8  through 77.  This is Government's 79, Ms. Young.

9    A.  Okay.

10    Q.  And 80 and 81.  Ms. Young, did you ever see the

11  firearms that were in the bag --

12    A.  No, ma'am.

13    Q.  -- that you handed to the CI in this case?

14    A.  I did not.  I just handed him the bag.

15    Q.  Okay.  I want to show you Government Exhibit 88.

16  Ms. Young, Government's 88 is being shown to you now.

17  Do you recognize what that is?

18    A.  Yes, ma'am.  It's my plea.

19    Q.  Okay.  And whose name is at the top of the plea

20  agreement?

21    A.  Mine.  Elizabeth Anne Young.

22    Q.  Do you recognize your signature on page 9?

23    A.  Yes, ma'am.

24    Q.  And whose is that?

25    A.  Mine.  Elizabeth Anne Young.

1    Q.  And I'm showing you the sealed supplement to your

2  plea agreement, and this is page 3 of the sealed

3  supplement.  Do you recognize the signature on this

4  page?

5    A.  Yes, ma'am.  It's mine again.

6    Q.  And is the plea agreement and the sealed

7  supplement, is that your plea agreement where you have

8  agreed to plead guilty to the charges arising from the

9  June 4th, 2021 --

10    A.  Yes, ma'am.

11    Q.  -- incident?

12         MS. SANDLING:  Your Honor, government would

13  move to introduce Government's 88 at this time.

14         THE COURT:  It's admitted without objection.

15  BY MS. SANDLING:

16    Q.  Ms. Young, I want to ask you about whether or not

17  you've ever been convicted of any crimes.

18    A.  I have not.

19    Q.  Okay.  Now, in November of 2021, I want to ask

20  you about whether or not you had the defendant living

21  with you at your house.

22    A.  Yes, ma'am.  When he got out of jail in Georgia,

23  which would have been in August, he --

24         MR. CHETSON:  Object to that, Your Honor.

25  Move to strike.

1          THE COURT:  Sustained.  We can talk about

2     the fact that he moved in.  Please don't talk about

3     anything that happened in another courtroom.

4          THE WITNESS:  Yes, sir.  So in August, he

5     came to live with me and my daughter and granddaughter.

6     BY MS. SANDLING:

7     Q.  And he lived with you for how long, Ms. Young?

8     A.  He was still traveling a lot during that time, so

9     it was off and on.  But until November when we got

10    arrested, he was there.

11    Q.  And when you say that the defendant was traveling

12    a lot, what do you mean he was traveling?  What was he

13    doing?

14    A.  Going back and down -- up and down the road to

15    Georgia, and I think that's the only state.  At that

16    point I couldn't travel, so I wasn't going.

17    Q.  Why could you not travel?

18    A.  I happened to have an ankle monitor on.

19    Q.  And your ankle monitor was --

20    A.  I had a curfew, yes.

21    Q.  Okay.  Because you had been arrested.  Is that

22    correct?

23    A.  Yes, ma'am.  I had been arrested in Virginia.

24    Q.  And what had you been arrested for?

25    A.  Possession of methamphetamines.

        1      Q.  So you were staying at home because you had an

        2    ankle monitor.  The defendant was living at your house.

        3    And on November the 17th of 2021, were you arrested

        4    pursuant to federal charges in this particular case?

        5      A.  Yes, ma'am.

        6      Q.  And on that date, did you have methamphetamine in

        7    your house, Ms. Young?

        8      A.  Yes, ma'am, I did.

        9      Q.  How much methamphetamine was in your house on

       10    November 17th of 2021?

       11      A.  Well, it would have been in separate places, like

       12    mine and then his, so I'm not honestly sure what was

       13    there.

       14      Q.  Okay.  The methamphetamine that was in your house

       15    on November 17th of 2021, how did that methamphetamine

       16    come to be in your house?

       17      A.  You mean as far as drivers go or...

       18      Q.  Yes.

       19      A.  Okay.  Well, the last time that we all re-upped,

       20    my oldest son and his girlfriend drove down.

       21      Q.  And your oldest son?

       22      A.  Austin.

       23      Q.  And they drove -- Austin and his girlfriend drove

       24    down where?

       25      A.  To Georgia somewhere.  At that time he wasn't

1    seeing Bam anymore, but down in Georgia, and then his
2    stops again, South Carolina, North Carolina.
3        Q.   Why did Austin drive down to Georgia?
4        A.   I guess he couldn't find another driver.  Someone
5    else that had been driving for him wasn't available, so.
6        Q.   Who could not find another driver?
7        A.   Mr. Baker.
8        Q.   Okay.  So Mr. Baker asked your son Austin to go
9    down to Georgia.
10       A.   Yes, ma'am.
11       Q.   And get what?
12       A.   Methamphetamines.
13       Q.   Okay.  Are you aware of how much methamphetamine
14   the defendant asked your son Austin to pick up for him?
15       A.   I don't know, honestly.
16       Q.   Why did the defendant not want to go to Georgia
17   and pick up the meth himself?
18       A.   He also had an ankle monitor on, so I don't know
19   if that has anything to do with it.  But also he was
20   tired of traveling, so he was spending time with Ashley.
21       Q.   Are you aware of how much methamphetamine the
22   defendant asked Austin to pick up for him when he went
23   to Georgia?
24       A.   No.  I mean, it had to be over a key because I
25   was getting, I think, a kilo myself, so I'm not sure how

1    much additional, and then also Austin would have dropped

2    it off on the way.

3        Q.   I want to go back to Government's Exhibit 88,

4    Ms. Young.

5        A.   Okay.

6        Q.   You pled guilty -- or have agreed to plead guilty

7    to conspiracy to distribute 50 grams or more of

8    methamphetamine in this case.  Is that correct?

9        A.   Yes, ma'am.

10       Q.   And distribution of methamphetamine?

11       A.   Yes.

12       Q.   And possession of a firearm in furtherance of a

13   drug trafficking crime?

14       A.   Yes, ma'am.

15               MS. SANDLING:  I have no further questions,

16   Your Honor.

17               THE COURT:  Cross-examination, counsel.

18               MR. CHETSON:  Yes, Your Honor.  Thank you.

19                    CROSS-EXAMINATION

20   BY MR. CHETSON:

21       Q.   Ms. Young, my name is Damon Chetson, and I'm

22   Chris Baker's attorney.  I'm gonna ask you a few

23   questions if that's okay.

24       A.   Okay.

25       Q.   You talked a little bit about having a motorcycle

1    and driving a motorcycle.  When did you first get into

2    motorcycles?

3       A.   My husband and I both got in together, probably

4    15 years ago, maybe.  It's been a while.

5       Q.   I'm sorry about his passing.

6       A.   Thank you.

7       Q.   But he passed when?

8       A.   September 17th, the day before my birthday, 2018.

9       Q.   And were you still together with him at the time?

10   Were you still a married couple?

11      A.   Oh, yes, ma'am -- sir.  I'm sorry.  We've been

12   together for 18 years, so.

13      Q.   Okay.

14      A.   Yeah.

15      Q.   And so was he a part of any motorcycle club?

16      A.   Yes, he was.

17      Q.   What motorcycle club was he a part of?

18      A.   Several of them.  He started off as a Norsemen,

19   and then he became a Street Nightmare, and then at one

20   point he was part of K9, and Rock Machine.

21      Q.   Rock Machine?

22      A.   Yes, sir.

23      Q.   I think we've heard about Rock Machine before in

24   this trial, but there are some -- as you under- --

25   you've been around motorcycles and motorcycle clubs now

1    for a decade and a half.

2        A.  Yes, sir.

3        Q.  And you understand that there are some large

4    one-percent motorcycle clubs.  Is that fair to say?

5        A.  Yes.

6        Q.  Some of them have the name Pagans or Hells Angels

7    and so forth.  Is that fair to say?

8        A.  Yes, sir.

9        Q.  Now, there are smaller motorcycle clubs, and

10   those are called support clubs.

11       A.  Yes.

12       Q.  Is Rock Machine a support club?

13       A.  No, sir.

14       Q.  Wasn't a support -- was it a major club?

15       A.  They were one-percenters, sir.

16       Q.  One-percenters.

17       A.  Yes.

18       Q.  So your husband was part of a one-percenter

19   motorcycle --

20       A.  He was, yes.

21       Q.  And then the other motorcycle clubs -- I'm sorry.

22   I didn't get all the names.

23       A.  Mm-hmm.

24       Q.  But we have a stenographer taking them all down.

25   The other one-percenter -- the other clubs, were some of

1    them support clubs?

2        A.   Two out of the three were, yes.

3        Q.   Which were the support clubs for one-percenter

4    clubs?

5        A.   Yes, for the Pagans.

6        Q.   For the Pagans.

7        A.   Mm-hmm.

8        Q.   Rock Machine was its own large one-percenter.

9        A.   Yes.

10       Q.   Is that fair to say?

11       A.   Mm-hmm.

12       Q.   And what did your husband do for a living?

13       A.   He was a truck driver until he hurt his leg and

14   then became disabled.

15       Q.   And it was about 2003 or so that he would have

16   gotten into -- after 9/11/2001, is that fair to say?

17       A.   Somewhere probably around there, mm-hmm.

18       Q.   And did you also hang around with -- I mean,

19   these are male-only clubs, is that fair?

20       A.   Correct, but women were involved, especially in

21   the support clubs.  We did a lot of fundraisers.  We

22   raised money for the homeless shelter.  We helped at the

23   soup kitchens at Thanksgiving time.  We did a lot of

24   good things for our community.

25       Q.   So some of the support clubs and some of the

```
 1    one-percenter clubs do good things as well.
 2        A.   Yes.
 3        Q.   And you named some of them.  They support their
 4    community.
 5        A.   I'm sorry?
 6        Q.   They support their community.
 7        A.   Yes.
 8        Q.   Would it be fair to say that there's a lot of
 9    meth use around one-percenter clubs?
10        A.   I wouldn't say that.  I would clump that with
11    every one percent club.
12        Q.   Around the Pagans, as you came to know them?
13        A.   So when I was with my husband, my husband didn't
14    use a single drug in his life.  I mean, he liked to
15    drink a couple beers, but -- I'm sure there was drug use
16    going on, but I wasn't a part of it at that time.
17        Q.   Okay.  But around the group that you came around
18    with Mr. Baker, there was significant meth use.  Is that
19    fair to say?
20        A.   Yes.  Mm-hmm.
21        Q.   And women take on a -- they're sort of support
22    for the men in the club.  Is that how it kind of
23    functions?
24        A.   I mean, they can't be a part of the club, but I
25    would ride my motorcycle with guys from the clubs, so.
```

1    Q.   Right.  And you would -- and you would hang

2    around at parties, right?

3    A.   Yeah.  I would go to parties.

4    Q.   Okay.  And at some of those parties, even -- at

5    some of those parties, even though you may not have

6    started using meth, was there drug use at some of those

7    parties you attended?

8    A.   Yes --

9    Q.   Prior to joining -- or prior to being around the

10   Pagans.

11   A.   Prior to being around the Pagans.

12   Q.   Yes.

13   A.   I didn't go to any parties before being around

14   the Pagans.

15   Q.   Okay.

16   A.   Because his first club he was in was a Pagan

17   support club.  I didn't see any when he was with the

18   Norsemen, so.

19   Q.   And what was the final club that your husband was

20   part of?  Was it Rock Machine?

21   A.   Yes, and then he retired.

22   Q.   And when did he retire from...

23   A.   2015.

24   Q.   2015.  And it's your testimony that -- at that

25   point, is it your testimony that you had never used any

1    methamphetamine as of 2015?

2        A.  Me?  I have not, no.

3        Q.  When's the first time you tried methamphetamine?

4        A.  I moved back to West Virginia after my husband

5    passed away, so it probably would have been in -- he

6    passed away in 2018 -- the beginning of 2019.

7        Q.  Now, you have been at Sampson County Detention

8    Center for part of your detention.  Is that correct?

9        A.  Yes.

10       Q.  And you have access at Sampson County Detention

11   Center to pads that can -- electronic pads or iPad type

12   devices that can allow you to communicate with the

13   outside world.

14       A.  Yes, sir.

15       Q.  And you've been striking up conversations with

16   folks as part of your stay at Sampson County.

17       A.  Okay.

18       Q.  One of those individuals -- who is Arthur

19   Jackson?

20       A.  He also was a part of the Pagans at one point.

21   He hasn't been a Pagan for years.

22       Q.  So back in March, you were having communications

23   with Arthur Jackson.

24       A.  Yeah.  He's a friend of mine.  Mm-hmm.

25       Q.  And Nancy Crawford.  Is that fair to say?

```
 1      A.   Yes.

 2      Q.   Is she affiliated with any motorcycle gang?

 3      A.   No.

 4      Q.   And then also your daughter?

 5      A.   Yes.

 6      Q.   Ms. Hall, right?

 7      A.   Yes.

 8      Q.   Ashley Hall.

 9      A.   Mm-hmm.

10      Q.   Who was in an intimate relationship with my

11 client, is that correct?

12      A.   Yes, sir.

13      Q.   Were you also in an intimate relationship with

14 Chris?

15      A.   So I met Chris long before my daughter did, and

16 yes, we did have relations once or twice.  But it was

17 very casual at the time and -- I mean, he met my

18 daughter later and then they began dating.

19      Q.   And at some point he met your daughter, and he

20 asked you whether it was okay whether he could date your

21 daughter.

22      A.   I'm not sure he really asked me if it was okay.

23      Q.   Well, you nodded and you said that was fine,

24 right?

25      A.   No.  Actually, I believe I threatened to kill him
```

1  at the time.

2      Q.  Okay.

3      A.  Clearly he's still alive, so.

4      Q.  And he stayed at your home for a period of time.

5      A.  Yes.

6      Q.  August of 2021.  You took him into your home.

7      A.  Yes.

8      Q.  And he's there with you and your daughter and

9  your son, staying at your home.

10     A.  Yes, sir.

11     Q.  And you were arrested, I think you said it was --

12 was it Virginia or Georgia?  I may have misheard.

13     A.  I was arrested in Virginia, sir.

14     Q.  Virginia.  And even after you were arrested, you

15 continued to engage in methamphetamine use.  Is that

16 correct?

17     A.  I did.  Yes.

18     Q.  And did you continue to sell methamphetamine?

19     A.  Yes, sir.

20     Q.  About how many customers did you have up in

21 West Virginia?

22     A.  Not many; a very tight circle of guys.  Three,

23 maybe.  Four at the most.

24     Q.  Four.  And how much would you sell a week?

25     A.  Usually between a pound and a key.

1    Q.  So pound and a key of meth to those folks.  Were

2    they users of methamphetamine or were they also

3    themselves having customers?

4    A.  Both.

5    Q.  So you would be kind of a middle person for some

6    of those folks.  You would be getting it from Mr. Baker

7    or whoever his supplier was, and you would then in turn

8    be supplying it to users in West Virginia and also

9    distributors in West Virginia --

10   A.  As far as I know, they were distributing it.  I

11   mean, I don't think they used the quantities that they

12   were buying from me, so.

13   Q.  What sort of quantities were they buying from

14   you?

15   A.  A half an ounce, an ounce.

16   Q.  And that would be more of a distribution

17   quantity?

18               MS. SANDLING:  Objection.

19               MR. CHETSON:  She's knows.  She's been in

20   the business.

21               THE COURT:  I believe the witness has

22   testified that she's been in the business.  She can

23   testify to what constitutes distribution.

24               MR. CHETSON:  Sorry, Your Honor.  Thank you.

25   BY MR. CHETSON:

1    Q.  So what was the -- what were the amounts --

2    A.  So between a half-ounce and an ounce.  Now, it

3  depends what kind of user you are.  I mean, we were

4  doing probably an ounce a day, so it could be personal

5  use.

6    Q.  So if you're a heavy user, you'd go through quite

7  a bit of --

8    A.  Yes, sir.

9    Q.  We've heard about some of the prices, but what

10 would you sell an ounce for?

11   A.  It varied, so I didn't have a set price.  It just

12 depended on how much I had paid to get it for and then

13 depending on what else was in my area, and I tried to

14 stay competitive.  It just became a game of sales.

15   Q.  It's a market as well.

16   A.  Correct.

17   Q.  It's an illegal market, but it's a market.

18   A.  Mm-hmm.

19   Q.  And so how much would you -- what would be kind

20 of the low end price for an ounce?

21   A.  $600 maybe.

22   Q.  And what would be the most you might charge for

23 an ounce?

24   A.  $1200.

25   Q.  And were you the major -- were you a mid-level or

1    a high-level or a low-level distributor in

2    Berkeley Springs, West Virginia?

3        A.    I mean, I wasn't the only one, so.

4        Q.    Did you have some understanding of where you

5    stood in the marketplace for selling methamphetamine?

6        A.    No, because I didn't cater to the market.    I

7    catered to just my people.    So I don't know where they

8    were -- you know, if they were selling it again, where

9    they were taking it.    Because in Berkeley Springs, I'm

10   in the funny little part of West Virginia where it takes

11   about half an hour to get to Virginia, takes about 20

12   minutes to get to Maryland.    I can be in Pennsylvania in

13   40 minutes.    So they could have been taking it anywhere.

14       Q.    Do you remember -- so after -- when -- you were

15   arrested in November of 2021.

16       A.    Mm-hmm.

17       Q.    In this case.

18       A.    Yes.

19       Q.    And ultimately you come to be at Sampson County

20   Detention Center.

21       A.    Okay.

22       Q.    And do you remember saying:    Well, I don't know

23   if the government has any evidence on me.

24       A.    I do recall saying that because I hadn't seen my

25   discovery.    Yes, I did.    I didn't know if they really

```
 1   had a video.  I kept hearing that they had a video, but
 2   no one had shown me the video.  So at that point I felt
 3   like I've been arrested and detained all this time and
 4   they have no proof that I committed a crime.
 5        Q.  But you knew very well you'd been selling and
 6   distributing large amounts of methamphetamine in
 7   Berkeley Springs, West Virginia.
 8        A.  It depends on what you call "large amounts."
 9        Q.  Well, ounce quantities and half-kilo quantities
10   and so forth.  Is that correct?
11        A.  Yes.  And actually when I was arrested, we spoke
12   about the incident on June 4th, so it wasn't like I was
13   trying to hide.  I feel like I have a problem, and this
14   is the only way -- and I thank God every day that they
15   arrested me and I stopped using drugs, because I want to
16   put this behind me and just move on with my life.  I
17   need to make it up to my grandbaby.  It's not fair.
18   She's been in foster care because of all of this.  It's
19   not fair to her.  It's not fair to any of my children
20   that I put them through this because I couldn't cope
21   with my grief and my depression.  I put my kids and my
22   grandbaby through that, and I'll never forgive myself
23   for that.
24        Q.  That shotgun that you delivered on that day we
25   talked about, you drove all the way from King -- King
```

1    Mountain to Raleigh.  Is that correct?

2        A.  Yes, sir.

3        Q.  How many hours did that --

4        A.  About three, after I'd just ridden six hours from

5    West Virginia, so.

6        Q.  So took nine total hours on a bike.

7        A.  And then three back.  So keep on adding.  Yup.

8        Q.  So it was a long day.

9        A.  It was a long day.  But again, I'm on meth, so

10   I'm wide awake.

11       Q.  Right.

12       A.  Yeah.

13       Q.  And were you using meth in between to kind of

14   keep you going throughout the day?

15       A.  Yes.  Mm-hmm.

16       Q.  You end up not taking any detours or stops from

17   Kings Mountain to Raleigh.  Is that correct?

18       A.  I took one stop to get gas.

19       Q.  Drove through the rain?

20       A.  I did.

21       Q.  All to deliver what you had on your bike,

22   correct?

23       A.  Correct.

24       Q.  You didn't pull over at any point and say, "I

25   should turn this in to the police," correct?

 1    A.   No.  I mean, I was on drugs.  Clearly my thinking

 2   was skewed.

 3    Q.   And that had been going on for a number of years.

 4    A.   A number of years, yes.

 5    Q.   Where did you, just generally -- I don't want you

 6   to tell the specific location, but where, generally

 7   speaking, did you grow up?

 8    A.   I grew up in northern Virginia, about an hour out

 9   of D.C., in Fairfax County.

10    Q.   Okay.  Did you grow up around firearms?  Or were

11   firearms part of your life?

12    A.   No, sir.  My dad worked for the Department of

13   Defense.  My mom was a school teacher.  So actually I

14   grew up in, like, the upper middle class, and no one had

15   any guns in my house.

16    Q.   Did you find that when you went to West Virginia,

17   there were more guns around the community that you were

18   in?

19    A.   When I married my husband -- he's a hunter, and

20   he loved having his guns, going out to the range and

21   shooting, and he taught me how to shoot.  I had a

22   concealed carry permit.

23    Q.   Did your son Austin have some guns?

24    A.   Austin has owned guns before, yes, and so has my

25   youngest son Dylan.

1    Q.  And Dylan.

2    A.  Yeah.  Dylan, I think, was more of the avid

3    collector.  He had all of his dad's guns before they

4    were all taken.

5    Q.  A lot of guns in different shapes and sizes --

6    A.  Yeah.  He had a whole collection.  But again,

7    it's legal in West Virginia.  You don't have to have --

8    you can carry concealed there without having a license,

9    so.

10    Q.  I'm not --

11    A.  They were all -- yeah.  I mean, I'm just saying

12    they were all legally obtained firearms in my house that

13    I had.

14    Q.  I'm not challenging you about the guns.  I'm just

15    asking were there a lot of guns in your home.

16    A.  Yes.

17    Q.  In November of 2021.

18    A.  Oh.  In November, yeah, Dylan had a nice little

19    collection there, and then Mr. Baker had some guns

20    there, but I don't know how many either one of them had.

21    Q.  I'm gonna turn your attention to Government's

22    Exhibit 88, if we could put that up on the screen.  This

23    is the plea agreement that you entered into?

24    A.  Yes, sir.

25    Q.  So you've talked about your position in March

1   back in Sampson County awaiting the video, but

2   ultimately -- ultimately you're scheduled -- scheduled

3   to enter a plea agreement in this case.  Is that

4   correct?

5       A.  We had been discussing a plea agreement the whole

6   time, but like I said, I didn't have my discovery at

7   that time.

8       Q.  Right.  But I'm saying now at this point you're

9   scheduled to enter a plea agreement.  Is that correct?

10      A.  I already have signed it.

11      Q.  You have signed it.

12      A.  Mm-hmm.

13      Q.  And that plea agreement, you have pled guilty to

14  three counts.  Is that correct?

15      A.  Yes, sir.

16      Q.  And in pleading guilty to that three counts, you

17  have agreed that you're guilty of conspiracy to possess

18  with the intent to distribute 50 grams or more of

19  methamphetamine.  Is that correct?

20      A.  Yes, sir.

21      Q.  And you understand that that carries with it a

22  ten-year mandatory minimum?

23      A.  Yes, sir.

24      Q.  And then count 3 is -- if we could be on page 4

25  for count 1 -- that's count 1.  Page 5.  If we could go

1    to page 5.  Okay.  Great.  Page 5 is the distribution

2    count on June 4th, 2021.  That's when you drove up from

3    Kings Mountain through the rain.  And then if you're

4    gonna meet me on page 6, that's count 4.  That's

5    possession of a firearm in furtherance of a drug

6    trafficking crime.  And in particular, in your

7    particular case, because the government -- because the

8    government says that that's a short-barreled shotgun,

9    that carries with it a ten-year mandatory minimum,

10   correct?

11        A.  Yes, sir.

12        Q.  And that mandatory minimum is consecutive to all

13   other sentences, correct?

14        A.  Yes.

15        Q.  So what will happen is that you will be sentenced

16   on counts 1 and 3, and then the judge, Judge Myers, will

17   hand down a sentence on those, and then follow -- then

18   the ten-year mandatory minimum runs consecutive, or

19   after that time.  Correct?

20        A.  Yes, sir.

21        Q.  And you've also agreed that you are -- you are --

22   you distributed more than 4.5 kilograms of

23   methamphetamine.  Is that correct?

24        A.  Yes, sir.

25        Q.  And that's the readily provable quantity of

1    methamphetamine.  And you understand that that -- those

2    guidelines help shape -- ultimately the judge decides,

3    but those guidelines are the starting point for what

4    kind of sentence you might get.  Is that correct?

5        A.  Yes, sir.

6        Q.  And ultimately, you're depending or hoping that

7    the government will file various motions to recommend to

8    the judge, or in some cases allow the judge go below

9    what the recommended sentence is or below the mandatory

10   minimum.  That's what you're hoping for.

11       A.  Nothing's been promised to me.

12       Q.  I understand.

13       A.  Yes.  Obviously I'm hoping to get some credit on

14   my sentence.  Like I said, I want to put this chapter

15   behind me and be able to see to my kids, my grandbaby,

16   and not spend 20 years in prison.

17       Q.  And you understand that if the government doesn't

18   file a 3553(e) motion in your case, that the mandatory

19   minimum stays at 20 years.  Is that correct?

20       A.  I do understand that, sir.  Yes.  But as far as

21   me testifying today, the government has evidence to

22   prove that there was a crime committed with or without

23   my testimony, so.

24       Q.  Right.  Then you made the decision to do that.

25       A.  I did, sir.  Yes.

1    Q.  And testify.

2    A.  Yes.

3    Q.  And you're hoping that whatever you say, the

4  government will look favorably upon.

5    A.  I would say yes to that.  Yes.

6    Q.  And you're hoping that the government will file

7  that motion that allows the judge to go below that

8  20-year mandatory minimum.

9         MS. SANDLING:  Objection, Your Honor.  I

10  think this is asked and answered.

11         THE COURT:  It is.

12         MR. CHETSON:  Thank you, Your Honor.  No

13  further questions, Ms. Young.

14                    CROSS-EXAMINATION

15  BY MS. SALMON:

16    Q.  Ms. Young, I'm Elisa Salmon.  I represent Landon

17  Holcomb.  Do you know Landon Holcomb?

18    A.  I do not.

19    Q.  And I'm just gonna briefly dial the clock back to

20  when you first got involved with motorcycle clubs, okay?

21  And I just have a few questions.

22    A.  Okay.

23    Q.  When you and your husband first started riding

24  with the Norsemen, neither of you had any intention to

25  involve yourself with narcotics, did you?

1    A.   No, ma'am.

2    Q.   And when you said that was a support club for the

3  Pagans, what does a support club mean?

4    A.   Well, when we do fundraisers, the Pagans would

5  get a certain percentage of what we raised.  They would

6  wear a patch just saying that they supported them.  And

7  then if there were other things that needed to be done,

8  they would call on their support clubs to do that.

9    Q.   So within the motorcycle club community,

10  including support clubs and one percent clubs, there is

11  positive community outreach and fundraisers and things?

12  Am I right?

13    A.   Yes.  Yes, ma'am.

14    Q.   Just describe a few of the things in the last 20

15  years you've done positive for the community.

16    A.   Every Christmas we would do the Toys for Tots,

17  collect them.  We would adopt a couple families and

18  bring an entire meal to them and toys for the kids.

19  Like I said, helping out at the shelters during

20  Thanksgiving, serving the meals.  We did a big Halloween

21  party and took all the proceeds and brought gift cards

22  and gave it to the women's shelter so they could hand it

23  out.

24    Q.   And that was also true of -- I'm sorry.  I missed

25  what the other -- the name -- is it Street Nightmare?

```
1      A.  Street Nightmares, yes.

2      Q.  Also true of them, correct?

3      A.  Yes, ma'am.

4      Q.  That public face of all of these clubs, you

5  perceived it as very positive, correct?

6      A.  Yes, ma'am.

7      Q.  And that was true for you for over a decade,

8  wasn't it?

9      A.  Yes.

10     Q.  And so it wasn't really until you got closely

11 associated with Mr. Baker that that took a turn for you,

12 correct?

13     A.  Well, it would have been a couple Pagans before

14 that, but around that same time frame, yes.

15     Q.  Sometime like after 2018, right?

16     A.  Yeah.  It would have been 2019 at some point.

17     Q.  That's not whatever what you intended to get

18 involved in when you started getting involved with

19 motorcycle groups --

20     A.  No, ma'am.

21          MS. SALMON:  No further questions, Your

22 Honor.  Thank you.

23          THE COURT:  Redirect, counsel.

24          MS. SANDLING:  No, Your Honor.

25          THE COURT:  All right.  Thank you, ma'am.
```

```
 1                THE WITNESS:  Thank you.
 2                THE COURT:  And you're excused from your
 3    subpoena.
 4                The government may call its next witness.
 5    I'm gonna signal in advance.  We'll take a break at 3:30
 6    wherever we are with the witness.
 7                MR. DODSON:  Understood, Your Honor.  The
 8    United States calls Ashley Hall.  She's an in-custody
 9    witness, Your Honor.
10                (Brief pause in proceedings.)
11                THE COURT:  If counsel would please
12    approach.
13                (At sidebar on the record.)
14                THE COURT:  This has been -- this is a
15    high-security trial.  There's been some direct question
16    asked of inmates where they're currently housed.  I
17    don't want to ask that question anymore.  You can ask
18    you're currently incarcerated or you're currently housed
19    in a jail, but if we say which facility, there are
20    concerns about retaliation that do exist in this trial.
21    So I'm just gonna raise it now.  Going forward, ask the
22    question "Are you currently in a jail," not which
23    specific facility, because I think there are legitimate
24    concerns.  I understand it wasn't intended that way, but
25    let's be thoughtful about that.
```

```
 1                  MS. SALMON:  Yes, sir.

 2                  (End of discussion at sidebar.)

 3                  THE CLERK:  Can you please stand.  Raise

 4      your right hand, and left hand on the Bible.  Please

 5      state your name for the record.

 6                  THE WITNESS:  Ashley Hall.

 7                  (The witness was placed under oath.)

 8                  THE COURT:  Your witness.

 9                  MR. DODSON:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11      BY MR. DODSON:

12          Q.  Good afternoon, Ms. Hall.

13          A.  Good afternoon.

14          Q.  Can you introduce yourself to the jury.

15          A.  My name is Ashley Hall.

16          Q.  Where are you from?

17          A.  West Virginia.

18          Q.  How old are you?

19          A.  I am 22 years old.

20          Q.  Do you have any children?

21          A.  I have one.  She's 6, my daughter, Ava.

22          Q.  Ms. Hall, were you charged in connection with

23      this case?

24          A.  Yes.

25          Q.  Have you agreed to plead guilty to conspiracy to
```

```
 1    distribute methamphetamine?
 2        A.   Yes.
 3        Q.   Have you also agreed to plead guilty to
 4    conspiracy to commit money laundering?
 5        A.   Yes.
 6        Q.   Have you entered into a written plea agreement
 7    with the government?
 8        A.   I have.
 9        Q.   And the things that I just asked you about, the
10    charges that you intend to plead guilty to, did you do
11    all of that?
12        A.   I did.
13        Q.   I want to show you -- turn your attention to the
14    screen in front of you and show you what's been marked
15    as Government's Exhibit 89.  Do you recognize the first
16    page?
17        A.   Yes.
18        Q.   All right.  We'll just flip through the other
19    pages.  Okay.  Stop for one moment.  And you see your
20    signature there on page 8 of Government's Exhibit 89?
21        A.   I do.
22        Q.   And is your lawyer's signature beneath yours?
23        A.   Yes.
24        Q.   All right.  Next page.  Do you recognize this
25    document?
```

1    A.  Yes.

2    Q.  And let's go to the last page.  And you also

3  signed this as well, correct?

4    A.  I did.

5    Q.  Does your plea agreement contain all of the

6  agreements that you've made with the government and that

7  the government has made with you?

8    A.  Yes.

9    Q.  Are there any other agreements outside of what's

10  contained in your written plea agreement?

11    A.  No.

12        MR. DODSON:  Your Honor, we'd move to admit

13  Government's Exhibit 89 into evidence and request

14  permission to publish.

15        THE COURT:  It's admitted without objection.

16  You may publish.

17  BY MR. DODSON:

18    Q.  Ms. Hall, this is the first time the jury is

19  seeing this, so I'm gonna run through it real quick

20  again.  First page of Government's Exhibit 89, it says

21  "United States of America versus Ashley Hall," correct?

22    A.  Yes.

23    Q.  And this is your plea agreement.

24    A.  Yes.

25    Q.  And on page 8 of this same exhibit, you have

1    signed it and so has your lawyer.

2        A.   Yes.

3        Q.   And on the next page, starts -- this is the

4    section of your plea agreement concerning your

5    cooperation with the government.  Is that correct?

6        A.   Yes.

7        Q.   And if we go to the last page of Government's

8    Exhibit 88 -- 89.  You and your lawyer have signed this

9    page as well, correct?

10       A.   Yes.

11       Q.   Ms. Hall, are you hoping to get some credit off

12   of any sentence you might receive for your testimony

13   here today?

14       A.   Yes.

15       Q.   Has the government promised you any particular

16   sentence that you might receive?

17       A.   No.

18       Q.   Who is it that determines what your sentence is

19   gonna be?

20       A.   The judge.

21       Q.   Thank you.  Ms. Hall, do you know the defendant

22   Christopher Baker?

23       A.   I do.

24       Q.   How do you know Mr. Baker?

25       A.   I'm engaged to him.

1    Q.   You're engaged to Mr. Baker?  How long have you

2    known Mr. Baker?

3    A.   Since April of 2021.

4    Q.   How did you meet him?

5    A.   Through my mother.

6    Q.   Who is your mother?

7    A.   Elizabeth Young.

8    Q.   Does she also go by "Piper"?

9    A.   Yes.

10   Q.   And so you met Mr. Baker through your mom, Piper,

11   and you said April of 2021?

12   A.   Yes.

13   Q.   Can you describe how the two of you met?

14   A.   He had actually come over to our house with my

15   mom, and I was living in her house at the time, so we

16   had met when he had come over.

17   Q.   All right.  Do you know whether or not Mr. Baker

18   was a member of any motorcycle club?

19   A.   I do.  He was involved with the Pagans Motorcycle

20   Club.

21   Q.   Do you know if he held any particular position

22   within the Pagans?

23   A.   I believe he was a Diamond.  He was higher up in

24   the club.

25   Q.   You understood him to be in a position of

1    leadership within the Pagans?

2        A.   Yes.

3        Q.   Ms. Hall, have you ever seen Mr. Baker in

4    possession of any narcotics?

5        A.   I have.

6        Q.   What kind?

7        A.   Methamphetamines and cocaine and pills, but I'm

8    not sure what kind of pills.

9        Q.   Have you ever been with Mr. Baker when he's

10   transported methamphetamine?

11       A.   I have.

12       Q.   Can you tell the jury about that?

13       A.   I have went with him to pick up money and pick up

14   the methamphetamines and then go back and distribute the

15   methamphetamines and so forth.  We would make those

16   trips regularly.

17       Q.   When is the first time you made a trip with

18   Mr. Baker to pick up methamphetamine?

19       A.   I would have to say around May.  It was very

20   early on when we had met.

21       Q.   May of 2021?

22       A.   Yes.

23       Q.   Where did you go?

24       A.   We had went to pick up money in North Carolina

25   and then pick up money in South Carolina and then in

Georgia, and then pick up the drugs in Georgia and then
go back to South Carolina and then back to North
Carolina.

Q.   Why did you and Mr. Baker pick up money along the
way to Georgia?

A.   To pay for the drugs.

Q.   How did you all get to Georgia?

A.   Sometimes we rode in the car.  Sometimes we rode
on the motorcycle.  It just depended.

Q.   When you went in the car, who would drive?

A.   I would.

Q.   Why would you drive and not Mr. Baker?

A.   It was just one of those things.  I would always
drive.

Q.   Did you always drive him around?

A.   Mm-hmm, except for when we were on the
motorcycle, and then I would be on the back of the
motorcycle.

Q.   How many times would you say you made these trips
to Georgia?

A.   Altogether, probably around ten times.

Q.   And when you went down to Georgia to pick up
methamphetamine with Mr. Baker, do you know how much
methamphetamine he would pick up?

A.   He would buy two keys and then usually get

1   fronted two more, so he would have four in total.

2      Q.  And when you say "keys," are you referring to

3   kilograms?

4      A.  Yes.

5      Q.  That's short for kilogram, or kilo?

6      A.  Yes.

7      Q.  And so all told, if you went -- you said about

8   ten times?  Is that what you said?

9      A.  Yes.

10     Q.  And you picked up about -- you would pick up two

11  kilograms -- or he would pay for two kilograms?

12     A.  Yes.

13     Q.  And he would also get fronted two kilograms?

14     A.  Yes.

15     Q.  What does it mean to be fronted methamphetamine?

16     A.  So they would give him an extra two; and the next

17  time that he went back, he would pay for the extra two

18  that he received.

19     Q.  So he'd pay for half and then sort of get the

20  other half on credit, if you will.

21     A.  Yes.

22     Q.  And he'd have to pay for that at a later date?

23     A.  Yes.

24     Q.  And so if he picked up roughly two kilograms each

25  time, and you went ten times, is it fair to say that's

1   about 20 kilograms of methamphetamine?

2     A.  Yes.

3     Q.  How do you know he picked up this amount?  Did

4   you see it with your own eyes?

5     A.  I did.

6     Q.  Where would you go in Georgia with Mr. Baker to

7   pick it up?

8     A.  There was a few different residences that we went

9   to.  We would go to Ted Cannon's house and pick up

10   there.  Sometimes we would meet him in hotels.  It just

11   depended on where and who he was getting it from at the

12   time.

13     Q.  Did you know Ted Cannon by another name?

14     A.  By "Bam."

15     Q.  Is that how Mr. Baker referred to him, as Bam?

16     A.  Yes.

17     Q.  Have you ever heard him referred to as Bam Bam?

18     A.  Sometimes, yes.

19     Q.  Okay.  Who else would he pick up methamphetamine

20   from?

21     A.  Her name is Kara.  I'm not sure of her last name

22   now.

23     Q.  What did Kara look like?

24     A.  I'm not sure.  I didn't see her very often.  I

25   think I've only seen her once.

1     Q.  Did Mr. Baker ever refer to her by name?

2     A.  Mm-hmm.

3     Q.  To you?

4     A.  Yes.

5     Q.  And did he call her Kara?

6     A.  Yeah.

7     Q.  All right.  And when y'all went to pick up from

8  Kara, was that in a hotel?

9     A.  No.  That was at her house, but I had stayed in

10  the car.

11    Q.  All right.  And when you went to pick up from

12  hotels, from whom were you getting when you went to the

13  hotels?

14    A.  Those were from Bam.

15    Q.  All right.  Ms. Hall, your mom, Elizabeth Young,

16  also known as Piper, do you know if your mom also sold

17  methamphetamine?

18    A.  She did.

19    Q.  How do you know that?

20    A.  I've seen her.

21    Q.  Do you know where she got her drugs from?

22    A.  From Christopher Baker.

23    Q.  How do you know that?

24    A.  I've seen it.

25    Q.  Do you know how much she was getting from

1  Mr. Baker?  Was it a user amount or something else?

2    A.  It was more than that.  It was about half a key

3  each week.

4    Q.  All right.  And so again, when you say "key,"

5  you're talking about kilogram, correct?

6    A.  Yes.

7    Q.  So about a half a kilogram?

8    A.  Yes.

9    Q.  And do you know what she was doing?  Was she

10  using up all that half a kilogram?

11    A.  No.  She was using it and selling it.

12    Q.  Okay.  And how do you know that?

13    A.  I watched her do both.

14    Q.  All right.  Did Mr. Baker ever ask you to assist

15  him in receiving payments from his methamphetamine

16  sales?

17    A.  Yes.

18    Q.  In what way?

19    A.  On Cash App, or I would go and pick up money from

20  people, or they would give me the money.  Or if they

21  didn't have it all in cash, they would send me half of

22  it or however much they had on Cash App.

23    Q.  And so when Mr. Baker would sell methamphetamine,

24  would you be with him sometimes when he was selling?

25    A.  I would, yes.

```
 1      Q.   Were you always with him when he was selling?

 2      A.   No.

 3      Q.   And so he would sometimes have folks send you

 4  payment on Cash App.

 5      A.   Yes.

 6      Q.   And that would either be a full payment or a

 7  partial payment, correct?

 8      A.   Yes.

 9      Q.   And what did you do with that money once it got

10  onto your Cash App?

11      A.   It just depended.  Sometimes he would have me

12  take it off of my Cash App and he'd put it in his card,

13  or he'd have it in cash, or if I needed something he'd

14  tell me to buy it with that money.  It just depended on

15  what he needed it for at the time.

16      Q.   How would you get the money off your Cash App

17  onto a card?  Are you talking about like a debit or a

18  credit card?

19      A.   Yes.  You can put a debit card onto your Cash

20  App.  So you can actually take money from your bank

21  account and put it on Cash App, or take money that's on

22  Cash App and put it back in your bank account.

23      Q.   And what would y'all do with that money that you

24  got on Cash App?  Did he turn it back into purchasing

25  drugs?
```

 1    A.   Most of the time, yes.

 2    Q.   Did you all use it when you went down to Georgia?

 3    A.   Yes.

 4    Q.   In what way?

 5    A.   For food on the way, hotels, gas.

 6    Q.   And to be clear, when I say go "down to Georgia,"

 7  you understand I mean to go on these resupply trips to

 8  get methamphetamine.

 9    A.   Yes.

10    Q.   So on those trips, you would use it for gas and

11  food and lodging and that kind of thing?

12    A.   Yes.

13    Q.   How many Cash App accounts did you have,

14  Ms. Hall?

15    A.   Three.

16    Q.   And did you use all three of these Cash App

17  accounts for that purpose?

18    A.   Yes.

19    Q.   Did you have a Cash App account in the name of

20  Ashley Hall?

21    A.   I did, yes.

22    Q.   Did you also have an account in the name of

23  Ashley Baker?

24    A.   I did, yes.

25    Q.   Did you also have an account with a cash tag --

1    and you understand what a cash tag is?  It's almost like

2    a username?

3        A.   Yes.

4        Q.   Was one called Death Society?

5        A.   It was, yes.

6        Q.   And so you used all three of those to receive

7    some money from the methamphetamine dealing?

8        A.   The Death Society one and the Ashley Baker one

9    weren't for the methamphetamines.  I did get money sent

10   to me on those from people that were told by him to send

11   it to those Cash Apps.  The Ashley Hall 18 one was

12   definitely used for the methamphetamines.

13       Q.   Okay.  Do you know an individual named

14   Amanda Greene?

15       A.   I do.

16       Q.   How do you know Ms. Greene?

17       A.   She had bought methamphetamines from him pretty

18   much weekly when we had lived in North Carolina.

19       Q.   Do you know how much methamphetamine

20   Amanda Greene was getting from Mr. Baker?

21       A.   I believe she was buying a key, or a kilogram, a

22   week.

23       Q.   And did Ms. Greene ever send you money via

24   Cash App in payment for a methamphetamine supply?

25       A.   She did.

1    Q.  Do you recall how much money Ms. Greene would

2  have sent to you right off the -- right off the top?

3    A.  I don't.

4    Q.  Okay.  Do you know if it was several hundred or

5  more than a thousand?  Do you have any idea?

6    A.  Probably more than a thousand.

7          MR. DODSON:  May I have one moment,

8  Your Honor?

9  BY MR. DODSON:

10    Q.  Ms. Hall, you were living with your mom,

11  Elizabeth Young, at her house in West Virginia, correct?

12    A.  Yes.

13    Q.  And you were living there with her in November of

14  last year.  Is that fair?

15    A.  It was, yes.

16    Q.  Of 2021?

17    A.  Yes.

18    Q.  Was Mr. Baker living there with you also?

19    A.  He was, yes.

20    Q.  Were you present when a search warrant was

21  executed on your mom's house in November of 2021?

22    A.  I was, yes.

23    Q.  Who else was present?

24    A.  Me, Mr. Baker, my mom, Elizabeth Young; my older

25  brother, Austin Hall; my daughter, Ava; and my younger

```
1    brother, Dylan Young.
2       Q.   And did agents from the ATF search that house?
3       A.   They did, yes.
4       Q.   And do you know what they found there?
5       A.   Methamphetamines, guns.  I know they found other
6    drugs there too, but I'm not entirely sure what they
7    were.
8       Q.   The methamphetamine that was found in your mom's
9    house, do you know whether any of those drugs belonged
10   to Christopher Baker?
11      A.   Yes, between Christopher Baker and my mom,
12   Elizabeth Young.
13      Q.   Did Mr. Baker store firearms at your mom's house?
14      A.   He did, yes.
15      Q.   Did she also store firearms there too?
16      A.   She did.
17      Q.   Okay.  Did you ever transport any methamphetamine
18   for Mr. Baker alone?
19      A.   No.
20      Q.   Did you ever meet up with Amanda Greene to take
21   her any methamphetamine --
22      A.   Yes.
23      Q.   -- that you can remember?
24      A.   Yes.
25      Q.   All right.  Was someone else with you when you
```

```
 1   went to meet with her?

 2       A.  I was at Raw's house.  So it would have been me,

 3   Raw, Amanda, and then my daughter was in the other

 4   house, and then Raw's girlfriend, Chelsea.

 5       Q.  Okay.  And "Raw" is a nickname or road name for

 6   Justin Fite, correct?

 7       A.  Yes.

 8       Q.  And he had a house in Kings Mountain?  Is that

 9   correct?

10       A.  Yes.

11       Q.  In North Carolina.

12       A.  Yes.

13       Q.  That's in the western part of the state, right?

14       A.  I believe so.  I'm not sure.

15       Q.  Okay.  And can you just briefly describe Raw's

16   house, his place?

17       A.  We had -- his house was over to the right, and

18   then to the left there was another building in which me

19   and Mr. Baker and my daughter, Ava, lived in.

20       Q.  And in that building beside Raw's house, did it

21   also serve as a clubhouse for the Pagans?  Or at least a

22   meeting location?

23       A.  Sometimes.  They would come over and hang out.

24   But I wouldn't -- I don't know if I would say it was

25   like a meeting.  It was more of a hangout spot.
```

```
1       Q.   Okay.  And so there was one occasion when
2   Amanda Greene came over there to Raw's house where you
3   and Baker were staying, and you gave him -- you gave her
4   methamphetamine?
5       A.   Yes.
6       Q.   Do you remember how much?
7       A.   I believe it was a key, or a kilogram.
8       Q.   Where'd you get that kilogram from?
9       A.   In Georgia.  I believe it was Bam that time.
10      Q.   So you and Baker got that meth from Bam, and then
11  did Baker tell you to give that to Amanda?
12      A.   Yes.
13      Q.   Amanda Greene?  Okay.
14               Thank you, Ms. Hall.  I have nothing
15  further, Your Honor.
16               THE COURT:  Cross-examination, counsel.
17               MR. CHETSON:  No questions.  Thank you,
18  Ms. Hall.
19               MS. SALMON:  No questions for the witness,
20  Your Honor.
21               THE COURT:  All right.  Thank you, ma'am.
22  You're excused.  And you're excused from your subpoena.
23               Counsel, you may call your next witness.
24               MR. DODSON:  The United States calls
25  Amanda Greene.
```

```
 1              THE CLERK:  Raise your right hand, left hand
 2     on the Bible, and please state your name for the record.
 3              THE WITNESS:  Amanda Greene.
 4              (The witness was placed under oath.)
 5              THE COURT:  You may inquire.
 6              MR. DODSON:  Thank you, Your Honor.
 7                       DIRECT EXAMINATION
 8     BY MR. DODSON:
 9         Q.  Good afternoon, Ms. Greene.
10         A.  Hello.
11         Q.  Can you introduce yourself to the jury.
12         A.  I'm Amanda Greene.
13         Q.  How old are you, ma'am?
14         A.  49.
15         Q.  Where do you live?
16         A.  I live in Shelby, North Carolina.
17         Q.  Are you currently working?
18         A.  No, sir.
19         Q.  Have you previously been employed?
20         A.  Yes, sir.
21         Q.  What line of work were you in?
22         A.  I was a cosmetologist for 28 years.
23         Q.  Ms. Greene, you're charged in connection with
24     this case, correct?
25         A.  Yes, sir.
```

1    Q.  And you've agreed to plead guilty to conspiracy

2    to distribute and possess with intent to distribute

3    methamphetamine?

4    A.  Yes, sir.

5    Q.  And you've agreed to plead guilty to distributing

6    methamphetamine?

7    A.  Yes, sir.

8    Q.  Did you do all that?

9    A.  Yes, sir.

10   Q.  Did you enter into a written plea agreement with

11   the government?

12   A.  Yes, sir, I did.

13   Q.  I want to turn your attention to the screen in

14   front of you and show you what's been marked as

15   Government's Exhibit 93.  Page 2, please.  Page 3 of

16   Government's Exhibit 93.  Ms. Greene, do you recognize

17   this document?

18   A.  Yes, sir.

19   Q.  I want to flip the pages for you.  And is this

20   the document that contains your agreement about your

21   cooperation in this case?

22   A.  Yes, sir, it is.

23   Q.  And did you sign that document?

24   A.  Yes, sir.

25   Q.  Did you sign it with your lawyer?

1       A.   Yes, sir.

2       Q.   Ms. Greene, you entered a plea of guilty to these

3   charges we talked about, haven't you?

4       A.   Yes, sir.

5       Q.   And you signed -- this agreement that's in front

6   of you is the agreement about your cooperation in this

7   case.

8       A.   Yes, sir, it is.

9       Q.   And it says "Sealed Supplement to Memorandum of

10  Plea Agreement"?

11      A.   Yes, sir.

12      Q.   And as you see, it says "United States of America

13  versus Amanda Greene"?

14      A.   Yes, sir.

15           MR. DODSON:   Your Honor, we'd move to admit

16  Government's Exhibit 93 into evidence.

17           THE COURT:   It's admitted without objection.

18  BY MR. DODSON:

19      Q.   Now, Ms. Greene, there's a separate document.

20  This document's about your cooperation, correct?

21      A.   Yes, sir.

22      Q.   You have a separate document which is your full

23  plea agreement, correct?

24      A.   Yes, sir.

25      Q.   And that's where you agree to plead guilty, and

1    you have pled guilty to certain charges in connection

2    with this case.

3        A.   Yes, sir, I have.

4        Q.   And as a part of that agreement, are you hoping

5    to get some credit off of any sentence you might receive

6    for your testimony here today?

7        A.   Yes, sir.

8        Q.   Has the government promised you any particular

9    sentence that you might receive?

10       A.   No, sir, they have not.

11       Q.   Who is it that determines what your ultimate

12   sentence is gonna be?

13       A.   The judge.

14       Q.   Ms. Greene, do you have any criminal history?

15       A.   Yes, sir, I do.

16       Q.   Are you a convicted felon?

17       A.   Yes, sir.

18       Q.   What felony conviction do you have?

19       A.   It was possession of methamphetamine.

20       Q.   And did you plead guilty to those charges?

21       A.   Yes, sir, I did.

22       Q.   Did you serve a prison sentence for that?

23       A.   Yes, sir, I did.

24       Q.   How long was that?

25       A.   Six months.

1    Q.   And did you serve a period of supervision by a

2    probation officer after that?

3    A.   Yes, sir.  It was nine months post-release.

4    Q.   All right.  Ms. Greene, have you in the past been

5    a user of methamphetamine?

6    A.   Yes, sir.

7    Q.   When did you first start starting -- when did you

8    first start using methamphetamine?

9    A.   Around 2014, 2015.

10   Q.   Why did you start using meth?

11   A.   Going through tragedies in my life, different

12   things happening, and I just tried it.

13   Q.   Prior to 2014, had you ever used methamphetamine

14   before in your life?

15   A.   No, sir.

16   Q.   Did you use any other drugs?

17   A.   No, sir.

18   Q.   You mentioned that you had been a cosmetologist

19   for 28 years.  Is that right?

20   A.   Yes, sir.

21   Q.   Once you started using methamphetamine, did you

22   essentially end your cosmetology career?

23   A.   Yes, sir.

24   Q.   Did you at some point stop using methamphetamine?

25   A.   Yes.

```
1        Q.   When was that?

2        A.   That was March the 1st, 2019.

3        Q.   Is that when you went to prison?

4        A.   Yes, sir, it is.

5        Q.   And then you stayed clean when you were in

6   prison.

7        A.   While I was in prison, yes.

8        Q.   And then when you got out, you had a period of...

9        A.   Nine months.

10       Q.   And during that nine months, did you stay clean?

11       A.   Yes, sir, I did.

12       Q.   Did you at some point go back to methamphetamine?

13       A.   Yes, sir, I did.

14       Q.   When was that?

15       A.   It was 2021, about March of 2021.

16       Q.   All right.  Do you know the defendant in this

17  case, Mr. Christopher Baker?

18       A.   Yes, sir.

19       Q.   How do you know Mr. Baker?

20       A.   I got drugs from Mr. Baker, bought drugs from

21  Mr. Baker.

22       Q.   When did you first start buying drugs from

23  Mr. Baker?

24       A.   At the end of April of '21, 2021.

25       Q.   And so that would have been about a month after
```

1  you started using meth again?

2     A.  Yes, sir.

3     Q.  How did you first meet Mr. Baker?

4     A.  Through a mutual acquaintance.

5     Q.  And who would that be?

6     A.  Chelsea Brown.

7     Q.  And did Chelsea have a boyfriend named Raw?

8     A.  Yes, Raw.  Justin Fite, yes.

9     Q.  And did Chelsea and Justin Raw -- Justin Fite,

10 also known as Raw, did they live together?

11    A.  Yes.

12    Q.  Where did they live?

13    A.  In Kings Mountain.

14    Q.  And can you describe their house or where they

15 lived?

16    A.  Yes.  They had a -- it was a -- like a doublewide

17 size house, and it had three bedrooms in it, two

18 bathrooms.

19    Q.  Did he have another building on his property?

20    A.  Yes, sir, he did.

21    Q.  Okay.  And what kind of building was that?  Do

22 you know?

23    A.  Yes.  It was a brick building, and it was

24 probably -- it was in walking distance from the house.

25    Q.  And is that where you met Chris Baker?

```
 1       A.   Yes.
 2       Q.   And can you tell the jury the circumstances about
 3  how you met him?
 4       A.   Yes.  Well, actually when I met him was at -- the
 5  first time was the Quality Inn where they were -- is
 6  where I was introduced to him.
 7       Q.   Okay.  And so you were -- why were you at a
 8  Quality Inn?
 9       A.   I was with Chelsea and Justin.
10       Q.   All right.  And so y'all went over to a hotel.
11       A.   Yes, sir.
12       Q.   And Mr. Baker was staying there?
13       A.   Yes, sir.
14       Q.   And that was in April of 2021.
15       A.   Yes.
16       Q.   And you met him.
17       A.   Yes, sir.
18       Q.   Did you buy any methamphetamine from him at that
19  time?
20       A.   No, sir.
21       Q.   Did you engage in any conversation with him?
22       A.   Not that night, no.
23       Q.   Did you have an opportunity to meet him a second
24  time?
25       A.   Yes.
```

```
1        Q.   And was that over at Raw's house?

2        A.   Yes.

3        Q.   Can you tell the jury about that?

4        A.   Yes.  That's when I met him and we talked about

5    getting methamphetamines.

6        Q.   Was Mr. Baker in that building beside Raw's house

7    when you met him?

8        A.   Yes, sir.

9        Q.   Who was he in there with?

10       A.   It was his girlfriend, Ashley, and Justin and

11   Chelsea and me.  And to the best of my knowledge, I

12   think that was everyone at that point.

13       Q.   Is that Ashley Hall?

14       A.   Yes, sir.

15       Q.   Can you describe what you saw when you met

16   Chris Baker in that building?

17       A.   There was a lot of drug paraphernalia, like glass

18   pipes and things like that, and drugs, meth and

19   marijuana.

20       Q.   Did you see any firearms?

21       A.   Yes, sir.

22       Q.   What kind?

23       A.   It was a -- like a short shotgun, like a

24   sawed-off short shotgun.

25       Q.   And did you buy any methamphetamine from -- well,
```

```
 1    let me back up.  That shotgun, where did you see it in

 2    the -- in the building?

 3        A.  It was in the floor underneath the couch.  Like,

 4    you know, couch is raised off the ground, and you could

 5    see it laying under there.  And he showed it to me as

 6    well.

 7        Q.  Who showed it to you?

 8        A.  Christopher Baker.

 9        Q.  What did he say when he showed it to you?

10        A.  Just showing it to me and telling me that he had

11    got that; and just looking at it, showing it off, I

12    guess.

13        Q.  Did he describe it as a sawed-off shotgun or is

14    that your description?

15        A.  It -- no, I -- that's what it is.  It was a

16    sawed-off shotgun.

17        Q.  Okay.

18        A.  Because the full size shotgun is full size.

19        Q.  You're familiar -- you've seen a full size

20    shotgun before, correct?

21        A.  Yes, sir, I have.

22        Q.  Did you buy methamphetamine from Mr. Baker that

23    night?

24        A.  It was -- yes.  It was during that week.  I'm not

25    100 percent sure if it was that night, but it was that
```

1   week.

2       Q.  All right.  And you were a user of

3   methamphetamine at that time.

4       A.  Yes, sir.

5       Q.  Were you also selling methamphetamine?

6       A.  Yes, sir.

7       Q.  Were you a large-scale distributor at that time?

8       A.  No, sir.

9       Q.  What kinds of quantities were you selling?

10      A.  An ounce to less.

11      Q.  All right.  And did you have a discussion with

12  Mr. Baker about getting a supply of methamphetamine?

13      A.  Yes.

14      Q.  What did he tell you?

15      A.  That he could get larger amounts than that,

16  kilos.

17      Q.  Did he -- what did he say about it?

18      A.  That he could get it and have it on hand, I

19  wouldn't have to wait.  And he told me the price, how

20  much it would be, and to deal with him.

21      Q.  Okay.  Give the details about that.  What was the

22  price?

23      A.  10,500 for a kilo.

24      Q.  Okay.  And so he told you he could get you a kilo

25  for $10,500?

```
 1      A.   Yes, sir.

 2      Q.   Did you accept that offer?

 3      A.   Yes, sir, I did.

 4      Q.   Did you take a kilogram of methamphetamine from

 5   him at that time?

 6      A.   Yes, sir, I did.

 7      Q.   Did you pay $10,500?

 8      A.   No, sir.  He gave it to me on front, so you pay

 9   for it later.

10      Q.   Okay.  So he fronted it to you.

11      A.   Yes, he fronted it to me.

12      Q.   And what did you do with that -- and I want to be

13   clear, when was that that he fronted you this kilo of

14   methamphetamine?

15      A.   That was within the first week or so of meeting

16   him.

17      Q.   And you said you met him in April of 2021?

18      A.   Yes, sir.

19      Q.   So it was during that -- in April of 2021 when

20   you got fronted that kilo of methamphetamine?

21      A.   Yes, sir.

22      Q.   What'd you do with it?

23      A.   I in turn sold it.

24      Q.   Did you go back and get more from Mr. Baker?

25      A.   Yes, sir, I did.
```

```
 1        Q.  How much did you get?
 2        A.  Throughout the course of the whole time that I
 3   know him or...
 4        Q.  Yeah.  Well, let me break it down.  How many
 5   times did you go back to him to get resupplied for
 6   methamphetamine?
 7        A.  My best estimate was between seven and ten times.
 8        Q.  And on those seven to ten occasions, how much
 9   methamphetamine were you getting from Mr. Baker?
10        A.  There was one time I only got half a kilo, but
11   the rest of the times it was a kilo.
12        Q.  Okay.  So a half a kilo to a kilo each time?
13        A.  Yes, sir.
14        Q.  And you did that seven or ten -- seven to ten
15   times?
16        A.  Seven to ten times.  Yes, sir.
17        Q.  You can't remember the exact number, correct?
18        A.  No, sir, I can't.
19        Q.  And what would you do with the methamphetamine
20   you got from Mr. Baker?
21        A.  I would sell it and I would use some of it.
22        Q.  Okay.  How often did you go get either a half a
23   kilo or a kilo from Mr. Baker?
24        A.  I went every week.  Sometimes I would go twice a
25   week and the rest -- but most of the time it was like
```

1  once a week, just whenever I was running low.

2      Q.  Okay.  And you said you did it seven to ten

3  times?

4      A.  Yes, sir.  That was my best estimate.

5      Q.  And you went about every week, once a week?

6      A.  Yes, sir.

7      Q.  So does that mean you went -- this was -- we're

8  dealing with like a seven to eight -- or seven to

9  ten-week time period?

10     A.  Yes, sir.

11     Q.  So would that take us into the summer of 2021?

12     A.  Yes.  July.

13     Q.  Okay.  Did Mr. Baker ever ask you to travel with

14  him out of state?

15     A.  Yes, he did.

16     Q.  And when I say "out of state," out of

17  North Carolina, right?

18     A.  Yes, sir.

19     Q.  And where did he ask you to go?

20     A.  To Georgia, Virginia.

21     Q.  For what purpose?

22     A.  To pick up methamphetamine.

23     Q.  Did you agree to go with him?

24     A.  I did one time.  The other times I did not.  But

25  the one time that I went, July the 13th.

```
1        Q.  Of 2021?

2        A.  Yes, sir.

3        Q.  Tell the jury what happened.

4        A.  I went with him to pick it up -- well, no.  He

5   called me and told me that his motorcycle was messed up,

6   and he -- to get it quicker, that he would need me to

7   come to him.  So I went to him in Georgia.  He was

8   already in Georgia.  I went to Georgia, and we went to

9   his supply person's house and stayed for a while, and...

10       Q.  Do you know whose house that was?

11       A.  Ms. Hernandez, I believe, was her name.

12       Q.  Do you know Ms. Hernandez's first name?

13       A.  Kara.

14       Q.  Kara Hernandez?

15       A.  Yes.

16       Q.  Okay.  So you went to Kara Hernandez's house, and

17  what happened?

18       A.  And we were all sitting around smoking meth and

19  talking, and then it was gonna be a little while, so I

20  left, went to the Dollar Store, and come back because I

21  just wasn't feeling comfortable.  And basically we just

22  hung out there and smoked meth that day.

23       Q.  And when you came back from the Dollar Store, did

24  Mr. Baker come out of Mrs. Hernandez's house?

25       A.  He was in the house, and he had text me, and I
```

told him I was just gonna sit outside because there were more people there and I just didn't feel comfortable, so I stayed in my car.  And he texted me and told me he would be out in a little bit or a little while.

Q.  Did he eventually come out of the house?

A.  Yes, sir.

Q.  Did he have anything with him?

A.  Yes, sir.  He had a book bag or a backpack thing with him.

Q.  Okay.  Did you know what was inside the book bag?

A.  No, sir --

Q.  At that time?

A.  No, sir, I did not.

Q.  What did he do with the book bag?

A.  He put it in my trunk.

Q.  And after he put it in your trunk -- and you're still driving, correct?

A.  Yes.

Q.  He got in the passenger seat?

A.  Yes.

Q.  And then did y'all leave Georgia on the way back to North Carolina?

A.  Yes.  We were leaving, yes, to head back to North Carolina.

Q.  Okay.  Were you traffic stopped by law

1  enforcement in Georgia?

2      A.  Yes, sir, I was.

3      Q.  Tell the jury what happened.

4      A.  I got pulled over.  They said that I was

5  swerving, and so they pulled me over, and I got out and

6  took a sobriety test, which I passed.

7          And they asked me if I had anything in the car,

8  and I informed them that I had some Xanax, like three or

9  four Xanax in the front.  And they wanted to conduct a

10 search of my car, and they asked if they could, and they

11 said they had a K-9 that was going to check the car.

12 And at first I said no because I didn't see any reason

13 for them to check my car because I had told them what I

14 had in there.

15         And they ran the K-9 around my car, and he didn't

16 hit on anything.  And then they let him sit for a little

17 bit, ran him around the car again, and then he jumped up

18 on the hood, so that gave them probable cause to search,

19 I guess is -- and then they searched my car.  And when

20 they got to the trunk, they found his book bag that was

21 in there.  And they cut it open, and it had drugs in it,

22 had had meth in it and other things in it.

23     Q.  And --

24     A.  Paraphernalia.

25     Q.  And when they got that book bag out of the car,

1    did they search it right in front of you?

2        A.   Yes.  And they sat it up on the trunk, yes.

3        Q.   Okay.  And where was Mr. Baker when this was

4    happening?

5        A.   At first he was sitting in my car for the

6    majority of the time, and then when they started to

7    search the car, when they ran the dog around and started

8    to search the car, they got him out and let him sit on

9    the guardrail, side of the road.

10       Q.   And when they searched the book bag, was he also

11   present?

12       A.   Yes.  He was sitting on the guardrail.

13       Q.   Okay.  Now, Ms. Greene, you knew you were going

14   down to Georgia to pick up methamphetamine --

15       A.   Yes, sir, I did.

16       Q.   And to pick up Mr. Baker.

17       A.   Yes, sir, I did.

18       Q.   But you weren't sure when Mr. Baker came out of

19   Kara Hernandez's house whether he had meth or not.

20       A.   No, sir.  I did not know at that point.

21       Q.   All right.  But again, you knew you were going

22   down there to get meth.

23       A.   Yes, sir.

24       Q.   And when you saw that meth come out of that book

25   bag, what was going through your mind?

1      A.  I got sick.  I did not realize that it was in

2   there.  It was a lot of meth, and I was shocked and

3   sick.  I don't even know.  I think I went into shock.

4      Q.  You've seen dash cam footage from that traffic

5   stop, correct?

6      A.  Yes, sir.

7      Q.  And you don't dispute anything that dash cam or

8   video shows, right?

9      A.  No, sir.

10      Q.  I want to show you what's been marked for

11   identification as Government's Exhibit 94.  Do you

12   recognize this photograph?

13      A.  Yes, sir, I do.

14      Q.  And it's actually not a photograph, it's a still

15   shot, isn't it?

16      A.  Yes, sir, it is.

17      Q.  Of the dash camera of the trooper that -- or the

18   law enforcement officer that pulled you over.

19      A.  Yes, sir.

20      Q.  Does this picture fairly represent what the scene

21   looked like that night?

22      A.  Yes, it does.

23            MR. DODSON:  We move to admit, Your Honor,

24   Government's Exhibit 94 and request permission to

25   publish.

1              THE COURT:  It's admitted without objection.

2    You may publish.

3    BY MR. DODSON:

4        Q.  Ms. Greene, are we looking at the rear of your

5    car?

6        A.  Yes, sir.

7        Q.  What kind of car did you have?

8        A.  A Honda Accord.

9        Q.  What is on the trunk of your car?

10       A.  Drugs.  Methamphetamine.

11       Q.  And you see it looks like about five bags there,

12   correct?

13       A.  Yes.

14       Q.  What kind of bags were they?

15       A.  It looks like Ziploc bags, like tall Ziploc bags.

16       Q.  And is that what you -- is that what you saw that

17   night?  It looked like Ziploc bags to you?

18       A.  When I was standing outside the car and they cut

19   it open?

20       Q.  Yes, ma'am.

21       A.  Yes, sir.

22       Q.  We see some law enforcement officers in this

23   still shot, correct?

24       A.  Yes, sir.

25       Q.  And I don't -- do you see you in this photograph?

1    A.  No, sir.

2    Q.  Where are you -- do you know where you're at

3  right at this time?  I know it's a still shot, but do

4  you know where you're at?

5    A.  I may be standing back here, or I may be still

6  sitting in the police car, because they had me sitting

7  in the police car while they were watching.

8    Q.  And who -- do you see on the right-hand side it

9  looks like there's somebody with their back to the

10  camera on the right-hand side of the --

11    A.  Oh, there's an officer -- yes.

12    Q.  Who is that right there?

13    A.  That's me.  Are you talking about...

14    Q.  It looks like we're looking at the back of

15  somebody's shirt.

16    A.  Oh, that's another -- are you talking about over

17  here?  I'm sorry.

18    Q.  It's okay.  So I'll slow down.  If you're looking

19  at this --

20    A.  Oh, that's Baker's shirt.  I'm sorry.

21    Q.  Okay.

22    A.  Yeah.  I'm sorry.  The head's -- I just saw what

23  you're talking about.  Sorry.

24    Q.  It's okay.  What's the back of his shirt say?  Do

25  you know what it says?  A little hard to read.  Or if

1    you don't -- I'm just asking if you remember from that

2    night what he was wearing.

3        A.  Oh, no.  I just -- no.  Usually it was a T-shirt

4    or something.

5        Q.  Okay.  When you got supply from Chris Baker, I

6    want to take you back to when you said, you know, you

7    were getting half-kilo to kilogram amounts of

8    methamphetamine from Mr. Baker.  Did it look like that,

9    that's on your trunk?  Did it come in bags like that?

10       A.  Yes, it did.

11               MR. DODSON:  Okay.  Your Honor, may we have

12   one moment?

13               (Discussion off the record.)

14               THE COURT:  You may.  Mr. Dodson, would this

15   be an appropriate time to take our afternoon break?

16               MR. DODSON:  Yes, Your Honor.  I apologize.

17   Yes.

18               THE COURT:  Let's do that.  Ladies and

19   gentlemen of the jury, we'll now take a 15-minute recess

20   so that you can avail yourself of the facilities or get

21   refreshment.  We will return at ten minutes till the

22   hour.

23               (The jury exited the courtroom.)

24               THE COURT:  All right.  On the record and

25   outside the presence of the jury.  Is there anything we

```
 1    need to take up at this time?

 2                    MS. SANDLING:  No, Your Honor.

 3                    MR. CHETSON:  Yes.  Just very briefly, Your

 4    Honor.  With respect to the issue of me asking witnesses

 5    about their location, the first thing is I did not

 6    intend that to be anything --

 7                    THE COURT:  I understood.

 8                    MR. CHETSON:  -- other than just trying --

 9    the second issue is I'll just let the Court know that --

10    for purposes, I'm -- I won't name the website, but there

11    is a publicly available website where I've been able to

12    identify where people are in order to subpoena records.

13    So I wasn't thinking I was giving away any secrets.

14    Thank you.  That's all.

15                    THE COURT:  There was no negative inference

16    drawn, Mr. Chetson.  It was just --

17                    MR. CHETSON:  I understand.  Just putting it

18    on the record for future...

19                    THE COURT:  Absolutely.

20                    MR. CHETSON:  Thank you.

21                    THE COURT:  And I'm putting my "no negative

22    inference" on the record as well.

23                    MR. CHETSON:  Thank you.

24                    THE COURT:  All right.  We'll take our

25    recess.
```

```
 1                    (Proceedings recessed at 3:36 p.m.)
 2                    (Proceedings recommenced at 3:53 p.m.)
 3                    THE COURT:  All right.  Mr. Dodson, your
 4   witness -- oh, we'll bring back the jury.  I keep doing
 5   this.
 6                    Anything we need to take up?  No?
 7                    MR. DODSON:  Not from the government.
 8                    (The jury entered the courtroom.)
 9                    THE COURT:  All right.  Back on the record
10   and in the presence of the jury.  Mr. Dodson, you may
11   proceed.
12                    MR. DODSON:  Thank you, Your Honor.
13   BY MR. DODSON:
14      Q.  Ms. Greene, I want to turn your attention back to
15   the screen in front of you.  And do you remember earlier
16   when I was asking you questions about the agreement
17   which contains your cooperation?
18      A.  Yes, sir.
19      Q.  And we looked at that on the screen earlier?
20      A.  Yes, sir.
21      Q.  I want to turn your attention to the screen again
22   and ask you if you recognize this document, and I'll
23   zoom out of the camera a little bit.  Do you recognize
24   this?  And it's labeled Government's Exhibit 149.  Do
25   you recognize it?
```

1    A.  Yes, sir.

2    Q.  And this is your actual plea agreement, is it

3  not?

4    A.  Yes, sir, it is.

5    Q.  It talks about the charges that you agree to

6  plead guilty to?

7    A.  Yes, sir.

8    Q.  I'm flipping to the last page of Government's

9  Exhibit 149.  Do you see your signature there?

10    A.  Yes, sir, I do.

11    Q.  Ma'am, did the government have any promises that

12  are not contained outside of this plea agreement or the

13  agreement about your cooperation that we looked at

14  earlier?

15    A.  No, sir.

16         MR. DODSON:  Your Honor, we move to admit

17  Government's Exhibit 149 into evidence.

18         THE COURT:  It's admitted without objection.

19         MR. DODSON:  And request permission to

20  publish.

21         THE COURT:  You may.

22  BY MR. DODSON:

23    Q.  And, Ms. Greene, you see this says "United States

24  of America versus Amanda Ingle Greene," correct?

25    A.  Yes, sir.

1    Q.   And "Memorandum of Plea Agreement"?

2    A.   Yes, sir.

3    Q.   And it contains your signature again on the last

4    page, doesn't it?

5    A.   Yes, sir, it does.

6    Q.   And it contains the signature of your lawyer?

7    A.   Yes, sir.

8              MR. DODSON:  Thank you, Ms. Greene.  I have

9    nothing further, Your Honor.

10             MR. CHETSON:  No questions, Your Honor.

11   Thank you.

12             MS. SALMON:  Yes, Your Honor.

13                     CROSS-EXAMINATION

14   BY MS. SALMON:

15   Q.   Good afternoon, Ms. Greene.  I'm Elisa Salmon.  I

16   represent Landon Holcomb.

17   A.   Yes, ma'am.

18   Q.   Do you know who Landon Holcomb is?

19   A.   No, ma'am.

20   Q.   Never seen him before in your life?

21   A.   No, ma'am.

22   Q.   I just wanted to ask you a couple of questions

23   about the night you were stopped.  I heard you say when

24   Mr. Dodson was asking you questions that you left

25   Ms. Hernandez's house.

1    A.  Yes.

2    Q.  And then sometime later you were stopped.

3    A.  Yes.

4    Q.  How much later was that?

5    A.  We had not been gone very long.  To the best of

6    -- my estimated guess is maybe an hour.  I'm not sure.

7    About an hour, maybe a little bit less.

8    Q.  And you said when you saw what was in the bag,

9    you were shocked, right?

10   A.  Yes, ma'am.

11   Q.  Because even though you had been in the car with

12   Mr. Baker for an hour, you did not talk about what he

13   had done.

14   A.  No, ma'am.

15   Q.  Right.  Or anything that he had put in the bag.

16   A.  No, ma'am.

17           MR. DODSON:  Objection, Your Honor.

18           THE COURT:  Basis.

19           MR. DODSON:  Just like to inquire if this

20   line of questioning has anything to do with the

21   defendant Landon Holcomb.

22           THE COURT:  I understand where -- I

23   understand where she's going.  You may inquire.

24           MS. SALMON:  Thank you, Your Honor.

25   BY MS. SALMON:

1    Q.  He was not chatting you up about any of the

2  specifics of the drug deal he had just done, was he?

3  Mr. Baker.

4    A.  No.  He -- no.

5    Q.  Because he kept that kind of stuff pretty close

6  to the vest, correct?

7    A.  Not always, no.  That particular night, yes.

8    Q.  He didn't share the details with you that night,

9  correct?

10    A.  Not -- no.

11         MS. SALMON:  No further questions, Your

12  Honor.

13         THE COURT:  Redirect?

14         MR. DODSON:  No, Your Honor.

15         THE COURT:  All right.  Thank you, ma'am.

16  You may step down, and you're released from your

17  subpoena.

18         You may call your next witness.

19         MS. SANDLING:  Your Honor, the government

20  would call Erika Derks.

21         THE CLERK:  Raise your right hand, left hand

22  on the Bible.  Please state your name for the record.

23         THE WITNESS:  My name is Erika Derks.  You

24  spell the last name D-E-R-K-S.

25         (The witness was placed under oath.)

```
 1              MS. SANDLING:  Thank you, Your Honor.
 2                      DIRECT EXAMINATION
 3   BY MS. SANDLING:
 4        Q.  Good afternoon, Ms. Derks.
 5        A.  Hi.
 6        Q.  If you could, please state your name for the
 7   jury.
 8        A.  My name is Erika Derks.
 9        Q.  What is your occupation?
10        A.  I am a senior forensic chemist with the Drug
11   Enforcement Administration.
12        Q.  How long have you been with the DEA?
13        A.  I have been a forensic chemist with the Drug
14   Enforcement for approximately 22 years.
15        Q.  And if you would, please, describe your duties
16   and responsibilities as a forensic chemist with the DEA.
17        A.  My primary duty is to look at evidence that's
18   brought into our lab and determine if there is a
19   presence or absence of controlled substances.  I prepare
20   official reports to my findings, testify in court when
21   needed, and also assist agents and police officers in
22   clandestine laboratories that are found out in the
23   public if they need scientific help.
24        Q.  And what sort of training and education did you
25   receive in order to become a forensic chemist?
```

1    A.   First my education, I have a Bachelor of Science

2  degree in chemistry from the University of New

3  Hampshire, and then I also received in-house training

4  with the Drug Enforcement Administration.  That program

5  at the time that I did it was approximately nine months

6  long, and they trained us about all of our duties as a

7  forensic chemist, and all of our policies and procedures

8  were included with that.

9    Q.   Have you received any sort of certifications as a

10  forensic chemist?

11    A.   Just the certification that I completed, the

12  basic chemist certifications for the Drug Enforcement.

13    Q.   And in your numerous years with the DEA, you've

14  had the opportunity to analyze controlled substances in

15  order to determine whether or not they contain

16  narcotics.  Is that correct?

17    A.   Yes.

18    Q.   Approximately how many times would you say you've

19  analyzed substances in order to determine whether it's a

20  controlled substance?

21    A.   I have analyzed over 9,000 exhibits in my time.

22    Q.   What types of drugs would you say that you've had

23  the chance to analyze?

24    A.   There's quite a few.  Cocaine, heroin, fentanyl,

25  methamphetamine, marijuana, basically any type of

1  stimulant, opioid, steroids.  There's a broad range.

2     Q.  Have you ever testified as an expert in a court

3  before?

4     A.  I have.

5     Q.  And approximately how many times would you say

6  you've testified as an expert before?

7     A.  I have approximately testified for approximately

8  100 times.

9     Q.  And in which courts would those be?

10    A.  I don't remember the districts, but I have

11 testified in Illinois, New York, New Jersey, West

12 Virginia, Virginia, Kentucky, Tennessee, Delaware.  I'm

13 sorry.  I don't remember if I said Georgia.  Florida,

14 Mississippi, Alabama, Louisiana, Texas, Nevada, Arizona,

15 and there might be one or two others that I might have

16 forgotten at this moment.

17    Q.  And would that be state or federal court or both?

18    A.  Mostly federal, some state, and once in military

19 court.

20    Q.  Have you ever not been -- or have you ever

21 testified by a court and not been declared an expert?

22    A.  No.

23    Q.  How does the DEA lab receive substances for

24 examination?

25    A.  There's two ways that we receive substances for

examination into our laboratory.  One is they are
hand-carried by some type of law enforcement personnel,
and then the second way is they are shipped through
either FedEx or the U.S. postal mail service.

Q.  Does the DEA lab employ quality controls as a
part of the lab?

A.  Yes, we do.

Q.  Could you describe those for the jury, please.

A.  Well, we have lots of policies that we have to
follow, rules and regulations that we go by, standard
operating procedures, or SOPs, quality controls.  We are
tested yearly with blind samples to make sure that we
have accurate results.  That's kind of how we have our
quality testing.

MS. SANDLING:  Your Honor, the government
would move to tender Ms. Derks as an expert in the field
of chemistry and analysis of narcotics at this time.

MR. CHETSON:  No objection from Mr. Baker.

MS. SALMON:  No objection, Your Honor.
Thank you.

THE COURT:  The witness has been tendered
and will be accepted by the Court.

BY MS. SANDLING:

Q.  Ms. Derks, turning to the case that we're here
for and that you're here for today, can you let me know

1  when you received the substances that you analyzed in

2  this case?

3     A.  I do not have any paperwork.  I do not recall off

4  the top of my head.  If I can refresh my memory with the

5  paperwork that's gonna be submitted into evidence?

6            MS. SANDLING:  If I may, Your Honor, I would

7  ask to show the witness Government Exhibit 106 at this

8  time.

9            THE COURT:  You may.

10 BY MS. SANDLING:

11    Q.  Ms. Derks, do you recognize Government's Exhibit

12 106?  And it's several pages, so if we could flip

13 through these pages.

14        Ms. Derks, have you had an opportunity to review

15 Government's 106?

16    A.  Yes, I did.

17    Q.  Do you recognize it?

18    A.  Yes.  These are reports that I prepared to my

19 findings.  Each one of them has my findings at the top,

20 and then it is -- each page is digitally signed by

21 myself at the bottom.

22    Q.  Okay.  And when did you perform the testing?

23    A.  Well, each one of them could be on a different

24 day.  So the first page of Government Exhibit 106, I

25 received the evidence on January 12th, 2022.  I can't

```
 1    tell you exactly what days my examination occurred, but
 2    it was -- that was the day -- from that day until I
 3    signed my report was February 8th, 2022.  So it was in
 4    my possession for a few weeks.
 5        Q.  On page 1 of 1 of Government's Exhibit 106, what
 6    did that substance contain?
 7        A.  It was found to contain methamphetamine
 8    hydrochloride.
 9        Q.  And on page -- the next page -- well, and let me
10    refer to page 1, Exhibit 16, what did that substance
11    contain?  Of Government's Exhibit 106.
12        A.  Okay.  Government Exhibit 106, which is DEA
13    Exhibit No. 16, contained methamphetamine hydrochloride.
14        Q.  Exhibit 39?  What did that substance contain?
15        A.  Exhibit 39 contained methamphetamine
16    hydrochloride.
17        Q.  Exhibit 40?
18        A.  Exhibit 40 contained aspirin and caffeine.
19        Q.  Exhibit 41?
20        A.  Exhibit 41 contained cocaine hydrochloride,
21    methamphetamine, and phenyltetrahydroimidazothiazole.
22        Q.  Exhibit 42.
23        A.  Exhibit 42 contained methamphetamine
24    hydrochloride.
25        Q.  Forty-four.
```

```
 1       A.   Exhibit 44 contained methamphetamine

 2   hydrochloride.

 3       Q.   Exhibit 50?

 4       A.   Exhibit 50 has what we call three subexhibits.

 5   So there were three different aliquots that were

 6   taken -- they were used as separate -- tested

 7   separately.  So Exhibit 50.01 contained cocaine

 8   hydrochloride and phenyltetrahydroimidazothiazole.

 9           The next one was Exhibit 50.02.  That contained

10   no controlled substances, and Exhibit 50.03 contained

11   oxycodone.

12       Q.   And, finally, Exhibit 51?

13       A.   And Exhibit 51 contained methamphetamine

14   hydrochloride.

15               MS. SANDLING:  Your Honor, government would

16   move to introduce Government's Exhibit 106.

17               THE COURT:  It's admitted without objection.

18               MS. SANDLING:  Government would move to

19   publish Exhibit --

20               THE COURT:  You may.

21               MS. SANDLING:  -- Exhibit 106.

22   BY MS. SANDLING:

23       Q.   All right.  Ms. Derks, if we could take a look at

24   Government Exhibit 106, Exhibit 16, please.  And you

25   analyzed the DEA Exhibit 16.  Is that correct?
```

1    A.   Yes.

2    Q.   And what did you find that it contained?

3    A.   It contained methamphetamine hydrochloride.

4    Q.   And on these columns here, we have a net weight

5    column, a substance purity column, and an amount of pure

6    substance column.  If you could explain for the jury,

7    what does each of those columns mean?

8    A.   Sure.  The net weight means that is the weight of

9    the powder, or the substance and only the substance.

10   There's no packaging material in that.

11        The purity is how pure that substance is.  So in

12   this case it's 98 percent pure.  That means 2 percent

13   can be something else of that powder.

14        The amount pure substance is basically just a net

15   weight.  And then you multiply it by the purity to get

16   the amount of pure net weight of pure substance of

17   methamphetamine.

18   Q.   Now, as it relates to methamphetamine, why is

19   substance purity analyzed or documented?

20   A.   We at the Drug Enforcement laboratory always get

21   the purity of methamphetamine because the purity of

22   methamphetamine can have implications on sentencing

23   issues for the court system.  So we always get the

24   purity on methamphetamine samples.

25   Q.   And is methamphetamine -- can it be cut with

1   adulterants?

2       A.  It can be.

3       Q.  And related to purity, if a substance is 98

4   percent pure, does that mean that there are very few

5   adulterants in that particular Exhibit 16?

6       A.  It's very close to 100 percent pure.  There is

7   approximately 2 percent of other substances in it.  And

8   I can't tell you -- because that -- methamphetamine was

9   the only thing that I found, I can't tell you what that

10  other percent is made up of.

11      Q.  And the actual pure substance of Exhibit 16 was

12  what?

13      A.  186.36 grams, plus or minus 11.48 grams.

14      Q.  Turning to Exhibit 39, you analyzed this

15  substance and found it to contain methamphetamine.  Is

16  that correct?

17      A.  Yes.

18      Q.  And the net weight of it?

19      A.  3.273 grams, plus or minus 0.002 grams.

20      Q.  With a substance purity of how much?

21      A.  3.240, plus or minus 0.198 grams.

22      Q.  Turning to Exhibit 40.  This substance was just

23  aspirin and caffeine, correct?

24      A.  Correct, with a net weight of 15.243 grams, plus

25  or minus 0.002.

1    Q.   Turning to Exhibit 41, that contained cocaine

2  hydrochloride, methamphetamine, and -- you'll have to

3  pronounce that last one for me.

4    A.   Phenyltetrahydroimidazothiazole.  And this

5  substance was found to have a net weight of 3.053, plus

6  or minus 0.002 grams.

7    Q.   What is cocaine hydrochloride?

8    A.   So cocaine hydrochloride is a Schedule II

9  controlled substance federally.  Cocaine can have two

10 forms that it's found in, cocaine hydrochloride and

11 cocaine base.

12       Essentially, the difference between the two forms

13 is one is water soluble and the other is not.  So the

14 difference between the two is -- because of water

15 solubility, it would be used differently.  For instance,

16 cocaine hydrochloride could be dissolved in water,

17 meaning your mouth or needle or whatever.  Cocaine base

18 is not water soluble in that way, so it is often smoked.

19 And that's the difference between the base and the

20 hydrochloride.

21   Q.   And cocaine hydrochloride is essentially powder

22 cocaine.

23   A.   Correct.

24   Q.   Turning to Exhibit 42 that you analyzed, you

25 found this to contain methamphetamine.  Is that correct?

1    A.   That's correct.  It's methamphetamine

2    hydrochloride with a net weight of 709.3 grams, plus or

3    minus 0.2 grams.

4    Q.   And a substance purity of?

5    A.   688.0 grams, plus or minus 42.7 grams.

6    Q.   Turning to Exhibit 44.  You found this to contain

7    methamphetamine?

8    A.   Yes.  This was methamphetamine hydrochloride with

9    a net weight of 4.544 grams, plus or minus 0.002 grams,

10   with amount pure substance of 4.453 grams, plus or minus

11   0.274 grams.

12   Q.   Exhibit 50.  This contained several substances,

13   cocaine hydrochloride and oxycodone and the other --

14   you'll have to help me again.

15   A.   Yes.  So Exhibit 50.01 contained cocaine

16   hydrochloride and phenyltetrahydroimidazothiazole with a

17   net weight of 57.966 grams, plus or minus 0.002 grams.

18        The next exhibit, 50.02, contained no controlled

19   substances, with a net weight of 10.080 grams, plus or

20   minus 0.002 grams.

21        And the third one on this page, 50.03, was found

22   to contain oxycodone with a net weight of 0.101 grams,

23   plus or minus 0.002 grams.

24   Q.   And finally, government's -- or DEA Exhibit 51,

25   you also analyzed this and found it to contain

```
1    methamphetamine.  What was the net weight attributable
2    to that meth that you analyzed?
3        A.  It was found that the substance had a net weight
4    of 2,060 grams, plus or minus 1 gram, with an amount of
5    pure substance of 2,018 grams, plus or minus 124 grams.
6        Q.  And just to put this in perspective, a kilo of
7    methamphetamine, or any controlled substance, is 1,000
8    grams.  Is that correct?
9        A.  Yes.
10       Q.  So this was over two kilos --
11       A.  Correct.
12       Q.  -- of methamphetamine.
13               MS. SANDLING:  Your Honor, government would
14   move to introduce Government's Exhibit 106 into evidence
15   at this time.
16               THE COURT:  I believe it's already been
17   admitted.
18               MS. SANDLING:  I'm sorry.  No further
19   questions.
20               THE COURT:  Are we gonna tie this evidence
21   to the case through a different witness?
22               MS. SANDLING:  We are, Your Honor.
23               THE COURT:  Okay.
24               MS. SANDLING:  We are having to call
25   Ms. Derks out of order given that she's due in Atlanta
```

```
 1   tomorrow.

 2                THE COURT:  Okay.

 3                MS. SANDLING:  Okay.

 4                THE COURT:  Cross-examination, counsel.

 5                MR. CHETSON:  No questions.  Thank you, Your

 6   Honor.

 7                MS. SALMON:  No, sir.

 8                THE COURT:  All right.  Thank you, ma'am.

 9                THE WITNESS:  Thank you.

10                THE COURT:  You're excused from your

11   subpoena.

12                THE WITNESS:  Thank you.

13                THE COURT:  All right.  You may call your

14   next witness.

15                MS. SANDLING:  Your Honor, the government

16   would call Kathy Cochran.

17                THE CLERK:  Raise your right hand, left hand

18   on the Bible, and please state your name for the record.

19                THE WITNESS:  My name is Kathryn Cochran.

20                (The witness was placed under oath.)

21                       DIRECT EXAMINATION

22   BY MS. SANDLING:

23      Q.  Good afternoon, Ms. Cochran.

24      A.  Good afternoon.

25      Q.  If you could please introduce yourself to the
```

1  jury.

2      A.   Like I said, my name is Kathryn Cochran.  I am a

3  forensic investigator, work for the U.S. Attorney's

4  Office here in Raleigh.

5      Q.   What do you do as a forensic auditor with the

6  U.S. Attorney's Office?

7      A.   So I'm usually involved with the case right from

8  the beginning.  I do more of the financial analysis, but

9  I also conduct interviews and look through the rest of

10 the evidence as well; interview reports, lab reports,

11 anything that relates to the case because I have to know

12 all about it.

13     Q.   How long have you been employed with the

14 United States Attorney's office?

15     A.   I've been employed here for about four years, and

16 prior to that, I was with the North Carolina Attorney

17 General's Office for 14 years as a financial

18 investigator.

19     Q.   Now, just a moment ago, you stated that you

20 review reports and look at other records pertaining to

21 individual cases.  Is that correct?

22     A.   That's correct.

23     Q.   Did you have an opportunity to review reports and

24 other records relating to Christopher Lamar Baker?

25     A.   I did.  I reviewed bank records, Cash App

```
 1   records, any other documents that were received
 2   pertinent to the investigation.
 3       Q.  Were grand jury subpoenas issued for the
 4   defendants's Cash App accounts as well as Ashley Hall's
 5   Cash App accounts?
 6       A.  Yes, there was.
 7       Q.  Ms. Cochran, how many Cash App accounts did the
 8   defendant Christopher Baker have?
 9       A.  He had two.  Excuse me.  He had one in his name.
10       Q.  And how many accounts for Cash App did Ms. Hall
11   have?
12       A.  Ms. Hall had three.
13       Q.  And are you familiar with the accounts that
14   Ms. Hall had?
15       A.  Yes, I am.
16       Q.  Now, yesterday, Government's Exhibit 92 was
17   introduced into evidence, which were the Cash App
18   records for both Mr. Baker and Ms. Hall.  Have you had
19   an opportunity to review those records?
20       A.  I have.
21       Q.  I want to show you Government's Exhibit 97, and
22   this as well was admitted yesterday into evidence.
23       A.  Okay.
24       Q.  Ms. Cochran, are you able to view Government's
25   97?
```

1    A.  Yes, I am.

2    Q.  And I want to focus in on lines 39 through 52,

3    please.  Ms. Cochran, do you recognize the records that

4    we're looking at right now?

5    A.  Yes.  I highlighted them.  Yes.

6    Q.  And these are Chris Baker's Cash App records.  Is

7    that correct?

8    A.  Yes, they are.

9    Q.  Now, pertaining to line 39, what are we looking

10   at here?

11   A.  So we're looking at a transaction that was

12   initiated through Cash App for $400, actually two.  And

13   it went from Christopher Baker to K. Hernandez, which I

14   know as Kara Hernandez.

15   Q.  And how do you know who Kara Hernandez is?

16   A.  Because I've reviewed the evidence in the case,

17   the interview reports, everything.

18   Q.  Are you also familiar with dates of controlled

19   buys which occurred in this case?

20   A.  I am.

21   Q.  And looking at line 40, what date is line 40

22   pertaining to?

23   A.  So line 40, February 27th, 2021, there was a

24   controlled purchase done that day here in Raleigh.

25   Q.  Okay.  And looking at the second column, which

1    states "paid out," what does that mean?

2       A.   That means the money actually moved from the

3    sender to the receiver, so from Chris Baker to

4    Kara Hernandez.

5       Q.   And Kara Hernandez, you're familiar with who

6    Ms. Hernandez is?

7       A.   Yes.

8       Q.   And according to your review and conversations

9    with officers in this case, who was Kara Hernandez?

10      A.   So Kara Hernandez was a supplier for Chris Baker

11   for methamphetamine.

12      Q.   And so on the date of the controlled buy on

13   February 27th of 2021, the defendant actually Cash App'd

14   $400 to Kara Hernandez.  Is that correct?

15      A.   That's correct.

16      Q.   And on the 28th of February, the day after that

17   controlled buy -- this would be line 39 -- how much

18   money did Mr. Baker pay out to Kara Hernandez?

19      A.   $400.

20      Q.   Looking at lines 50 through 52, Ms. Cochran, can

21   you explain for the jury what this is?

22      A.   So the date of that transaction was on February

23   19th, 2021, and the night before -- the day before, on

24   that February 18th, there was a controlled purchase here

25   again in Raleigh for methamphetamine.  And Mr. Baker

then on the 19th, which is the day after the controlled
purchase, he Cash App'd a total of $500 in three
separate transactions to Kara Hernandez.

Q. So the total amount that Mr. Baker Cash App'd to
his source of supply the day after the February 18th
controlled buy was how much money?

A. Was $1,000.

Q. And on the day of the February 27th controlled
buy, how much money did Mr. Baker Cash App to his source
of supply?

A. On that day, 400.

Q. And on the next day?

A. Another 400.

Q. So a total of $800?

A. Yes.

Q. And again, we're looking at another page of
Mr. Baker's Cash App records. Are you familiar with
Road Kill Jones?

A. I am familiar with the name, yes.

Q. Who, again, was Road Kill?

A. His real name was David Jones. He's deceased.
I'm aware that he allegedly died of an overdose of
heroin.

Q. And on this particular page, what are we seeing
here?

1    A.  So on this page, you're seeing various dates

2   through 2020 where Christopher Baker Cash App'd money to

3   what his username was in Cash App, which is "Roadkill

4   Jones."  And you can see there's significant amounts of

5   money.

6    Q.  And are you familiar with whether or not the

7   defendant was receiving methamphetamine initially from

8   Road Kill in this case?

9    A.  I am aware of that.

10    Q.  We can go to the next page.  Ms. Cochran, on this

11   page, I want to look at transactions as they relate to

12   Piper Young.  Are you familiar with Piper Young?

13    A.  Yes, I am.

14    Q.  Who is Piper Young?

15    A.  Well, her real name is Elizabeth Young.  She is a

16   known co-conspirator of Mr. Baker's; started out being a

17   customer of his and then was working with him and

18   receiving methamphetamine.  She was selling it as well.

19    Q.  Do you have a total amount of money that

20   Mr. Baker was Cash Apping to Ms. Young?

21    A.  I believe it was -- I think I had that on a

22   separate page, but I want to say that it was around

23   $3,000.

24    Q.  This page is reflecting Ashley Hall's Cash App

25   payments.  Are you familiar with this particular page

1   that we're looking at right now, Ms. Cochran?

2       A.  Yes, I am.

3       Q.  And in looking at Ashley Hall's Cash App

4   payments, specifically starting on line 319, looking at

5   column number B, "Sender Blacklisted."

6       A.  That's Cash App's term to say he's blocked.  He

7   is no longer allowed to use Cash App.  So on that

8   particular day, May 11th, 2021, he was able to get one

9   transaction sent -- actually two transactions sent to

10  Ashley Hall through Cash App, and then right after that,

11  Cash App shut down his account.

12      Q.  So was this Mr. Baker trying to send money to

13  Ashley or Ashley sending money to Christopher Baker and

14  not being able to send it?

15      A.  It was Mr. Baker trying to send money to Ashley,

16  and Cash App said "no more."

17      Q.  Looking at columns 286 -- 284 and 286, with

18  respect to Amanda Greene, what are we looking at on both

19  July 5th and July 2nd related to Amanda Greene?

20      A.  We interviewed Amanda Greene, Agent Fields and I

21  did, and she stated that that money was for

22  methamphetamine that she was purchasing from Christopher

23  Baker.  He told her to pay some of it in real cash, bulk

24  cash, and to Cash App the rest of it to Ms. Hall.

25      Q.  And how much money did Amanda Greene give

1    Ashley Hall on July 2nd of 2021?

2        A.   On July 2nd she gave her $2,125.

3        Q.   And that $2,125 was for methamphetamine, is that

4    correct?

5        A.   It is, yes.

6        Q.   And did you interview Ashley Hall in this case?

7        A.   I did, with Agent Fields, yes.

8        Q.   And Ms. Hall admitted that to you?

9        A.   She did.

10       Q.   And have you also spoken or read reports

11   regarding Amanda Greene?

12       A.   Yes, I have.

13       Q.   And does Ms. Greene say -- what does Ms. Greene

14   say related to July 2nd of 2021?

15       A.   Ms. Greene admitted that those transactions were

16   for methamphetamine, and then when she met with

17   Agent Fields and I, she stated it again.

18       Q.   I want to look at line 296.  This would be June

19   9th, 2021.  In column D it states, "u already know."  Is

20   that correct?

21       A.   It does, yes.

22       Q.   And that was by a Brian Lopez.  Are you familiar

23   with Brian Lopez --

24       A.   I am --

25       Q.   -- and his relation to the defendant?

1     A.   Yes, I am.

2     Q.   And who was Brian Lopez?

3     A.   Brian Lopez was a customer, a methamphetamine

4  customer of Mr. Baker's.

5     Q.   And how much money did he give Mr. Baker on

6  June the 9th of 2021?

7     A.   June the 9th he sent $500 to Ms. Hall, and he put

8  on the comment line or the explanation line, "u already

9  know."

10     Q.   And was that common when you were reviewing

11 Mr. Baker's records to see notations such as "u already

12 know" or other coded communications on Mr. Baker's Cash

13 App records?

14     A.   Yes.   That's quite frequent.

15          MS. SANDLING:   I have no further questions,

16 Your Honor.

17          THE COURT:   Cross-examination.

18          MR. CHETSON:   No questions for this witness,

19 Your Honor.

20          MS. SALMON:   Nothing for Ms. Cochran, Your

21 Honor.

22          THE COURT:   Okay.   Thank you, ma'am.

23          THE WITNESS:   Thank you.

24          MS. SANDLING:   May Ms. Cochran be released,

25 Your Honor?

```
1                    THE COURT:  She is.

2                    MS. SANDLING:  Your Honor, at this time,

3     government would move to introduce Government's 91 into

4     evidence.  This is an FDIC certificate.

5                    THE COURT:  Has it been shown to -- provided

6     to defense counsel?

7                    Any objection?

8                    MR. CHETSON:  No, Your Honor.

9                    THE COURT:  It's admitted without objection.

10                   MS. SANDLING:  Thank you.  May I call my

11    next witness, Your Honor?

12                   THE COURT:  You may call your next witness.

13                   MS. SANDLING:  The government would call

14    Agent Catherine Fields.

15                   THE CLERK:  Raise your right hand, left hand

16    on the Bible.  Please state your name for the record.

17                   THE WITNESS:  Catherine Fields.

18                   (The witness was placed under oath.)

19                   THE COURT:  You may inquire.

20                         DIRECT EXAMINATION

21    BY MS. SANDLING:

22       Q.  Agent Fields, if you would introduce yourself to

23    the jury.

24       A.  My name is Catherine Fields, and I'm a special

25    agent with the Bureau of Alcohol, Tobacco, Firearms, and
```

1   Explosives, otherwise known as ATF.

2       Q.   How long have you been employed with ATF?

3       A.   A little over 12 and a half years.

4       Q.   If you would, please, describe for the jury your

5   career through ATF and where you were first employed.

6       A.   Yes.  I began after my training with ATF at the

7   Federal Law Enforcement Training Center in Glynco,

8   Georgia.  I completed CITP, which is Criminal

9   Investigator Training Program, and then went straight

10  into special agent basic training with ATF; there for

11  approximately six to seven months.

12          After that, my first duty station was the Phoenix

13  field division, the Tucson field office; was there for

14  approximately three years.  From there I transferred to

15  the Washington field office in Washington, D.C., and

16  worked exclusively in a firearms trafficking group in

17  the city and was there for approximately six years, and

18  then have been here since 2019 in Raleigh, North

19  Carolina.

20      Q.   And what do you do in the Raleigh field office

21  for ATF?

22      A.   I do investigations relating to firearms

23  trafficking, arson and explosives investigations, armed

24  narcotics trafficking, illegal possession, criminal use

25  of guns, gang investigations, and those sort of

1    investigations.

2        Q.   And describe for the jury your training and

3    experience since becoming employed as an ATF agent.

4        A.   Since becoming employed as an ATF agent, like I

5    said, I went to the Criminal Investigator Training

6    Program and the special agent basic training as well as

7    numerous trainings, mostly in firearms trafficking,

8    international firearms trafficking, while working on the

9    border and other sorts of training in guns, gangs,

10   et cetera.

11       Q.   Agent Fields, describe for the jury how you

12   became involved in this particular case.

13       A.   I became involved in May of 2021 when we at the

14   Raleigh ATF office along with the Raleigh Police

15   Department began our wiretap Title III on Mr. Baker.

16       Q.   And do you see Christopher Baker seated in the

17   courtroom today?

18       A.   Yes, I do.  He's seated at the table there with

19   the long beard.

20            MS. SANDLING:  I'd ask that the record

21   reflect...

22            THE COURT:  Record shall reflect the agent

23   identified the defendant Christopher Baker.

24   BY MS. SANDLING:

25       Q.   And do you recognize Defendant Landon Holcomb

1  seated in the courtroom today?

2    A.  I do.  He's seated to the right of his attorney,

3  from my angle, to the left of her.

4          MS. SANDLING:  I'd...

5          THE COURT:  And the record shall reflect the

6  agent identified the defendant Landon Holcomb.

7  BY MS. SANDLING:

8    Q.  Agent Fields, the wiretap on the defendant in

9  this case, you were involved and -- basically manning

10  the wiretap on the defendant's phone.  Is that correct?

11    A.  That is correct.

12    Q.  You heard Ms. Hall -- or Ms. Young testify today

13  that she was arrested in Virginia for possession of

14  methamphetamine.  Is that correct?

15    A.  That is correct.  Yes.

16    Q.  Was there a reason that Ms. Young was arrested in

17  Virginia with methamphetamine?

18    A.  Yes.  She was intercepted on the wiretap, and we

19  knew that she was going to be moving quantity of

20  methamphetamine back up to West Virginia.  So we had her

21  stopped.  She was stopped on a traffic violation as to

22  not interrupt the Title III wiretap.

23    Q.  And who did she receive the methamphetamine from?

24    A.  She had been in North Carolina and received it

25  from Christopher Baker in Kings Mountain, North

1    Carolina.

2        Q.   How much methamphetamine did Ms. Young get from

3    Mr. Baker?

4        A.   I believe that time it was approximately a pound.

5        Q.   And you heard Ms. Greene testify earlier today

6    regarding the July 13th, 2021, stop of her vehicle.   Is

7    that correct?

8        A.   Yes, I did.

9        Q.   And is there a reason that that stop occurred on

10   Ms. Greene's vehicle?

11       A.   Yes.   Based off interceptions from the Title III

12   wiretap that we were up on listening to Mr. Baker's

13   phone, we received some information that he was -- or we

14   heard that he was going down to Georgia to resupply for

15   his methamphetamine.

16           We traveled down from the Raleigh field office

17   with ATF and met up with ATF in our Atlanta field

18   office.   We did surveillance on Mr. Baker throughout the

19   day and watched him travel from a location, which is

20   actually the aunt of Devan Christopher, Vickie

21   Christopher's residence or trailer in Buford, Georgia,

22   all the way over to Kara Hernandez, one of his sources

23   of supply, in Atlanta -- in Stone Mountain, Georgia --

24   excuse me -- just outside of Atlanta.

25           He traveled to her house.   When he traveled to

her house -- we had previously seen him at that
residence in Buford, Georgia, on a motorcycle. So when
he arrived, we were intercepting, obviously, live at the
time, so on his telephone. So we heard phone calls
coming through, and we thought that maybe Amanda Greene
would be down in the Georgia area, which was unusual to
us because we had never heard her travel down there
while up on the wiretap. And at this point, we were
actually coming up on 60 days up on his phone, so we
kind of had established a pattern of what was going on.

So we did see a vehicle come up to Kara
Hernandez's house because we had surveillance at that
location as well knowing that that was where he was
en route to. The vehicle that pulled up was the black
Honda Accord that you saw earlier in the still shot from
the Georgia State Police stop on I-85 on July 13th.
That pulled up. We ran the plates. The registered
owner was Amanda Greene, the lady you heard testify
earlier. And we saw her in the car. We saw Mr. Baker
go in and her go in. We had one unit on the street
doing surveillance. And then obviously we had people in
our wire room in the Raleigh ATF office monitoring what
was going on.

It appeared that there was a delay in the
methamphetamine coming from Kara Hernandez's supplier.

So Amanda Greene and Mr. Baker actually left, and we
were listening to Mr. Baker make calls or, you know,
send text messages out to Ms. Hall and other people, his
girlfriend, Ms. Hall that testified earlier, girlfriend
at the time, saying that things were delayed and, you
know, he was annoyed or, you know, things of that
nature.

We followed Ms. Greene and Mr. Baker to a
McDonald's down the street in Stone Mountain. We sat
there. They kind of waited there for a little bit.

Eventually we followed them back to Kara
Hernandez's house in Stone Mountain, and Ms. Greene
proceeded to -- Baker got out of the car, and Ms. Greene
proceeded to leave for a little bit. She came back
eventually, but she never went back into the house like
she had done the first time when they initially stopped
by Kara's house.

Mr. Baker -- we saw it was very heavy traffic at
that point with people coming and going. We saw a
Hispanic male come up in a, like, white utility van, I
believe. And when I say "we," there was only one unit
on the street because it was very -- they were calling
out law enforcement, I guess I should say, or would
easily call out law enforcement on that particular
block. We would stand out. So there was one unit. And

1  actually they did call one of the cars out, somebody

2  else did, not related to this case.

3        So we had to switch the unit out one time, but we

4  saw -- that unit relayed to us that Mr. Baker was

5  exiting the house after seeing that Hispanic male walk

6  in with a large parcel.

7        When Mr. Baker came out, he put a black backpack

8  and his Pagan Motorcycle Club cut in the trunk of Amanda

9  Greene's car, and they took off.  From that location,

10  they got on 285 and then got onto I-85, headed

11  northbound.

12        At that time, Ms. Greene was swerving through the

13  lanes back and forth a little bit, weaving.  It appeared

14  -- I guess we learned after the fact that she had missed

15  her exit or thought she had missed her exit and was

16  looking at her cell phone.  But the Georgia State Police

17  had been on standby for us to stop that vehicle.

18        When they did, they had their PC to stop her in

19  reference -- or probable cause to stop her in reference

20  to her swerving.  They talked to her, realized -- you

21  know, did the field sobriety test that we talked about

22  -- or Ms. Greene testified to earlier.  And then they,

23  like she said, had the drug dog from Georgia State

24  Police run around her vehicle, and it did indicate to

25  the scent of narcotics.  Therefore, they searched the

1    vehicle.

2          As they searched the vehicle, they located

3    exactly what had been seen by surveillance units in --

4    at Kara Hernandez's house, and that was a black backpack

5    that Mr. Baker had walked out of the house with as well

6    as the Pagan Motorcycle Club cut placed on top of it, I

7    believe, or in close proximity in the trunk.

8          They asked both occupants -- at this point,

9    Mr. Baker and Ms. Greene were both out of the vehicle,

10   and they asked both occupants if it was their bag, and

11   both of them denied it, so they cut into it because it

12   was locked with a lock.  So the state police cut it

13   open, and then that is when they retrieved some currency

14   and the five kilograms and then some other things that

15   matched up with stuff that was in Mr. Baker pockets, I

16   believe.

17     Q.  And five kilograms of methamphetamine, is that

18   correct?

19     A.  Yes, ma'am.  Five kilograms of methamphetamine.

20     Q.  While ATF was intercepting Defendant Christopher

21   Baker's phone, did it become apparent who Mr. Baker's

22   sources of supply were?

23     A.  Yes.  It became apparent rather quickly when we

24   started the Title III wiretap in May, mid-May of 2021,

25   that his sources of supply were Kara Hernandez; her

boyfriend, Lanny Bentley, also known as Lambo [ph.]; and
Angela Bowman, also known as Boo Boo.  Boo Boo was
mostly the courier for Mr. Bentley and Ms. Hernandez,
and she would either meet Mr. Baker at different
locations when he would come down to Georgia with the
methamphetamine, or she would drive it up to Kings
Mountain for Mr. Baker and come to his residence that he
was living at next to Raw's house, or Justin Fite's
house.

      The other source of supply became pretty apparent
-- or very apparent quickly was Ted Cannon, otherwise
known as Bam, or Bam Bam, as well as his girlfriend,
Bobbie Ford.

    Q.  Related to Ms. Hernandez, was she identified as a
convicted felon?

    A.  Yes, she was.

    Q.  And what were her previous convictions for,
Agent Fields?

    A.  She has an extensive criminal history dealing
with methamphetamine and firearms while dealing in
methamphetamine.

    Q.  Did you hear Brian Jaeger testify earlier in this
case?

    A.  Yes, ma'am, I did.

    Q.  And did you hear him testify and describe a time

1    where he went with Mr. Baker down to Georgia and met

2    with a heavier-set female?

3        A.  That is correct.  Yes, he did.

4        Q.  And are you able to identify who Mr. Jaeger was

5    referring to when he testified earlier today as to who

6    the heavier-set female was?

7        A.  He is referring to Kara Hernandez.

8        Q.  Agent Fields, after July the 13th of 2021 with

9    the five-kilo stop on the defendant Mr. Baker and

10   Amanda Greene, did ATF cease wiretap interceptions on

11   Mr. Baker's phone?

12       A.  Yes, we did.  Actually, I believe they were due

13   to go down right around that same time period, and

14   Mr. Baker was locked up in the Gwinnett County Jail in

15   Georgia.

16       Q.  And after the defendant was -- the interceptions

17   on his phone went down, did ATF continue to monitor the

18   defendant's whereabouts and where and what he was doing?

19       A.  Yes, we did.

20       Q.  In the monitoring of the defendant -- he

21   eventually bonded out on the five-kilo stop.

22       A.  Yes, he did.

23       Q.  And after bonding out on that stop -- and

24   Ms. Greene did as well, is that correct?

25       A.  Yes, she did.  Prior to Mr. Baker bonding out,

1    she did.

2       Q.   Describe for the jury the defendant's pattern

3    after bonding out from Gwinnett County on the five-kilo

4    stop.

5       A.   The defendant, within I would say a week or two,

6    was back up to his same patterns, traveling back and

7    forth.  This time he just wasn't living or -- you know,

8    as much living in Kings Mountain as he was at that time

9    since he was traveling so much.  He was based out of

10   West Virginia, at this point, out of Ms. Young's house.

11      Q.   Are you aware of where the defendant was living

12   or staying?

13      A.   At that point --

14      Q.   During this time?

15      A.   -- after he bonded out from Gwinnett County,

16   Georgia, he was staying from August of 2021 until the

17   time of his arrest at Ms. Young's house in Berkeley

18   Springs, West Virginia.

19      Q.   And his arrest in this case, is that correct?

20      A.   In this case.  I'm sorry.  Yes.

21      Q.   Now, are you familiar with an individual who's

22   been referred to from time to time during the course of

23   this trial as Demon, or Vincent Kotarsky?

24      A.   Yes, I am.

25      Q.   Describe for the jury who Vincent Kotarsky is.

1    A.  You've heard him talked about through several

2    people.  Goes by "Demon."  His name is Vincent Kotarsky.

3    They've referred to being at his house or being in a

4    kind of outbuilding behind his house that he had in

5    Advance, North Carolina.

6        He was a close associate in the Pagans with

7    Mr. Baker.  At the time of the wire intercept, I believe

8    he was the president of the Greensboro chapter, but

9    there was a lot of changes going on within the Pagans

10   Motorcycle Club about which chapters they had, whether

11   it was Mocksville or Greensboro.  But he was a higher

12   ranking Pagan, and he was a very close associate and

13   trusted by Mr. Baker.

14   Q.  Are you familiar with the role that the defendant

15   had within the Pagans Outlaw Motorcycle Gang?

16   A.  Yes.  He was a 13.

17   Q.  And what is a 13, Agent Fields?

18   A.  That is part of the Pagans mother club chapter,

19   which is the national Pagans rank where it's president,

20   vice president, and then all the 13s fall under that.

21   Q.  Now, Mr. Kotarsky, was he staying in contact

22   with the defendant after Mr. Baker arrived at

23   Elizabeth Young's house?

24   A.  Yes, he did stay in contact with Mr. Baker.

25   Q.  Now, did there come a time when Mr. Kotarsky

1   approached law enforcement and wanted to provide

2   information on the Pagans?

3       A.  Yes.  There was a time where he approached law

4   enforcement shortly after the events that we're talking

5   about, after the wiretap was over.

6       Q.  Who did Mr. Kotarsky initially approach?

7       A.  He approached an SBI agent, which is North

8   Carolina State Bureau of Investigation, and her name is

9   Kelly McMurray [ph.].

10      Q.  Did Ms. Murray contact ATF?

11      A.  Yes.  Ms. McMurray contacted -- I believe she

12  contacted -- she works with an intel unit that has

13  connections with the Raleigh Police Department.  So she

14  contacted some people within that, and they linked her

15  up with Detective Stangler from Raleigh Police

16  Department that you heard testify earlier.  And that was

17  pretty much my co-case agent, so he reached out to me

18  and I contacted her.

19      Q.  After you made contact with SBI Agent McMurray,

20  did you and Detective Stangler then meet with

21  Vincent Kotarsky?

22      A.  Yes, we did.  I believe the first meeting with

23  Vincent Kotarsky was with SBI Agent Kelly McMurray,

24  myself, it was at the time Detective Wescoe, now

25  Sergeant Wescoe, and a special agent from ATF, Brian

1   Shuford.

2       Q.  Did you meet with Mr. Kotarsky?

3       A.  We did.  We met with them, and he was not aware

4   at the time that he had approached -- obviously, Special

5   Agent McMurray -- that we had done the investigation

6   that we had done.  Eventually we would have been

7   approaching him or arresting him.  However, he came to

8   us first, so we just kind of listened to what he had to

9   say in reference to the Pagans Motorcycle Club and any

10  kind of criminal activity or methamphetamine dealing.

11  And then I believe on the second interview is when we

12  kind of confronted him with the information that we

13  already knew.

14      Q.  Now, you initially met with Mr. Kotarsky on

15  August the 26th of 2021, is that correct?

16      A.  That is correct.

17      Q.  And you and other ATF agents sat down with him

18  and debriefed him.  Is that correct?

19      A.  Yes.

20      Q.  And describe for the jury what a debrief is.

21      A.  A debrief is just basically sitting down talking

22  to somebody after the course of events.  I think we've

23  referred to it.  It could be somebody who's been

24  arrested and they're sitting down to give us all the

25  information that they have.  You could also debrief

1  somebody after a law enforcement operation.  We could,

2  you know, do a controlled purchase, and then we could

3  have a debrief after and talk about what went well, what

4  didn't go well, what we should do different, if anybody

5  saw anything unsafe.  But basically just sitting down

6  talking things out, whether it be in an interview or --

7  or that nature.

8      Q.  Eventually, did Mr. Kotarsky hire counsel to

9  represent him in this case?

10     A.  Yes, he did.  Tommy Manning.

11     Q.  And upon further debriefs, did Mr. Manning and

12 Mr. Kotarsky meet with you and other ATF agents?

13     A.  Yes, they did.

14     Q.  Upon multiple debriefs with Mr. Kotarsky, were

15 you aware of the defendant, Mr. Baker, wanting to

16 acquire automatic weapons?

17     A.  Yes.

18     Q.  How did ATF become aware that the defendant

19 Mr. Baker wanted to acquire automatic weapons?

20     A.  Mr. Kotarsky, after hiring Tommy Manning as his

21 counsel, we all sat down and had a talk and decided that

22 it would be a good idea, since Mr. Kotarsky was still in

23 contact with Mr. Baker, to -- or he agreed to a

24 consensual Title III, consensual -- wiretap of his phone

25 but just consensual instead of going through the court.

1   So he signed that, and we monitored his phone live for

2   any phone calls or text messages, the same as we had

3   done for Mr. Baker.

4       He had a conversation with Mr. Baker in reference

5   to having somebody that could purchase -- or that could

6   sell some -- wanted to get rid of some automatic

7   firearms, fully automatic machine guns.  And Mr. Baker

8   immediately said that he could get rid of ten of them, I

9   believe he said.  He said he just needed to know the

10  price; as long as the price wasn't, I believe his words

11  were "retarded," that he would be able to get rid of

12  them.

13      Q.  And was this communication over the consensual

14  Title III?

15      A.  Yes, ma'am, it was.

16      Q.  Okay.  And just so we're clear, Mr. Kotarsky

17  consented to all the phone calls and text messages on

18  his phone being live monitored.

19      A.  That is correct.

20      Q.  Now, are investigative techniques used for

21  certain activities related to firearms and/or drugs by

22  ATF?

23      A.  Yes.

24      Q.  Okay.  When the ATF learned that the defendant

25  wanted to possess and distribute automatic weapons, what

1   if anything do you do, Agent Fields?

2       A.   I contacted -- ATF has a -- it's called EUP,

3   enhanced undercover program, and it's run through our

4   undercover branch out of our headquarters in

5   Washington, D.C.  So I contacted them to see if they had

6   somebody that would fit the role that could potentially

7   sell or set up to sell machine guns in what we call a

8   machine gun reverse, and that's where we're providing

9   the firearms, as opposed to somebody selling them to us,

10  in which there's immediate arrest done, obviously, since

11  we're not gonna let any machine guns or firearms get out

12  of our possession.

13      So I contacted them to see if there was somebody

14  that would be willing and available and would fit that

15  role, and they referred me to Special Agent Greg

16  Sheridan.

17      Q.   And who is Agent Greg Sheridan?

18      A.   He is an ATF agent, and he is also involved as a

19  collateral duty in the ATF enhanced undercover program.

20      Q.   You talked with Agent Sheridan?  Is that correct?

21      A.   That is correct.  I did speak with him directly.

22      Q.   And after speaking with Agent Sheridan, what did

23  you do in order to set up the controlled buy on the

24  automatic weapons for Mr. Baker?

25      A.   Mr. Sheridan traveled down to -- Agent Sheridan

1  traveled down to Raleigh.  He and I got together and we

2  met with Mr. Kotarsky the night before the deal was

3  scheduled to be done so that he could make the

4  introduction between Mr. Kotarsky and Mr. Baker over the

5  telephone.

6       We met him, Mr. Kotarsky.  Agent Sheridan and

7  Vincent Kotarsky made the phone call to Mr. Baker, which

8  was obviously all recorded on the consensual  Title III

9  line that ATF was monitoring, and basically just set

10  things up for the next day for Mr. Baker and undercover

11  Agent Sheridan to meet in the Raleigh area to -- I

12  believe Mr. Baker was going to provide, with the

13  arrangement they made on that phone call -- we had asked

14  for a half a pound of methamphetamine in exchange for

15  two fully automatic machine guns, an AR style and an AK

16  style, and a thousand dollars cash.  So it was going to

17  be a half a pound of methamphetamine that we are going

18  to receive from him in exchange for a thousand dollars

19  and two fully automatic machine guns.

20     Q.  And this call between Mr. Kotarsky, Agent

21  Sheridan, and the defendant setting up this deal would

22  have occurred on what date?

23     A.  That would have been on November 4th, 2021.

24     Q.  And that call on the 4th of November of 2021, can

25  you describe for the jury how that went?

1    A.  It went well.  They just basically -- he said:
2    Hey, I'm meeting up -- Mr. Kotarsky said to Baker:  I'm
3    meeting up with my guy, which was the undercover agent.
4    He says that he can meet you.  And I believe, if my
5    memory is correct, something along the lines of he
6    wasn't sure if he was gonna be able to come with him,
7    Mr. Kotarsky.
8    Q.  Was -- well, on November the 4th of 2021,
9    Mr. Baker, the defendant, spoke with Vincent Kotarsky
10   and Greg Sheridan.  Correct?
11   A.  That is correct.
12   Q.  And was there an agreement upon when the deal
13   would actually take place?
14   A.  That it would take place the next day on
15   November 5th, 2021.
16   Q.  All right.  Describe the protocols that took
17   place on November 5th of 2021 in preparation for this
18   particular buy.
19   A.  Okay.  We have our machine guns that are our
20   property.  And Agent Sheridan spoke with Mr. Baker via
21   text message and, I believe, phone calls back and forth
22   just kind of arranging what time it was gonna be.  And
23   obviously when dealing with somebody that's in the
24   business of drugs, they may not always be timely, so
25   things were getting delayed and delayed.

1         Eventually, Mr. Baker said that he was tied up in

2    another part of the state and he wasn't able to come

3    himself.

4         Prior to that, though, obviously we had our

5    operation plan together.  We had gotten the selective

6    enforcement unit, which is the Raleigh Police Department

7    SWAT Team, prepared to do the actual takedown of

8    Mr. Baker when he came to do the exchange of the machine

9    guns and the methamphetamine.

10   Q.  So all of these procedures and protocols had been

11   put in place in preparation for the November 5th, 2021,

12   controlled buy.  Describe for the jury how that went,

13   Agent Fields, the actual buy itself.

14   A.  The actual buy.  So on November 5th, 2021, like I

15   said before -- I got a little ahead of myself.

16        Mr. Baker said that he was tied up in another

17   part of the state and he wasn't gonna be able to make it

18   to the deal.  Undercover Agent Sheridan then said, you

19   know:  I've got to do this tonight, I can't wait around

20   for you much longer.  He said:  I'm gonna send one of my

21   guys.  At that point, Mr. Baker contacted somebody else

22   and said he was sending one of his guys.

23        Several hours after this, I believe it was

24   approximately 10 p.m., correct me if I'm wrong, but

25   around that time frame, Mr. Baker said that his guy was

close by, because we had to continue to call Mr. Baker.

Obviously we didn't know who was coming.  And he said he

was close by.  Then he described a location that he

parked in the Wal-Mart -- the back of the Wal-Mart

parking lot at the Brier Creek shopping center.

Q.  This controlled buy on November 5th, 2021, was

audio/video recorded.  Is that correct?

A.  Yes, it was.

Q.  Was Agent Sheridan, was he -- was his car hooked

up or monitored for it to record all communications that

were occurring that day?

A.  I believe he had it on him, his monitoring

device, yes, for audio/video.

Q.  And was the audio/video recording, was it put

into evidence in the ATF --

A.  Yes.

Q.  -- after this particular buy?

A.  Yes, it was, as well as all of his text messages

or phone calls that were directly with Baker and not on

the consensual Title III on Mr. Kotarsky's phone.

THE COURT:  It's 5:00.  Before we start with

that piece of evidence and get interrupted in the middle

of it, we will stop for the day.

Ladies and gentlemen of the jury, I'm going

to remind you that you're not to discuss this case with

1  anyone, including each other, until you are ready to

2  deliberate.  If anyone attempts to talk to you about the

3  case, please notify me immediately.  We will reconvene

4  tomorrow morning at 9:30.

5          (The jury exited the courtroom.)

6          THE COURT:  All right.  On the record and

7  outside the presence of the jury.  My understanding is

8  that there's gonna be an exchange of information tonight

9  on a possible set of stipulations regarding the

10  testimony -- or the need for testimony from the Drug

11  Enforcement Administration lab analysts.  So it's the

12  lab analysts and it's the interstate nexus from the ATF?

13  Is that correct?

14          MS. SANDLING:  Your Honor, that's correct.

15          THE COURT:  And if the parties -- what we'll

16  do is we'll convene at 9:15 so that anything that needs

17  to be worked out regarding any possible stipulations can

18  be worked out before we bring the jury in.  I think -- I

19  feel like we're moving relatively quickly now.  We'll

20  try to stay on schedule.

21          Is there anything else that needs to be

22  brought up at this time?

23          MS. SANDLING:  Not for the government, Your

24  Honor.

25          MS. SALMON:  Yes, Your Honor.  With respect

1  to the proposed expert for the defense, Dr. Dulaney, he

2  is -- we are trying to schedule him for a flight.  We

3  thought it was more prudent to schedule him for tomorrow

4  in case the government does close its case tomorrow

5  evening.  And the government has agreed that if they are

6  not finished tomorrow, that we can call him.

7          THE COURT:  Out of order.

8          MS. SALMON:  Out of order so that he can fly

9  back tomorrow evening.

10          THE COURT:  That's acceptable to the Court

11  if it's acceptable to the parties.

12          MS. SALMON:  Thank you, Your Honor.

13          MR. CHETSON:  Nothing, Your Honor.

14          THE COURT:  All right.  Thank you,

15  everybody.  We will be in recess until 9:15.

16          (Proceedings recessed at 5:03 p.m.)

17

18              **C E R T I F I C A T E**

19

20      I certify that the foregoing is a correct

21  transcript from the record of proceedings in the

22  above-entitled matter.

23

24  /s/Risa A. Kramer                    6/19/2023

25  Risa A. Kramer, RMR, CRR                 Date